*11cv282 comp*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

HEALTHCARE STRATEGIES, INC., Plan
Administrator of the Healthcare Strategies, Inc.
401(k) Plan and the Healthcare Strategies, Inc.
CBU 401(k) Plan, On Behalf of Itself and All
Others Similarly Situated,

              Plaintiff,

vs.

ING LIFE INSURANCE AND ANNUITY
COMPANY,

              Defendant.

Civil Action No. *3:11cv282 (JCH)*

## CLASS ACTION COMPLAINT

### JURY TRIAL DEMANDED

February 22, 2011

Plaintiff, Healthcare Strategies, Inc. ("Plaintiff" or "HSI"), by and through its undersigned

counsel, in support of this Complaint, hereby pleads and avers as follows:

## I.  INTRODUCTION

1.      ING (defined below) has entered into revenue sharing agreements and similar

arrangements ("revenue sharing contracts" or "participation agreements") with various mutual

funds, affiliates of mutual funds, mutual fund advisors, investment funds, including collective

trusts, and other investment instruments or vehicles (collectively, "mutual funds") pursuant to

which ING receives revenue sharing payments (which amount to kickbacks) for its own benefit

from these mutual funds in violation of, *inter alia*, the prohibited transaction rules of the

Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§1001 *et seq.* (*i.e.*, ERISA §§

404 and 406(b), 29 U.S.C. §§ 1104 and 1106(b)), as well as ERISA's fiduciary rules (*i.e.*, ERISA

§§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B)).

2.      The kickback payments at issue are essentially part of a pay-to-play scheme in

which ING receives payments from mutual funds in the form of 12b-1 fees, administration fees, service fees, sub-transfer agent fees and/or similar fees (the "revenue sharing payments") in return for providing the mutual funds with access to its retirement plan customers, including its 401(k) plan customers.

3.     ING uses its ownership and control over separate accounts in which its retirement plan customers' investments are placed to negotiate for the receipt of these revenue sharing payments from mutual funds, and the revenue sharing payments have the effect of increasing the expense ratios of the mutual funds, which expenses are deducted directly from the assets of the separate accounts.

4.     The revenue sharing payments are based, in whole or in part, on a percentage of the retirement plans' investments in a mutual fund that are delivered to it by ING and/or based on the magnitude of the investments by such retirement plans in the mutual fund.

5.     While the revenue sharing payments are often internally described by service providers, such as ING, as "services fees" and reimbursement for expenses incurred in providing services for, to or on behalf of the mutual funds, the amount of the revenue sharing payments bear absolutely no relationship to the cost or value of any such services.

6.     The services provided by ING that may incidentally benefit mutual funds (beyond pure and simple access to retirement plan customers -- referred to sometimes as pay-to-play, shelf-space or kickback arrangements) are actually services that ING has historically provided to its retirement plan customers as a necessary part of its business in return for fees directly collected by it from such customers, and these fees generally did not change as a result of ING's receipt of the revenue sharing kickbacks from the mutual funds.

-2-

7.     ING's receipt of the revenue sharing payments at issue violates ERISA's

prohibited transaction and fiduciary duty rules and should not be countenanced since the receipt

of such payments places ING in a conflicted position in which the interests of its retirement plan

customers can be and are sacrificed in the interest of ING earning greater profits through the

receipt of revenue sharing payments.

8.     As explained below, ING also has engaged in acts of self-dealing with respect to

the retirement assets of the Plans and the Class held in the Separate Accounts (defined below)

and Fixed Account (defined below) and, in so doing, also has otherwise violated the prohibited

transaction rules of ERISA, as well as ERISA's fiduciary rules.

9.     This is an action for equitable relief and damages under ERISA in which Plaintiff

seeks to recover for the benefit of its 401(k) plans and all other similarly situated retirement plans

and entities (collectively, the "Plans"), also known as employee pension benefit plans under

ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A) that are subject to Internal Revenue Code

Sections 401(a) and 401(k), the revenue sharing payments and other compensation that ING

improperly received.

10.     Plaintiff brings this action on its own behalf and on behalf of all those similarly

situated Plans under ERISA §§ 409(a) and 502(a)(2) and (g), 29 U.S.C. §§ 1109(a) and

1132(a)(2) and (g), to recover the following relief:

- A declaratory judgment holding that the acts of Defendants described
  herein violate ERISA and applicable law;

- A permanent injunction against Defendants prohibiting the practices
  described herein;

- Disgorgement and/or restitution of all the revenue sharing payments and

-3-

other compensation improperly received by ING, or, alternatively, the profits earned by ING in connection with its receipt of such revenue sharing payments and other unlawful compensation;

- Attorneys' fees, costs and other recoverable expenses of litigation; and

- Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.  THE PARTIES

11.  Plaintiff is the Plan Administrator of the Healthcare Strategies, Inc. 401(k) Plan and the Healthcare Strategies, Inc. CBU 401(k) Plan (individually and collectively, the "HSI Plan" or the "Plan"). In that capacity, HSI is a fiduciary of the Plan. Both Plaintiff and the Plan are located at 3031 Walton Road, Plymouth Meeting, Pennsylvania 19462-2369. All of Plaintiff's operations, including its principal place of business, are located in Plymouth Meeting, Pennsylvania.

12.  Defendant, ING Life Insurance and Annuity Company ("ING" or "ILIAC" or "Defendant"), is a business entity with its headquarters and principal place of business at One Orange Way, Windsor, Connecticut 06095-4774. ING is a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

## III.  JURISDICTION AND VENUE

13.  Plaintiff seeks relief on behalf of the HSI Plan and all other similarly situated Plans pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under ERISA Section 409, 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

14.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and

-4-

ERISA Section 502(e)(1)(2), 29 U.S.C. § 1132(e)(1)(2).

15.     Venue is proper in this judicial district pursuant to ERISA Section 502(e)(2), 29

U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391, because ING maintains its headquarters and principal

place of business in Windsor, Connecticut.

16.     At all pertinent times, ING has conducted its retirement business and the

retirement business of all other ING affiliates and entities from its offices in this judicial district

in Windsor, Connecticut, which functions as the nerve center for the retirement operations of

ING, which is known and sometimes referred to as ING Retirement Services.

## IV.   BACKGROUND FACTS

### A.     The Services That ING Provides

17.     At all pertinent times, ING Retirement Services has held itself out and continues

to hold itself out to Plaintiff and the Class (defined below) as providing a full array of services,

including "pure record-keeping services to a full-service investment provider," and states that

"ING U.S. Retirement Services has a leadership presence and the ability to offer retirement

solutions for all sizes and segments of the defined contribution market -- corporate, education,

government, healthcare and not-for-profit entities." *See* http://ing.us/employers/retirement-plans,

*citing* "Pensions & Investments," Top Defined Contribution Recordkeepers, April 5, 2010

(Statistics reported as of December 31, 2009).

18.     ING also represents that it "consistently rank[s] among top-tier providers in the

industry by key metrics," including ranking as "No. 1 in plan sponsors with 54,429," "No. 2 in

participants with 6,462,006," and "No. 3 in assets with $277.5 billion." *Id.*

19.     ING asserts that it is "continually adapting to the changing environment" and that

-5-

it "build[s] partnerships and offer[s] smart retirement plan solutions with a sharp focus on the goals that are important to" plan administrators and their employees, including "[c]ustomized investment strategies, [p]lan communications, [p]articipant education, [s]pecialized expertise in plan services, [and] [h]igh-tech answers to your recordkeeping needs" in the following "key markets: Corporate, Healthcare/Not-For-Profit, Education, Government, [and] Institutional Corporate." *Id.*

20.     ING also trumpets its relationship with the "ING Institute for Retirement Research (IIRR)": "We also take pride in our dedication to better understanding the psychology of saving and all that occurs in the hearts and minds of individuals, as they strive to reach financial security, and of employers, as they may struggle to manage effective plans in today's challenging environment." *Id.* To that end, ING represents to its customers and the public that IIRR "is dedicated to providing clear, incisive commentary, information, tools and resources to help employers make better use of their retirement and investment resources" and "[w]ith this knowledge and these tools you can help your employees to understand the importance of and more effectively manage their retirement plans." *Id.*

21.     The retirement services at issue are provided, from a corporate perspective, by ING and certain related/affiliated companies: "ING U.S. Retirement Services products and services are provided by ING Life Insurance and Annuity Company, ING Institutional Plan Services, LLC and their affiliated companies." *Id.*

22.     The Plans' assets that are held in the Separate Accounts (defined below) are included in the over $275 billion that ING has under management.

23.     ING is considered a leader in providing services to the "micro" (less than $5

-6-

million in assets) and "small" (between $5 million and $50 million in assets) employer retirement markets, which markets include retirement plans such as the HSI Plan.

24.    ING markets itself as providing employers, such as HSI, with "a comprehensive suite of dedicated tools and resources to help support and manage your plan" and ING "focus[es] on your plan so you can focus on your business." *See*

http://ing.us/employers/retirement-plans/401k-infocenter. For example, ING states that "[f]rom assisting with plan design questions and operational issues to maintaining prototype plan documents, the ING Qualified Plan Consulting team can serve as an extension of your HR department." *Id.*

25.    ING provides a number of services to the Plans generally and the HSI Plan specifically, including supplying Plaintiff with all contract documents; providing Plaintiff with quarterly activity statements; responding to customer inquiries on behalf of the Plan; updating contractual, regulatory and disclosure documents; performing a daily valuation of the Plan's assets, while also managing the assets of the Plans that are held in the Separate Accounts (defined and described more fully below); and conducting all settlement operations regarding the assets of the Plans from its offices and by and through its employees, including its officers and executive team, that are all located in Windsor, Connecticut.

## B.    The Agreements Between The Plans And ING And The Retirement Investments Provided Under Those Agreements

26.    Pursuant to the terms of Group Annuity Contracts or Group Funding Agreements (the "Contracts" or "Group Contracts"), ING represents that it "manage[s] [Plaintiff's and other Class member's] retirement plan assets."

-7-

27.     ING enters into these standard form Group Contracts with virtually all of the Plans.

28.     Pursuant to the Group Contracts or similar group funding agreements, ING provides investment options to the HSI Plan and other similarly situated Plans, through insurance products called group variable annuities or through similar insurance arrangements/vehicles.

29.     Pursuant to the terms of the Group Contracts, the Plans' retirement assets are invested in one of three options: (a) a Fixed Account or money market equivalents (collectively, "Fixed Account") in which ING (i) takes custody and control of the Plans' retirement assets and places them in its general account (as a fiduciary under applicable law because, *inter alia*, ING takes ownership of these retirement assets and makes all investment decisions with respect to those assets while determining its own fee), (ii) commingles those retirement assets with ING's other assets in its general account (while subjecting those retirement assets to the risks undertaken by ING in conducting its business enterprise and subjecting those retirement assets to claims by the general creditors of ING), (iii) generally guarantees a minimum rate of return, and (iv) sets its own rate of compensation by earning the spread between the return achieved on ING's own investment of these retirement assets and the rate of return established by ING (which ING retains the right to adjust in its own discretion); (b) a general accumulation account ("GAA"), which (i) ING owns along with all of the retirement assets contained in those accounts (and for which ING indisputably functions as a fiduciary under applicable law), (ii) guarantees a stipulated rate of interest for a specified time period, (iii) is invested in a non-unitized Separate Account established under Conn.Gen.Stat. § 38a-433, (iv) is not charged with the liabilities of ING to the extent of the reserves and anticipated contract liabilities of the GAA, but otherwise is

-8-

subject to the claims of creditors of ING, (v) generally guarantees a minimum rate of return, and

(vi) sets its own rate of compensation by earning the spread between the return achieved on

ING's own investment of these retirement assets and the rate of return established by ING, which

ING effectively retains the right to adjust in its own discretion by eliminating or changing the

terms of the GAA with thirty (30) days notice; and (c) other Separate Accounts created by ING

for the purpose of investing in mutual funds, which (i) ING owns along with all of the retirement

assets contained in those accounts (and for which ING indisputably functions as a fiduciary under

applicable law), (ii) are created under Conn.Gen.Stat. § 38a-433, (iii) are not charged with the

liabilities of ING to the extent of the reserves and anticipated contract liabilities of those

accounts, but otherwise are subject to the claims of creditors of ING, (iv) buy and hold the shares

of the mutual funds in which the Plans' participants choose to invest, (v) are utilized by ING as

the tool to negotiate revenue sharing or participation agreements with the mutual funds so that

ING can earn additional compensation that bears no relationship to the services that it provides to

the Plans and/or the mutual funds.

30.     Plans and their participants do not invest directly in the mutual funds, but invest in

"variable accounts," including the "Separate Accounts," as well as the "Fixed Account"

discussed above, all of which are established by ING.

31.     The Separate Accounts are established, administered, owned and managed by ING

and the Separate Accounts' assets are segregated from the general assets of ING.

32.     The Separate Accounts are part of an investment vehicle known as a group

variable annuity offered by ING. A group variable annuity is an insurance contract that provides

for both general account (*i.e.,* the Fixed Account) and "Separate Account" investments. These

types of investment vehicles are used to fund qualified retirement plans, like 401(k), profit-sharing, and other types of company-sponsored retirement plans. The Separate Accounts permit ING to pool the investments of the Plans to invest in mutual funds and similar investments. The assets of each Separate Account are segregated (or separate) from all of the other assets of ING but, as explained above, are not entirely immune from the claims of creditors of ING. The Separate Accounts purchase and own selected mutual funds or other funds/investment vehicles that mimic the performance of these mutual funds.

33.     The Separate Accounts maintained by ING are divided into sub-accounts that correspond to the mutual funds and other investment options available under the Group Contracts that ING maintains with the Plans.

34.     The Separate Accounts are divided into accumulation units (sometimes referred to as "record units") that track the performance of shares of a selected mutual fund investment with the price per accumulation unit calculated by dividing the total value of the assets of the Separate Account by the number of units in the Separate Account.

35.     Pursuant to the Group Contracts, participants may choose the mutual funds in which their contributions and any matching contributions made by their employers are invested, and ING allocates those contributions to particular sub-accounts within the Separate Accounts that correspond to the chosen mutual funds. In return for the contributions, which are assets of these ERISA qualified plans, the Plans and their participants receive accumulation units (shares) in the applicable sub-accounts of the separate accounts, which accumulation units, like the Separate Accounts themselves and the sub-accounts, are held and owned by ING.

36.     ING maintains authority and control over the Separate Accounts, the sub-accounts

-10-

and the accumulation units.

37.     The accumulation units of the Plans and their participants, which are held by ING, like the Separate Accounts and sub-accounts, constitute assets of the Plans.

38.     Based on the combined contributions to the sub-accounts made by all these Plans and their participants, ING sells and purchases mutual fund shares to hold in the Separate Accounts (and receives revenue sharing kickbacks in return for these purchases).

39.     The value of a plan's accumulation units (shares) in the Separate Account fluctuates based upon the value of the mutual fund shares held within the various sub-accounts.

40.     Pursuant to the Group Contracts administered and managed by ING and issued in its name, ING manages the retirement assets of the Plans in the Separate Accounts and serves as legal title owner and holder of the assets in the Separate Accounts. The investments of the HSI Plan are held in Separate Accounts in the name of ING, which are administered and managed by ING as well.

41.     ING exercises discretionary authority and control with respect to the Plans' assets held in the Separate Accounts by, among other things, electing to receive dividends from the mutual funds into the Separate Accounts in the form of additional mutual funds shares and/or by making the affirmative investment decision to reinvest all cash dividends from mutual funds in additional mutual fund shares of the same mutual funds.

42.     Under the terms of its own Group Contracts, and in recognition of its fiduciary status, ING holds the Plans' assets in Separate Accounts under its own name, places those funds in short-term investments as it sees fit (*i.e.*, in its discretion), and may set off certain amounts the funds held in those Separate Accounts, based on its own unilateral determinations with respect to

-11-

the non-payment of fees and other factors, before ultimately transferring the Plans' assets to mutual funds in return for which it is paid kickbacks.

43. ING also influences its own compensation by effectively electing to receive all dividends payable to the Plans from mutual funds in the form of additional mutual fund shares, thereby increasing the amount of the assets of the Plans in the Separate Accounts and under ING's management, thereby increasing the amount of revenue sharing kickbacks payable to ING.

44. ING exercises discretion, authority and control with respect to the Plans' assets and acts as a fiduciary by managing the Plans' investments in the Fixed Account and placing those assets of the Plans in the general account(s) of ING. ING determines its own compensation with respect to the Fixed Account investments and has breached its fiduciary duty to the Plans by extracting excessive compensation in connection with its investments in the Fixed Account.

45. ING also places the Plans' investments in a "suspense account" or the equivalent thereof when awaiting further or clarifying investment instructions from the Plans' participants, ING acts as a fiduciary with respect to such temporary accounts and, even during this holding period, ING earns without justification impermissible revenue sharing payment kickbacks and other fees from its suspense account investments.

46. ING indisputably holds, owns, administers, manages and controls the Separate Accounts, as well as their sub-accounts, and uses the Separate Accounts as a delivery mechanism to purchase and sell shares in the mutual funds.

47. In direct return for delivering these funds from the Separate Accounts to the mutual funds, ING receives the revenue sharing kickbacks at issue pursuant to the scheme detailed below.

-12-

48.     ING owns and manages the Separate Accounts and maintains and exercises

discretion and control with respect to the retirement assets in the Separate Accounts. ING is able

to influence and control its own compensation derived from the Separate Accounts by, among

other things, negotiating the terms of the participation agreements with the mutual funds, which

generally make revenue sharing payments on the basis of the assets invested by the Separate

Accounts in their mutual funds. As detailed in the Group Contracts, ING maintains complete

discretion to substitute, eliminate and add funds within its Separate Accounts:

> When deemed desirable by the Company to accomplish the
> purpose of the Separate Account, the Company or the Separate
> Account may:
>
> (a)     Change the Fund(s) which may be invested
>          in by the Separate Account;
>
> (b)     Make additional Fund(s) available through
>          the Separate Account;
>
> (c)     Discontinue offering any Fund(s) through
>          the Separate Account; and
>
> (d)     Replace the shares of any Fund(s) held in a
>          Separate Account with shares of any other
>          Fund(s), where such replacement is
>          approved by a majority vote of persons
>          having an interest in the Separate Account(s)
>          being replaced.

49.     ING also controls the menu of available mutual funds offered in its Separate

Accounts and retains the discretion to change its fund menus and to not offer certain investment

options to Plans based upon contract pricing and other considerations.

50.     Under the Group Contracts, ING also retains and exercises the discretion and

control to self-determine its own compensation under the Separate Accounts by (a) calculating

-13-

the current value of the Separate Accounts by applying a "daily asset charge," which ING

calculates itself based on so-called "expense risks" and which can, in ING's discretion, include a

profit payable to ING, and (b) applying so-called "experience credits" to reduce or increase the

fees charged to the Separate Accounts, based upon ING's unilateral determination. ING uses its

ownership of and control over the Separate Accounts and their assets, as well as this discretion

and control which it exercises, to, among other things, negotiate for the receipt of revenue

sharing payments from mutual funds.

51.     Upon information and belief, ING also utilizes the assets contained in the

Separate Accounts, including the GAA, all of which appear on its balance sheet, to earn

additional compensation independent of the revenue sharing payments by utilizing uncommitted

assets in these Separate Accounts to engage in certain hedging transactions, securities lending

transactions and to negotiate for the payment of additional compensation from third parties on

the basis of its ownership and control of these retirement assets. Thus, ING utilizes its ownership

and authority over the Separate Accounts, as well as the discretion and control that it exercises

over the Separate Accounts, to earn additional, undisclosed compensation from third parties by

essentially investing the retirement assets of its customers through schemes and utilizing devices

independent and separate and apart from the investment of these assets in mutual funds and other

contemplated investments.

52.     ING also requires that all Plans offer the Fixed Account option to their

participants. ING imposes this contractual requirement because, regardless of the suitability of

the investment for any given plan or participant, historically the spreads that it has earned on its

Fixed Account investment options are enormous and those spreads serve as a source of

-14-

significant profits for ING, which bear no relationship to the services provided to the Plans at issue (and thereby serve to provide ING with unreasonable and excessive compensation).

53. Pursuant to the Group Contracts, in addition to earning the spread on the Fixed Account and the GAA, ING charges the HSI Plan and other similarly situated Plans separate account fees (typically referred to as "mortality and expense risk charges" or "wrap fees"), which are calculated by taking a percentage of the daily value of a given plan's investment in the Separate Accounts in and through which ING purchased, sold and held the shares of the underlying mutual funds.

54. The Group Contracts also obligate the HSI Plan and other similarly situated Plans to pay ING brokerage commissions, transfer taxes and any expenses incurred by ING, which ING determines are reasonably necessary to preserve or enhance the value of the assets in the sub-accounts (which are expressed in terms of accumulation units discussed below) representing these Plans' ERISA qualified retirement investments.

55. The Group Contracts do not disclose that revenue sharing payments will be made to ING by the mutual funds offered as investments to the Plans or that ING will utilize the Separate Accounts and Fixed Accounts investments to generate profits based upon the existence and leveraging of these assets for ING's own benefit.

**C. The Plans**

56. At all pertinent times, the HSI Plan was a 401(k) retirement plan and, as of the date of the filing of this Complaint, it remains a 401(k) retirement plan (and since the "HSI Plan" is defined collectively to include two distinct plans, there are and remain two distinct 401(k) retirement plans constituting the "HSI Plan" as defined above). HSI and its Plan's participants

-15-

have funded and continue to fund the Plan.

57. Under the Plans, and through the Group Contracts with ING, participants are entitled to invest in various mutual funds selected by ING for inclusion as investment options within the Plans.

58. Plaintiff is informed and believes that thousands of qualified ERISA retirement Plans are members of the Class, which contracted with ING to provide the same or similar services with respect to the management and administration of the Plans and the disposition, investment and management of these Plans' assets.

**D. The Relationship Between and Among Class Members, ING and The Mutual Funds**

59. The employers that are the sponsors and plan administrators of the Plans, which compose the Class, engage full-service providers, such as ING, to design and implement the qualified ERISA retirement plans and to provide an entire range of administrative, investment, management and other services necessary to operate them. Agents of ING solicit business on its behalf on the basis that it is a full-service provider that designs and implements such qualified ERISA retirement plans, and these agents for ING receive commissions for obtaining such business for ING.

60. In promoting its services, ING claims to be a leading provider for corporate retirement plans that offers a comprehensive array of retirement solutions for its customers.

61. After setting up a qualified ERISA retirement plan such as Plaintiff's Plans, ING provides all of the services necessary for such plans to operate, including record-keeping; compliance; allocation of participant contributions; distribution of account proceeds to departing participants; loan processing and administration; asset transfers; IRS tax withholding and

-16-

reporting; provision of benefits illustrations; processing and distribution of benefits and withdrawals; and administration of communications with participants.

62. ING knew or reasonably should have known of the material importance of fees and costs to the Plans and their participants, including the amount of any "revenue sharing payments."

63. Mutual funds contract with various entities to perform managerial, administrative, accounting, legal and other services. Mutual funds pay the entities providing those services, and the mutual funds pass those costs on to their investors by charging them a variety of fees, which are typically referred to as investment management fees, distribution fees, commissions, sub-transfer agency fees, marketing fees or 12b-1 fees. Investors thereby effectively pay fees to the mutual funds for these and other services. The mutual funds determine these fees, based on a designated percentage of the net asset value of all of the shares held in the mutual fund, causing the net asset value of all of the shares to decrease by the proportionate percentage attributable to these shares. As a result of the charging of these fees, by way of example, the value of the mutual fund shares held by ING in the Separate Accounts decrease by a corresponding percentage, which, in turn, reduces the value of each Plan's and participant's accumulation of units held by ING in the Separate Accounts.

64. At all relevant times, the mutual funds offered by ING to the Plans have been offered through Group Contracts and similar contracts. Certain of these funds have been owned and/or operated by ING itself or its subsidiaries or affiliates.

65. In return for the fees and other amounts charged to the Plan and other similarly situated Plans, ING selects, maintains and monitors a menu of mutual funds available for

-17-

investment by these Plans while, as explained above, reserving the right to unilaterally change the composition of that menu of mutual funds.

66.     Pursuant to its contracts with the HSI Plan and other similarly situated ERISA retirement Plans, ING has the discretion to unilaterally cease offering mutual funds selected by participants and substitute in their place other investments selected by ING. Upon information and belief, ING has added, removed or substituted offerings of mutual funds on its menu of available investments for current and future Plans.

67.     Under the Group Contracts, ING retains the unfettered and sole discretion both to delete any Separate Account and the corresponding mutual fund investment established and to offer new Separate Account investments.

68.     ING retains the discretion, authority and control to delete and add investment options from the Plans' available menu of investments.

69.     ING also retains the right and discretion to unilaterally change its investment management and administrative charges assessed under the Group Contracts.

70.     ING has engaged investment advisors and other professionals to review the investment options available to participants in the Plans, allegedly to ensure that the investment options comprise a wide array of asset classes and money managers that can be used to build a well-diversified retirement program for 401(k) participants. ING's primary criterion for inclusion of a mutual fund on its menu of funds, however, is the amount of revenue sharing payments that the mutual fund is willing to pay ING, and this criterion trumps the appropriateness of the investment and/or the size of fees and costs that the Plans (and their participants) will be required to pay as a result of, *inter alia*, asset-based charges and the share

-18-

classes of the designated mutual funds. Indeed, in its marketing and other materials, ING attempts to conceal the nature of the higher cost share classes that it includes in its retirement offerings as providing certain advantages to Plans when, in fact, the only reason for the inclusion of these higher cost share classes of the mutual funds is that (a) the mutual funds can use these higher fee share classes to earn greater compensation, and (b) ING can share in this increased compensation in the form of revenue sharing payments/kickbacks.

71.     The mutual funds establish the percentages of the Plans' assets that they charge as fees for their services to cover their normal operating expenses, as well as anticipated profit, and the amount of the revenue sharing payments that they have agreed to make to ING.

72.     The revenue sharing payments do not bear any relationship to any services performed by ING. In fact, ING cannot ascribe specific services performed to the revenue sharing payments received and, when ING obtains increased revenue sharing payments from mutual funds, it provides no additional services. Instead, ING literally has lined its pockets with tens of millions of dollars in revenue sharing payments by and through self-dealing, other prohibited transactions and breaches of fiduciary duty.

73.     In certain materials available to customers, ING has recently, obliquely and deceptively referenced its receipt of revenue sharing payments, including 12b-1 fees, service fees and sub transfer agency/expense reimbursement fees. In referencing such revenue sharing payments, however, ING has attempted to mask the nature of these kickback payments by falsely and deceptively claiming that the payments relate to the provision of services by ING on behalf of the mutual funds, even though the payments at issue bear no relationship to any services that ING purportedly provides on behalf of the mutual funds.

-19-

74.    In recognition of the fact that ING deliberately attempts to conceal the true nature and magnitude of the revenue sharing payments, ING refuses to provide its customers, including Plaintiff, with detailed information regarding its receipt of revenue sharing payments. Specifically, although Plaintiff demanded that ING disclose the amount of the "revenue sharing payments" it had received in connection with the investment of the Plans' assets, as well as provide an explanation of the manner in which such payments were calculated, ING has failed and thereby effectively refused to provide the demanded information to HSI.

75.    At all pertinent times, ING's receipt of the revenue sharing payments and other improper compensation delineated in this Complaint constituted a continuing violation of ERISA and was fraudulently and deceptively concealed by ING.

76.    Even assuming *arguendo* that ING contends that it somehow adequately disclosed the existence and nature of these revenue sharing payments, regardless of how it obscured such disclosure (or purports to assert that any of the Plans consented to its conduct), ING's receipt of revenue sharing payments for its own account is *per se* unlawful and cannot be excused by alleging that there was any purported disclosure or consent. Similarly, ING's receipt of compensation on its own account by leveraging the assets contained in the Separate Accounts and the Fixed Accounts, which amounts to self-dealing and the self-payment to ING of unreasonable compensation through the investment and use of the Plans' retirement assets, violates applicable law (specifically, ERISA).

77.    While effectively keeping the revenue sharing payments a secret from its customers and the Plans, ING regularly negotiates with mutual funds to increase the amount of these payments, despite the undesirable impact of increased payments on Plaintiff and the Plans.

**E.   The Revenue Sharing Scheme**

78.    ING holds itself out to Plaintiff, the Class and the public as an expert in administering employee pension benefit plans and with respect to developing investment strategies, goals and philosophies and making investment recommendations.

79.    At all pertinent times, ING implemented and participated in a scheme whereby mutual funds made revenue sharing payments to it based upon a percentage of the Plans' assets invested in these mutual funds, respectively, by and through ING. ING explicitly made it a condition to offering a mutual fund family's funds to the Plans that the mutual fund family pay it revenue sharing on all or most of the funds offered and/or recommended by ING.

80.    To implement this scheme, ING negotiated revenue sharing agreements with mutual funds on behalf of itself and its affiliates.

81.    Revenue sharing payments are made to ING pursuant to written contracts (previously defined as "revenue sharing contracts" or "participation agreements"), often also referred to as service contracts, administration contracts, fund services contracts, fund participation contracts and broker dealer contracts, and these contracts are often entered into by and between ING and the mutual funds or the investment management firms that provide management and other services to mutual funds.

82.    These revenue sharing payments may be in the form of 12b-1 fees (which are supposed to be fees for marketing of the fund), administration fees, service fees, sub-transfer agent fees and/or similar fees. All of the revenue sharing payments are based, in whole or in part, on a percentage of a given plan's investment in a mutual fund and/or based on the magnitude of the investments by the Plans in the mutual fund.

83.     While the revenue sharing payments are often described in participation

agreements as reimbursements for expenses incurred in providing services to the mutual funds,

those services by which mutual funds may incidentally benefit are actually ones that ING had

historically provided to the Plans as a necessary part of its business in return for the fees directly

collected by it, and these fees did not change as a result of revenue sharing or based upon the

percentage or the magnitude of a plan's investments in the mutual fund.

84.     The revenue sharing payments are generally calculated based upon a percentage of

the Plans' assets invested in the mutual funds by and through ING.  These amounts are not based

on the cost of providing the services or a reasonable fair market value for ING's services.

Typically, the fees for ING's services would be provided on an annual per participant basis and

not on a percentage of assets or revenue sharing basis.  Furthermore, the reasonable fair market

price of ING's services would be significantly less than the amounts of the revenue sharing

payments received by it.  Finally, ING earns disproportionate profits on the basis of the revenue

sharing payments it receives.

85.     At all pertinent times, ING has been arranging for, receiving and keeping the

revenue sharing payments for its own use and benefit, in breach of its fiduciary duties under

ERISA.  These revenue sharing payments range from twenty-five (25) basis points of the total

assets of the Plans for each year during the Class Period (defined below) to substantially greater

revenue sharing payments.

86.     Under all of the circumstances, the revenue sharing payments received by ING

constituted excessive fees and otherwise violated ERISA because the receipt of these revenue

sharing payments constituted prohibited transactions under ERISA.

-22-

**F.    ING Also Improperly Earns Income On The Fixed Account, GAA And Separate
Accounts Through Its Conflicted Arrangements And Self-Dealing**

87.    ING also earns excessive compensation in breach of its fiduciary and legal duties

through the "spreads" that it earns on the investments in the Fixed Account and GAA. As

explained above, ING effectively engages in self-dealing by establishing its own compensation

with respect to the investment of these retirement assets, which excessive compensation ING

assiduously conceals from the Plans and their participants.

88.    ING also has utilized investments in the Separate Accounts through leveraging

and securities lending schemes to earn additional, undisclosed compensation and these acts of

self-dealing have resulted in ING earning additional, undisclosed and excessive compensation as

a result of its use of the Plans' retirement assets for its own profit and gain.

## V.    CLASS ACTION ALLEGATIONS

89.    This action is brought as a class action by Plaintiff on behalf of itself and the

following proposed Class ("Class"):

### Class

All administrators of employee pension benefit plans covered by
the Employee Retirement Income Security Act of 1974 subject to
Internal Revenue Code §§ 401(a), (k) with which ING has
maintained a contractual relationship based on a group annuity
contract or group funding agreement.

Excluded from the Class are Defendants, any administrators of employee pension benefit plans

for which Defendants' directors, officers or employees are beneficiaries and any employee

pension benefit plans for which the Judge to whom this case is assigned or any other judicial

officer having responsibility for this case is a beneficiary.

-23-

90.     This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

91.     **Numerosity**. Plaintiff is informed and believes that there are at least thousands of Class members throughout the United States. As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

92.     **Commonality**. There are numerous questions of fact and/or law that are common to Plaintiff and all the members of the Class, including, but not limited to the following:

(a)     whether Defendant acted and continues to act as fiduciary under ERISA in connection with the conduct described herein;

(b)     whether Defendant breached its fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plans;

(c)     whether Defendant engaged in prohibited transactions by receiving the revenue sharing payments for its own benefit and otherwise earning excessive compensation and effectively charging excessive fees for the administrative, management and investment services it provided to the Plans;

(d)     whether Defendant failed to disclose or inform the Plans of the existence and true nature of the revenue sharing payments, as well as the excessive fees and compensation, received by ING; and

(e)     whether and what form of relief should be afforded to Plaintiff and the Class.

93.     **Typicality**. Plaintiff, which is a member of the Class, has claims that are typical of all of the members of the Class. Plaintiff's claims and all of the Class members' claims arise

out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class.

94.     **Adequacy of Representation**. Plaintiff will fairly and adequately represent the interests of the members of the Class. Plaintiff has no conflicts of interest with or interests that are any different from the other members of the Class. Plaintiff has retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

95.     **Predominance**. Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues. Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar certification.

96.     **Superiority**. A class action is superior to all other feasible alternatives for the resolution of this matter. The vast majority, if not all, of the Class members are unaware of Defendant's breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually. Furthermore, even if they were aware of the claims they have against Defendant, the claims of the virtually all Class members would be too small to economically justify individual litigation. Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

97.     **Manageability**. This case is well suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced,

-25-

and proof of liability and damages can be presented, on a Class-wide basis, while the allocation
and distribution of damages to Class members would be essentially a ministerial function.

98.    Defendant has acted on grounds generally applicable to the Class by uniformly
subjecting Class members to the revenue sharing scheme described above, which scheme
Defendant clearly intends to continue to perpetrate in the future. Accordingly, injunctive relief,
as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along
with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

## COUNT I
## (For Breach Of Fiduciary Duty)

99.    Plaintiff incorporates the allegations in the previous paragraphs of this Complaint
as if fully set forth herein.

100.   Defendant is a fiduciary of the Plans under ERISA § 3(21)(A), 29 U.S.C. §
1002(21)(a), as explained above, and is a fiduciary based on its discretion, authority and/or
control with respect to the administration, management and/or disposition of the Plans and their
assets, and its provision of investment advice for a fee or other compensation with respect to the
monies or other property of the Plans and Defendant's authority and responsibility with respect to
the administration and management of the Plans and their retirement assets.

101.   Defendant controls the selection of the mutual funds available as investment
options for the Plans and participants, provides investment advice for compensation with respect
to these investment options, uses its custody, control, ownership and dominion over the Separate
Accounts and accumulated units of assets of the Plans and uses its discretionary authority and
responsibility in the administration of the Plans to obtain revenue sharing payments from the

mutual funds and to earn other compensation from self-dealing as described above.

102.    Defendant is prohibited from receiving benefits in connection with its position as a fiduciary of the Plans.

103.    The revenue sharing payments made by the mutual fund companies to ING constitute plan assets because: (a) ING received the payments as a result of its fiduciary status or function (*e.g.*, because ING received payments from mutual funds in exchange for offering and/or recommending the funds as an investment option to the Plans and their participants); (b) the mutual funds make payments to ING at the expense of the Plans and participants (*e.g.*, because the mutual funds set the fees they charge Plans and participants to cover not only the fees they would normally charge but also the amount of the revenue sharing payments they have to make to ING); and/or (c) revenue sharing payments effectively constitute the proceeds of the Plans' and participants' investments.

104.    ING is a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(a), with respect to the revenue sharing payments, because it has discretion and control, or exercises authority, with respect to the management or disposition of these payments by arranging for, accepting and retaining them either directly or through its subsidiaries or affiliates.

105.    ING's arranging for and retention (or the retention by their affiliates or subsidiaries) of the revenue sharing payments, as set forth above, violates its fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), in that ING failed and continues to fail to discharge its duties with respect to the Plans solely in the interest of the Plans' participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries and (ii) defraying reasonable expenses of administering the

-27-

Plans with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

106.     ING breached its fiduciary duties, by using its discretion and control over or influence with respect to the Fixed Account and Separate Accounts, as well as their accumulation units, to generate the revenue-sharing payments and other improper compensation for its own benefit. ING did not use the Fixed Account, Separate Accounts and the accumulation units for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans and failed to act with the care, skill, prudence and diligence of a prudent person. As to the revenue sharing payments themselves, to the extent they constitute Plan assets, ING failed to use them for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans and also failed to act with the care, skill, prudence and diligence of a prudent person.

107.     As a direct result of Defendant's breaches of duties, Plaintiff and the Class have suffered losses and damages.

108.     Pursuant to ERISA § 408, 29 U.S.C. § 1109, and ERISA § 502(a), Defendant is liable to restore to the Plans the losses they have suffered as a direct result of Defendant's breaches of fiduciary duty and are liable for any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT II
**(For Breach Of Fiduciary Duty And Violation Of ERISA's Prohibited Transaction Rules)**

109. Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

110. ING has engaged in and continues to engage in prohibited transactions in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), by dealing with the assets of the Plans in its own interest or for its own account.

111. ING's receipt and retention (or the receipt and/or retention by its affiliates or subsidiaries) of the revenue sharing payments, as set forth above, constituted and continues to constitute prohibited transactions under ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), in that the receipt of revenue sharing payments by ING amounts to and constitutes a fiduciary receiving consideration in the form of revenue sharing payments for its own personal account from parties such as mutual funds that are dealing with the Plans in connection with transactions (*i.e.*, the purchase and sale of mutual fund shares) involving the assets of the Plans held in the separate accounts or sub-accounts, and/or represented by the accumulation units. Specifically, the mutual funds deal with the Plans by accepting funds from Separate Accounts that represent the investment of the Plans' assets, and they do so in connection with transactions involving the assets of the Plans. Furthermore, as explained above, ING also has engaged in prohibited transactions with respect to its control over the investments in the Fixed Account and Separate Accounts and its earning of improper and excessive compensation through acts of self-dealing and by acting solely for its own benefit, as opposed to for the benefit of the Plans.

112. Pursuant to ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2),

ING is liable to the Plans to credit back, disgorge and/or make restitution of all revenue sharing payments and other improper compensation received by it; or, alternatively, ING is liable to the Plans and the Class to make restitution to the Plans in an amount representing the difference between the revenue sharing payments and other compensation that it received, and the reasonable fair market value of any services provided by ING.

113.    Plaintiff and the Class are entitled to all equitable or remedial relief as the Court may deem appropriate and just.

114.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Class seeks an order declaring that the above-described practices of ING in connection with the revenue sharing payments and its earning of excessive compensation through self-dealing violate ERISA, as set forth above, and seeks a permanent injunction preventing ING from engaging in such conduct in the future.

## COUNT III
### (For Co-Fiduciary Breach And Liability For Knowing Breach Of Trust)

115.    Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

116.    In the alternative, to the extent that Defendant is not deemed a fiduciary or co-fiduciary under ERISA, Defendant is liable to the Class for all recoverable damages and relief as a non-fiduciary that knowingly participated in a breach of trust.

-30-

WHEREFORE, Plaintiff, on behalf of itself and the Class, demands judgment against Defendant, ING Life Insurance and Annuity Company, for the following relief:

(a)    Declaratory and injunctive relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) as detailed above;

(b)    Disgorgement, restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2);

(c)    Pre judgment and post judgment interest at the maximum permissible rates, whether at law or in equity;

(d)    Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)    Such further and additional relief to which Plaintiff and the Class may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all claims so triable.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the

undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was

served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return

receipt requested.

Respectfully submitted,

James E. Miller (ct21560)
Patrick A. Klingman (ct17813)
Laurie Rubinow (ct27243)
Karen M. Leser-Grenon (ct23587)
Shepherd Finkelman Miller & Shah, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120
Email: jmiller@sfmslaw.com
        pklingman@sfmslaw.com
        lrubinow@sfmslaw.com
        kleser@sfmslaw.com

Scott R. Shepherd
Eric L. Young
Shepherd Finkelman Miller & Shah, LLP
35 East State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (610) 891-9883
Email: sshepherd@sfmslaw.com
        eyoung@sfmslaw.com

Attorneys for Plaintiff and the Proposed Class

-32-