## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

HEALTHCARE STRATEGIES, INC., Plan   :
Administrator of the Healthcare Strategies,   :
Inc. 401(k) Plan and the Healthcare   :
Strategies, Inc. CBU 401(k) Plan, On Behalf   :
of Itself and All Others Similarly Situated,   :
  :
                Plaintiff,   :        No. 3:11-cv-00282 (JCH)
  :
         v.   :
  :
ING LIFE INSURANCE AND ANNUITY   :
COMPANY,   :
  :
            Defendant.   :        May 27, 2011

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS (IN PART) PLAINTIFF'S COMPLAINT

### I.    INTRODUCTION

ING Life Insurance and Annuity Company ("ILIAC" or the "Company") sells retirement

services and investment products through group annuity contracts to employee benefits plans

across the country. Compl. ¶¶ 17-25. Plaintiff identifies itself as the Plan Administrator of the

Healthcare Strategies, Inc. 401(k) Plan and the Healthcare Strategies, Inc. CBU 401(k) Plan

(collectively the "Plans"). *Id.* ¶ 11. Plaintiff, apparently acting on behalf of both Plans, chose in

1997 to purchase group annuity contracts from ILIAC that provide a variety of investment

options and services to the Plans. *Id.* ¶ 57.

At the heart of this case is Plaintiff's belated allegation over ten years later that ILIAC

improperly used its ability to select and modify the menu of investment options that it offered

under the group annuity contracts to obtain revenue sharing payments (and other allegedly

improper compensation) in violation of ERISA's fiduciary rules. *Id.* ¶¶ 2-3. Plaintiff's

allegations are flatly wrong. The arrangements that Plaintiff now casts as somehow nefarious

were legitimate, arms length commercial transactions that are perfectly reasonable.  Plaintiff's claims will ultimately be proven to be both factually and legally defective.  Certain of Plaintiff's claims, however, are defective on the face of the Complaint, and are, therefore, ripe for determination by this Court on a Rule 12(b)(6) motions to dismiss.  Specifically, the Court should dismiss Plaintiff's claims based on alleged fiduciary breaches that occurred more than six years prior to the date that Plaintiff filed the Complaint and dismiss claims alleging ERISA violations involving the Fixed Account and the Guaranteed Accumulation Account ("GAA").

First, Plaintiff's claims are subject to ERISA's six-year statue of limitations, which begins to run on the date of the last act of the alleged breach.  In the Complaint, Plaintiff attempts to recover for ERISA violations that allegedly occurred over an undefined period that apparently goes back to the beginning of (relevant) time, relying on a limited exception to the accrual of the six-year limitations period in cases of fraud or concealment.  *Id.* ¶ 85.[1]  Plaintiff's conclusory references in the Complaint to "fraud" and "concealment" are insufficient, however, to satisfy the applicable heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  *See id.* ¶¶ 70, 74, 75, and 87.  The Court should, therefore, limit Plaintiff's Complaint to the six-year statute of limitations and dismiss any claims in Plaintiff's Complaint, no matter how vaguely pled, of a fiduciary breach or conduct that occurred more than six years prior to the filing of the Complaint.

Second, Plaintiff's similar ERISA claims with respect to ILIAC's fixed interest investment options – the Fixed Account and the GAA – should also be dismissed because neither of these accounts holds plan assets, as defined by ERISA and the Department of Labor's plan asset regulations.  Because these investment options do not involve ERISA plan assets, ERISA's

---

[1]     Paragraph 85 of the Complaint references the "Class Period", which Plaintiff claims is defined later in the Complaint.  ILIAC, however, has been unable to locate any such definition.

prohibited transaction and fiduciary duty rules are not applicable to ILIAC's investment of assets in these accounts.

Finally, pursuant to Rule 12(f) of the Federal Rules of Civil Procedure, the Court should strike Plaintiff's demand for a jury trial because ERISA section 502, 29 U.S.C. § 1132, does not provide for a trial by jury.

## II.   FACTUAL BACKGROUND

Plaintiff claims to be the Plan Administrator of the Healthcare Strategies, Inc. 401(k) Plan and the Healthcare Strategies, Inc. CBU 401(k) Plan.  Compl. ¶ 11.  Plaintiff purports to bring its claims on behalf of the Plans it administers and on behalf of a class of all plan administrators of employee benefit plans, as defined under ERISA, 29 U.S.C. § 1002(1), that at any time ever had a contractual relationship with Defendant ILIAC, either through group annuity contracts or through group funding agreements (hereinafter collectively, "group annuity contracts").  *Id.* ¶ 89.  ILIAC is an insurance company that sells its retirement services and investment products to plans through group annuity contracts.  *Id.* ¶¶ 26-28.  ILIAC enters into these contracts with the trustees of retirement plans, who are themselves fiduciaries of their respective plans.  *Id.*

On December 5, 1997, the Trustees of each of the Healthcare Strategies Plans purchased an ILIAC group annuity contract called the Multiple Asset Portfolio (MAP) V – Allocated Funding Agreement ("MAP V Contract")[2] (attached hereto as Exhibit 1).[3]  The MAP V Contract

---

[2]   The Trustees purchased the MAP V Contract from Aetna Life Insurance and Annuity Company, which later changed its name to ING Life Insurance and Annuity Company ("ILIAC").  The Trustees of the both Plans entered into two independent, but in all relevant cited sections identical, MAP V contracts.  Exhibit 1 includes copies of both contracts.

[3]   In deciding a motion to dismiss under Rule 12(b)(6), a court may consider the complaint itself and documents that are "incorporated in the complaint by reference."  *See Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (internal citation omitted); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991); *Cusack v. Delphi Corp.*, 686 F.Supp. 2d 254, 256 (W.D.N.Y. 2010); *Beary v. ING Life Ins. & Annuity Co.*, 520 F. Supp. 2d 356, 359 n.1 (D. Conn. 2007).  In the section of its Complaint

3

defines the terms of the relationship between ILIAC, the Plans, and the Plans' participants. *See id.* Thousands of plans nationwide have purchased group annuity contracts from ILIAC and/or its predecessors through a number of different agreements under a variety of circumstances. *See* Compl. ¶ 91.

Pursuant to the terms of the MAP V Contract, ILIAC provides a menu of available investment options to the Plan Trustees. *See id.* ¶ 66. The Trustees then select up to 10 investment options from this menu, which are offered as investment options to their plan participants. MAP V § 3.07. Plaintiff's Plans are self directed – meaning that the participants themselves decide how to allocate their retirement funds among investment options offered to them by the Plan Trustees through the MAP V Contract. Compl. ¶ 35. The MAP V Contract requires that two of these options be the Fixed Account and the GAA. *Id.* ¶ 29; MAP V §3.02. The Fixed Account and the GAA operate differently than the other investment options. Compl. ¶¶ 29-33. The other options are subaccounts of a Separate Account[4] established by ILIAC, and each subaccount is designed to purchase and hold shares in a single underlying investment – usually a mutual fund. *Id.* ¶ 29. A participant's return on an investment in a subaccount of the Separate Account depends on the performance of the underlying investment. *Id.* ¶¶ 29-33. The value of these subaccounts to plan participants who choose to invest in them depends on their

---

titled "The Agreements Between the Plans and [ILIAC] and the Retirement Investments Provided Under Those Agreements," Plaintiff repeatedly incorporates the MAP V Contract into its Complaint. *See* Compl. at 7, Section IV.B.

[4] The Contract defines "Separate Account" as:

"[A]n account set up by the Company under Title 38a-433, of the Connecticut General Statutes which buys and holds shares of the Fund(s). Income, gains or losses, realized or unrealized are credited or charged to this account without regard to other income, gains or losses of the Company. The Company owns the assets held in such an account and is not a trustee as to the amounts held. These accounts generally are not guaranteed and assets therein are held at market value. The assets of such accounts, to the extent of reserves and other contract liabilities of the account, shall not be charged with other Company liabilities."

MAP V §1.22.

investment performance, or more precisely the performance of the mutual funds or other underlying investments in which the subaccount invests. *Id.* ¶ 39. Under the Fixed Account and GAA, participants allocate amounts to these options in exchange for a guarantee that ILIAC will repay them their net investment plus interest at a stated rate. *Id.* ¶ 29. ILIAC then places the amounts invested by participants into its general account and assumes the investment risk. *Id.* Regardless of the performance of the general account, ILIAC must repay the participants their net investment and the guaranteed interest. *Id.*

## III.   **THE COMPLAINT'S PRINCIPAL ALLEGATIONS**

Plaintiff alleges that ILIAC used its ability to select and modify the menu of investment options that it offers to the Plans to obtain revenue sharing payments. *Id.* ¶ 70. Specifically, Plaintiff alleges that ILIAC "enters into revenue sharing agreements and similar arrangements [] with various mutual funds . . . pursuant to which [ILIAC] receives revenue sharing payments (which amount to kickbacks)." *Id.* ¶ 1. The alleged "kickbacks," Plaintiff claims, are essentially part of a pay-to-play scheme in which ILIAC receives payments from mutual funds in the form of 12b-1 fees, administration fees, service fees, sub-transfer fees and/or similar fees [] in return for providing the mutual funds with access to its retirement plan customers, including its 401(k) plan customers." *Id.* ¶ 2. Plaintiff also alleges that ILIAC earns "excessive" income on the Fixed Account and the GAA by retaining the "spread" between what it earns in investment income and the fixed interest that it pays to participants. *Id.* ¶ 87.

Relying on these allegations, Plaintiff contends that ILIAC breached the fiduciary duties imposed by ERISA § 404, 29 U.S.C. § 1104 and engaged in prohibited transactions as defined in ERISA § 406(b)(1) and (b)(3), *id.* §§ 1106(b)(1) and (b)(3). Compl. ¶¶ 99-114. Count I alleges that ILIAC unlawfully collected "revenue sharing payments and other improper compensation." *Id.* ¶ 106. Count II alleges that "[ILIAC]'s receipt and retention . . . of the revenue sharing

payments . . . constituted . . . prohibited transactions under ERISA." *Id.* ¶ 111.  Counts I and II

are premised upon ILIAC's alleged fiduciary status.  *Id.* ¶¶ 99-114.  Count III alleges that, to the

extent ILIAC was not an ERISA fiduciary, it is still liable for damages as a non-fiduciary that

knowingly participated in a breach of trust.  *Id.* ¶ 116.

## IV.   <u>ARGUMENT</u>

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts

to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007).  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief'

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do."  *Id.* at 555 (internal citation omitted).  Rather, a plaintiff must plead

sufficient "factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged," and the mere possibility that defendant acted

unlawfully is not enough.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  "Where a complaint

pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line

between possibility and plausibility of 'entitlement to relief.'"  *Id.* (internal citations omitted)

(dismissing claims because conclusory allegations were insufficient to meet the pleading

requirements of Rule 8).

### A.   <u>Plaintiff's Claims Are Restricted To ERISA's Six-Year Statute Of Limitations.</u>

Absent fraud or concealment, a plaintiff suing over a fiduciary's violation of ERISA

sections 401-414 must file suit within the *shorter* of six years from the date of the breach or three

years from the date that plaintiff had "actual knowledge" of the breach.  ERISA § 413, 29 U.S.C.

§ 1113.[5]  Under most circumstances ERISA's statute of limitations begins to run from the date

---

[5]     Section 413 provides in relevant part:

that "the last action which constituted a part of the breach or violation" occurred regardless of when the participant actually discovers the breach. *Id.*; *see also Librizzi v. Children's Mem. Med. Ctr.*, 134 F.3d 1302, 1307 (7th Cir. 1998); *Kanawi v. Bechtel Corp.*, 590 F. Supp. 2d 1213, 1225 (N.D. Cal. 2008) ("Section 413(1) bars claims for breach of fiduciary duty if a party does not file an action within six years of the date of the alleged violation, regardless of when the participant actually learns of the breach."). ERISA section 413 provides for tolling of the statute of limitations, however, in cases of fraud and concealment. 29 U.S.C. § 1113. In those cases, the six-year statute of limitations begins to run not on the date that defendant breached its fiduciary duty, but on the date that plaintiff discovered that breach. *Id.* Plaintiff here seeks to recover for ERISA violations for an undefined period of time and attempts to invoke the fraud or concealment exception simply by reciting the words "fraud" and "concealment" a few times throughout the Complaint. *See*, *e.g.*, Compl. ¶ 70. But these passing and conclusory references to fraud and concealment are not sufficient to toll the otherwise applicable statute of limitations.

The Second Circuit has defined fraud as "false representation of a matter of fact, whether by words or conduct . . . which deceives and is intended to deceive another so that he shall act upon it to his legal injury," and concealment as "some trick or artifice . . . to prevent inquiry or elude investigation, or to mislead and hinder a party who has a cause of action from obtaining

---

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of:

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such a breach of violation.

29 U.S.C. § 1113.

information . . . ."  *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 189-90 (2d Cir. 2001) (quoting *Black's Law Dictionary* 788, 361 (Rev. 4th ed. 1968)).  Applying this definition in the ERISA context, the Second Circuit held that the fraud or concealment limitations period applies where a fiduciary: "(1) breached its duty by making a knowing misrepresentation or omission of material fact to induce an employee/beneficiary to act to his detriment; or (2) engaged in acts to hinder the discovery of a breach of fiduciary duty."  *Id.* at 190 (internal citation omitted).

It is not enough for Plaintiff to make a passing reference to fraud or concealment to avoid ERISA's traditional limitations period.  Rather, Plaintiff must plead fraud or concealment with the type of particularity required by Federal Rule of Civil Procedure 9(b).  *Id.* at 191.  Plaintiff must, at the very least, specify the time, place, speaker, and content of the alleged misrepresentations.  *Id.* (citing *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986)).  Furthermore, Plaintiff must detail how those misrepresentations were fraudulent and "plead those events which give rise to a strong inference that the defendant had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth."  *Id. (*quoting *Conn. Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987)).

Since *Caputo*, courts in the Second Circuit have refused to apply the fraud or concealment limitations period in cases where the complaint failed to satisfy the pleading requirements of Rule 9(b).  *See Oechsner v. Connell Ltd. P'ship*, 283 F. Supp. 2d 926, 933 (S.D.N.Y. 2003) (holding that generic allegations that defendants made false statements to "various employees" at "various meetings" did not state a claim for fraud or concealment with the requisite particularity), *aff'd*, 101 F. App'x 849 (2d Cir. 2004); *Watson v. Consol. Edison*, 594 F. Supp. 2d 399, 411 (S.D.N.Y. 2009) (holding fraud or concealment limitations period did not apply where plaintiffs' complaint failed to name the individuals who made the

8

misrepresentations, specify in "concrete terms" when plaintiffs learned of the alleged fraud, or allege facts that would infer fraudulent intent); *Inst. of Applied Human Dynamics v. Mut. of Am.*, No. 02-cv-2331 NRB, 2003 WL 22126691, at *3 (S.D.N.Y. Sept. 12, 2003); *Wasley Prods. v. Bulakites*, Nos. 3:03CV383 (MRK)(WIG) & 3:03CV1790 (MRK)(WIG), 2006 WL 3834240, at *4-5 (D. Conn. May 31, 2006) (holding six-year "fraud or concealment" limitations period did not apply where complaint failed to include specific allegations of fraud or fraudulent concealment); *Janese v. Fay*, 751 F. Supp. 2d 469, 479-80 (W.D.N.Y. 2010) (same).

Plaintiff here falls far short of Rule 9(b)'s standard.  Plaintiff does not identify the "time, place, speaker, and content of the alleged misrepresentations," nor does the Complaint "explain how the misrepresentations were fraudulent and plead those events which give rise to a strong inference that the defendant had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth."  *Caputo*, 267 F.3d at 191 (internal quotations and citation omitted).  Rather, Plaintiff relies on the same generalized allegations of fraud and concealment that courts in this Circuit have rejected time and again.[6]  These conclusory allegations are not sufficient to satisfy Rule 9(b)'s heightened pleading standard or toll the statute of limitations.  For this reason,

---

[6]    For example, Plaintiff alleges:

- "[ILIAC] attempts to conceal the nature of the higher cost share classes that it includes in its retirement offerings as providing certain advantages to Plans when, in fact, the only reason for the inclusion of these higher cost share classes of the mutual funds . . ." Compl. ¶ 70.

- "In certain materials available to customers, [ILIAC] has recently, obliquely and deceptively referenced its receipt of revenue sharing payments, including 12b-1 fees, service fees and sub transfer agency/expense reimbursement fees.  In referencing such revenue sharing payments, however, [ILIAC] has attempted to mask the nature of these kickback payments by falsely and deceptively claiming that the payments relate to the provision of services by [ILIAC] on behalf of the mutual funds, even though the payments at issue bear no relationship to any services that [ILIAC] purportedly provides on behalf of the mutual funds." *Id.* ¶ 73.

- "In recognition of the fact that [ILIAC] deliberately attempts to conceal the true nature and magnitude of revenue sharing payments, [ILIAC] refuses to provide its customers, including Plaintiff, with detailed information regarding its receipt of revenue sharing payments." *Id.* ¶ 74.

- "At all pertinent times, [ILIAC]'s receipt of the revenue sharing payments and other improper compensation delineated in this Complaint constituted a continuing violation of ERISA and was fraudulently and deceptively concealed by [ILIAC]." *Id.* ¶ 75.

the Court should dismiss Plaintiff's claims to the extent they are based on any alleged breach where the last action ILIAC allegedly undertook in furtherance of the alleged breach occurred more than six years prior to the date that Plaintiff filed the Complaint.  Similarly, Plaintiff's Complaint should be dismissed to the extent it asserts any claim arising from any act or alleged harm occurring more than six years prior to its filing.

The Complaints alleges that ILIAC "has entered into revenue sharing agreements and similar arrangements . . . with various mutual funds. . .."  Compl. ¶ 1.  Although Plaintiff never explicitly states that it seeks to recover for ILIAC's receipt of revenue sharing before February 23, 2005, Plaintiff alleges that ILIAC's "receipt of revenue sharing payments and other improper compensation delineated in this Complaint constituted a continuing violation of ERISA . . . ."  Compl. ¶ 75.  To the extent Plaintiff is attempting to seek recovery for actions or harm occurring earlier than six years prior to the filing of the Complaint, there is no basis to do so, and the Court should limit this lawsuit solely to acts occurring within six years of the filing of the Complaint.  *See Int'l Union of Elec. Workers v. Murata*, 980 F.2d 889, 899 (3d Cir. 1992) (rejecting plaintiff's continuing violation theory where that defendants' initial breach was grounded in a distinct plan amendment or benefits determination); *Ranke v. Sanofi-Synthelabo Inc.*, No. 04-1618, 2004 U.S. Dist. LEXIS 22427, at *13-14 (E.D. Pa. Nov. 2, 2004), *aff'd*, 436 F.3d 197 (3d Cir. 2006); *Miele v. Pension Plan of N.Y. State Teamsters Conference Pension & Ret. Fund*, 72 F. Supp. 2d 88, 102 (E.D.N.Y. 1999).  Similarly, to the extent that Plaintiff is seeking to recover alleged damages attributable to revenue sharing or other agreements entered into by ILIAC and any mutual fund or other entity before February 23, 2005, such claims must be dismissed.  *Leister*, 546 F.3d at 878; *Librizzi*, 134 F.3d at 1307 (finding that Section 413 provides that the six-year statute of limitations period is "measured from the violation"); *Martin*, 906 F.2d at

1087-88;  *Tibble*, 639 F. Supp. 2d. at 1119-20; *Kanawi*, 590 F. Supp. 2d at 1225-26; *Ranke*, 2004 U.S. Dist. LEXIS 22427, at *14.

**B.**     **Plaintiff's Claims Regarding The Fixed Account And GAA Must Be Dismissed Because Neither Account Holds Plan Assets.**

Plaintiff's claim that the Fixed Account and the GAA violate ERISA is, to put it mildly, difficult to follow.  Plaintiff seems to argue that, by retaining the difference between the amount that ILIAC earns on its own general account investments and the interest that ILIAC guaranteed on the Fixed Account and GAA accounts, ILIAC is "establishing its own compensation with respect to the investment of these retirement assets" and engaging in a prohibited transaction.  Compl. ¶ 87.  This claim is fundamentally flawed because both the Fixed Account and GAA are "guaranteed benefit policies" under ERISA section 401(b)(2); 29 U.S.C. § 1101(b)(2).  As such, as a matter of law, neither account holds plan assets, a condition precedent to a prohibited transaction or other breach of fiduciary duty claim.

**1.**     **Overview Of The Fixed Account And GAA**

ILIAC's MAP V Contract makes available two guaranteed fixed interest options that are at issue in this case, the Fixed Account and the GAA.  The MAP V Contract describes the Fixed Account as "an accumulation account with a guaranteed minimum interest rate.  The Company may credit a higher rate which is not guaranteed."  MAP V § 1.09.  The Contract describes the GAA as "an accumulation option which guarantees a stipulated rate of interest for a specific period of time."  MAP V § 1.10.

The basic operation of both accounts is the same.  Compare MAP V § 4.02 with MAP V § 4.03(d).  Plan participants allocate a percentage of their retirement funds to these guaranteed fixed interest options.  Compl. ¶ 29.  ILIAC takes possession of these funds, co-mingles them with its own assets, and then invests those assets as ILIAC sees fit.  Compl. ¶ 29.  In exchange,

11

ILIAC guarantees that it will return each participant's net investment plus a guaranteed rate of return.[7]  MAP V §§ 4.02, 4.03; Compl. ¶ 29.  This guarantee is not affected in any way by the performance of the investments ILIAC makes.  MAP V. §§ 4.02, 4.03.  If ILIAC's investments do well, the Company makes profit on the difference between the investments' performance and the guaranteed interest.  Compl. ¶ 29.  Plaintiff refers to this profit as the "spread."  *See id.*  If ILIAC's investments do not do well, ILIAC incurs a loss on the difference between its investments' performance and a guaranteed interest.  MAP V §§ 4.02 & 4.03.  The fact that these accounts provide a guaranteed rate of return is not in dispute as Plaintiff acknowledges this fact in its Complaint.  Compl. ¶¶ 29.

Contrary to Plaintiff's allegations, ILIAC does not "set its own rate of compensation" by retaining the spread.  *See id.*  ILIAC sets the guaranteed interest rates for the Fixed Account and the GAA prospectively, and ILIAC has no way of knowing at the time that it sets the guaranteed interest rates that its return on investments will exceed those rates.  If ILIAC's investments do poorly, then ILIAC must still credit the participants' net investment with interest at the guaranteed rate; in other words, ILIAC loses money.  *See* MAP V §§ 4.02, 4.03.  If the inverse occurs, ILIAC makes money.  *See* Compl. ¶ 29.  In either event, the participants will always receive their net investments plus a guaranteed interest rate, and ILIAC assumes all of the investment risk.  *See* MAP V §§ 4.02, 4.03.

Because ILIAC assumes all of the investment risk, the investment performance of the Fixed Account and GAA is not "passed directly through to the Plans."  Therefore, under Department of Labor regulations and as explained in more detail below, the amounts applied by

---

[7]     While both accounts guarantee that the participant will ultimately earn a minimum rate of return regardless of market conditions, the accounts differ with respect to how that rate of return is calculated.

12

the Plan to purchase the guaranteed returns of the Fixed Account and GAA are not plan assets

and ILIAC's use of those assets is not subject to ERISA.  *See* 29 C.F.R. § 2550.401c-1.

2.     **Guaranteed Interest Rates For The Fixed Account and GAA**

Participant contributions invested in the Fixed Account are held in ILIAC's General

Account.  *See* Morningstar report on the ILIAC Fixed Account (attached hereto as Exhibit 2).[8]

The Fixed Account credits interest on a "portfolio basis," meaning all amounts held in

connection with the account are credited with the same rate of interest for the life of the contract.

*See* Ex. 2.  Under the MAP V Contract, ILIAC guarantees that it will credit interest on

participant contributions "at an annual rate no less than 3%."  MAP V § 4.02.  The MAP V

Contract also provides that ILIAC may "add interest daily at any higher rate," but does not

require that ILIAC do so, nor does it prescribe a method for calculating any added interest.  *Id.*

Under the GAA, ILIAC promises to pay a guaranteed interest rate (or set of interest rates)

for a specific "Guaranteed Term."[9]  *Id.* § 4.03(c).  The GAA provides both a short and long

"Guaranteed Term."  *See* MAP V Endorsement EKGAA (9/98).  The short Guaranteed Term

lasts for up to and including three years.  *Id.*  The long Guaranteed Term lasts for greater than

three years up to and including ten years.  *Id.*  All amounts allocated by Plan participants to the

GAA are held in a Nonunitized Separate Account.[10]  *Id.* §§ 1.15; 4.03(c), (g).  Assets in this

---

[8]     Morningstar reports are documents that in general terms describe the structure and operations of the Fixed
Account and GAA.  Because Plaintiff has made reference to the structure and operations of these accounts in
her Complaint, *see, e.g.,* Compl ¶ 29, the Court may properly consider these documents on a Rule 12(b)(6)
motion.

[9]     The Contract defines "guaranteed term" as "[t]he period of time for which interest rates are guaranteed on Net
Purchase Payment(s) and on transfers allocated into a Deposit Period of the GAA.  Terms are offered at the
Company's discretion for various lengths of time ranging up to and including ten years."  MAP V §4.03(b)

[10]    The Contract defines "nonunitized separate account" as "[a] separate account, established by the Company
under Section 38a-433 of the Connecticut General Statutes, that holds assets for GA Account Guaranteed
Terms of more than three years, and after the effective date of this endorsement, amounts allocated or
transferred to Guaranteed Terms of three years or less.  There are no discrete units for this Account.  The
Contract Holder or Participant, as applicable, does not participate in the investment gain or loss from assets
held in the Nonunitized Separate Account.  Such gain or loss is borne entirely by the Company.  The assets of

13

account are "insulated" from ILIAC's other business liabilities.  *See* Morningstar report on

ILIAC's General Accumulation Account (attached hereto as Exhibit 3).   Prior to the start date of

the Guaranteed Term, ILIAC declares that Term's guaranteed interest rate.  *See id.*  That interest

rate must be a minimum of at least 3%.  MAP V § 4.03(d).  That interest rate is then locked-in

for the life of the Guaranteed Term.  *Id.* § 4.03(h).

### 3.      ILIAC's Ability Amend The MAP V Contract

The MAP V Contract's "Change of Contract" provisions state that in general the MAP V

Contract may be altered at any time only upon *mutual* agreement between the policyholder and

ILIAC.  MAP V § 8.01.  ILIAC retains the right to unilaterally amend the MAP V Contract only

in specifically limited circumstances such as when necessary to protect itself from adverse

changes in plan provisions; changes in plan administrative practices; or actions by legislative,

judicial, or regulatory bodies that would affect operation of the plan or the MAP V Contract.  *Id.*

In these circumstances, the MAP V Contract requires ILIAC to notify the Contract Holder in

writing at least 30 days before the effective date of any change.  *Id.*

An Endorsement to Section 4.02 explicitly states that, notwithstanding the language in

the Change of Contract provision, ILIAC may never reduce the minimum guaranteed interest

rate below 3% for amounts already deposited into the Fixed Account.  MAP V Endorsement

EG401-GIEV-98.  Likewise, the MAP V Contract provides that ILIAC may not change the 3%

minimum interest rate or the additional fixed interest rates set for the existing guaranteed terms

for the GAA.  *Id.* § 4.03(d).  While ILIAC retains the right to alter the terms of the GAA or

eliminate the account entirely, it specifically states "[a]ny such change shall become effective for

the Purchase Payments, transfers or reinvestments applied to any new [Guaranteed] Term by any

---

the Nonunitized Separate Account, to the extent of reserves and other contract liabilities, may not be charged
with other Company liabilities."  MAP V Endorsement EKGAA (9/98).

14

present or future Participant." *Id.* § 4.02(h).  In short, once ILIAC sets the GAA's Guaranteed

Term's interest rate (which can never be less than 3%) it can never be changed with respect to

previously received contributions.  *See Id.*

### 4.     The Fixed Account Qualifies As A Guaranteed Benefit Policy Under ERISA Section 401(b)(2).

ERISA section 401(b)(2) provides that:

> In the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, but shall not, solely by reason of the issuance of such policy, be deemed to include any assets of such insurer.

29 U.S.C. § 1101(b)(2).  ERISA defines a "guaranteed benefit policy" as:

> an insurance policy or contract to the extent that such policy or contract provides for benefits the amount of which is guaranteed by the insurer.  Such term includes any surplus in a separate account, but excludes any other portions of a separate account.

*Id.* § 1101(b)(2)(B).  Thus, when a plan invests in a guaranteed benefit policy offered by an

insurer, the plan's investment in the policy is a plan asset, but the assets of the insurer offering

the policy are not.  *See id.* § 1101(b)(2).

In 1993, the Supreme Court addressed the application of the guaranteed benefit policy

exclusion to annuity contracts in *John Hancock Mutual Life Insurance Co. v. Harris Trust &*

*Savings Bank*, 510 U.S. 86 (1993).  The Supreme Court held that, in order for an insurance

contract to qualify as a guaranteed benefit policy, the contract must allocate the investment risk

to the insurer.  *Id.* at 106.  According to the Supreme Court, such an allocation is present when

the insurer: (1) guarantees a reasonable rate of return on the participants' investment; and (2)

provides a mechanism to convert account assets into guaranteed benefits at rates guaranteed by

contract.  *Id.*  Applying this test, the Supreme Court found that a portion of the contract at issue

did not qualify as a guaranteed benefit policy because it did not provide a guaranteed interest rate

and "the contract's aggregate value depended upon the insurer's success as an investment manager." *Id.* at 103.

In determining whether an insurance contract allocates investment risk to the insurer, courts have focused primarily on whether the insurance contract guarantees a return of the participant's principal investment plus a guaranteed minimum interest rate. *See, e.g.*, *Rapides Reg'l Med. Ctr. v. Am. United Life Ins. Co.*, 938 F. Supp. 380 (W.D. La. 1996). Courts also view an insurer's provision of interest rates above the guaranteed minimum rate as further evidence that the insurance company has assumed the investment risk. *See, e.g.*, *Assocs. in Adolescent Psychiatry v. Home Life Ins. Co.*, 729 F. Supp. 1162, 1186 (N.D. Ill. 1989) (finding insurer's additional guarantee of an interest rate greater than the stated minimum rate for a one-year term was strong support that it qualified as a guaranteed benefit policy). At least one court has even found that a contract containing no guaranteed minimum interest rate may still qualify as a guaranteed benefit policy because each year the insurer prospectively set a reasonable one-year guaranteed interest rate. *Harper-Wyman Co. v. Conn. Gen. Life Ins. Co.*, No. 86 C 9595, 1991 U.S. Dist. LEXIS 18080 (N.D. Ill Dec. 23, 1991).

In addition to looking to whether the insurance contract guarantees a minimum rate of return, courts have also focused on an insurer's authority to amend the contract and whether that authority may alter the guaranteed rate of return. Courts are less likely to find that an insurer truly has assumed the investment risk where it retains the unfettered right to reduce or eliminate the guaranteed minimum rate of return. *See, e.g.*, *Rapides*, 938 F. Supp. 380, 388-89 (finding insurer did not assume investment risk where contract gave insurer the right to retroactively amend the contract's guaranteed interest rate).

16

The Fixed Account is not a separate account.  Rather, amounts allocated into this account are held in ILIAC's general account.  *See* Compl. ¶ 29.  The Fixed Account qualifies as a guaranteed benefit policy because by guaranteeing that ILIAC will return to participants their net investment plus a guaranteed minimum 3% rate of return for the life of the contract, ILIAC has assumed all of the investment risk.  *See* 29 U.S.C. 1101(b)(2)(B).  Under no circumstances can ILIAC lower the rate of return on the Fixed Account below 3%.  *See* MAP V § 4.02.

The Supreme Court in *Harris Trust* also noted that a guaranteed benefit policy must provide a mechanism to convert amounts held by the insurer into guaranteed benefits at rates set by the contract.  *Harris Trust*, 510 U.S. at 106.  The contracts entered into by the Plans meet this requirement.  *See* MAP V § 6.01 (guaranteeing conversion to an annuity at 3%).  Accordingly, the Fixed Account is a "guaranteed benefit policy" within the meaning of ERISA section 401(b)(2)(B).

### 5.   The Assets Held In The GAA's Nonunitized Separate Accounts Also Are Not Plan Assets Under The Plan Asset Regulations.

Assets allocated by the Plans in the GAA, unlike those in the Fixed Account, are held in an insurance company separate account.  Under 29 C.F.R § 2510.3-101(h)(1)(iii) an insurance company separate account is not deemed to hold plan assets if the separate account:

> is maintained solely in connection with fixed contractual obligations of the insurance company under which the amounts payable, or credited, to the plan and to any participant or beneficiary of the plan (including an annuitant) are not affected in any manner by the investment performance of the separate account.

As explained above, ILIAC guarantees the return of the participants' net investment in the GAA plus a fixed interest rate for a Guaranteed Term and, therefore, meets the requirements of a "guaranteed benefit policy" under ERISA §401(b)(2).  *See* MAP V § 4.03.  Moreover, the separate account into which participant investments are allocated when they invest in the GAA "are not affected in any manner by the investment performance of the separate account."  *See* 29

17

C.F.R § 2510.3-101(h)(1)(iii).  ILIAC declares these interest rates in advance and cannot reduce them during the Guaranteed Term.  *See* MAP V § 4.03(h).  The rates that ILIAC sets "are not based on the actual investment experience of the underlying assets in the GAA."  *Id.* § 4.03(d).  Thus, the GAA fits squarely into the exception stated in 29 C.F.R § 2510.3-101(h)(1)(iii) and, for this additional reason, assets allocated by Plan participants to the GAA are not plan assets in ILIAC's hands and their investment for profit (or loss) by ILIAC cannot result in a prohibited transaction or breach of fiduciary duty.

      **C.**      **The Court Should Strike Plaintiff's Demand For A Jury Trial Because ERISA Section 502 Does Not Provide For Trial By Jury.**

Plaintiff demands a trial by jury on "all claims so triable."  Compl. at 31 ("Demand for Jury Trial").  The right to a jury trial exists only where claims seek legal, not equitable, relief and, thus, are provided for by statute or the Seventh Amendment.  *Curtis v. Loether*, 415 U.S. 189, 191-93 (1974).  Plaintiff's claims, however, are equitable and, as a result, Plaintiff's jury demand runs headlong into an overwhelming body of case law holding that no such right exists for its claims.  Plaintiff's demand for a trial by jury, therefore, should be stricken pursuant to Rule 12(f) of the Federal Rules of Civil Procedure.

The Second Circuit has held that, because cases involving ERISA benefits are inherently equitable, there is no right to a jury trial for ERISA claims.  *See Tischmann v. ITT/Sheraton Corp.*, 145 F.3d 561, 568 (2d Cir. 1998) (holding that there was no right to a jury trial for a claim for benefits under ERISA); *DeFelice v. Am. Int'l Life Assurance Co.*, 112 F.3d 61, 64 (2d Cir. 1997) (holding that "cases involving ERISA benefits are inherently equitable in nature, not contractual, and that no right to a jury trial attaches to such claims"); *Sullivan v. LTV Aerospace & Def. Co.*, 82 F.3d 1251, 1258-59 (2d Cir. 1996) ("there is no right to a jury trial in a suit brought to recover ERISA benefits").  Furthermore, there is broad agreement across the Circuits

18

that ERISA section 502 contemplates only equitable remedies, and such claims are tried to a judge, not a jury. *See*, *e.g.*, *Hampers v. W.R. Grace & Co.*, 202 F.3d 44, 54 (1st Cir. 2000); *Cox v. Keystone Carbon Co.*, 894 F.2d 647, 649-50 (3d Cir. 1990); *Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003, 1006-07 (4th Cir. 1985); *Borst v. Chevron Corp.*, 36 F.3d 1308, 1324 (5th Cir. 1994); *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 616 (6th Cir. 1998); *Wardle v. Cent. States, Se. & Sw. Areas Pension Fund*, 627 F.2d 820, 828-30 (7th Cir. 1980); *Thomas v. Or. Fruit Prods. Co.*, 228 F.3d 991, 996 (9th Cir. 2000); *Adams v. Cyprus Amax Minerals Co.*, 149 F.3d 1156, 1160-62 (10th Cir. 1998); *Blake v. Unionmutual Stock Life Ins. Co. of Am.*, 906 F.2d 1525, 1526 (11th Cir. 1990).

In the Complaint, Plaintiff brings claims under ERISA section 502(a) seeking equitable relief. Plaintiff asks the Court to impose liability on ILIAC to "restore to the plans the losses they have suffered" and "any other available equitable or remedial relief," pursuant to ERISA sections 502(a), 408, and 409. Compl. ¶ 108. Plaintiff further requests that the Court order ILIAC to "disgorge and/or make restitution," *id.* ¶ 112, and seeks "all equitable or remedial relief" and a "permanent injunction," *id.* ¶¶ 113, 114, pursuant to ERISA sections 502(a)(2) and 502(a)(3).

ERISA sections 502(a)(2) and 502(a)(3) specifically empower only claims for equitable relief.[11] Such claims, as discussed above, are tried to a judge, not a jury. Moreover, attempts by plaintiffs in this and other Circuits to argue that some opinions may create a jury right under ERISA have been unavailing. *See*, *e.g.*, *Tischmann*, 145 F.3d at 568 (rejecting the plaintiff's

---

[11]  Section 502(a)(2) states that "[a] civil action may be brought . . . by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title." 29 U.S.C. § 1132(a)(2). Section 409, in turn, provides that any fiduciary who breaches his or her duty "shall be personally liable to make good to such plan any losses to the plan resulting from such breach . . . and shall be subject to such other equitable or remedial relief as the court may deem appropriate." *Id.* § 1109. Section 502(a)(3) provides that "a participant, beneficiary, or fiduciary . . . [may] enjoin any act or practice which violates [ERISA] or . . . obtain other appropriate equitable relief." *Id.* § 1132(a)(3).

argument that a prior Second Circuit decision created a right to a jury trial); *Hunt v. Hawthorne Assocs., Inc.*, 119 F.3d 888, 908 n.53 (11th Cir. 1997) (noting that no courts of appeals have interpreted the Supreme Court opinion in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), to create a right to a jury trial).

The law is settled, and Plaintiff's jury demand should be stricken.

## V.   <u>CONCLUSION</u>

For the reasons set forth above, the Court should:  (1) dismiss Plaintiff's claims that are based on a fiduciary breach or actions that occurred six years prior to the filing of the Complaint; (2) dismiss any claims relating to ILIAC's Fixed Account and GAA; and (3) strike Plaintiff's demand for a jury trial.

Dated: May 27, 2011

    /s/ Jonathan B. Orleans
Jonathan B. Orleans (ct05442)
Pullman & Comley LLC
850 Main St., PO Box 7006
Bridgeport, CT  06601-7006
Telephone: (203) 330-2129
Facsimile: (203) 576-8888
Email: JBOrleans@pullcom.com

  /s/ Gregory C. Braden
Gregory C. Braden (*admitted pro hac vice*)
Christopher A. Weals (*admitted pro hac vice*)
Morgan, Lewis & Bockius, LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 739-5217
Facsimile: (202) 739-3001
Email: gbraden@morganlewis.com
        cweals@morganlewis.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2011, a copy of foregoing Memorandum of Law in Support of Defendant's Motion to Dismiss (In Part) Plaintiff's Complaint was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

James E. Miller
Patrick A. Klingman
Laurie Rubinow
Karen M. Leser-Grenon
Shepherd Finkelman Miller & Shah, LLP
65 Main Street
Chester, CT 06412
Email:    jmiller@sfmslaw.com
              pkling@sfmslaw.com
              lrubinow@sfmslaw.com
              kleser@sfmslaw.com

Scott R. Shepherd
Eric L. Young
Shepherd Finkelman Miller & Shah, LLP
Media, PA 19063
Email:    sshepherd@sfmslaw.com
              eyoung@sfmslaw.com

*Attorneys for Plaintiff*

/s/Gregory C. Braden
Gregory C. Braden
Morgan, Lewis & Bockius, LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 739-5217
Facsimile: (202) 739-3001
Email:  gbraden@morganlewis.com