## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HEALTHCARE STRATEGIES, INC., Plan | : | |
| Administrator of the Healthcare Strategies, Inc. | : | |
| 401(k) Plan and the Healthcare Strategies, Inc. | : | |
| CBU 401(k) Plan, On Behalf of Itself and All | : | |
| Others Similarly Situated, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | No. 3:11-cv-00282 (JCH) |
| | : | |
| ING LIFE INSURANCE AND ANNUITY | : | |
| COMPANY, | : | |
| | : | |
| Defendant. | : | June 17, 2011 |
| ———————————————————— | : | |

---

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S PARTIAL MOTION TO DISMISS COMPLAINT

---

SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP
James E. Miller (CT21560)
Patrick A. Klingman (CT17813)
Karen M. Leser (CT23587)
65 Main Street
Chester, Connecticut 06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120
E-mail: jmiller@sfmslaw.com
       pklingman@sfmslaw.com
       kleser@sfmslaw.com

SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP
Scott R. Shepherd
Eric L. Young
35 East State Street
Media, Pennsylvania 19063
Telephone: (610) 891-9880
Facsimile: (610) 891-9883
Email:  sshepherd@sfmslaw.com
       eyoung@sfmslaw.com

Attorneys for Plaintiff

**TABLE OF CONTENTS**

Table Of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table Of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.   Procedural History And Statement Of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       A.     Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       B.     Statement Of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

              1.     The Plan And The Duties Performed By ING . . . . . . . . . . . . . . . . . 4

              2.     The Agreements Between The Plans And ING, And
                     The Retirement Investments Provided Under Those Agreements . . . . . . . . . 7

              3.     The Revenue Sharing Scheme . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

              4.     ING Also Improperly Earns Income On The Fixed Account,
                     GAA And Separate Accounts Through Its Conflicted
                     Arrangements And Self-Dealing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV.    Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

       A.     Standard Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

       B.     Defendant's Statute Of Limitations Argument Is Pure Makeweight . . . . . . . . . . . . 17

              1.     A Statute Of Limitations Defense May Only Be Raised Via A
                     Motion To Dismiss When The Complaint, On Its Face,
                     Establishes That A Claim Has Not Been Brought Within
                     An Applicable Statutory Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

2.    The Complaint Cannot Be Dismissed On Statute Of Limitations
Grounds As ING's Receipt And Retention Of Revenue Sharing
Payments During Any Applicable Statute Of Limitations Results
In Actionable Prohibited Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

3.    There Is No Requirement That A Plaintiff Anticipate The Affirmative
Defense Of A Statute Of Limitations And Plead Fraud Or
Concealment In A Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

C.    ING's Feigned "Confusion" Regarding The Nature Of Plaintiff's Claims
With Respect To The Fixed Account And GAA Is Unpersuasive . . . . . . . . . . . . . 26

D.    Plaintiff's Request For A Jury Trial Should Not Be Stricken . . . . . . . . . . . . . . . . . 34

V.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Amalgamated Cotton Garment & Allied Industries Retirement Fund*
*v. Youngworld Stores Group, Inc.*,
No. 99-3852, 2001 WL 314650, 26 Employee Benefits Cas. 1700,
Pens. Plan Guide (CCH) ¶ 23974G (S.D.N.Y., March 30, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Ansoumana v. Gristede's Operating Corp.*,
201 F.R.D. 81 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Blatt v. Marshall & Lassman*,
812 F.2d 810 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Bona v. Barasch*,
No. 01 Civ. 2289 (MBM), 2003 WL 1395932(S.D.N.Y. Mar. 20, 2003) . . . . . . . . . . . . . . . 38, 39

*Brock v. Hendershott*,
840 F.2d 339 (6th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Caputo v. Pfizer, Inc.*,
267 F.3d 181 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Coldesina v. Estate of Simper*,
407 F.3d 1126 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Connors v. Hallmark & Son Coal Co.*,
935 F.2d 336 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*DiMaria v. Silvester*,
89 F.Supp.2d 195 (D.Conn. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Dreyfus Mut. Funds Fee Litigation*,
428 F. Supp. 2d 342 (W.D. Pa. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Edmonson v. Lincoln Nat. Life Ins. Co.*,
Civil Action No. 10–4919, 2011 WL 1234889 (E.D.Pa. April 1, 2011) . . . . . . . . . . . . . . . . . . . 26

*EEOC. v. Creative Playthings, Ltd.*,
375 F. Supp. 2d 427 (E.D. Pa. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*,
375 F.3d 168 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*F.H. Krear & Co. v. Nineteen Named Trustees,*
810 F.2d 1250 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*In re Fruehauf Trailer Corp.*, 250 B.R. 168 (D.Del. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Gant v. Wallingford Bd. Of Educ.*,
69 F.3d 669, 674 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Geer v. Cox*,
216 F.R.D. 677 (D.Kan. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*George v. Kraft Foods Global, Inc.*,
674 F.Supp.2d 1031, 48 Employee Benefits Cas. 1449,
Pens. Plan Guide (CCH) ¶ 24006O (N.D.Ill. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 24

*Goldman v. Belden,*
754 F.2d 1059 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Granfinanciera, S.A. v. Nordberg,*
492 U.S. 33, 42 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Great-West Life & Annuity Ins. Co. v. Knudson,*
534 U.S. 204 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36, 37, 38, 39

*Haddock v. Nationwide Financial Services, Inc.*,
419 F.Supp.2d 156 (D. Conn. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 32

*Haddock v. Nationwide Financial Services, Inc.*,
262 F.R.D. 97 (D.Conn. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Janese v. Fay*,
751 F.Supp.2d 469 (W.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*,
510 U.S. 86 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Kanawi v. Bechtel Corp.*,
590 F.Supp.2d 1213 (N.D.Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Kirse v. McCullough*,
No. 04-1067-CV-W-SOW, 2005 U.S. Dist. LEXIS 17023 (W.D. Mo. May 12, 2005) . . . . . 38, 39

*Lamberty v. Premier Millwork & Lumber Co.*,
329 F. Supp. 2d 737 (E.D. Va. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Leister v. Dovetail, Inc.*,
546 F.3d 875 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Mass. Mut. Life Ins. Co. v. Russell*,
473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*McMahan v. International Ass'n of Bridge, Structural and Ornamental*,
964 F.2d 1462 (4th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Mercator Software, Inc. Secs. Litig.*,
161 F. Supp. 2d 143 (D. Conn. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Mertens v. Hewitt Assoc.*,
508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Midwest Community Health Service, Inc. v. American United Life Ins.*,
255 F.3d 374 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Mogel v. UNUM Life Ins. Co. Of America*,
547 F.3d 23 (1st Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Neveu v. City of Fresno*,
392 F. Supp. 2d 1159 (E.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Northwestern Mut. Life Ins. Co. v. Resolution Trust Corp.*,
848 F.Supp. 1515 (N.D.Ala.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Oeschner v. Connell Ltd. P'ship*, 283 F.Supp.2d 926 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . 25

*Operating Engineers' Pension Trust Fund v.*
*Clark's Welding and Machine*,
No. 09-0044, 2009 WL 2252121 (N.D.Cal., July 28, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Papesh v. American Nat. Can Co.*,
177 F.R.D. 344 (D.Md. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Patel v. Pacific Life Ins. Co.*,
No. 3:08–CV–0249–B, 2009 WL 1456526 (N.D.Tex. May 22, 2009) . . . . . . . . . . . . . . . . . . . . 24

*Pegram v. Herdrich*,
530 U.S. 211, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Pereira v. Farace*,
413 F.3d 330 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37, 38, 39

*Perry v. Scholar*,
696 F. Supp. 2d 91 (D.D.C. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Phelps v. Kapnolas*,
308 F.3d 180 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Phones Plus, Inc. v. The Hartford Financial Services Group, Inc. et al.*,
No. 3:06-CV-1835, 2007 WL 3124733 (D. Conn. Oct. 23, 2007) . . . . . . . . . . . . . . . . . . . . . . . . 1

*Phones Plus, Inc. v. Hartford Financial Services Group, Inc.*,
No. 3:06-CV-1835(AVC)(September 30, 2008)(slip opinion) . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Pieseski v. Northrop Grumman Corp.*,
No. 01-993, 2002 WL 977449, 27 Employee Benefits Cas. 2663 (W.D.Pa., April 22, 2002) . . . . 20

*Rapides Reg'l Med. Ctr. v. Am. United Life Ins. Co.,*
938 F.Supp. 380 (W.D.La.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Reiser v. Residential Funding Corp.,*
380 F.3d 1027 (7th Cir. 2004), *cert. denied,*
125 S. Ct. 1301, 161 L. Ed. 2d 107 (U.S. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Rhodes v. Piggly Wiggly Ala. Distrib. Co., Inc.,*
741 F. Supp. 1542, 1544-46 (N.D. Ala. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Rubinstein v. Skyteller, Inc.,*
48 F. Supp. 2d 315 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Scheuer v. Rhodes,*
416 U.S. 232 (1974), *overruled on other grounds,*
*Davis v. Scherer,* 468 U.S. 183 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Selby v. Principal Mut. Life Ins. Co.,*
197 F.R.D. 48 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Sirna v. Prudential Securities, Inc.,*
964 F.Supp. 147 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Sperber Adams Associates v. Jem Management Associates Corp.,*
No. 90 Civ. 7405, 1992 WL 28444 (S.D.N.Y. Feb. 7, 1992) . . . . . . . . . . . . . . . . . . . . . . 21

*Stanton v. Shearson/Lehman American Express, Inc.,* 631 F.Supp. 100 (N.D.Ga.1986) . . . . . . 33

*Thompson v. Retirement Plan for Employees of S.C. Johnson & Sons,*
No. 07-CV-1047, 2008 WL 4964714 (E.D.Wis. Nov. 14, 2008) . . . . . . . . . . . . . . . . . . . . 21

*United States v. City of New York,*
359 F.3d 83 (2d Cir. 2004), *cert. denied,* 543 U.S. 1146 (2005) . . . . . . . . . . . . . . . . . . . . 15

*Verda Industries, Inc. v. Lightning Deterrent Corp.,*
No. 94-C-1693, 1995 WL 548610 (September 13, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## STATE CASES

*In re Executive Life Ins. Co.*,
32 Cal.App.4th 344, 38 Cal.Rptr.2d 453 (2nd Dist. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Miller v. Field*,
No. CV 950547773S, 1997 WL 693020 (Conn.Super. Oct. 29, 1997) . . . . . . . . . . . . . . . . . . . 25

## STATUTES AND RULES

29 U.S.C. §1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

29 U.S.C. §1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

29 U.S.C. § 1104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

29 U.S.C. § 1106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 22, 34

29 U.S.C. § 1109 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

29 U.S.C. § 1132 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Federal Rule of Civil Procedure 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Federal Rule of Civil Procedure 10(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Federal Rule of Civil Procedure 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

Federal Rule of Civil Procedure 12(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

Federal Rule of Civil Procedure 12(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## OTHER AUTHORITIES

1 W.S. Holdsworth, A History of English Law, 57-58 (3rd ed. 1922) . . . . . . . . . . . . . . . . . . . . . . 2

Plaintiff, Healthcare Strategies, Inc. ("Plaintiff" or "HSI"), individually and on behalf of the class

it seeks to represent, respectfully submits this Memorandum of Law in Opposition to the Partial Motion

to Dismiss the Complaint (the "Partial Motion" or "Partial Motion to Dismiss") filed by Defendant, ING

Life Insurance and Annuity Company ("Defendant" or "ING").

## I.    <u>INTRODUCTION</u>

Motions to dismiss are filed far too often in class action and other complex cases essentially as

an automatic reaction to the filing of a complaint with little, if any, attention to prospects for success of

the underlying motion. *Verda Industries, Inc. v. Lightning Deterrent Corp.*, No. 94-C-1693, 1995

WL 548610 * 3 (September 13, 1995)(noting that "[m]otions to dismiss should not be a knee-jerk or

routine reaction to the filing of a complaint" but "[r]ather, counsel would do their clients well to consider

whether the stringent standards governing a motion to dismiss can be met before filing such a motion").

Here, Defendant's Partial Motion falls exactly into this category.  As explained below, Defendant's

Partial Motion fails to challenge the core allegations of the Complaint with respect to liability in light of

the authority in this district establishing that Plaintiff's claims with respect to ING's receipt of revenue

sharing payments are legally cognizable, *see Phones Plus, Inc. v. The Hartford Financial Services*

*Group, Inc. et al.*, Civil No. 3:06-1835, 2007 WL 3124733 (D. Conn. Oct. 23, 2007)(denying

motion to dismiss complaint under ERISA challenging insurer's receipt and retention of revenue sharing

payments); *Haddock v. Nationwide Financial Services, Inc.*, 419 F.Supp.2d 156 (D. Conn.

2006)(denying motion for summary judgment in class action challenging revenue sharing practices);

*Haddock v. Nationwide Financial Services, Inc.*, 262 F.R.D. 97 (D.Conn. 2009)(certifying class of

retirement plans in case challenging receipt of revenue sharing payments), and otherwise essentially

seeks an advisory opinion with respect to the applicable statute of limitations, while attempting to obtain

partial dismissal of certain claims and elimination of Plaintiff's demand for a jury trial, based on

astoundingly weak legal arguments.[1]   Accordingly, Plaintiff respectfully requests that the Court

summarily deny ING's Partial Motion so that the parties can proceed to an adjudication on the merits

based upon the full discovery to which Plaintiff is entitled and evidence regarding ING's misconduct

that will be adduced through such discovery.

## II.   SUMMARY OF ARGUMENT

This action concerns the attempt by ING to take advantage of, and profit as a result of, its

fiduciary relationship with retirement savings plans.  The allegations in Plaintiff's Complaint demonstrate

that ING used, and continues to use, its fiduciary position to generate revenue for itself, in the form of

"revenue sharing payments" from mutual funds, while earning other unlawful compensation.  The

revenue sharing payments that ING receives for its own benefit amount to kickbacks in violation of,

*inter alia*, the prohibited transaction rules of the Employee Retirement Income Security Act

("ERISA"), 29 U.S.C. §§1001 *et seq*. (*i.e.*, ERISA §§ 404 and 406(b), 29 U.S.C. §§ 1104 and

1106(b)), as well as ERISA's fiduciary rules (*i.e.*, ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§

1104(a)(1)(A) and (B)).  These kickback payments at issue are essentially part of a pay-to-play

---

[1]The reason for ING's Partial Motion is apparent in light of the parties' agreement to limit discovery pending adjudication of the motion to dismiss that ING indicated it would file.  ING undoubtedly is aware of the truism that "justice delayed is justice denied," based upon the 40th clause of the Magna Carta, providing that "justice be to none denied or delayed," *see* 1 W.S. Holdsworth, A History of English Law, 57-58 (3rd ed. 1922), and, through its Partial Motion, ING clearly seeks to delay and thereby temporarily deny Plaintiff and the putative class it represents the justice to which it is entitled.

scheme in which ING receives payments from mutual funds in the form of 12b-1 fees, administration fees, service fees, sub-transfer agent fees and/or similar fees (the "revenue sharing payments") in return for providing the mutual funds with access to its retirement plan customers, including its 401(k) plan customers.[2]  As explained below, ING also has engaged in acts of self-dealing with respect to the retirement assets of the Plans and the Class held in the Separate Accounts (defined below) and Fixed Account (defined below) and, in so doing, also has otherwise violated the prohibited transaction rules of ERISA, as well as ERISA's fiduciary rules.  In its Partial Motion, ING does not challenge the sufficiency of Plaintiff's core allegations regarding its revenue sharing practices.  Instead, ING merely (1) seeks an effective advisory opinion that, to the extent Plaintiff seeks to recover damages for revenue sharing payments made more than six (6) years before the date the Complaint was filed, those claims

---

[2]ING uses its ownership and control over separate accounts in which its retirement plan customers' investments are placed to negotiate for the receipt of these revenue sharing payments from mutual funds, and the revenue sharing payments have the effect of increasing the expense ratios of the mutual funds, which expenses are deducted directly from the assets of the separate accounts.  The revenue sharing payments are based, in whole or in part, on a percentage of the retirement plans' investments in a mutual fund that are delivered to it by ING and/or based on the magnitude of the investments by such retirement plans in the mutual fund. While the revenue sharing payments are often internally described by service providers, such as ING, as "services fees" and reimbursement for expenses incurred in providing services for, to or on behalf of the mutual funds, the amount of the revenue sharing payments bear absolutely no relationship to the cost or value of any such services. The services provided by ING that may incidentally benefit mutual funds (beyond pure and simple access to retirement plan customers -- referred to sometimes as pay-to-play, shelf-space or kickback arrangements) are actually services that ING has historically provided to its retirement plan customers as a necessary part of its business in return for fees directly collected by it from such customers, and these fees generally did not change as a result of ING's receipt of the revenue sharing kickbacks from the mutual funds.  ING's receipt of the revenue sharing payments at issue violates ERISA's prohibited transaction and fiduciary duty rules and should not be countenanced since the receipt of such payments places ING in a conflicted position in which the interests of its retirement plan customers can be and are sacrificed in the interest of ING earning greater profits through the receipt of revenue sharing payments.

should be deemed time-barred based on an affirmative defense ING apparently intends to assert; (2)

Plaintiff's claims with respect to the Fixed Account and General Accumulation Account ("GAA") --

which are discussed fully below -- should be dismissed on the merits as legally insufficient (even though

they plainly are well pled); and (3) seeks to strike Plaintiff's well-founded jury demand.  In sum, ING's

Partial Motion to Dismiss is completely lacking in merit and should be summarily denied so that full

discovery can proceed expeditiously on the merits.

## III.   PROCEDURAL HISTORY AND STATEMENT OF FACTS

### A.   Procedural History

Plaintiff commenced this action on February 23, 2011.  After service of the Complaint was

promptly effectuated, and Defendant obtained an extension of time until May 29, 2011 to respond to

the Complaint, the parties met and conferred regarding discovery and other pretrial matters pursuant to

Fed.R.Civ.P. 26.  The parties submitted their Joint Report pursuant to Fed.R.Civ.P. 26(f) on April 28,

2011.  The Court held a telephonic status conference on May 24, 2011 and established a pretrial

schedule on May 27, 2011 based upon the parties' Joint Report.  Defendant filed its Partial Motion, to

which this Memorandum is timely submitted in opposition and response.

### B.   Statement Of Facts

#### 1.   *The Plan And The Duties Performed By ING*

As alleged in its Complaint, HSI is the Plan Administrator of the Healthcare Strategies, Inc.

401(k) Plan and the Healthcare Strategies, Inc. CBU 401(k) Plan (individually and collectively, the

"HSI Plan" or the "Plan").  Complaint at ¶ 11.  In that capacity, HSI is a fiduciary of the Plan.  *Id*.

ING is a business entity with its headquarters and principal place of business located in Windsor,

Connecticut and is a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. §

1002(21)(A).  *Id*. at ¶ 12.

      At all pertinent times, ING has held itself out and continues to hold itself out to Plaintiff and the

Class (defined below) as providing a full array of services, including "pure record-keeping services to a

full-service investment provider," and states that "ING U.S. Retirement Services has a leadership

presence and the ability to offer retirement solutions for all sizes and segments of the defined

contribution market -- corporate, education, government, healthcare and not-for-profit entities."  *Id*. at

¶ 17.  ING also represents that it "consistently rank[s] among top-tier providers in the industry by key

metrics," including ranking as "No. 1 in plan sponsors with 54,429," "No. 2 in participants with

6,462,006," and "No. 3 in assets with $277.5 billion."  *Id*. at ¶ 18.  ING asserts that it is "continually

adapting to the changing environment" and that it "build[s] partnerships and offer[s] smart retirement

plan solutions with a sharp focus on the goals that are important to" plan administrators and their

employees, including "[c]ustomized investment strategies, [p]lan communications, [p]articipant

education, [s]pecialized expertise in plan services, [and] [h]igh-tech answers to your recordkeeping

needs" in the following "key markets: Corporate, Healthcare/Not-For-Profit, Education, Government,

[and] Institutional Corporate."  *Id*. at ¶ 19.

      ING also trumpets its relationship with the "ING Institute for Retirement Research (IIRR)":

"We also take pride in our dedication to better understanding the psychology of saving and all that

occurs in the hearts and minds of individuals, as they strive to reach financial security, and of employers,

as they may struggle to manage effective plans in today's challenging environment."  *Id*. at ¶ 20.  To that

end, ING represents to its customers and the public that IIRR "is dedicated to providing clear, incisive

commentary, information, tools and resources to help employers make better use of their retirement and investment resources" and "[w]ith this knowledge and these tools you can help your employees to understand the importance of and more effectively manage their retirement plans." *Id*.

The retirement services at issue are provided, from a corporate perspective, by ING and certain related/affiliated companies: "ING U.S. Retirement Services products and services are provided by ING Life Insurance and Annuity Company, ING Institutional Plan Services, LLC and their affiliated companies." *Id*. at ¶ 21.

The assets of the Plans (meaning the retirement plans that comprise the proposed class) are held in the Separate Accounts, and are included in the over $275 billion that ING has under management. *Id*. at ¶ 22. ING is considered a leader in providing services to the "micro" (less than $5 million in assets) and "small" (between $5 million and $50 million in assets) employer retirement markets, which markets include retirement plans such as the HSI Plan. *Id*. at ¶ 23. ING markets itself as providing employers, such as HSI, with "a comprehensive suite of dedicated tools and resources to help support and manage your plan" and ING "focus[es] on your plan so you can focus on your business." *Id*. at ¶ 24. For example, ING states that "[f]rom assisting with plan design questions and operational issues to maintaining prototype plan documents, the ING Qualified Plan Consulting team can serve as an extension of your HR department." *Id*.

ING provides a number of services to the Plans generally and the HSI Plan specifically, including supplying Plaintiff with all contract documents; providing Plaintiff with quarterly activity statements; responding to customer inquiries on behalf of the Plan; updating contractual, regulatory and disclosure documents; performing a daily valuation of the Plan's assets, while also managing the assets

of the Plans that are held in the Separate Accounts (defined and described more fully below); and

conducting all settlement operations regarding the assets of the Plans from its offices and by and through

its employees, including its officers and executive team, that are all located in Windsor, Connecticut.

*Id*. at ¶ 25.

        2.    *The Agreements Between The Plans And ING And The Retirement*
               *Investments Provided Under Those Agreements*

      Pursuant to the terms of Group Annuity Contracts or Group Funding Agreements (the

"Contracts" or "Group Contracts"), ING represents that it "manage[s] [Plaintiff's and other Class

member's] retirement plan assets." *Id*. at ¶ 26.  ING enters into these standard form Group Contracts

with virtually all of the Plans.  *Id*. at ¶ 27.  Pursuant to the Group Contracts or similar group funding

agreements, ING provides investment options to the HSI Plan and other similarly situated Plans,

through insurance products called group variable annuities or through similar insurance

arrangements/vehicles.  *Id*. at ¶ 28.

      Pursuant to the terms of the Group Contracts, the Plans' retirement assets are invested in one of

three options: (a) a Fixed Account or money market equivalents (collectively, "Fixed Account") in

which ING (i) takes custody and control of the Plans' retirement assets and places them in its general

account (as a fiduciary under applicable law because, *inter alia*, ING takes ownership of these

retirement assets and makes all investment decisions with respect to those assets while determining its

own fee), (ii) commingles those retirement assets with ING's other assets in its general account (while

subjecting those retirement assets to the risks undertaken by ING in conducting its business enterprise

and subjecting those retirement assets to claims by the general creditors of ING), (iii) generally

guarantees a minimum rate of return, and (iv) sets its own rate of compensation by earning the spread between the return achieved on ING's own investment of these retirement assets and the rate of return established by ING (which ING retains the right to adjust in its own discretion); (b) a general accumulation account ("GAA"), which (i) ING owns along with all of the retirement assets contained in those accounts (and for which ING indisputably functions as a fiduciary under applicable law), (ii) guarantees a stipulated rate of interest for a specified time period, (iii) is invested in a non-unitized Separate Account established under Conn.Gen.Stat. § 38a-433, (iv) is not charged with the liabilities of ING to the extent of the reserves and anticipated contract liabilities of the GAA, but otherwise is subject to the claims of creditors of ING, (v) generally guarantees a minimum rate of return, and (vi) sets its own rate of compensation by earning the spread between the return achieved on ING's own investment of these retirement assets and the rate of return established by ING, which ING effectively retains the right to adjust in its own discretion by eliminating or changing the terms of the GAA with thirty (30) days notice; and (c) other Separate Accounts created by ING for the purpose of investing in mutual funds, which (i) ING owns along with all of the retirement assets contained in those accounts (and for which ING indisputably functions as a fiduciary under applicable law), (ii) are created under Conn.Gen.Stat. § 38a-433, (iii) are not charged with the liabilities of ING to the extent of the reserves and anticipated contract liabilities of those accounts, but otherwise are subject to the claims of creditors of ING, (iv) buy and hold the shares of the mutual funds in which the Plans' participants choose to invest, and (v) are utilized by ING as the tool to negotiate revenue sharing or participation agreements with the mutual funds so that ING can earn additional compensation that bears no relationship to the services that it provides to the Plans and/or the mutual funds. *Id*. at ¶ 29.

Plans and their participants do not invest directly in the mutual funds, but invest in "variable accounts," including the "Separate Accounts," as well as the "Fixed Account" discussed above, all of which are established by ING.  *Id*. at ¶ 30.  The Separate Accounts are established, administered, owned and managed by ING and the Separate Accounts' assets are segregated from the general assets of ING.  *Id*. at ¶ 31.  The Separate Accounts are part of an investment vehicle known as a group variable annuity offered by ING.  *Id*. at ¶ 32.  A group variable annuity is an insurance contract that provides for both general account (*i.e.,* the Fixed Account) and Separate Account investments.  *Id*.  These types of investment vehicles are used to fund qualified retirement plans, like 401(k), profit-sharing, and other types of company-sponsored retirement plans.  *Id*.  The Separate Accounts permit ING to pool the investments of the Plans to invest in mutual funds and similar investments.  *Id*.  The assets of each Separate Account are segregated (or separate) from all of the other assets of ING but, as explained above, are not entirely immune from the claims of creditors of ING.  *Id*.  The Separate Accounts purchase and own selected mutual funds or other funds/investment vehicles that mimic the performance of these mutual funds.  *Id*.

The Separate Accounts maintained by ING are divided into sub-accounts that correspond to the mutual funds and other investment options available under the Group Contracts that ING maintains with the Plans.  *Id*. at ¶ 33.  The Separate Accounts are divided into accumulation units (sometimes referred to as "record units") that track the performance of shares of a selected mutual fund investment with the price per accumulation unit calculated by dividing the total value of the assets of the Separate Account by the number of units in the Separate Account.  *Id*. at ¶ 34.  Pursuant to the Group Contracts, participants may choose the mutual funds in which their contributions and any matching

contributions made by their employers are invested, and ING allocates those contributions to particular sub-accounts within the Separate Accounts that correspond to the chosen mutual funds. *Id.* at ¶ 35. In return for the contributions, which are assets of these ERISA qualified plans, the Plans and their participants receive accumulation units (shares) in the applicable sub-accounts of the separate accounts, which accumulation units, like the Separate Accounts themselves and the sub-accounts, are held and owned by ING. *Id.* at ¶ 36.

ING maintains authority and control over the Separate Accounts, the sub-accounts and the accumulation units. *Id.* at ¶ 37. The accumulation units of the Plans and their participants, which are held by ING, like the Separate Accounts and sub-accounts, constitute assets of the Plans. *Id.* at ¶ 38. Based on the combined contributions to the sub-accounts made by all these Plans and their participants, ING sells and purchases mutual fund shares to hold in the Separate Accounts (and receives revenue sharing kickbacks in return for these purchases). *Id.* at ¶ 39. The value of a plan's accumulation units (shares) in the Separate Account fluctuates based upon the value of the mutual fund shares held within the various sub-accounts. *Id.* at ¶ 40.

Pursuant to the Group Contracts administered and managed by ING and issued in its name, ING manages the retirement assets of the Plans in the Separate Accounts and serves as legal title owner and holder of the assets in the Separate Accounts. *Id.* at ¶ 41. The investments of the HSI Plan are held in Separate Accounts in the name of ING, which are administered and managed by ING as well. *Id.*

ING exercises discretionary authority and control with respect to the Plans' assets held in the Separate Accounts by, among other things, electing to receive dividends from the mutual funds into the

Separate Accounts in the form of additional mutual funds shares and/or by making the affirmative

investment decision to reinvest all cash dividends from mutual funds in additional mutual fund shares of

the same mutual funds. *Id.* at ¶ 42. Under the terms of its own Group Contracts, and in recognition of

its fiduciary status, ING holds the Plans' assets in Separate Accounts under its own name, places those

funds in short-term investments as it sees fit (*i.e.*, in its discretion), and may set off certain amounts the

funds held in those Separate Accounts, based on its own unilateral determinations with respect to the

non-payment of fees and other factors, before ultimately transferring the Plans' assets to mutual funds in

return for which it is paid kickbacks. *Id.* at ¶ 43. ING also influences its own compensation by

effectively electing to receive all dividends payable to the Plans from mutual funds in the form of

additional mutual fund shares, thereby increasing the amount of the assets of the Plans in the Separate

Accounts and under ING's management, thereby increasing the amount of revenue sharing kickbacks

payable to ING. *Id.* at ¶ 44.

ING also exercises discretion, authority and control with respect to the Plans' assets and acts

as a fiduciary by managing the Plans' investments in the Fixed Account and placing those assets of the

Plans in the general account(s) of ING. *Id.* at ¶ 45. ING determines its own compensation with

respect to the Fixed Account investments and has breached its fiduciary duty to the Plans by extracting

excessive compensation in connection with its investments in the Fixed Account. *Id.*

ING also places the Plans' investments in a "suspense account" or the equivalent thereof when

awaiting further or clarifying investment instructions from the Plans' participants, ING acts as a fiduciary

with respect to such temporary accounts and, even during this holding period, ING earns without

justification impermissible revenue sharing payment kickbacks and other fees from its suspense account

investments. *Id*. at ¶ 46.

Upon information and belief, ING also utilizes the assets contained in the Separate Accounts, including the GAA, all of which appear on its balance sheet, to earn additional compensation independent of the revenue sharing payments by utilizing uncommitted assets in these Separate Accounts to engage in certain hedging transactions, securities lending transactions and to negotiate for the payment of additional compensation from third parties on the basis of its ownership and control of these retirement assets. *Id*. at ¶ 51. Thus, ING utilizes its ownership and authority over the Separate Accounts, as well as the discretion and control that it exercises over the Separate Accounts, to earn additional, undisclosed compensation from third parties by essentially investing the retirement assets of its customers through schemes and utilizing devices independent and separate and apart from the investment of these assets in mutual funds and other contemplated investments. *Id*.

ING also requires that all Plans offer the Fixed Account option to their participants. *Id*. at ¶ 52. ING imposes this contractual requirement because, regardless of the suitability of the investment for any given plan or participant, historically the spreads that it has earned on its Fixed Account investment options are enormous and those spreads serve as a source of significant profits for ING, which bear no relationship to the services provided to the Plans at issue (and thereby serve to provide ING with unreasonable and excessive compensation). *Id*. Pursuant to the Group Contracts, in addition to earning the spread on the Fixed Account and the GAA, ING charges the HSI Plan and other similarly situated Plans separate account fees (typically referred to as "mortality and expense risk charges" or "wrap fees"), which are calculated by taking a percentage of the daily value of a given plan's investment in the Separate Accounts in and through which ING purchased, sold and held the

shares of the underlying mutual funds. *Id.* Similarly, ING's receipt of compensation on its own account by leveraging the assets contained in the Separate Accounts and the Fixed Accounts, which amounts to self-dealing and the self-payment to ING of unreasonable compensation through the investment and use of the Plans' retirement assets, violates applicable law (specifically, ERISA). *Id.* at ¶¶ 87, 88.

3.     *The Revenue Sharing Scheme*

ING holds itself out to Plaintiff, the Class and the public as an expert in administering employee pension benefit plans and with respect to developing investment strategies, goals and philosophies and making investment recommendations. *Id.* at ¶ 78. At all pertinent times, ING implemented and participated in a scheme whereby mutual funds made revenue sharing payments to it based upon a percentage of the Plans' assets invested in these mutual funds, respectively, by and through ING. *Id.* at ¶ 79. ING explicitly made it a condition to offering a mutual fund family's funds to the Plans that the mutual fund family pay it revenue sharing on all or most of the funds offered and/or recommended by ING. *Id.*

To implement this scheme, ING negotiated revenue sharing agreements with mutual funds on behalf of itself and its affiliates. *Id.* at ¶ 80. Revenue sharing payments are made to ING pursuant to written contracts (previously defined as "revenue sharing contracts" or "participation agreements"), often also referred to as service contracts, administration contracts, fund services contracts, fund participation contracts and broker dealer contracts, and these contracts are often entered into by and between ING and the mutual funds or the investment management firms that provide management and other services to mutual funds. *Id.* at ¶ 81. These revenue sharing payments may be in the form of 12b-1 fees (which are supposed to be fees for marketing of the fund), administration fees, service fees,

sub-transfer agent fees and/or similar fees.  *Id.* at ¶ 82.  All of the revenue sharing payments are based, in whole or in part, on a percentage of a given plan's investment in a mutual fund and/or based on the magnitude of the investments by the Plans in the mutual fund.  *Id.*

While the revenue sharing payments are often described in participation agreements as reimbursements for expenses incurred in providing services to the mutual funds, those services by which mutual funds may incidentally benefit are actually ones that ING had historically provided to the Plans as a necessary part of its business in return for the fees directly collected by it, and these fees did not change as a result of revenue sharing or based upon the percentage or the magnitude of a plan's investments in the mutual fund.  *Id.* at ¶ 83.  The revenue sharing payments are generally calculated based upon a percentage of the Plans' assets invested in the mutual funds by and through ING.  *Id.* at ¶ 84.  These amounts are not based on the cost of providing the services or a reasonable fair market value for ING's services.  *Id.*  Typically, the fees for ING's services would be provided on an annual per participant basis and not on a percentage of assets or revenue sharing basis.  *Id.*  Furthermore, the reasonable fair market price of ING's services would be significantly less than the amounts of the revenue sharing payments received by it.  *Id.*  Finally, ING earns disproportionate profits on the basis of the revenue sharing payments it receives.  *Id.*

At all pertinent times, ING has been arranging for, receiving and keeping the revenue sharing payments for its own use and benefit, in breach of its fiduciary duties under ERISA.  *Id.* at ¶ 85.  These revenue sharing payments range from twenty-five (25) basis points of the total assets of the Plans for each year to substantially greater revenue sharing payments.  *Id.*  Under all of the circumstances, the revenue sharing payments received by ING constituted excessive fees and otherwise violated ERISA

because the receipt of these revenue sharing payments constituted prohibited transactions under ERISA.

        4.     *ING Also Improperly Earns Income On The Fixed Account, GAA And Separate Accounts Through Its Conflicted Arrangements And Self-Dealing*

ING also earns excessive compensation in breach of its fiduciary and legal duties through the "spreads" that it earns on the investments in the Fixed Account and GAA. *Id*. at ¶ 87. As explained above, ING effectively engages in self-dealing by establishing its own compensation with respect to the investment of these retirement assets, which excessive compensation ING assiduously conceals from the Plans and their participants. *Id*. at ¶ 88.

## IV.    <u>ARGUMENT</u>

### A.    <u>Standard Of Review</u>

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure "tests only the adequacy of the complaint." *United States v. City of New York*, 359 F.3d 83, 88 (2d Cir. 2004), *cert. denied*, 543 U.S. 1146 (2005); *see Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds*, *Davis v. Scherer*, 468 U.S. 183 (1984) (motion to dismiss determines "whether the claimant is entitled to offer evidence to support the claims"); *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 176 (2d Cir. 2004) (the purpose of a motion to dismiss "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof") (citations omitted); *see also Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985) ("[t]he court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether

-15-

the complaint itself is legally sufficient") (citation omitted).

When considering a Rule 12 motion to dismiss, the issue "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Phelps v. Kapnolas*, 308 F.3d 180, 184-85 (2d Cir. 2002). When assessing the Complaint, it also is well accepted that this Court must accept as true all material facts alleged in the Complaint and draw all reasonable inferences from the facts alleged in plaintiff's favor. *See Novak v. Kasaks*, 216 F.3d 300, 305 (2d Cir. 2000). Defendants' burden on a motion to dismiss is "substantial." *Rubinstein v. Skyteller, Inc.*, 48 F. Supp. 2d 315, 319 (S.D.N.Y. 1999). Additionally, all allegations must be read in their totality, not in isolation, to determine whether plaintiff states a cause of action. *See In re Mercator Software, Inc. Secs. Litig.*, 161 F. Supp. 2d 143, 150 (D. Conn. 2001).

The standard of review applicable to the adjudication of a motion to dismiss is well established. In spite of this, however, Defendant completely disregards the standard. Indeed, the Partial Motion to Dismiss is predicated completely upon matters outside the Complaint,[3] and raises issues are not

---

[3]"Although a court considering a motion to dismiss for failure to state a claim is limited to the facts stated in the complaint, the complaint includes any written instrument attached to it as an exhibit and any statements or documents incorporated into it by reference." *Gant v. Wallingford Bd. Of Educ.*, 69 F.3d 669, 674 (2d Cir. 1995) (citations omitted). Throughout its Partial Motion, however, Defendant consistently ignores the established precedent that the Court need not assume as true the contents of a document, here the contracts, referenced in a complaint, even if it is deemed to be included in the complaint. *See Id.* ("Both the district court and the defendants assume that Rule 10(c) requires a plaintiff to adopt as true the full contents of any document attached to a complaint or adopted by reference. This is not a proper reading of the rule.... [for example,] a libel plaintiff may attach the writing alleged in the complaint to be libelous without risk that the court will deem true all libels in it.") Similarly, here, simply because ING's contract documents deny its fiduciary status does not make it so. Likewise, simply because ING asserts under its contract documents that its Fixed Account and GAA, *see* Complaint at ¶ 29, operate in a specific manner does not make that true or a completely accurate recitation of the manner in which the Fixed Account and GAA is managed and operated by ING -- especially when its contractual interpretation and description are at odds with the averments of the Complaint. In other words, the Court should not permit ING to turn its Partial Motion into an inappropriate and premature

-16-

properly asserted or decided at this point of the litigation.  It is clear that Defendant's Partial Motion to Dismiss should be denied in its entirety.

### B.    Defendant's Statute Of Limitations Argument Is Pure Makeweight

Defendant's entire statute of limitations argument, which is the essential focus of its Motion to Dismiss, amounts to little more than a "straw man" that ING created so that it could knock it down.  In essence, ING seeks an advisory opinion regarding the applicable statute of limitations which, if at all appropriate, should have been accomplished through a motion under Fed.R.Civ.P. 12(e) for a more definite statement, as opposed to a motion to dismiss.  *See DiMaria v. Silvester*, 89 F.Supp.2d 195, 196, n. 5 (D.Conn. 1999)(holding that "under Rule 12(g) ... defendants have waived any claim for a more definite statement under Rule 12(e) by not filing a motion previous to or concurrently with their response"); Fed.R.Civ.P. 12(g)(2)("a party that makes a motion under this rule [Rule 12] must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion").

ING's statute of limitations argument is essentially constructed as follows: (1) ING assumes that the Complaint asserts fraud and/or concealment[4] to toll the statute of limitations beyond the six (6) year statutory period under ERISA based upon the Complaint's allegations with respect to Defendant's deceptive conduct; (2) ING then argues that, to the extent fraud or concealment is asserted, those allegations are somehow inadequate; and (3) ING then seeks a holding that Plaintiff should be limited to

---

motion for summary judgment.

[4]Although Plaintiff may well be able to establish facts to support a fraud and/or concealment claim and, therefore, could plead such facts if necessary, as explained below, there is no reason for or requirement that Plaintiff so plead at this procedural juncture.

-17-

recovering for unlawful revenue sharing payments in the six (6) years pre-dating the filing of the

Complaint to the extent that fraud or concealment can be deemed to be asserted in the Complaint.

There are three significant problems with ING's argument.  First, it is black-letter law that a motion to

dismiss only can be granted with respect to a statute of limitations defense if, from the face of a

complaint, it is apparent that the statute of limitations bars the claims asserted -- which is not the case

here.   Second, even if the six (6) year statute of limitations is applied to Plaintiff's claims, it is beyond

cavil that ING's receipt and retention of revenue sharing payments during any applicable statute of

limitations constitute prohibited transactions which are actionable (regardless of any statute of

limitations).[5]   Third, there is no requirement that Plaintiff plead fraud or concealment in a complaint but,

rather, such conduct may be established to defeat the ***affirmative defense of the statute of***

***limitations*** if evidence is adduced to support such concealment.[6]

---

[5]ING's true object in filing its strange and misguided Partial Motion may be revealed when it
argues in favor of the Court issuing an advisory opinion that "to the extent that Plaintiff is seeking to
recover alleged damages attributable to revenue sharing agreements entered into by ILIAC and any
mutual fund or other entity before February 23, 2005, such claims must be dismissed." *See*
Defendant's Partial Motion at 9-10.  In essence, despite the fact that there is no statute of limitations
defense available from the face of the pleading, ING appears to be arguing for issuance of an advisory
opinion (unrelated to the actual allegations of the Complaint) that, if certain of its unlawful practices
began more than six (6) years ago, it should be immunized from liability for the prohibited transactions
in which it has engaged during the statutory period.  As explained below, in addition to being an
inappropriate request for the issuance of an advisory opinion, that is not the law, and even the authority
cited by ING in its Partial Motion establishes that it is completely and abjectly incorrect.

[6]ING appears to argue that the Complaint is somehow infirm because it does not define a
specific class period at this procedural stage.  First, there is no requirement that a class period be pled
in a complaint.  *See Geer v. Cox,* 216 F.R.D. 677, 680 (D.Kan. 2003)(certifying class even though no
specific class period was defined because "this [c]lass definition is subject to refinement based upon
further development of the record, and can be expanded or contracted if the facts so warrant, the
Court will not deny certification on this basis").   Rather, a class period is typically defined at the time of
class certification when the parties and court have discovery and evidence available to them.  *See*

-18-

1.     *A Statute Of Limitations Defense May Only Be Raised Via A Motion To Dismiss When The Complaint, On Its Face, Establishes That A Claim Has Not Been Brought Within An Applicable Statutory Period*

It is well established that "[a] limitations defense can be raised by a motion to dismiss for failure to state a claim, but only if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations."  *In re Dreyfus Mut. Funds Fee Litigation*, 428 F. Supp. 2d 342 (W.D. Pa. 2005).  Here, ING's Partial Motion to Dismiss is fatally flawed because it utterly fails to establish any time alleged in the Complaint, which renders the claims asserted time-barred.  *See also Janese v. Fay*, 751 F.Supp.2d 469 (W.D.N.Y. 2010)("While a court may grant a motion to dismiss on statute of limitations grounds if the complaint, on its face, clearly shows the claim is out of time, survival of motion to dismiss for failure to state a claim requires only allegations consistent with a claim that would not be time-barred"); *Perry v. Scholar*, 696 F. Supp. 2d 91 (D.D.C. 2010)(A court should grant a pre-discovery motion to dismiss on limitations grounds only if the complaint on its face is conclusively time-barred, and the parties do not dispute when the limitations period began); *EEOC. v. Creative Playthings, Ltd.*, 375 F. Supp. 2d 427 (E.D. Pa. 2005)(issue of whether former employee's mental and emotional distress and turmoil claim against employer was barred by statute of

---

*Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 85, n.2 (S.D.N.Y. 2001)(defining the class period at the time of certification); *Selby v. Principal Mut. Life Ins. Co.*, 197 F.R.D. 48, 56 (S.D.N.Y. 2000)(in ERISA class action and at class certification, noting that "the court ... agrees with defendant that the class' definition must refer to a specific and bounded time frame in order to be workable, and at present plaintiffs have failed to identify what period Class I's claims cover" but also holding that "[t]he court ... has the discretion to revise an overly broad class definition" at the class certification stage).  Thus, it is clear that the class period should be established and defined at class certification.  Second, even if ING somehow was legally entitled to receive a complaint with a class period pled (which is not the law), the only proper response would be resort to Fed.R.Civ.P. 12(e), which ING declined to invoke.

limitations could not be resolved at motion to dismiss phase due to questions of fact; "complaint did not

specify dates for alleged conduct and further indicated that employer continued to subject employee to

mental and emotional distress and turmoil"); *Reiser v. Residential Funding Corp.*, 380 F.3d 1027

(7th Cir. 2004), *cert. denied*, 125 S. Ct. 1301, 161 L. Ed. 2d 107 (U.S. 2005)(whether statute of

limitations applicable to mortgagors' claims under TILA and RESPA against purchaser of their second

mortgage notes was equitably tolled or whether acts of purchaser justified equitable estoppel could not

be resolved on motion to dismiss mortgagors' claims for failure to state a claim); *Neveu v. City of*

*Fresno*, 392 F. Supp. 2d 1159 (E.D. Cal. 2005)(when motion to dismiss is based on running of statute

of limitations, it can be granted only if assertions of complaint, read with required liberality, would not

permit plaintiff to prove that statute was tolled).

       That approach makes especial sense here, since it is established that the statute of limitations

under ERISA is an affirmative defense that generally should not be resolved via a motion to dismiss.

*George v. Kraft Foods Global, Inc.*, 674 F.Supp.2d 1031, 48 Employee Benefits Cas. 1449, Pens.

Plan Guide (CCH) ¶ 24006O (N.D.Ill. 2009)(whether certain claims were barred by ERISA's

six-year statute of limitations could not be decided on motion to dismiss and, under ERISA, statute of

limitations is an affirmative defense); *Operating Engineers' Pension Trust Fund v. Clark's Welding*

*and Machine*, No. 09-0044, 2009 WL 2252121 (N.D.Cal., July 28, 2009)(statute of limitations

under ERISA is an affirmative defense); *Pieseski v. Northrop Grumman Corp.*, No. 01-993, 2002

WL 977449, 27 Employee Benefits Cas. 2663 (W.D.Pa., April 22, 2002)(recognizing that statute of

limitations under ERISA is as an affirmative defense); *Amalgamated Cotton Garment & Allied*

*Industries Retirement Fund v. Youngworld Stores Group, Inc.*, No. 99-3852, 2001 WL 314650,

-20-

26 Employee Benefits Cas. 1700, Pens. Plan Guide (CCH) P 23974G (S.D.N.Y., March 30,

2001)(same); *Papesh v. American Nat. Can Co.*, 177 F.R.D. 344 (D.Md. 1997)(statute of

limitations under ERISA is an affirmative defense).   Accordingly, Defendant's Partial Motion to Dismiss

on the basis that Plaintiff's claims should be restricted to ERISA's six-year statute of limitations should

be denied.  *See* Defendant's Partial Motion at 6-11.  Indeed, by its very nature, Defendant's Partial

Motion admits that, on its face, the Complaint does not reveal any statute of limitations infirmity.

Rather, Defendant is essentially seeking an advisory opinion regarding an affirmative defense -- which is

inappropriate and premature at this procedural stage.  *Thompson v. Retirement Plan for Employees*

*of S.C. Johnson & Sons*, No. 07-CV-1047, 2008 WL 4964714 * 10 (E.D.Wis. Nov. 14, 2008)(in

an ERISA class action, "the court will not address the statute of limitations issue in an anticipatory way

[but] [i]nstead, the court will adjudicate the matter of which statute of limitations applies and whether

the claims of particular class members are time-barred at an appropriate juncture-when the court can

make the determination based on discovery and argument from both parties"); *Sperber Adams*

*Associates v. Jem Management Associates Corp.*, No. 90 Civ. 7405,1992 WL 28444 (S.D.N.Y.

Feb. 7, 1992)("[A]s the Court has not yet decided whether to certify the class, it would be premature

for it to rule on whether these plaintiffs' Section 10(b) claims would be barred by the statute of

limitations [and] [a]t this stage such a decision would be tantamount to an advisory opinion"); *see also*

*McMahan v. International Ass'n of Bridge, Structural and Ornamental*, 964 F.2d 1462, 1467 (4th

Cir. 1992)("Statutes of limitation are notorious for their exceptions and nuances of application, and

even if we chose an applicable limitations period, a remand would still be required to assure that it is

properly applied to the facts and circumstances of this case [and] [r]ather than risk issuing an advisory

opinion or one based on a misperception of facts, we will leave this issue as well for the district court"

to develop).

        2.    *The Complaint Cannot Be Dismissed On Statute Of Limitations Grounds As ING's Receipt And Retention Of Revenue Sharing Payments During Any Applicable Statute Of Limitations Results In Actionable Prohibited Transactions*

Notwithstanding Defendant's effective request that it be immunized from liability for its

prohibited transactions to the extent it entered into participation agreements before February 23, 2005

with certain mutual funds, *see* Defendant's Partial Motion at 10, it is established based on the authority

which ING cites, that Defendant will be held liable for its unlawful prohibited transactions during the

statutory period that ultimately is determined to be applicable by the Court.  *See Kanawi v. Bechtel*

*Corp.*, 590 F.Supp.2d 1213, 1233 (N.D.Cal. 2008)(upon which Defendant relies in its Partial Motion

and which holds that "Plaintiffs claim under § 406 survives to the extent that Plan assets were used to

pay FIA's fees for four months during November 2003 until February 2004"); *see also In re Fruehauf*

*Trailer Corp.*, 250 B.R. 168, 201-203 (D.Del. 2000)(statute of limitations under ERISA must be

judged based on the date of the alleged violation and whether each overt act results in a new injury to

the plaintiff).[7]

---

[7]The cases cited by ING in support for its desperate request for an advisory opinion that would presumably immunize it from liability for certain misconduct also do not support its position.  For example, *Leister v. Dovetail, Inc.*, 546 F.3d 875, 878 (7th Cir. 2008), simply discusses the general statute of limitations applicable to ERISA actions, and does not address the circumstance where specific prohibited transactions in the form of revenue sharing payments and other misconduct are occurring to the distinct injury of the retirement plan.  Likewise, none of the other cases cited by ING (with the exception of *Kanawi* that supports Plaintiff's position), *see* Defendant's Memorandum at 10-11, provide any meaningful support for the advisory opinion that ING seeks in its Partial Motion.  In fact, careful examination of those cases reveals that most discuss sections of ERISA not even

3.      *There Is No Requirement That A Plaintiff Anticipate The Affirmative Defense Of A Statute Of Limitations And Plead Fraud Or Concealment In A Complaint*

The decision by the District of Columbia Court of Appeals in *Connors v. Hallmark & Son Coal Co.*, 935 F.2d 336, 343, n.12 (D.C. Cir. 1991), places the issues at hand in the proper context. In *Connors*, the Court explicitly identified the inconsistency in a defendant arguing that a plaintiff is obligated to plead fraudulent concealment in a complaint when the statute of limitations unquestionably is an affirmative defense:

> We note, although the Trustees did not so argue on this appeal, the inconsistency between Hallmark's claim that the Trustees were obliged to plead fraudulent concealment in their complaint and the provision of Rule 8(c) that the statute of limitations is an affirmative defense. The Trustees were not obliged to anticipate this defense in their complaint. *See* C. Wright & A. Miller, 5 *Federal Practice & Procedure* § 1276 (1990) ("On occasion, a plaintiff's complaint will contain allegations that seek to avoid or defeat a potential affirmative defense; technically this is improper pleading because these allegations are not an integral part of plaintiff's claim.... [T]he court should treat plaintiff's references to the defense as surplusage."). Moreover, once the matter went to summary judgment and the court had before it a copy of the second audit, stating the precise months and amounts of alleged underpayments-the document Hallmark had received six months before the complaint was filed-the particularity *vel non* of the complaint was irrelevant. Even courts that have purported, on summary judgment, to apply the Rule 9(b) "particularity" standard to the complaint's allegations of fraudulent concealment have in fact considered affidavits and other materials in the record. *See, e.g., Pinney Dock & Transport Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1472-80 (6th Cir.), *cert. denied*, 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988); *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir.1975); *Schaefer v. First Nat'l Bank of Lincolnwood*, 509 F.2d 1287, 1297-98 (7th Cir.1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1682, 48 L.Ed.2d 186 (1976); *see also Summer v. Land & Leisure, Inc.*, 664 F.2d 965, 970-71 (5th Cir. Unit B Dec. 1981) (dismissal of complaint on Rule 9(b) grounds affirmed, but with leave to amend), *cert. denied*, 458 U.S. 1106, 102 S.Ct. 3484, 73 L.Ed.2d 1367 (1982).

_____

implicated by this case.

-23-

The logic of *Connors* is especially applicable where, as here, there is no valid basis to seek dismissal based on the statute of limitations from the face of Plaintiff's Complaint and, instead, to the extent Defendant actually believes that a statute of limitations defense can be used to defeat or limit Plaintiff's claims (or the ultimate class period determined by the Court), that "defense" should be asserted affirmatively and resolved by the parties following discovery. *See also George v. Kraft Foods Global, Inc.,* 674 F.Supp.2d 1031, 1045 (N.D.Ill.,2009), *quoting Cancer Found., Inc. v. Cerberus Capital Mgmt., LP,* 559 F.3d 671, 674 (7th Cir.2009)(in ERISA case, noting that "[d]ismissing a claim as untimely at the pleading state is an 'unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations' and "[d]ismissal is [only] appropriate, however, 'when the plaintiff pleads himself out of court by alleging facts sufficient to establish the complaint's tardiness'"); *Patel v. Pacific Life Ins. Co.*, No. 3:08–CV–0249–B, 2009 WL 1456526 (N.D.Tex. May 22, 2009)("'there is no affirmative duty on the plaintiffs to plead facts in their complaint necessary to defeat a statute of limitations defense'"); *Miller v. Field*, No. CV 950547773S, 1997 WL 693020 * 5 (Conn.Super. Oct. 29, 1997)("Because the plaintiff is not required to plead the elements of fraudulent concealment in his complaint and should be afforded an opportunity to reply to a special defense and allege facts in avoidance of the statute of limitations, a motion for summary judgment is premature as to this issue at this stage of the proceedings").

The cases cited by ING regarding the need to meet the requirements of Fed.R.Civ.P. 9(b) when pleading fraudulent concealment do not support its position.  Simply put, none of those cases address the issue of whether a plaintiff is required to anticipate affirmative defenses that may be asserted and plead conduct in a complaint to defeat such allegations.  First, *Caputo v. Pfizer, Inc.*,

267 F.3d 181, 189-90 (2d Cir. 2001), relates to the question of whether plaintiffs pled fraud or

concealment sufficiently to avail themselves of a specific statute of limitations -- an issue not raised by

ING.  The *Caputo* decision does not in any way hold that a plaintiff must plead his, her or its complaint

to anticipate and defeat affirmative defenses that ***may be*** asserted by a defendant.  Moreover, all of the

cases cited by Defendant to support its position, *see* Defendant's Memorandum at 8-9, all relate to

circumstances in which a statute of limitations defense was apparent from the face of the complaint -- a

circumstance not present here.  For example, in *Oeschner v. Connell Ltd. P'ship*, 283 F.Supp.2d

926, 933 (S.D.N.Y. 2003), the complaint itself revealed that plaintiffs were on notice of their claims

and the injury suffered for a period of more than twelve years.  Nothing in Plaintiff's Complaint (or, for

that matter, the documents submitted by Defendant in support of its Partial Motion), provide any basis

for reaching a similar conclusion.  In sum, the key distinction between this case and the cases cited by

Defendant is that, in the cases cited by Defendant, on the face of the pleading, a statute of limitations

defense was available with respect to the claims asserted.  Here, as explained above, that simply is not

the case.

**C.     ING's Feigned "Confusion" Regarding The Nature Of Plaintiff's Claims With Respect To The Fixed Account And GAA Is Unpersuasive**

ING essentially argues that it is entitled to dismissal of the claims asserted with respect to the

Fixed Account and GAA on the basis that both qualify as guaranteed benefit policies under Section

401(b)(2) of ERISA (emphasis added), which provides as follows:

> (b) Securities or policies deemed to be included in plan assets
>
> For purposes of this part:
>
> *          *          *
>
> (2) In the case of a plan to which a guaranteed benefit policy is issued
> by an insurer, the assets of such plan shall be deemed to include such
> policy, but shall not, ***solely by reason of the issuance of such
> policy***, be deemed to include any assets of such insurer....

It is well established that "[t]he guaranteed benefit policy exemption by its terms does not exempt

insurers from fiduciary duties [but] [w]hat it does is to exclude an insurance policy from plan assets 'to

the extent that such policy ... provides for benefits the amount of which is guaranteed by the insurer.'"

*Mogel v. UNUM Life Ins. Co. Of America*, 547 F.3d 23, 27 (1st Cir. 2008).  The Court's recent

discussion of the guaranteed benefit policy exemption in *Edmonson v. Lincoln Nat. Life Ins. Co.*,

Civil Action No. 10–49192011 WL 1234889 * 11 (E.D.Pa. April 1, 2011), is instructive:

> The term "guaranteed benefit policy" is not a term of art in the insurance industry, but
> rather "a statutory invention placed in ERISA." *John Hancock Mut. Life Ins. Co. v.
> Harris Trust & Sav. Bank*, 510 U.S. 86, 90, 114 S.Ct. 517, 126 L.Ed.2d 524
> (1993). The purpose of the exemption is to protect insurance companies from fiduciary
> liability where they owe duties not only to ERISA participants and beneficiaries but also
> to parties such as policy holders, shareholders, and creditors, in operating their general
> accounts. *Trs. of Laborers' Local No. 72 Pension Fund v. Nationwide Life Ins.
> Co.*, 783 F.Supp. 899, 904 n. 7 (D.N.J.1992) (*quoting* Stephen H. Goldberg &
> Melvin S. Altman, *The Case for the Non-application of ERISA to Insurers' General*

*Account Assets*, 21 Tort & Ins. L.J. 475, 476–77 (1986)); see also *Trs. of the S. Cal. Bakery Drivers Sec. Fund v. Middleton*, 474 F.3d 642, 646 (9th Cir.2007) (explaining that "the policy behind the exemption reflects ERISA's historic deference to state insurance law").

In *Harris Trust*, the Supreme Court examined the scope of the guaranteed benefit policy exemption and determined that it was "markedly confined." 510 U.S. at 96, 114 S.Ct. 517.  The Court noted that Congress did not pass a proposal that would have exempted all funds held by an insurer in its general account from fiduciary liability under ERISA. *Id.* at 100–01, 101 n. 12, 114 S.Ct. 517. *Harris Trust* resolved a circuit split on how narrowly to interpret the exemption.  The Supreme Court followed the Seventh Circuit's approach in *Peoria Union* of "division of the contract into its component parts and examination of risk allocation in each component." *Id.* at 102, 114 S.Ct. 517. In the *Harris Trust* framework, "[a] contract component that provides for something other than guaranteed payments to plan participants or beneficiaries – *e.g.*, a guaranteed return to the plan -- does not, without more, provide for guaranteed benefits and thus does not fall within the statutory exclusion." *Id.* at 105, 114 S.Ct. 517. To fall within the exemption, the contract component must "allocate[ ] investment risk to the insurer." *Id.* at 106, 114 S.Ct. 517. Applying the exemption in this restricted manner was consistent with the principle of statutory interpretation that courts should read exemptions to comprehensive statutory schemes narrowly. *Id.* at 97, 114 S.Ct. 517.

In *Harris Trust*, the Supreme Court explained that "Congress has specifically instructed, by the words of limitation it used, that we closely contain the guaranteed benefit policy exclusion." *Id.* at 97, 114 S.Ct. 517. The Supreme Court held that although the insurer commingled deposits by participants with other assets in its general corporate account, from which it paid guaranteed benefits to retirees, the exemption applied only in part. *Id.* at 106, 114 S.Ct. 517. Any "funds in excess of those that have been converted into guaranteed benefits" were "plan assets" subject to fiduciary duties under ERISA. *Id.* District courts applying the exemption have recognized the "narrow language of the guarantee benefit policy exclusion." *Rapides Reg'l Med. Ctr. v. Am. United Life Ins. Co.*, 938 F.Supp. 380, 389 (W.D.La.1996) (Little, J.) (a group annuity contract, where the insurer purportedly guaranteed the minimum interest rate and minimum annuity purchase rate, was not a "guaranteed benefit" because the insurer retained the power to amend the contract); *Moreland v. Behl*, No. C–92–1238 MHP, 1996 WL 193843, at *6–7 (N.D.Cal. Apr. 17, 1996) (Patel, J.) (a pre-conversion life insurance policy, "issued at a fixed face value," where the assets were held in a "non-segregated general investment account," "appears to satisfy the requirements of the guaranteed benefits policy exclusion," but "[w]hether the excess funds portion of the contract qualifies for the guaranteed benefit exception remains a question of fact for trial").

-27-

Here, as explained below, despite ING's attempt to argue that it falls squarely within the guaranteed benefit policy exemption with respect to both the Fixed Account and GAA, the Complaint and the contract documents attached by ING to its Partial Motion establish otherwise.

First, in apparent recognition of the fact that it is uncomfortable with the actual terms of its own contracts, ING selectively quotes from its contracts with respect to its ability to unilaterally change the terms of its contract and significantly (and undoubtedly intentionally) omits the following language from its recitation of its contractual rights: "The Company [ING] may change the terms of this Contract when, *in its opinion*, such change is *necessary to protect* it from ... '*investment options offered by the Plan*....'" *See* December 5, 1997 Multiple Asset Portfolio (MAP) V - Allocated Funding Agreements ("MAP V Agreements") at 22, § 801, copies of which have been attached as Exhibit "1" collectively to the Declaration of Marianne Hogan in support of Defendant's Partial Motion.  The reason that ING conveniently omits this language from the discussion of its contractual rights on page 14 of its Memorandum is plain and clear -- ING recognizes that this language vests it with discretionary authority and control to effectively make investment decisions on behalf of the Plans, including with respect to the Fixed Account and GAA, based on other investment options selected by the Plans.  As explained below, this discretion, authority and control is the hallmark of fiduciary status.

Moreover, although ING suggests (albeit incorrectly) that Section 4.03(d) of the MAP V Agreements guarantees a minimum rate of return, *see* Defendant's Memorandum at 14, nothing in Section 4.03(d) or any other provision of the Agreements, including Section 4.02, prevents ING from exercising its discretion, authority and control under Section 8.01 of the Agreements to change those

-28-

terms and, ultimately, self-determine the rate of return provided under the Fixed Account and GAA.[8] For this reason, as well as others, as the Court held in *Rapides Reg'l Med. Ctr. v. Am. United Life Ins. Co.*, 938 F.Supp. 380, 389 (W.D.La.1996), such broad contractual powers eliminate any basis for an insurer, like ING, to claim the limited statutory exemption created for actual guaranteed benefit policies.  *See also Midwest Community Health Service, Inc. v. American United Life Ins.*, 255 F.3d 374, 377-379 (7th Cir. 2001)(explaining that not all supposed guaranteed benefit policies are exempt from ERISA scrutiny).  That is why the Complaint properly pleads that "ING determines its own compensation with respect to the Fixed Account investments and has breached its fiduciary duty to the Plans by extracting excessive compensation in connection with its investments in the Fixed Account, ING ... earns excessive compensation in breach of its fiduciary and legal duties through the 'spreads' that it earns on the investments in the Fixed Account and GAA [and] [a]s explained above, ING effectively engages in self-dealing by establishing its own compensation with respect to the investment of these retirement assets, which excessive compensation ING assiduously conceals from the Plans and their participants."  Complaint at ¶¶ 44, 87.

    ING also utterly fails to address the fact that the Complaint explicitly pleads that both the Fixed

---

[8]ING also cites to an Endorsement to the Agreements (EG401-GIEV-98) with respect to the Fixed Account only, *see* Defendant's Memorandum at 14, which provides that interest will be added daily at three percent (3%), in an effort to save itself.  That Endorsement, however, is of little moment for several reasons.  First, the Endorsement does not apply to the GAA and, therefore, ING's fiduciary status as to the GAA is, in effect, established.  Second, although the Endorsement may guarantee an effective minimum interest rate, it does nothing to prevent ING from invading the amount of principal invested or lowering the previously declared interest rate with respect to the Fixed Account investments pursuant to its broad powers under Section 8.01 of the Agreements.  Thus, the omissions from the Endorsement cited are more significant than its contents.

Account and GAA are subject to the claims of general creditors, *see* Complaint at ¶ 29, thereby

placing both instruments outside of the protections of the guaranteed benefit policy exemption. As the

Supreme Court explained in *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*,

510 U.S. 86, 101-102 (1993):

> In *SEC v. Variable Annuity Life Ins. Co. of America*, 359 U.S. 65, 79 S.Ct. 618, 3
> L.Ed.2d 640 (1959), we observed that "the concept of 'insurance' involves some
> investment risk-taking on the part of the company," and "a guarantee that at least some
> fraction of the benefits will be payable in fixed amounts." *Id.*, at 71, 79 S.Ct., at 622. A
> variable annuity, we held, is not an "insurance policy" within the meaning of the
> statutory exemption because the contract's entire investment risk remains with the
> policyholder inasmuch as "benefit payments vary with the success of the [insurer's]
> investment policy," *id.*, at 69, 79 S.Ct., at 621, and may be "greater or less, depending
> on the wisdom of [that] policy," *id.*, at 70, 79 S.Ct., at 621.

Likewise, here, the payments and returns, if any, under the Fixed Account and GAA are entirely

subject to the success of ING's investment policies - since the entire investments are subject to claims

of creditors if those investments prove unsuitable/worthless or if ING becomes otherwise obligated to

creditors. *See* Complaint at ¶ 29. Moreover, such risk (which renders the GAA and Fixed Account

neither insurance policies or guarantees under Supreme Court precedent) is far from hypothetical. *See*

http://www.marketwatch.com/story/treasury-to-hand-insurers-tarp-billions-wsj (describing that six

major life insurers were approved to receive TARP funds); *In re Executive Life Ins. Co.*,

32 Cal.App.4th 344, 38 Cal.Rptr.2d 453 (2nd Dist. 1995)(discussing liquidation of large life insurance

company); *see also Northwestern Mut. Life Ins. Co. v. Resolution Trust Corp.*, 848 F.Supp. 1515,

1518-1519 (N.D.Ala.1994)(noting that, where, as here, a plan is unfunded and, instead, the assets

supporting retirement benefits are held by an insurance company and are subject to the claims of

creditors, the instrument at issue was not guaranteed).

ING's attempt to escape liability with respect to its management and control of the Fixed Account and GAA also effectively ignores the Complaint's averments that ING self-determines its compensation and earns excessive compensation with respect to the Plans' investments in these instruments. Complaint at ¶¶ 29, 44, 51, 52, 76, 87, 88, 106, 111.[9]  As the Second Circuit Court of Appeals explained: "[A]fter a person has entered into an agreement with an ERISA-covered plan, the agreement may give it such control over factors that determine the actual amount of its compensation that the person thereby becomes an ERISA fiduciary with respect to that compensation." *F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1259 (2d Cir. 1987).  As the Court in *Sirna v. Prudential Securities, Inc.*, 964 F.Supp. 147, 150 (S.D.N.Y. 1997), explained:

> *F.H. Krear* allowed for the possibility that even an administrative service provider might become an ERISA fiduciary after entering into a contract at arm's length. But the condition in which it indicated that might occur is instructive. The Circuit referred to a circumstance in which the agreement between the plan and the service provider gave the latter so much control over factors determinative of its own compensation that it would make the provider a fiduciary with respect to its compensation. *Id.* The touchstone was a transfer of control over the plan or its assets from the plan to the provider which would enable the provider to manipulate the plan or its assets to its own benefit.  As the hallmark of a fiduciary relationship is the entrusting of control of the property to another for the benefit of the *cestui que trust* and the hallmark of its breach the abuse of that control to the profit of the fiduciary or the detriment of the beneficiary, *F.H. Krear* fits comfortably within the mainstream of the law of fiduciary relations.

Here, as ING chooses to ignore, that is exactly what is alleged in the Complaint with respect to the Fixed Account and GAA.

_____

[9]ING also fails to respond to the averment that, with respect to the GAA's assets, it has engaged in "certain hedging transactions, securities lending transactions and to negotiate for the payment of additional compensation from third parties on the basis of its ownership and control of these retirement assets."  Complaint at ¶ 51.  As explained above, such ability to control retirement assets to self-determine compensation is a hallmark of fiduciary status.

"In every case charging breach of ERISA fiduciary duty ... the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest but, rather, whether the person was acting as a fiduciary (that is, was performing a fiduciary function)." *Pegram v. Herdrich*, 530 U.S. 211, 226, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000). An individual or entity's fiduciary status is not controlled by formal titles -- instead, courts apply a functional test in order to determine whether an individual or entity is an ERISA fiduciary. *Haddock*, 419 F.Supp.2d at 164, *citing Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir. 1987); *see also Mertens v. Hewitt Assoc.*, 508 U.S. 248, 262, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993) ("ERISA ... defines 'fiduciary' not in terms of formal trusteeship but in functional terms of control and authority over the plan"). That is why the term "fiduciary" is defined in ERISA with reference to the functions being performed for the plan, regardless of status or title. *Coldesina v. Estate of Simper*, 407 F.3d 1126, 1131-1132 (10th Cir. 2005). In pertinent part, ERISA specifically defines a "fiduciary" as follows:

> A person [or entity] is a fiduciary with respect to the plan to the extent that (i) he exercises *any* discretionary authority or discretionary control respecting management of such plan or exercises *any* authority or control respecting management or disposition of its assets, (ii) *he renders investment advice for a fee or other compensation, direct or indirect,* with respect to any moneys or other property of such plan, or has *any* authority or responsibility to do so, or (iii) he has *any* discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A)(i)-(iii)(emphasis added). It is clear from the language of the statute itself that Congress intended the term fiduciary to be applied liberally in order to effectuate the remedial purposes of ERISA. "A fair contextual reading of [ERISA] makes it abundantly clear that its draftsmen were primarily concerned with the possible misuse of plan assets ...." *Mass. Mut. Life Ins. Co. v. Russell*,

-32-

473 U.S. 134, 142-43, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985).  Moreover, it is well established the

courts should assign fiduciary status liberally to serve both the purpose and words of ERISA.

*Coldesina v. Estate of Simper*, 407 F.3d at 1134.

Here, Plaintiff's allegations in the Complaint regarding ING's authority, control and discretion

with respect to the Fixed Account and GAA -- including its insistence that all Plans offer the Fixed

Account as an investment option regardless of its suitability, *see* Complaint at ¶ 52, and, as discussed

above, its ability to unilaterally change the material terms with respect to the Fixed Account and GAA

based upon its determination of how the Plans' investments are affecting ING, all render it a functional

fiduciary.  The Second Circuit Court of Appeals has specifically held that "[a]n entity need not have

absolute discretion with respect to a benefit plan in order to be considered a fiduciary."  *Blatt*, 812

F.2d at 812.  In fact, courts have frequently held that the type of control alleged by Plaintiff in the

Complaint is more than sufficient to confer ERISA fiduciary status.  *See Blatt*, 812 F.2d at 813

(holding that accounting firm was an ERISA fiduciary because its refusal to sign and deliver to a former

employee a form required for him to receive a distribution from the plan was an exercise of actual

control over the disposition of plan assets); *Brock v. Hendershott*, 840 F.2d 339, 342 (6th Cir.1988)

(holding that a high-ranking union representative who used his "considerable influence" over local

unions to direct them to choose a particular dental plan was an ERISA fiduciary because of his exercise

of authority or control over the disposition of plan assets); *Stanton v. Shearson/Lehman American

Express, Inc.*, 631 F.Supp. 100, 105 (N.D.Ga.1986) (holding that a brokerage firm acts as an ERISA

fiduciary "when it exercises authority or control over the broker assigned to the ERISA account; since

the broker's employment respects the disposition of ERISA assets, control over the broker is control

respecting the disposition of those assets").  Thus, Defendant's attempt to obtain dismissal of the claims

related to the Fixed Account and GAA is unpersuasive.

> **D.      Plaintiff's Request For A Jury Trial Should Not Be Stricken**

ING finally argues that Plaintiff's request for a jury trial on those issues so triable should be

stricken.  In so arguing, Defendant attempts to frame the issue as simple and straightforward when, as

explained below, that simply is not the case.  Plaintiff alleges that, *inter alia*, ING, as a fiduciary of the

Plans, breached its fiduciary duty of trust, and expressly violated ERISA's strict prohibited transaction

rules, by accepting revenue sharing kickbacks from mutual funds that ING itself carefully selected for

inclusion on its platform of potential investments by the Plans.  In particular, ERISA § 406(b)(3)

expressly precludes a fiduciary from receiving "any consideration for his own personal account from

any party dealing with such plan in connection with a transaction involving the assets of the plan."  29

U.S.C. § 1106(b)(3).  Yet, what ING plainly did satisfies all the elements of ERISA § 406(b)(3) -- it

structured arrangements with the mutual funds that enabled it to receive consideration and profit from

transactions involving Plan assets under its control and authority.  These actions by ING are precisely

the reason ERISA's prohibited transaction rules were enacted in the first place -- to supplement

ERISA's core fiduciary requirements by expressly precluding fiduciaries from structuring self-serving

transactions that improperly utilize plan assets under its control and authority to pad the fiduciaries' own

account.

Significantly for the purposes of this jury trial determination, this action was brought under the

authority of ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), for relief under ERISA § 409(a).  *See*

Complaint at ¶ 10.   ERISA § 409(a) specifically provides as follows:

> Any person who is a fiduciary with respect to a plan who breaches any of the
> responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be
> personally liable to make good to such plan any losses to the plan resulting from each
> such breach, and to restore to such plan any profits of such fiduciary which have been
> made through use of assets of the plan by the fiduciary, and shall be subject to such
> other equitable or remedial relief as the court may deem appropriate, including removal
> of such fiduciary. A fiduciary may also be removed for a violation of section 411 of this
> Act [29 U.S.C. §1111].

The breaching fiduciary under ERISA § 409(a) must, therefore, restore monetary losses to the Plans

and/or any profits which have been made through the improper use of plan assets resulting from its

ERISA violations. The Plans also are entitled to any additional equitable or remedial relief. The Plaintiff

seeks a monetary recovery for the Plans from ING for engaging in prohibited, self-dealing transactions

that violate ERISA.

In *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002)*,* the Supreme

Court held that ERISA creates both legal and equitable causes of action and remedies.  *Great-West*

specifically emphasized that claims seeking to force a defendant to pay over a sum of money to the

plaintiff are paradigmatically legal.  Prior to *Great-West*, certain courts had denied plaintiffs the right to

a jury trial on their ERISA claims based on their conclusion that ERISA was exclusively equitable

because it was derived, in part, from trust law.  After *Great-West*, as Defendant's Partial Motion

consistently fails to appreciate, this assumption no longer holds true.

Courts revisiting the jury trial issue in light of *Great-West* have concluded that ERISA claims

seeking legal relief must be tried to a jury under established principles of Seventh Amendment

jurisprudence.  Significantly, the Second Circuit in *Pereira v. Farace*, 413 F.3d 330 (2d Cir. 2005),

applied the principles enunciated in *Great-West* in upholding the right to a jury trial in a claim for breach

of fiduciary duty in which the plaintiffs sought monetary relief from the defendants.  Although *Periera*

was not an ERISA case, it is respectfully submitted that the Second Circuit's holding in *Periera* clearly

indicates that the right to a jury trial under *Great-West* would apply equally to an ERISA fiduciary

breach claim.  Furthermore, since *Great-West*, district courts within and outside the Second Circuit

have consistently recognized that ERISA claims for monetary relief under ERISA § 409(a), 29 U.S.C.

§ 1109(a), are typically legal in nature for which a jury trial is warranted.

In *Great-West*, the Supreme Court held that where, as here, an ERISA plaintiff seeks a

monetary recovery that does not fall within the narrow definition of "equitable restitution," the relief is

inherently legal.  534 U.S. at 221.  In *Great-West*, an ERISA plan paid the medical expenses of the

defendant, a participant in an ERISA group health plan.  The participant then separately recovered the

medical expenses from a tortfeasor without reimbursing the plan.  The administrator of the ERISA plan

filed suit to recoup the medical expenses from the defendant/participant, claiming an entitlement under

the express, written terms of the group health plan.  The *Great-West* Court held that the ERISA

administrator could not maintain this action because it was brought under ERISA § 502(a)(3), where

remedies are limited to "other appropriate equitable relief."  *Id*.  The Court in *Great-West* rejected the

ERISA administrator's attempt to preserve the claim by characterizing its claims as seeking equitable

relief.  In so holding, the *Great-West* Court persuasively explained as follows:

> Almost invariably … suits seeking (whether by judgment, injunction, or declaration) to
> compel the defendants to pay a sum of money to the plaintiff are suits for "money
> damages," as that phrase has traditionally been applied, since they seek no more than
> compensation for loss resulting from the defendants' breach of legal duty.  And money
> damages are, of course, the classic form of legal relief.

*Great-West*, 534 U.S. at 210 (quotations omitted, ellipses in original). The *Great-West* Court went on to reject the administrator's attempts to characterize the relief as equitable restitution because it was not seeking the return of a specific fund in the beneficiary's possession, *Id*. at 212-14, or to characterize the relief as an injunction or any other form of equitable relief. *Id*. at 211, 219-20. Since the plaintiff's suit in *Great-West*, in essence, was one for money against the defendant, the Court held that it was a legal claim. *Id*. at 221.

In *Periera*, the Second Circuit squarely addressed whether a claim for fiduciary breach was one that should be tried before a jury in light of the holding in *Great-West*. Acknowledging that *Great-West* had indeed "reconfigured the legal landscape of restitution," *Periera*, 413 F.3d at 340, the *Periera* Court first analyzed the Supreme Court's two-prong test for determining whether an action was a legal or an equitable claim. Where a statute, such as ERISA, is silent on the right to a jury trial, courts employ a two-part inquiry to determine whether a right to trial by jury exists under the Seventh Amendment. *Tull v. United States*, 481 U.S. 412, 417 (1987). First, the court determines whether the action is more similar to cases that were traditionally tried to courts of law as opposed to courts of equity. *Id*. Then, the court examines whether the remedy sought is more legal than equitable in nature. *Id*. "The second step of this analysis is more important than the first." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989). Focusing on the second part of the *Granfinanciera* test (*i.e.*, the nature of the relief sought), the Second Circuit in *Periera* concluded that "it was compelled to read *Great-West* as broadly as it was written," *Periera*, at 340, and, as such, a fiduciary breach claim seeking a monetary recovery was clearly a legal action under *Great-West* principles, requiring that the case be tried to a jury under the Seventh Amendment.

Following *Great-West*, even in Circuits that previously had denied jury trials in ERISA cases, courts have held that ERISA plaintiffs are entitled to trial by jury where the relief they are seeking is essentially money damages.  For example, the Honorable Michael B. Mukasey specifically explained that cases denying a jury trial because ERISA has its origins in trust law are no longer controlling because they "antedate the Supreme Court's decision in Great-West."  *Bona v. Barasch*, No. 01 Civ. 2289 (MBM), 2003 WL 1395932 at \*34 (S.D.N.Y. Mar. 20, 2003); *see also Kirse v. McCullough*, No. 04-1067-CV-W-SOW, 2005 U.S. Dist. LEXIS 17023 (W.D. Mo. May 12, 2005) (in light of *Great-West*, plaintiffs had right to jury trial for legal claims under § 502(a)(2)).

Both the courts in *Bona* and *Kirse* held that, in light of the Supreme Court's ruling in *Great-West*, where, as here, a claim seeks money damages, it is quintessentially legal.  *Great-West*, 534 U.S. at 210; *see also Rhodes v. Piggly Wiggly Ala. Distrib. Co., Inc.*, 741 F. Supp. 1542, 1544-46 (N.D. Ala. 1990) (holding that ERISA claims seeking legal relief must be tried to jury after extensive historical analysis of Seventh Amendment).  In *Bona*, Judge Mukasey applied the Seventh Amendment analysis from *Granfinanciera*, and concluded that ERISA claims for money damages under ERISA §§ 502(a)(2) and 409(a) must be tried to a jury.  In so holding, Judge Mukasey reasoned, two years before the Second Circuit did likewise in *Periera*, that, even though the first *Granfinanciera* factor (whether breach of fiduciary duty was traditionally tried to courts of law) "weighs against a jury trial," the second, more important prong of the test -- "determin[ing] whether [the remedy sought] is legal or equitable" -- weighed in favor of a jury trial because, under the Supreme Court's analysis in *Great-West*, plaintiffs seek legal relief from the trustee.  *Bona*, 2003 WL 1395932 at \* 35.  This same conclusion was reached in *Kirse*, as well as in *Lamberty v. Premier Millwork &*

*Lumber Co.*, 329 F. Supp. 2d 737, 745 (E.D. Va. 2004) (holding that "plaintiff is constitutionally

entitled to trial by jury" and reasoning "while the overall ERISA action is equitable in nature, the

particular issues involved in that action may be legal [and] [s]uch appears to be the case here, as

plaintiff's suit to recover what is due and owing under a benefits plan essentially presents an action at

law to recover a legal entitlement").  Thus, there can be no serious question that Plaintiff's jury demand

is proper.[10]

---

[10]ING, in its Partial Motion, ignores *Great-West*, as well as *Periera*; choosing, instead, to principally cite cases that either pre-date *Great-West* or were brought under sections of ERISA other than ERISA §§ 502(a)(2) and 409(a) alleging fiduciary breach.  Unlike *Great-West* and *Periera*, none of the authorities cited by ING is binding on this Court.  ING simply parrots the same concept throughout their papers -- that no jury trial is available because ERISA claims were derived from the law of trusts and, thus, are always equitable in nature -- which the Supreme Court and Second Circuit have now expressly rejected in *Great-West* and *Periera*.  In light of *Great-West* and *Periera*, at best, ING's "analysis" is incomplete and unpersuasive.  To the contrary, Plaintiff respectfully submits that it is now clear that ERISA claims seeking legal, monetary relief must be tried to a jury.  At the very minimum, as the Honorable Alfred V. Covello held in the similar case, *Phones Plus, Inc. v. Hartford Financial Services Group, Inc.*, Civil No. 3:06-CV-1835(AVC)(September 30, 2008)(slip opinion), a true and correct copy of which is attached as Exhibit "A," the Court should hold that Plaintiff is entitled to a jury trial to the extent it seeks damages for losses to the Plans.  *Id*. at 10-11.  Although Plaintiff respectfully disagrees with certain of the reasoning and the entire result reached by Judge Covello in the *Phones Plus* case, this decision establishes that, at the very least, certain of the claims asserted by Plaintiff are legal in nature and that a right to jury trial attaches. *See* Complaint at ¶¶ 9, 107.  As Plaintiff believes that the better reasoned position is that a right to jury trial attaches to all of Plaintiff's claims, Plaintiff respectfully submits that the Court should adopt that position.

## V.    CONCLUSION

For all of the reasons explained above, Plaintiff respectfully submits that Defendant's Partial

Motion to Dismiss should be denied.  As Plaintiff's independent investigation continues and the parties

have agreed to engage in limited discovery pending adjudication of this Partial Motion, Plaintiff

respectfully requests leave to amend pursuant to Fed.R.Civ.P. 15 to the extent the Court identifies any

infirmity in Plaintiff's initial Complaint.

Respectfully submitted,


/s/ Patrick A. Klingman
James E. Miller (ct21560)
Patrick A. Klingman (ct17813)
Laurie Rubinow (ct27243)
Karen M. Leser-Grenon (ct23587)
Shepherd Finkelman Miller & Shah, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120
Email: jmiller@sfmslaw.com
       pklingman@sfmslaw.com
       lrubinow@sfmslaw.com
       kleser@sfmslaw.com

Scott R. Shepherd
Eric L. Young
Shepherd Finkelman Miller & Shah, LLP
35 East State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (610) 891-9883
Email:  sshepherd@sfmslaw.com
       eyoung@sfmslaw.com

Attorneys for Plaintiff and the Proposed Class

-40-

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2011, a copy of the foregoing Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss, or alternatively, to Enforce Arbitration was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


/s/ Patrick A. Klingman
Patrick A. Klingman (ct17813)