## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HEALTHCARE STRATEGIES, INC., Plan Administrator of the Healthcare Strategies, Inc. 401(k) Plan and the Healthcare Strategies, Inc. CBU 401(k) Plan, On Behalf of Itself and All Others Similarly Situated, | : : : : : : | |
| Plaintiff, | : : | |
| vs. | : : | No. 3:11-cv-00282 (JCH) |
| ING LIFE INSURANCE AND ANNUITY COMPANY, | : : : | |
| Defendant. | : : | December 3, 2012 |
| _____ | : | |

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
## THE MOTION FOR SUMMARY JUDGMENT OF DEFENDANT,
## ING LIFE INSURANCE AND ANNUITY COMPANY

---

| | |
|---|---|
| James E. Miller | Scott R. Shepherd |
| Laurie Rubinow | James C. Shah |
| Karen M. Leser-Grenon | Eric L. Young |
| Shepherd, Finkelman, Miller & Shah, LLP | Shepherd, Finkelman, Miller & Shah, LLP |
| 65 Main Street | 35 East State Street |
| Chester, CT  06412 | Media, PA 19063 |
| Telephone: (860) 526-1100 | Telephone: (610) 891-9880 |
| Facsimile: (860) 526-1120 | Facsimile: (610) 891-9883 |
| E-mail: jmiller@sfmslaw.com | E-mail:  sshepherd@sfmslaw.com |
| lrubinow@sfmslaw.com | jshah@sfmslaw.com |
| kleser@sfmslaw.com | eyoung@sfmslaw.com |

Attorneys for Plaintiff, Healthcare Strategies, Inc.

## TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.      INTRODUCTION AND SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.      Standard Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        B.      ING's Hypocritical Assertion That Its Receipt Of RSPS Comports With Long-
                Standing Practices Deemed Acceptable By The DOL In 1997 Finds No Support
                In The Facts Or Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        C.      ING Acts As A Fiduciary When It Receives The RSPs . . . . . . . . . . . . . . . . . . . . . 7

                1.      ING Was A Fiduciary When It Received The RSPs Because It Owned
                        And Exercises Authority And Control Over The Separate Accounts . . . . . . . . . . . 8

                2.      ING Was A Fiduciary When It Received The RSPs Because Of Its
                        Discretionary Authority In The Administration Of The Separate
                        Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                3.      ING Was A Fiduciary When It Received The RSPs Because Of Its
                        Discretionary Authority To Add, Delete, Or Substitute Funds . . . . . . . . . . . . . 14

                4.      ING Was A Fiduciary When It Received The RSPs Because It Exercised
                        Its Discretionary Authority To Add, Delete, Change
                        Or Substitute Funds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                5.      ING Was A Fiduciary When It Received The RSPs Because It Exercised
                        Discretionary Authority And Control Not To Offer, Purchase, Or
                        Substitute Institutional And Other Lower Cost Share Classes . . . . . . . . . . . . . 20

                6.      ING Was A Fiduciary When It Received The RSPs Because It Exercised
                        Discretionary Authority To Re-Invest The Mutual Fund Dividends
                        Generated By The Separate Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

                7.      ING Was A Fiduciary When It Received The RSPs Because Of Its
                        Discretionary Authority To Self-Determine And Draw Its Own
                        Compensation Directly From The Separate Accounts . . . . . . . . . . . . . . . . . . . 23

                8.      ING Was A Fiduciary When It Received The RSPs Because It Exercised
                        Its Discretionary Authority To Self-Determine And Draw Its
                        Compensation Directly From The Separate Accounts . . . . . . . . . . . . . . . . . . . 24

D.  ING Acted As A Fiduciary In Connection With Its Receipt Of The RSPs. . . . . . . . . . . . . 24

E.  ING's Mischaracterization Of Count I of Plaintiff's Complaint
Is UnPersuasive. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

F.  Plaintiff's Claims Asserted in Counts I And II Are Not Time-Barred
And Summary Judgment Is Not Warranted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

1.  Legal Standard For Determining Actual Knowledge. . . . . . . . . . . . . . . . . . . . . 28

2.  HSI's Purported Knowledge Of The Existence Of RSPs Does Not
Constitute Actual Knowledge Of ING's ERISA Violations. . . . . . . . . . . . . . . . 32

3.  ING Has Failed To Show That No Factual Dispute Exists As To
Whether HSI Had Actual Knowledge Of ING's ERISA Violations. . . . . . . . . . . 35

a.  HSI Did Not Have Actual Knowledge Of ING's
Fiduciary Status. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

b.  HSI Did Not Have Actual Knowledge That ING's Receipt Of
RSPs Was In Connection With Its Fiduciary Status Or
Otherwise Involved Self-Dealing With Plan Assets. . . . . . . . . . . . . . . . . 37

G.  ING Has Failed To Demonstrate That Summary Judgment Is Warranted
For Plaintiff's Alternative, Count III Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

III.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Acosta v. Pacific Enterprises,*
950 F.2d 611, 618 (9th Cir..1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Agway, Inc. Employees' 401(k) Thrift Investment Plan v. Magnuson,*
2006 WL 2934391 (N.D.N.Y. Oct. 12, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 35

*Anderson v. Liberty Lobby, Inc.,*
447 U.S. 242, 255 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Beddall v. State St. Bank & Trust Co.,*
137 F.3d 12 (1st Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Blatt v. Marshall,*
812 F.2d 810, 812, 813 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 16

*Bouboulis v. Transp. Workers Union of America,*
442 F.3d 55, 63, 65 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 13

*Briscoe v. Fine,*
444 F.3d 478, 490-94 (6th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Brock v. Nellis,*
809 F.2d 753, 755 (11th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Caputo v. Pfizer, Inc.,*
267 F. 3d 181, 193 (2nd Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Carlton v. Mystic Transp., Inc.,*
202 F. 3d 129, 134 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Celotex Corp. v. Catrett,*
477 U.S. 3617 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Chao v. Day,*
436 F.3d 234, 236 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Chao v. Emerald Capital Management, Ltd.,*
2006 WL 2620055 (W.D.N.Y. Sept. 13, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Chao v. Unique Mfg. Co., Inc.,*
649 F. Supp.2d 827 (N.D. Ill. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Charters v. John Hancock Life Ins. Co.,*
583 F. Supp. 2d at 189, 199 (D. Mass. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 23

*Coldesina v. Estate of Simper,*

407 F.3d 1126, 1132 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 16

*Daniels v. National Employee Benefit Services, Inc.*,
858 F. Supp. at 692. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Drolett v. DeMarco*,
2007 WL 1851102 (D. Conn. June 24, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Eaton v. D'Amato*,
581 F.Supp. 743 (D.D.C. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Fechter v. Connecticut General Life Ins. Co.*,
798 F. Supp. 1120 (E.D. Pa. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*FirsTier Bank, N.A. v. Zeller*,
16 F.3d  907, 911 (8th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Frommert v. Conkright*,
433 F.3d 254, 271 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

*Graham v. Long Island R.R.*,
230 F.3d 34, 38 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Greenblatt v. Prescription Plan Serv. Corp.*,
783 F. Supp. 814, 824 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Haddock v. Nationwide Fin. Servs., Inc.*,
*419 F. Supp. 25, 159 (D. Conn. 2006)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Haddock v. Nationwide Financial Services, Inc.????*,
*262 F.R.D. 97, 108, 126 (D. Conn. 2009)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14, 26

*Harris Trust & Sav. v. John Hancock Mut. Life Ins. Co.*,
302 F.3d at 18, 28 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Harris Trust and Savings Bank v. Salomon Smith Barney, Inc.*,
530 U.S. 238 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Herman v. NationsBank Trust Co.*,
126 F.3d 1354, 1367 (11th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re State Street Bank and Trust Co. Erisa Litigation*,
579 F. Supp. 2d 512, 518-519 (S.D.N.Y. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*IT Corp. v. Gen. Am. Life Ins. Co.*,
107 F.3d 1415, 1421 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13

*John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*,
510 U.S. 86, 100-101 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Leigh v. Engle,*
727 F.2d 113, 123 (7th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 35

*L. I. Head Start Child Development Services, Inc.,*
558 F. Supp. 2d at 393. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Leimkuehler v. Am. United Life Ins. Co.,*
WL 28608 (S.D. Ind. Jan. 5, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 19, 20

*Lockheed Corp. v. Spink,*
517 U.S. 882, 888-889 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*LoPresti v. Terwilliger,*
126 F.3d 34, 40 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 19

*Lowen v. Tower Asset Mgmt., Inc.,*
829 F.2d 1209, 1213, 1215 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 27

*Mack Boring and Parts v. Meeker Sharkey Moffitt,*
(930 F.2d 267, 275 (3d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Martin v. Schwab,*
1992 WL 296531 (W.D. Mo. Aug. 11, 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Midwest Community Health Service, Inc. v. American United Life Ins. Co.,*
255 F.3d 374 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Nationwide Life Ins. Co. v. Haddock,*
460 Fed. App'x. 26 (2d Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Olson v. E.F. Hutton & Co., Inc.,*
957 F.2d 622, 625 (8th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Pegram v. Herdrich,*
530 U.S. 211, 223 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Michigan,*
654 F.3d 618, 623-24 (6th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Pugliese v. United Technologies Corp.,*
552 F. Supp. 2d 266, 269 (D. Conn. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Reich v. Cook,*
94cv2069, slip op. At 10-11 (D. Conn. Mar. 24, 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Silverman v. Mutual Ben. Life Ins. Co.,*
138 F.3d 98, 104 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Smith v. IBT Local 819 Pension Plan,*
291 F.3d 236 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Sologub v. City of New York,*
202 F.3d 175, 178 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Srein v. Frankford Trust Co.,*
323 F.3d 214, 221 (3d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Tool v. National Employee Ben. Services., Inc.,*
957 F. Supp. 1114 (N.D. Cal. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Trustees of Laborers' Local No. 72 Pension Fund. v. Nationwide Life Ins. Co.,*
783 F. Supp. 899 (D.N.J. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Trs. of the Graphic Commcn's Int'l Union Upper Midwest Local 1M Health & Welfare Plan
v. Bjorkedal,*
516 F 3d 719 (8th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Tybout v. Karr Barth Pension Admin., Inc.,*
819 F. Supp. 371 (D. Del. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Glick,*
142 F.3d 520, 527-28 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Lucien,*
347 F.3d 45, 51 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Warner,*
396 F. Supp. 2d 924, 937 (N.D. Ill. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Varity Corp. v. Howe,*
516 U.S. 489, 502 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*White v. ABCO Engineering Co.,*
221 F.3d 293, 300 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Yeseta v. Baima,*
837 F.2d 380, 384-85 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Zang v. Paychex, Inc.,*
728 F. Supp. 2d 261 (W.D.N.Y. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

## **OTHER AUTHORITIES**

*In re Aetna Life Ins. & Annuity Co.,*
1997 WL 277979 (May 22, 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

*In re Frost Nat'l Bank,*
1997 WL 277980 (May 22, 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

Plaintiff, Healthcare Strategies, Inc. ("HSI"), individually in its capacity as the Plan

Administrator of the Healthcare Strategies, Inc. 401(k) Plan and the Healthcare Strategies, Inc. CBU

401(k) Plan (the "HSI Plan"), and on behalf of the Class of retirement plan administrators certified by

this Court on September 27, 2012, respectfully submits this Memorandum of Law in Opposition to the

Motion for Summary Judgment (the "Motion" or "Motion for Summary Judgment") of Defendant, ING

Life Insurance and Annuity Company ("Defendant" or "ING").[1]

I.      **INTRODUCTION AND SUMMARY OF ARGUMENT**

        ING's Motion for Summary Judgment deserves scant attention from this Court because it

misstates applicable law and ignores the actual facts of record, including facts establishing that material

issues of fact exist that require a trial on the merits.  Indeed, as explained below and in Plaintiff's

accompanying Response and Counter-Statement of Facts ("RCS") pursuant to Local Civil Rule 56(a)2,

ING's Statement of Material Facts pursuant to Local Civil Rule 56(a)1, despite its title, largely consists

of a statement of immaterial and misleading "facts."[2]  When stripped away of the false gloss that it

attempts to place on this case, however, ING's "defense" to its conduct, like The Emperor in Hans

Christian Anderson's classic children's story, is revealed to be naked and without truth or substance.

        As ING's Motion ignores, this case is about ING's lucrative 401k business that bases its program

architecture on critical violations of ERISA.  Despite ING's effort to convince the Court that its conduct

should be excused because "everybody does it" or that ING somehow disclosed its conduct and practices,

---

[1]This is an action for equitable relief and damages under the Employee Retirement Income Security Act ("ERISA" or "Act"), 29 U.S.C. §§1001 *et seq*., in which Plaintiff seeks to recover, for the benefit of its 401(k) Plans and all other similarly situated retirement plans, also known as employee pension benefit plans under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), which is subject to Internal Revenue Code ("IRC") § 401(k), payments from mutual funds, mutual fund advisors, investment funds, including collective trusts, and/or other investment instruments (collectively, "mutual funds") to ING ("the revenue sharing payments" or the "RSPs").

[2]Indeed, ING's Motion is essentially part "Emperor's New Clothes," *see* Anderson, Eventyr, fortalte for Børn ("Fairy Tales, Told for Children")(1837) and part a typical kickback-related "everybody does it defense." http://www.forbes.com/2004/10/15/cx_da_1015topnews.html (for a discussion of Marsh & McLellan's use of the everybody does it defense in an attempt to defend its receipt of kickbacks).  First, ING purports to offer the Court its own version of a hornbook on ERISA, where the author apparently hopes that the reader will not review the underlying legal and factual authority, or examine the logic (or lack thereof), of the authority upon which ING's principal arguments are made.

the facts of record confirm that this assertion is absolutely untrue.  It is undisputed that, unlike other service providers that use RSPs as a dollar-for-dollar offset against expenses that retirement plans would otherwise pay (like the service provider for which ING's own expert, E. Scott Peterson, worked for a number of years - as explained in HSI's RCS),[3] or service providers that provide retirement plans with advance notification with respect to changes in the available universe of investments before making any changes (as well as an effective opportunity to accept or reject such changes), as sanctioned by the Department of Labor ("DOL") in Advisory Opinions, it is crystal clear that ING engages in no such dollar-for-dollar offset (nor could it based on the manner in which it accounts for revenues and expenses) and that ING provides no meaningful or adequate advance notification of changes in the universe of available investments (much less an ability by retirement plan customers to terminate their relationship with ING without penalty when such changes occur).  ING uses the economic value of the separate accounts for which it serves as a fiduciary to negotiate kickbacks from the mutual fund complex that bear no relationship to services provided to the mutual fund companies or the Plans.  Despite all of ING's caviling and carping (and accompanying claims of disclosure), it is beyond dispute that ING never notified HSI or any of the Plans as to the true nature of the RSPs or that it was receiving the RSPs in connection with its fiduciary status.  Given ING's approach to date, Plaintiff has little doubt that, at least for right now, like The Emperor, ING will continue to "hold[] [its] head high and continue[] the procession" -- at least until ING engages in true self-examination or the Court puts a stop to its unlawful conduct.  The Court should recognize ING's "defenses" for what they are -- non-existent -- and disclose their true nature by summarily denying ING's Motion.[4]  For the reasons explained fully below, HSI respectfully submits that ING's Motion for Summary Judgment should be denied.

---

[3]In light of Mr. Peterson's admission that his former employer actually credited RSPs on a dollar-for-dollar basis to the benefit of retirement plans and adopted this methodology in an effort to be transparent regarding its fees and services (RCS, ¶ 11), it is perhaps unsurprising that Mr. Peterson has disappeared from the case and is not featured in ING's Motion for Summary Judgment.

[4]HSI incorporates by reference its RCS, which facts are referenced in response to ING's arguments in this Memorandum in the context of the arguments raised by ING.

## II.   ARGUMENT

### A.   Standard Of Review

It is well settled that on a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *Drolett v. DeMarco,* No 3:05-CV-1335 (JCH), 2007 WL 1851102, at *1 (D.Conn. June 24, 2007); *White v. ABCO Engineering Corp.*, 221 F.3d 293, 300 (2d Cir.2000). Once the moving party has met its burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial" and present such evidence as would allow a jury to find in his favor in order to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir.2000). "In determining whether the record presents genuine issues for trial, the court must view all inferences and ambiguities in a light most favorable to the non-moving party." *Pugliese v. United Technologies Corp.*, 552 F.Supp.2d 266, 269 (D. Conn. 2008) (citations omitted). "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir.2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the trier of fact. *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir.2000). Application of this standard results in one conclusion: ING's Motion should be denied.

### B.   ING's Hypocritical Assertion That Its Receipt Of RSPs Comports With Long-Standing Practices Deemed Acceptable By The DOL In 1997 Finds No Support In The Facts Or Applicable Law

ING brazenly begins its substantive arguments, as part of its desperate effort to avoid liability in this case, by asserting that the acceptance of RSPs has long been deemed acceptable by the DOL and that ING's conduct complies with the DOL's guidance on the subject.[5] ING is wrong on both counts.

---

[5]ING also attempts to create a "straw man" by asserting that it is HSI's position that an insurance company's receipt of RSPs is *per se* unlawful in all cases - by citing to paragraph 76 of HSI's Complaint. *See* ING's Memorandum at 13. ***Not so.*** As the Complaint makes clear, it simply is HSI's position that, under the facts of this case, ING's receipt and retention of RSPs "for its own account" is *per se* illegal because it constitutes a prohibited

As this Court is well aware, in 1997, the DOL approved of service providers' receipt of RSPs in two limited circumstances and provided substantial guidance to providers, such as ING, as to the manner in which RSPs could permissibly be accepted (and, conversely, provided significant guidance regarding actions that could be deemed violative of ERISA). *See In re Frost National Bank*, DOL Opinion No. 97-15A, Pens. Plan Guide (CCH) P 19,986N, 1997 WL 277980 (May 22, 1997)(the "*Frost Letter*"); *In re Aetna Insurance Company*, Opinion No. 97-16A, Pens. Plan Guide (CCH) P 19,986O, 1997 WL 277979 (May 22, 1997)(the "*Aetna* Letter"). ING's suggestion that its conduct complies with that of the *Frost Letter* and the *Aetna Letter* flies in the face of the evidence and is patently absurd.

In the *Frost Letter*, the DOL approved a fiduciary's receipt of RSPs in the following delimited circumstances:

> [T]he terms of Frost's ***fee arrangements with the mutual fund families will be fully disclosed to the Plans***. In addition, Frost's trustee agreement with a Plan will be structured so that any 12b-1 or subtransfer agent fees received by Frost that are attributable to the Plan's investment in a mutual fund will be used to benefit the Plan. Pursuant to the particular agreement with each Plan, Frost will offset such fees, ***on a dollar-for-dollar basis***, against the trustee fee that the Plan is obligated to pay Frost or against the recordkeeping fee that the Plan is obligated to pay to a third-party recordkeeper; or Frost will credit the Plan directly with the fees it receives based on the investment of Plan assets in the mutual fund. The trustee agreement will provide that, ***to the extent that Frost receives fees from mutual funds in connection with the Plan's investments that are in excess of the fee that the Plan owes to Frost***, the Plan will be entitled to the excess amount.

*Id.* at * 2 (emphasis added). Here, ING's fee arrangements with mutual fund families are not fully disclosed to the Plans, the RSPs are not credited to the benefit of the Plans on a dollar-for-dollar basis and there is no provision in ING's contract documents providing that, where the amount of the RSPs exceed the amount due from the Plans, the Plans will receive the excess amount. (RCS, ¶¶ 11, 23, 160-163.) Thus, it ING has no factual or evidentiary basis to suggest that it complies with the DOL's guidance, as contained in the *Frost Letter*. Moreover, the *Frost Letter* essentially establishes ING's fiduciary status: "[y]our submission indicates, however, that Frost ***reserves the right to add or remove mutual fund families that it makes available to Plans*** [and] [u]nder these circumstances, we are unable

---

transaction in violation of Section 406(b) of ERISA. 29 U.S.C. § 1106(b).

to conclude that Frost would not *exercise any discretionary authority or control to cause the Plans to invest in mutual funds that pay a fee or other compensation to Frost.*" *Id.* at * 3, *citing* "the [DOL]'s position as expressed in the preamble to the final regulation regarding participant-directed individual account plans (ERISA section 404(c) plans), 57 Fed. Reg. 46906, 46924 n. 27 (Oct. 13, 1992): '... the [DOL] points out that *the act of limiting or designating investment options which are intended to constitute all or part of the investment universe of an ERISA 404(c) plan is a fiduciary function* which, whether achieved through fiduciary designation or express plan language, is not a direct or necessary result of any participant direction of such plan.'" (Emphasis added.)  That is because ING indisputably holds and exercises the discretionary authority and control to add, delete, change and substitute investment options for the Plans.  (RCS, ¶¶ 42, 95, 148-155.)

Likewise, in the *Aetna* Letter, the DOL's opinion was predicated on (a) a fulsome disclosure of the amount and nature of the RSPs, including the services provided to mutual funds in return for the RSPs, *Id.* at * 2; (b) that the contracts at issue provided "[e]ither party [with the right to] terminate the arrangement without penalty on 60 days written notice," *Id.*; (c) that the service provider's contract only provided a right to modify the agreement by deleting or replacing an investment option if 60 days notice was provided to the Plans; *Id.* at * 3; (d) that the service provider's notice "would: (1) explain the proposed modification to the ... menu; (2) *fully disclose any resulting changes in the fees paid to* [the service provider] by the Plan, or *by any other entity with respect to Plan assets invested in the affected Funds*; (3) identify the effective date of the change; (4) *explain the Plan fiduciary's right to reject the change or terminate the agreement*; and (5) reiterate that, pursuant to the contract provisions agreed to by the Plan fiduciary, failure to object [would] be treated as consent to the proposed change. *Id.* (emphasis added); (e) if a Plan fiduciary rejected a proposed deletion or substitution, the service provider is not authorized to make any change and the Plan fiduciary is provided with an additional 60 days to identify another service provider, thereby providing each of the Plans with at least 120 days to reject any proposed deletion or substitution, *Id.*; and (f) an assumption that the service provider at issue was not the

owner of separate accounts, which would render it a fiduciary and materially alter the analysis ("[y]ou have assumed that ALIC, an affiliate under common control with ALIAC, is a fiduciary with respect to the Plans by virtue of exercising authority or control over Plan assets invested in separate accounts maintained by ALIC [but] [t]here is nothing, however, in your submission to indicate that ALIAC is in a position to (or in fact does) exercise any authority or control over those assets [and] [a]ccordingly it does not appear that ALIAC would be considered a fiduciary merely as a result of its affiliation with ALIC.") *Id.* at * 6. But, in this case, ING's conduct flaunts virtually each and every material requirement of the *Aetna Letter*: (a) ING has not provided accurate or fulsome disclosures regarding RSPs; (b) the Group Contracts do not provide the Plans with the right to terminate the agreements without penalty on 60 days written notice; (c) ING's Group Contracts do not require any period of notice before a deletion or substitution is accomplished at ING's discretion; (d) any notices provided by ING do not disclose the amount of the RSPs associated with a deletion or substitution; (e) any notices provided by ING do not explain that the Plans have the right to reject the change or terminate the Group Contracts; (f) any notices provided by ING do not explain that if the Plans reject a deletion or substitution, ING is not authorized to make any change or that the Plans are provided with an additional 60 days to identify another service provider, thereby providing each of the Plans with at least 120 days to reject any proposed deletion or substitution; and (g) ING is the owner of the Separate Accounts and, therefore, is a fiduciary of the Plans, thereby rendering the entire analysis of the *Aetna Letter* inapplicable. (RCS, ¶¶ 138-143, 149, 208-214.) Thus, ING's invocation of the *Frost* and *Aetna Letters* defies credulity and speaks volumes as to the legitimacy of its Motion.[6]

---

[6]ING's reference to the Working Group on Fiduciary Responsibilities and Revenue Sharing Practices, *see* Defendant's Memorandum at 15, borders on the nonsensical in light of its explicit admission that it does not represent the position of the DOL. *Id.* at n. 22.

C.      **ING Acts As A Fiduciary When It Receives The RSPs**

ERISA Section 3(21)(A) provides that "a person is a fiduciary with respect to a plan to the

extent:

> (i) he exercises any **discretionary authority or discretionary control respecting management of such plan** or **exercises any authority or control respect management or disposition of its assets**, or ...
>
> (iii) he **has any discretionary authority or discretionary responsibility in the administration of such plan.**

29 U.S.C. § 1002(21)(A)(emphasis added).[7] ERISA construes the term fiduciary broadly.  *See Frommert*

*v. Conkright*, 433 F.3d 254, 271 (2d Cir. 2006).[8]

Under the rubric of ERISA Section 3(21)(A) and the instruction that an ERISA fiduciary is to be

broadly construed, ING was acting as fiduciary to the Plans when it received the RSPs at issue for at least

eight (8) independent reasons: (1) ING's exercise of ownership and control of the Separate Accounts; (2)

ING's discretionary authority in the administration of the Separate Accounts; (3) ING's discretionary

authority to add, delete, change or substitute mutual funds from the menu available for the Separate

Accounts; (4) ING's exercise of discretionary authority to add, delete, change or substitute mutual funds

from the menu available for the Separate Accounts;  (5) ING's exercise of discretionary authority not to

offer, purchase, and substitute institutional share classes; (6) ING's exercise of discretionary authority to

re-invest the mutual fund dividends generated by the Separate Accounts; (7) ING's discretionary

---

[7]Plaintiff provides the complete text of subsections (i) and (iii) of ERISA Section 3(21)(A) since ING self-servingly truncates subsection (i).  *See* ING's Mem. at 16.

[8]The "test" for determining whether a person is an ERISA fiduciary is "functional," and not tethered to any disclaimer or title.  *See LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997). "[Section] 1002(21)(A) creates a bifurcated test: 'Subsection one imposes fiduciary status on those who exercise discretionary authority, regardless of whether such authority was ever granted.  Subsection three describes those individuals who have actually been granted discretionary authority, regardless of whether such authority is exercised.'" *Bouboulis v. Transp. Workers Union*, 442 F.3d 55, 63 (2d Cir. 2006) (*quoting Olson v. E.F. Hutton & Co.*, 957 F.2d 622, 625 (8th Cir. 1992)). Additionally, the second subpart to subsection one of 29 U.S.C. § 1002(21)(A) has no "discretionary requirement" for imposing fiduciary status on a person who "exercises **any** *authority or control* respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i) (emphasis added); *see, e.g., IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997) ("The statute treats control over the cash differently than control over administration [and] "[t]he statutory qualification, that control must be 'discretionary' for it to establish fiduciary status, applies to the first and third phrases, management and administration but not to the second, assets [because] '[a]ny' control over disposition of plan money makes the person who has control a fiduciary").

authority to self-determine and draw its compensation directly from the Separate Accounts; (8) ING's exercise of discretionary authority to set and draw its compensation directly from the Separate Accounts.

Although Plaintiff must prove *at trial* that ING is a fiduciary, on a motion for summary judgment, the burden is on ING, as the moving party, to show that "there is no genuine issue as to any material fact" and that ***it was not a fiduciary*** when it received the RSPs.  Fed. R. Civ. P. 56(c). Moreover, once ING is shown to be a fiduciary to the Plans, as ING's Motion for Summary Judgment **critically and fatally ignores**, the burden is on ING to show that its receipt of RSPs was ***not* "*in connection with*"** its fiduciary status.  *See Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1215 (2d Cir. 1987) ("We believe that a fiduciary charged with a violation of Section 406(b)(3) either must prove by a preponderance of the evidence that the transaction in question fell within an exemption, [citation omitted], or must prove by clear or convincing evidence that compensation it received was for services other than a transaction involving the assets of a plan")(emphasis added).  Not only has ING failed to meet this significant burden, the facts clearly show that ING received the RSPs directly "in connection with" its fiduciary status.

> 1.   ING Was A Fiduciary When It Received The RSPs Because It Owned
>       And Exercises Authority And Control Over The Separate Accounts

It is undisputed that the Separate Accounts at issue hold the Plans' assets, that ING manages and administers the Separate Accounts and that ING is the legal owner of and maintains sole possession, title, and control of the Separate Accounts.  (RCS, ¶¶ 138-141.)  It also is undisputed that a mutual fund will only provide RSPs to ING when ING delivers the Plans' assets to the mutual funds by and through the Separate Accounts.  (RCS, ¶ 142.)  In other words, the Separate Accounts are the delivery mechanism that ING utilizes to obtain the RSPs.  In fact, ING's participation agreements with the mutual funds explicitly reference the Separate Accounts and ING's ownership of them in connection with the mutual funds' agreement to pay Defendant the RSPs.  (RCS, ¶¶ 58, 67, 148, 165, 168.)  Thus, in direct return for delivering retirement assets from the Separate Accounts to the mutual funds, ING receives the revenue

sharing kickbacks at issue.[9]   Accordingly, ING is a fiduciary to the Plans when it manages the Separate

Accounts under the second subpart to ERISA Section 3(21)(A)(i) because it "exercises" its indisputable

authority and control over the Plans' assets in the Separate Accounts.  Moreover, the RSPs that ING

receives is directly related to its role managing the Separate Accounts because mutual funds would not

otherwise provide ING those RSPs, and ING asserts that it accepts those payments as a result of its status

as the sole shareholder of the Separate Accounts.[10]

---

[9]ING admits the direct connection between its status as the owner of the Separate Accounts and its receipt of RSPs when it asserts that mutual funds provide RSPs in part because "they 'recognize that there will be a substantial savings in administrative expense and recordkeeping expenses by virtue of having **one shareholder** [through ING's Separate Accounts] **rather than multiple shareholders** [if each Plan had its own account].'" [Dkt. No. 112-2, ¶ 63.]

[10]ING attempts to disclaim that fiduciary status by asserting that its managing role amounted to "little more than mechanical administration and booking," *i.e.* purely "ministerial" acts.  [Dkt. No. 112-1, at 24.]  This argument finds no support in the law.  *See* 29 U.S.C. § 1002(21)(A)(i) ("a person is a fiduciary with respect to a plan to the extent he . . . exercises *any* authority or control") (emphasis added).  As the court in *Chao v. Unique Mfg. Co., Inc.*, 649 F. Supp. 2d 827 (N.D. Ill. 2009), explained while rejecting the same "ministerial" argument ING puts forth:

> The Seventh Circuit has not addressed the issue, *but the majority of other circuits have held that the exercise of even **ministerial control or authority over plan assets will be sufficient to make a person or entity a fiduciary*.  See Briscoe v. Fine*, 444 F.3d 478, 490-94 (6th Cir. 2006); *Chao v. Day*, 436 F.3d 234, 236 (D.C. Cir. 2006); *Coldesina v. Estate of Simper*, 407 F.3d 1126, 1132 (10th Cir. 2005); *Srein v. Frankford Trust Co.*, 323 F.3d 214, 221 (3d Cir. 2003); *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997); *IT Corp. v. General Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997); *FirsTier Bank, N.A. v. Zeller*, 16 F.3d 907, 911 (8th Cir. 1994) . . . The majority view of the circuit courts, which is consistent with the plain language of the statute, will be followed.

*Chao*, 649 F. Supp. 2d at 823-33 (emphasis added); *see also LoPresti*, 126 F.3d at 40 (2d Cir. 1997) (finding defendant who had "ministerial" responsibilities a fiduciary and citing *Reich v. Cook*, 94cv2069, slip op. at 10-11 (D. Conn. Mar. 24, 1997), which held that defendants fell within the ambit of section 1002(21)(A) where, even though other employees processed checks for their signature, they were the only signatories on the corporate account, and they "retained the authority to instruct those employees as to what checks to process and what monies were to be paid out").  ING cites *Blatt*, *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Michigan*, 654 F.3d 618 (6th Cir. 2011) ("*Pipefitters*"), *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12 (1st Cir. 1998), and *Haddock v. Nationwide Fin. Serv., Inc.*, 419 F. Supp. 25 159 (D. Conn. 2006) ("*Haddock IV*") for its "ministerial" defense, but none provides actual support.  [Dkt. No. 112-1, at 24.]  The situation in *Beddall* was quite unique and distinct -- the agreement between the plan and the trustee allowed the plan's administrative committee to micromanage the defendant trustee's creation and control of the separate accounts, which it proceeded to do, and appoint individual investment managers who "relieved the [defendant] of all fiduciary responsibility." *Beddall*, 137 F.3d at 19-21.  Meanwhile, in *Platt* and *Pipefitters*, the courts actually found that, notwithstanding the defendants' protestations that their roles were "ministerial," effective control over the plan assets in the former and legal title of the plan assets in the latter were sufficient "control" of plan assets to confer fiduciary status.  *See Blatt*, 812 F.2d at 813 ("When [defendants] ignored [plaintiff's] requests and delayed executing the Notice of Change form [which was purportedly ministerial], they effectively prevented the Retirement Committee from returning [the plaintiff's] vested

ING also attempts to argue that RSPs are unrelated to ING's duties of ownership and management of the Separate Accounts because there is no evidentiary support that ING uses its control of the Separate Accounts to "leverage" RSPs. [Dkt. No. 112-1, at 24-25.]  First, as noted above, the burden is on ING to prove the same by clear or  convincing evidence -- which burden it has not even attempted to meet (much less met).  *Lowen*, *supra* at 1215.  Second, the reason for ING's failure to even attempt to meet this burden is plain – any argument that there was no connection between ING's fiduciary status with respect to the Separate Accounts and its receipt of RSPs is patently absurd.  As discussed above, ING only receives revenue-sharing ***because*** of its ownership and management of the Separate Account assets, which ING does not, because it cannot, refute.  Not only has ING failed to show that "there is no genuine issue as to any material fact" that it received RSPs "in connection with" its ownership and management of the Separate Accounts, it would be impossible for ING to do so.

2.   ING Was A Fiduciary When It Received The RSPs Because Of Its
     Discretionary Authority In The Administration Of The Separate Accounts

The plain language of ERISA is fully consistent with congressional intent to impose *per se* fiduciary status on any insurance company holding plan assets in separate accounts, such as ING here.[11] Congress exempted certain financial arrangements from giving rise to a fiduciary duty by excluding them from the definition of "plan assets" in 29 U.S.C. § 1101(b)(2).  But Congress omitted assets held in separate accounts from this exemption, and expressly provided that funds held in separate accounts are "plan assets."  *Id.*  In light of the clarity with which ERISA identifies funds held in separate accounts as

---

contributions to him"); *Pipefitters*, 654 F.3d at 623-24 ("We found the Fund's complaint stated a viable claim . . . alleg[ing] that the monetary assets were 'entrusted' to [defendant], which administered them within its authority as 'a fiduciary under ERISA'").  Finally, *Haddock IV* ruminated on the viability of the "ministerial" defense, but explained that "[s]everal courts have glossed over that distinction and have considered only whether a defendant exercised discretionary control, not whether the defendant exercised *any* control over plan assets," citing the statutory language and *Coldesina*, and concluding that "[i]t is not necessary for me to decide." *Haddock I*, 419 F. Supp. 2d at 167.

[11]The term "separate account" is a term of art under ERISA, defined at 29 U. S. C. 1002(17) as follows:

The term "separate account" means an account established or maintained by an insurance company under which income, gains, and losses, whether or not realized, from assets allocated to such account, are, in accordance with the applicable contract, credited to or charged against such account without regard to other income, gains, or losses of the insurance company.

plan assets, it is unsurprising that *it is black letter ERISA law that an insurance company owner of a separate account such as ING is a fiduciary*. *See Mack Boring and Parts v. Meeker Sharkey Moffitt*, 930 F.2d 267, 275 (3d Cir. 1991)("it is understood that assets placed in a separate account managed by an insurance company are separately managed and the insurance company's payments generally are based on the investment performance of these particular assets [and] [c]onsequently, insurance companies are to be responsible under the general fiduciary rules with respect to assets held under separate account contracts, and the assets of these contracts are to be considered as plan assets"); *In re State Street Bank and Trust Co. Erisa Litigation*, 579 F. Supp. 2d 512, 518-519 (S.D.N.Y. 2008) (holding that Prudential, by virtue of its ownership of separate accounts, was a fiduciary and had standing to assert claims against defendants on behalf of retirement plans with respect to allegedly inappropriate investments made through the separate accounts).[12]

The DOL's regulations explicitly provide that an insurer is a fiduciary with respect to a separate account because it administers the separate accounts:

> In general, an insurer is subject to ERISA's fiduciary responsibility provisions with respect to the assets of a separate account (other than a separate account registered under the Investment Company Act of 1940) to the extent that the investment performance of such assets is passed directly through to the plan policyholders. *ERISA requires insurers, in administering separate account assets, to act solely in the interest of the plan's participants and beneficiaries; prohibits self-dealing and conflicts of interest; and requires insurers to adhere to a prudent standard of care*. In contrast, ERISA generally imposes less stringent standards in the administration of general account contracts which were issued on or before December 31, 1998.

---

[12]Other courts have reached exactly the same conclusion. *See Tool v. National Employee Ben. Services, Inc.*, 957 F.Supp. 1114 (N.D. Cal. 1996) (insurance company was not an ERISA fiduciary, even though it held plan assets, as there was no allegation that it held plan assets in separate account); *Tybout v. Karr Barth Pension Admin., Inc.*, 819 F.Supp. 371 (D. Del. 1993)("[i]f insurance company maintains account for defined benefits plan, finances of which are independent of insurance company's own income, gains, or losses, separate account has been established, and exception to definition of asset under ERISA for guaranteed benefit policy would not apply"); *Trustees of Laborers' Local No. 72 Pension Fund v. Nationwide Life Ins. Co.*, 783 F.Supp. 899 (D.N.J. 1992) (pension plan's investment in insurance company, pursuant to insurance policy, to avoid categorization as "plan assets" subject to ERISA, must be deposited in insurance company's general account, not in a separate account, and policy must provide guaranteed benefits); *Fechter v. Connecticut General Life Ins. Co.*, 798 F.Supp. 1120 (E.D. Pa. 1991) (addressing investments in separate accounts and holding that "[w]e have no doubt that if plaintiffs can prove their allegations, then as a matter of law, Connecticut General is an ERISA fiduciary"). Indeed, the Supreme Court's decision in *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 100-101 (1993), is all about when an insurer becomes a fiduciary with respect to assets in its general account -- and that discussion is predicated on the understanding that an insurer, by law, is a fiduciary with respect to assets held in separate accounts.

29 C.F.R. § 2550.401c-1(d)(2)(c.)(emphasis added); *see also In re Aetna Life Ins. & Annuity Co.*, DOL Op. 97-16A, 1997 WL 277979 (May 22, 1997) ("*Aetna Letter*"), at *2 (recognizing that administration is inherent in the operation of the separate accounts in stating that "ALIC receives fees for administration and management of the GACs, including the separate accounts maintained in connection with the GACs").[13] This DOL regulation is extremely significant for at least two reasons.  First, the regulation recognizes that an insurer is involved in the administration of the separate accounts, thereby placing it squarely under the regulation of 1002(21)(A)(iii), which renders the insurer a fiduciary if it possesses discretion, whether exercised or not.  *See also Midwest Community Health Service, Inc. v. American United Life Ins. Co.*, 255 F.3d 374 (7th Cir. 2001) (holding that life insurer that issued group annuity contract was ERISA fiduciary since contracts were plan assets and the insurer had discretionary authority, whether exercised or not, with respect to contracts); *Herman v. NationsBank Trust Co.*, 126 F.3d 1354, 1367 (11th Cir. 1997) ("One participant might lose part of the value of his stake in the unallocated share pool due to another participant's imprudent decision or non-decision"); *Martin v. Schwab*, Case No. 91-5059-CV-W-1, 1992 WL 296531 * 5 (W.D. Mo. Aug. 11, 1992) (defendants' failure to appoint a committee was an exercise of their authority; *Eaton v. D'Amato*, 581 F.Supp. 743 (D.D.C. 1980) (holding that corporation was involved in more than ministerial duties and could be deemed fiduciary because it provided a range of administrative and management services under a series of service agreements that required it, among other things, to collect contributions, administer the funds' bank accounts and keep appropriate financial records).  Second, the regulation explicitly recognizes the importance of prohibiting ***self-dealing and conflicts of interest*** of the kind that exist in this case.  *See also* Christopher Grinnell, *ERISA Disclosure and Fiduciary Issues For Financial Service Providers: Fees And Revenue Sharing In Bundled Service Products*, Practicing Law Institute, Commercial Law and Practice Course Handbook Series, PLI Order No. 18506, at *871 (New York City, January 5-6,

---

[13]ING does not assert that the Separate Accounts were registered under the Investment Company Act of 1940 or that the investment performance of the assets in the separate accounts was not passed directly through to the plan policyholders.

2009)("ERISA's prohibited transaction restrictions are intended to protect the benefits of plan participants and beneficiaries by preventing transactions involving plan assets where there may be a conflict of interest or a risk of unfair dealing").[14]

Here, it is undisputed that ING administers the Separate Accounts. (RCS, ¶ 140.)  And as explained below, ING has discretionary authority when administering the Separate Accounts, including, as discussed below, the power to change the fund menu that the Separate Accounts access, changing the type of fund shares on the fund menu, setting and drawing its compensation directly from the Separate Accounts, and reinvesting dividends in the Separate Accounts.  Accordingly, ING also is plainly a fiduciary with respect to the Separate Accounts under 29 U.S.C. § 1002(21)(A)(iii).  And, as explained above, ING has not presented any evidence (much less clear or convincing evidence) to establish that ING's receipt of RSPs occurred in any manner other than in connection with that fiduciary status.  Thus, ING's summary judgment argument with respect to liability fails in this respect as well.[15]

_____

[14]The legislative history of ERISA also demonstrates that Congress intended that insurance companies holding plan assets in separate accounts would be fiduciaries under ERISA, given their exercise of control over plan assets.  As the Joint Conference Report's discussion of 29 U.S.C. § 1101 explains:

> [I]t is understood that assets placed in a separate account managed by an insurance company are separately managed and the insurance company's payments generally are based on the investment performance of these particular assets.  Consequently, insurance companies are to be responsible under the general fiduciary rules with respect to assets held under separate account contracts, and the assets of these contracts are to be considered plan assets.

H.R. Rep. No. 93-1280 at 296, WL ERISA-LH 9, at *41.  The Report further explains:

> To the extent that plan assets are held by an insurance company they need not be held in trust.  However, to the extent the substitute treats assets held by an insurance company as 'plan assets' the insurance company is to be treated as a fiduciary with respect to the plan, and is to meet the fiduciary standards of the conference substitute.

*Id.* at 298-99, WL ERISA-LH 9 at *43.  This legislative history leaves no doubt as to the nature of ING's fiduciary status.

[15]As the Second Circuit has conclusively held (and as ING has repeatedly failed to come to grips with), anyone with a right to exercise discretionary control is an ERISA fiduciary, whether or not they exercise that right.  *Bouboulis v. Transport Workers Union of America*, 442 F 3d 65 (2nd Cir 2006) ("Subsection three describes those individuals who have actually been granted discretionary authority, regardless of whether such authority is ever exercised").  *See also IT Corp. v. General American Life Ins. Co.*, 107 F.3d 1415 (9th Cir. 1997)(holding that administrator of ERISA plan could be fiduciary even though contract stated that administrator performed purely ministerial functions for employer within framework of policies made by employer*)*; *Daniels v. National Employee Benefit Services, Inc.*, 858 F.Supp. at 692 ("NEBS is a Plan fiduciary with respect to investment of Plan funds as a

3.    ING Was A Fiduciary When It Received The RSPs Because Of Its
Discretionary Authority To Add, Delete, Or Substitute Funds

It is uncontested that the Group Contracts grant ING the authority, responsibility and control to "add, delete, change or substitute [the] funds [available for allocating the Plan assets in the Separate Accounts] when [ING] deem[s it] necessary to accomplish the purposes of the separate account." (RCS, ¶ 144.)  The only contractual duty ING owes the Plans when it decides to unilaterally change the selection of funds is to provide some sort of ambiguous "notice" - and it is not even clear whether such notice is required before or after the addition, deletion, change or substitution occurs.  (RCS, ¶ 148.)  Thus, this latitude that ING has to "deem" the slate of funds "necessary to accomplish the purposes of the separate accounts," which the Plans have no contractual right to accept, reject or veto, is the essence of discretionary authority.  *See Haddock IV*, 262 F.R.D. at 108 n.6 (D. Conn. 2009) ("*Haddock IV*") ("Nationwide has 'final authority': the defendants have the power to permit or veto an investment option without the Trustees' input") *vacated on other grounds by Nationwide Life Ins. Co. v. Haddock*, 460 Fed. App'x 26 (2d Cir. 2012); *Charters v. John Hancock Life Ins. Co.*, 583 F. Supp. 2d 189, 199 (D. Mass. 2008)(holding that insurer's "ability to substitute investment options also rendered it a fiduciary of the [p]lan" because the plan "did not have a meaningful opportunity to reject substitutions"); *Aetna Letter*, 1997 WL 277979, at *5 (DOL explaining that a company retaining the right to delete or substitute available investments is not a fiduciary so long as the plan fiduciary has meaningful opportunity decision to accept or reject the change, assuming that the company does not hold title to the separate account); *In re Frost Nat'l Bank*, DOL Op. 97-15A, 1997 WL 277980, at *3 (May 22, 1997) ("*Frost Letter*") (DOL stating that a bank may have discretionary authority or control over plan assets if it has the right to add or remove "families" of mutual funds made available to plans); *see also Leimkuehler v. Am. United Life Ins. Co.*, No. 1:10-cv-0333-JMS-TAB, 2012 WL 28608, at *13 (S.D. Ind. Jan. 5, 2012) (defendant "does not

---

result of the discretionary authority conferred upon it by the Plan documents, regardless of whether this authority was ever exercised, pursuant to § 1002(21)(A)(iii)"); *Smith v. IBT Local 819 Pension Plan*, 291 F.3d 236 (2d Cir. 2002)(reversing dismissal of third party complaint against Connecticut General Life Insurance Company and finding that insurance company service provider was potentially liable as fiduciary under Section 1002(21)(A)(iii) on the basis that it possessed discretionary authority with respect to a pension plan).

deny that those contractual rights [which includes the right "to make additions to, deletions from, substitution for, or combinations of, the securities that are held by the Investment Account"] implicate discretionary administration of the [p]lan"); Black's Law Dictionary (defining "discretionary" as "involving an exercise of judgment and choice, not an implementation of a hard-and-fast rule").[16] And, maintaining a fund menu is one of the services that ING provides to the Plans to assist with plan administration; specifically, to "accomplish the purposes of the separate account." (RCS, ¶ 145.)  ING's argument that its authority to "add, delete, or substitute funds when necessary to accomplish the purposes of the separate account" only relates to "management or disposition of plan assets" but not "administration," ignores the Supreme Court's decision in *Varity Corp. v. Howe*, 516 U.S. 489, 502 (1996), where the Supreme Court defines "administration" using the ordinary trust law definition of exercise of "'such powers as are necessary or appropriate for the carrying out of the purposes' of the trust."  And, maintaining a fund menu is one of the services that ING provides to the Plans to assist with plan administration; specifically, to "accomplish the purposes of the separate account."  *See also Varity Corp. v. Howe*, at 502(defining "administration" under ERISA as an "exercise of a power 'appropriate' to carrying out an important plan purpose").[17]  Accordingly, ING is a fiduciary under 29 U.S.C. § 1002(21)(A)(iii) because of its contractual authority to unilaterally add, delete, or substitute funds available in the administration of the Separate Accounts.[18]

ING resists its fiduciary status under 29 U.S.C. § 1002(21)(A)(iii) for its contractual authority to

---

[16]"It is axiomatic that statutory interpretation begins with the language of the statute, and that 'the ordinary meaning of that language accurately expresses the legislative purpose.'" *United States v. Lucien*, 347 F.3d 45, 51 (2d Cir. 2003) (citations omitted).

[17]ING's repeared arguments that HSI somehow conceded any position when responding to its Rule 23(f) Petition, which mischaracterized the Court's decision granting class certification, also is unpersuasive.  In so arguing, ING fails to understand the fact that HSI simply was responding to the arguments ING attempted to raise, as opposed to briefing the merits of the claims in this case.

[18]It is undisputed that mutual funds only provide RSPs to ING if that fund is placed on the menu ING provides to the Separate Accounts. [Dkt. No. 112-2, ¶¶ 56-58, 63.] Indeed, it is undisputed that mutual funds provide RSPs as **part of the exchange** for being included by ING on the menu. [*Id.*, ¶¶ 58, 63.] Thus, ING's authority to alter its fund menu is undeniably and directly connected to the RSPs that the funds provide to ING.  Nor has ING presented any evidence (much less clear or convincing evidence) to persuade the Court otherwise.

unilaterally add, delete, or substitute funds by insisting on an absurdly strained and shunted interpretation of "administration." [Dkt. No. 112-1, at 19-20.]  According to ING, the authority to add, substitute, or delete funds falls exclusively in the category of "management or disposition of plan assets."[19]  The sole authority ING cites for its strained interpretation of 29 U.S.C. § 1002(16)(A)(which only addresses , *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3 18 (2d Cir. 2002) ("*Harris Trust*"), provides no support for ING's position.  In *Harris Trust*, the Second Circuit Court of Appeals simply held that the mere possibility that the defendant service provider could "waive the contractual requirement[s]" that controlled its obligation to roll over funds did not itself create discretionary authority to roll over funds, a completely uncontroversial and inapplicable holding.  *Harris Trust*, 302 F.3d at 28.  The "selecting investments, exchanging on instrument or asset for another, and so on" language that ING relies upon was merely a recitation, in dicta, of possible examples of "[t]he management or disposition" language in 29 U.S.C. § 1002(21)(A)(i); the Second Circuit Court of Appeals did not opine anywhere on whether "administration" in the context of 29 U.S.C. § 1002(21)(A)(iii) can only be performed by "plan administrators," or that "administration" could not include selection of funds as investment alternatives for plans.[20]

---

[19]ING also suggests, in a footnote, that only the named "plan administrator," here the plan sponsor, has authority over the administration of the plan.  This tautological reasoning is complete nonsense.  The title "administrator" is strictly defined under 29 U.S.C. § 1002(16)(A) to either a person specified by the plan documents, the plan sponsor, or a person prescribed by the Secretary of Labor if neither a person is specified in the plan documents nor is the plan sponsor identifiable.  So under ING's interpretation, 29 U.S.C. § 1002(21)(A)(iii) can only confer fiduciary status to the "plan administrators" defined under 29 U.S.C. § 1002(16)(A), an absurd result since Congress would have simply and expressly limited fiduciary liability under 29 U.S.C. § 1002(21)(A)(iii) to the "plan administrators" of 29 U.S.C. § 1002(16)(A).  *Cf. Coldesina*, 407 F.3d at 1132 ("regardless of status or title, parties are only plan fiduciaries to the extent they are performing one of the functions identified in the definition [from 29 U.S.C. § 1002(21)(A)]"); *Acosta v. Pacific Enterprises*, 950 F.2d 611, 618 (9th Cir. 1991) (stating that the language from 29 U.S.C. § 1002(21)(A) "makes clear that a person's action, not the official designation of his role, determine whether he enjoys fiduciary status").  ING's interpretation does much violence to the concept of a "functional fiduciary" and the Congressional intent that fiduciary duty under ERISA be "broadly construed." *Blatt v. Marshall*, 812 F.2d 810, 812 (2d Cir. 1987).  Indeed, ING's interpretation would give lie to every court that has applied 29 U.S.C. § 1002(21)(A)(iii) to a non-plan administrator. *See, e.g.*, *Pegram v. Herdrich*, 530 U.S. 211, 223 (2000) ("although [the health maintenance organization ("HMO")] that contracted with the health insurance plan provide services] is not an ERISA fiduciary merely because it administers or exercises discretionary authority over its own HMO business, it may still be a fiduciary if it administers the plan").

[20]Indeed, ERISA does not define "administration," and there is nothing to suggest that a person cannot "administer" a plan and "manage or dispose of plan assets" simultaneously when performing the same or similar duties. *See Greenblatt v. Prescription Plan Serv. Corp.*, 783 F. Supp. 814, 824 (1992) (finding that service provider

ING also argues that there is no "connection" between its right to add, delete, or substitute mutual funds and ING's receipt of revenue-sharing because there is no evidence showing one affecting the other. [Dkt. No. 112-1, at 22.]  Once again, ING's Motion fails on its face because Defendant critically fails to recognize that it is ING's burden to prove by clear or convincing evidence that this fiduciary status was unrelated to its fiduciary status.  Moreover, the evidence of record establishes otherwise.  Simply put, if mutual funds are not added to (or maintained on) ING's menu of available mutual fund investments, the mutual funds do not pay ING the RSPs – that is why ING refers to the agreements as "participation agreements."  (RCS, ¶¶ 142-143.)  Indeed, the evidence confirms that mutual funds make higher RSPs to more "competitive" than other mutual funds that ING may offer on its menus and that mutual funds will increase the amount of their RSPs for this same reason - because the services that ING provides are entirely unrelated to the amount of RSPs received. (RCS, ¶¶ 146-147.) The evidence also shows that the RSPs play a direct role in influencing whether a fund is added, maintained, changed, or even replaced on the menu.  (*Id*.)

> 4.  ING Was A Fiduciary When It Received The RSPs Because It Exercised
>     Its Discretionary Authority To Add, Delete, Change Or Substitute Funds

ING is also a fiduciary under 29 U.S.C. § 1002(21)(A)(i) because it exercised its contractual authority to unilaterally add, delete, or substitute funds.[21]  ING admits that its changed all of the Plans that were invested in Janus mutual funds at a time in the past, based upon its authority as the owner of the Separate Accounts.  (RCS, ¶¶ 42, 151-153.)  ING also concedes that it discontinued a set of "Solution

---

was fiduciary under both 29 U.S.C. § 1002(21)(A)(i) and (iii) because service provider's responsibility "for 'designing, implementing, and administering' a system for managing the plan" gave service provider "broad latitude in performing administrative tasks" and service provider held plan assets in the course of performing such responsibility); *see also Yeseta v. Baima*, 837 F.2d 380, 384-85 (9th Cir. 1988) (as officer of corporation, defendant exercised control over plan assets and had discretionary authority over administration of the plan); Black's Law Dictionary (9th ed. 2009) (defining "administration" as "1.  The management or performance of the executive duties of a government, institution, or business").  Likewise, ING's contractual authority to add, substitute, or delete funds from the menu available to the Separate Accounts implicates both the "management or disposition of plan assets" of 29 U.S.C. § 1002(21)(A)(i) and the "administration" of the plan of 29 U.S.C. § 1002(21)(A)(iii) because the Plans' assets are invested in ING's selections and the management of a fund menu clearly is an integral part to administering the Plans.

[21] ING apparently concedes that adding, changing, deleting, or substituting funds from the menu is within the "management or disposition" language of 29 U.S.C. § 1002(21)(A)(i).

Portfolio" funds and replaced it with a different set, which, no matter how "similar," are apparently different enough to warrant a substitution. (RCS, ¶ 150.)[22] ING attempts to innoculate this "substitution" by invoking the protection of the *Aetna Letter*, although, contrary to ING's misleading statements, the substitution materially failed to abide by the *Aetna Letter*'s requirements. The *Aetna Letter* grants safe harbor from fiduciary status to retirement plan service providers that accept RSPs and modify the fund menu, provided that the service provider: (1) does not have any authority or control over the separate accounts, and (2) (a) there is advance notice to the plan administrator of any menu change, which (b) must explain the proposed modification, (c) disclose any changes to the revenue-sharing fees received, (d) identify the date of change, (e) explain the plan fiduciary's right to reject the change or terminate the agreement within a reasonable time to secure a new service provider, and (f) reiterate that a failure to object will be treated as consent. 1997 WL 277979, at *5-*6. Since ING exercises authority and control (both discretionary and otherwise) over the Separate Accounts, as explained above, it is already impossible for ING to satisfy the *Aetna Letter* requirements (since it occupies the fiduciary position of "ALIC," as detailed in that opinion letter). And, even though ING represents that the Plans had the option to transfer out, convert to another ING product, or terminate the contract with ING, ING never actually disclosed those options to the Plans in a meaningful manner, disclosed any changes to the revenue-sharing fees, or provided the Plans with notice and time to identify a new service provider! (RCS, ¶ 149.) Accordingly, despite its assertion to the contrary, ING abjectly failed to satisfy the conditions set forth in the *Aetna Letter*.

Second, ING exercised its contractual authority to unilaterally add, delete, or substitute funds by affirmatively monitoring the ongoing performance of the funds and ultimately deciding not to change its menu selection. (RCS, ¶ 154.) Indeed, ING admits that a driving consideration when reviewing the funds is the impact of substituting a fund on its revenues. (RCS, ¶ 155.) This "ongoing fund review process"

---

[22]Strangely, ING attempts to characterize the substitution as a "switch," which have almost synonymous definitions. *See* Merriam-Webster Dictionary (2012 online ed.) (defining "substitute" as "a person or thing that takes the place or function of another" and "switch" as "to make a shift or exchange").

which measures each fund's impact on revenues is a reason why mutual funds continuously compete with each other to offer higher RSPs to ensure their place on the fund menu.  (RCS, ¶ 164.)  Additionally, ING considered and rejected advice from the Plans' investment advisers to delete an existing menu fund at least once.  In October 2006, Morningstar, a service provider that contracts with plan sponsors to provide fiduciary assistance in the selection and ongoing monitoring of investment options, advocated eliminating the Oppenheimer Capital Appreciation Fund from the menu selection. (RCS, ¶ 156.)  If plan sponsors did not do so, Morningstar would discontinue the services it provided them.  [*Id.*] Although aware of this development, ING chose not to eliminate the Oppenheimer Capital Appreciation Fund from the menu selection of the Plans that were both clients of Morningstar and ING. (*Id.*) This refusal to change the menu even though it would adversely affect some Plans is an obvious exercise of discretion.

ING argues that "theoretical authority" and lack of affirmative action is insufficient to constitute an "exercise" of authority within the meaning of 29 U.S.C. § 1002(21)(A)(I), citing *Trs. of the Graphic Commcn's Int'l Union Upper Midwest Local 1M Health & Welfare Plan v . Bjorkedal*, 516 F.3d 719 (8th Cir. 2008), *LoPresti v. Terwiliger*, and *Leimkuehler*.  But as explained above, there is nothing "theoretical" about ING's authority to modify the fund menu.  Unlike the situation here, there was no evidence in *LoPresti*, *Bjorkedal*, or *Leimkuehler* that the non-fiduciary defendants even **considered** the possibility of using their control over the plan assets.  *See LoPresti*, 126 F.3d at 40 (non-fiduciary defendant had "no responsibility for determining which of the company's creditors would be paid or in what order" from the plan assets); *Bjorkedal*, 516 F.3d at 733 (non-fiduciary defendant "was not involved in any of [the] financial decisions" affecting the plan assets); *Leimkuehler*, 2012 WL 28608, at *8 (plaintiff only "contends that the failure to exercise a contractual power to substitute or delete mutual funds that participants have already 'purchased' constitutes an exercise of authority or control").[23]  In contrast, the evidence here shows that ING actively and palpably considered its contractual right to add, delete, or substitute funds (RCS, ¶¶ 204-207), ultimately making a decision to use its authority to either

---

[23]Additionally, *Leimkuehler* is currently on appeal before the Seventh Circuit Court of Appeals. *Leimkuehler v. Am. United Life Ins. Co.*, 12-2536 (7th Cir.)

retain or change the existing fund menu (*Id.*), which undoubtedly constitutes an exercise of its authority

or control over plan assets.

        5.      ING Was A Fiduciary When It Received The RSPs Because It Exercised
                   Discretionary Authority And Control Not To Offer, Purchase, Or
                   Substitute Institutional And Other Lower Cost Share Classes

       Inherent within its contractual authority to add, delete, or substitute funds, as well as confirmed

by the terms of the participation agreements, ING also had the authority to choose and/or add, delete,

change or substitute existing share classes of mutual funds with institutional and other lower cost share

classes ("I share classes") of the same mutual fund, which would have resulted in the Plans receiving

higher returns on their investments (because of lower expense ratios than their counterparts) but also

would have resulted in ING receiving lower RSPs. (RSC, ¶¶ 166-167.) And, the evidence, including the

participation agreements between ING and the mutual funds, demonstrates that ING certainly had the

discretionary authority and power to choose lower cost mutual fund share classes, based upon the

financial status of the Separate Accounts, in connection with its administration of the menu of available

investment options and management of the Plans' assets. (RCS, ¶ 168.) But in most circumstances,

along with the "ongoing fund review process" that ING engages regarding different funds, ING actively

and affirmatively reviews the different available share classes while servicing the Plans and affirmatively

decides to remain with the share classes that have higher expense ratios but provide more RSPs. (RCS, ¶

169.) This is an exercise of discretionary authority and control within the meaning of 29 U.S.C. §

1002(21)(A)(i), and, obviously, inextricably related to ING's receipt of the RSPs -- a position that is

entirely consistent with the Department of Labor's views. *See* Brief of the Secretary of Labor as Amicus

Curiae in Support of Plaintiff-Appellant Urging Reversal and Remand filed June 6, 2012, *Leimkuehler v.*

*Am. United Life Ins. Co.*, No. 12-1081, at 12-14 (7th Cir.) (pending); *see also* Scheinberg Report, at 44-

45.]

       ING's justification in this regard is the same inadequate defense it supplies for its exercise of

discretionary authority of the funds on the fund menu; that the decisions are allegedly made pre-contract,

even though ING continues to actively monitor the different funds, contemplates unilateral changes

when the Separate Accounts may qualify for lower cost share classes post-contract, thereby resulting in

the exercise of a discretionary decision by ING each and every time that ING elects to remain invested in

higher cost share classes of the same mutual fund.[24]  Finally, ING's irrelevant (and unsupported)

assertion that the RSPs offset costs, which has no bearing on the fact that ING exercised its discretionary

authority, regardless of motive or purpose, is belied by the evidence (RCS, ¶¶ 162-163.)

> 6.   ING Was A Fiduciary When It Received The RSPs Because It Exercised
>       Discretionary Authority To Re-Invest The Mutual Fund Dividends
>       Generated By The Separate Accounts

ING does not dispute that it uniformly reinvests all mutual fund dividends in the Separate

Accounts.  (RCS, ¶¶ 192-194.)  ING also concedes that its reinvestment of mutual fund dividends could

be an exercise of discretionary investment decisions regarding the Plans' assets, which would render it an

ERISA fiduciary under 29 U.S.C. § 1002(21)(A)(i).  But according to ING, there was no discretion

because there are no "viable alternatives" due to purported tax considerations and the fact that dividend

reinvestment is supposedly a uniform practice.  Additionally, ING asserts that the Plans' sponsors and

participants expect mutual fund dividends to be reinvested.

ING's argument is nonsense.  First, the only "evidence" that ING offers is its own self-serving

and summary interpretation of the tax code and the unqualified opinion of Professor Langbein, who ING

admits is a legal scholar, and not a financial, economic, or tax expert qualified to opinion on the wisdom

of re-investing dividends. Second, ING provides no evidentiary support that the Plans' sponsors and

participants expected mutual fund dividends to be reinvested beyond what can only be ING's

clairvoyance; ING has proffered absolutely no evidence that the Plans' sponsors and participants made

that investment decision. Third, ING's consideration of the tax implications of receiving a cash dividend

is precisely an exercise of investment discretion (while ignoring the plain fact that, as described in the

Scheinberg Report and conceded by Mr. Peterson, dividends could be paid into a qualified cash account,

---

[24]Even ING's proffered expert, Professor John Langbein, admits that such actions amount to a breach of
fiduciary duty.  (Langbein Dep. at 114-115.

RCS ¶193); again, there is no evidence that the Plans' sponsors and participants agreed that re-investment is a better course of action than receiving a cash dividend or some other alternative in light of tax implications.  Moreover, the wisdom of reinvesting dividends depends on the investment strategy.  *See generally* Arden Dale, *Rethinking Reinvestment*, Wall Street Journal (May 7, 2012), *available at* http://online.wsj.com/article/SB10001424052702304432704577348090646918980.html ("Another knock against dividend reinvestment is how it can shift a portfolio overall . . . paying dividends into case accounts, rather than reinvesting them, gives him more control over rebalancing that aims to diversify a portfolio"); *see also* Scheinberg Rebuttal Report, at 13-14.] Lastly, ING's half-hearted "everyone does it" defense is not a legitimate defense.  *Cf. United States v. Warner*, 396 F. Supp. 2d 924, 937 (N.D. Ill. 2005) ("It may be that everybody does this and every single person has violated RICO.  It may be that everybody does it and nobody has violated RICO").

ING's position is completely undermined by its own publication that discusses the fact that ING itself (as the sole shareholder of the Separate Accounts) exercises the discretion to "elect" to reinvest the mutual fund dividends, rather than receive them in cash, and its participation agreements with mutual funds in which ING states that it will "assist[] customers in designating and changing dividend options...," thereby confirming that a discretionary decision exists and is exercised by ING.  (RCS, ¶ 192.)[25]  The mutual fund dividends could have been placed in a cash or cash-equivalent account, or invested in a different mutual fund, and even ING's own expert supports this position.  (RCS, ¶ 193.)   At the very least, ING had the option of depriving itself of any discretionary exercise by requesting instruction from the Plans' sponsors or participants for disposing of mutual fund dividends.

---

[25]ING attempts to preemptively defuse this damaging evidence by asserting that it "prove[s] nothing as to whether there is truly an option" and are "not plan documents" relating to ING and the Plans.  ING forgets that it bears the burden of showing that it is undisputed that there are no alternatives to dividend reinvestment.  Moreover, it is irrelevant whether this evidence is drawn from plan documents.  The evidence simply and conclusively demonstrate that ING has acknowledged that there are viable alternatives to dividend reinvestment.

7. ING Was A Fiduciary When It Received The RSPs Because Of Its Discretionary Authority To Self-Determine And Draw Its Own Compensation Directly From The Separate Accounts

It is undisputed that the Group Contracts provide ING the unilateral authority to change the fees it assesses and draws directly from the Separate Accounts for its compensation by and through, among other things, "fund fee adjustments" ("FFAs"). (RCS, ¶¶ 16, 23, 170-184.) Although that authority obviously grants ING discretionary authority in the administration of the Plans, thus rendering ING a fiduciary under 29 U.S.C. § 1002(21)(A)(iii), ING curiously asserts that FFAs do not render it a fiduciary because FFAs are part of the negotiated contract between the Plans and ING. [Dkt. No. 112-1, at 26-27.] Although a service provider is not liable for receiving agreed-upon *fixed* fees, it is crystal clear (and beyond cavil) that the authority to adjust fees drawn from Plan assets during the performance of the contract creates a fiduciary relationship. *See United States. v. Glick*, 142 F.3d 520, 527-28 (2d Cir. 1998) (the defendant "had full discretion in selecting the amount of [his company's] commission to be collected from each [plan] participant . . . [and] [i]t is clear that [the defendant] exercised fiduciary power with regard to those [plan] assets he used to pay [his company's] commissions"); *Charters v. John Hancock Life Ins. Co.*, 583 F. Supp. 2d 189, 199 (D. Mass. 2008) ("[i]n each of these cases [where the service provider was found not to be a fiduciary], however, the insurance companies exercised no discretionary authority with respect to their fees . . . As explained above, [the insurance company] did exercise discretion over the amount of its compensation by unilaterally setting the administrative maintenance charge").

ING also concedes that FFAs are related to RSPs, but argues that its purported policy of "revenue neutrality" should somehow absolve it of fiduciary status. [Dkt. No. 112-2, ¶ 23.] This policy of "revenue neutrality" is not disclosed to the Plans (RCS, ¶ 171.), the amount of RSPs received is not disclosed to the Plans so there is no way to verify that it is actually "neutral" (RCS, ¶ 173), and an increase in RSPs does not necessarily correspond to a dollar-for-dollar decrease in the FFA (RCS, ¶ 173.) More importantly, the Group Contract provides ING the discretionary authority to set or adjust its "target

revenue," so whatever "revenue neutrality" policy ING has in place is not fixed by contract and thus

illusory in any event. (RCS, ¶ 179.) Thus, ING is still a fiduciary regardless of whatever internal

"revenue neutrality" policy it ostensibly has in place.

> 8.  ING Was A Fiduciary When It Received The RSPs Because It
>     Exercised Its Discretionary Authority To Self Determine And
>     Draw Its Compensation Directly From The Separate Accounts

ING concedes it exercises the authority to unilaterally change the fees it assesses and draws

directly from the Separate Accounts for its compensation through the FFAs under the Group Contracts.

(RCS, ¶ 176.) As explained above, FFAs are directly related to the RSPs that ING receives from the

funds. (RCS, ¶¶ 171-178.)  Accordingly, ING was a fiduciary under 29 U.S.C. § 1002(21)(A)(i) when it

receives RSPs.

### D.    ING Acted As A Fiduciary In Connection With Its Receipt Of The RSPs

As explained above, ING was a fiduciary when it received the RSPs from the mutual funds for at

least eight independent reasons.  Indeed, ING effectively concedes that it "receives revenue sharing 'in

connection with' the services it performs for the mutual funds *and the plans*," and one of those "services"

is to provide the Separate Accounts access to the mutual funds.  And, as HSI's expert explains, ING

receives the RSPs in direct connection with its fiduciary status in each and every case.  *See* Scheinberg

Report at 40-45.  But even if the Court was not entirely convinced at this juncture, at the very least, ING

has failed its burden to demonstrate that the undisputed material facts conclusively shows that it was

never a fiduciary to the Plans, much less that it was not a fiduciary when it received the RSPs.   As

explained earlier, in the Second Circuit, once ING's fiduciary status is established, whether here or at

trial, ***the burden is on the fiduciary*** charged with engaging in prohibited transactions under 29 U.S.C. §

1106(b)(3) to either "prove by a preponderance of the evidence that the transaction in question fell within

an exemption" or "prove by clear or convincing evidence that compensation it received was for services

other than a transaction involving the assets of a plan." *Lowen*, 829 F.2d 1209, 1215 (2d Cir. 1987)

(citing *Celotex Corp. v. Catrett*, 477 U.S. 3617 (1986)).  The Second Circuit Court of Appeals explained:

> First, although the "in connection with" requirement departs from the
> strict common law rules regarding trustees, we are nevertheless
> instructed by ERISA to look to those rules for interpretive guidance.
> [citations omitted.] The "in connection with" requirement thus should
> not be construed in a way that creates a loophole that permits self-
> dealing and, in particular, "kickbacks" to fiduciaries. [citations omitted.]
> Second, because the fiduciary has a virtual monopoly of information
> concerning the transaction in question, it is in the best position to
> demonstrate the absence of self-dealing. Placing the burden of proof on
> the fiduciary is thus justified.

*Lowen*, 829 F.2d at 1215 (affirming summary judgment for plaintiffs). ING has not attempted, much less

met, its burden of proof.

Instead, ING argues that Plaintiff has no evidence showing that ING performed no services for

the mutual funds in exchange for the RSPs, and alleges, without any support, that all RSPs were used to

offset costs to the Plans and did not go into ING's personal account. Both assertions are beside the point.

The fact that ING performs no additional services to the mutual funds in exchange for the RSPs is an

indication that these payments are credited towards something besides those services. ING does not

disclose to the Plans where or how these payments are credited. Internally, ING does not track those

payments either, much less provide a dollar-for-dollar offset to the Plans. *See Frost Letter*, 1997 WL

277980, at *4 (DOL stating that dollar-for-dollar offset would not be violation of section 406(b)(1) or

(b)(3)). Instead, as explained above, the evidence shows that ING encourages funds to compete for

access to the menu through higher RSPs. The lack of transparency and ING's obvious interest in

encouraging higher RSPs creates an irresistible inference that the RSPs go towards its personal accounts.

After all, if ING did pursue a strict policy of "revenue neutrality," it should have no interest in the

amount of revenue-sharing since it would be compensated the same amount either way. In any event, as

a fiduciary to the Plans, it is ING's burden to prove that all of the RSPs were used to offset costs. But

ING does not, because it cannot, show that every dollar from the RSPs was used to offset fixed fees that

would have otherwise been assessed on the Plans rather than being diverted to ING's personal account.

**E.    ING's MISCHARACTERIZATION OF COUNT I OF PLAINTIFF'S COMPLAINT IS UNPERSUASIVE**

ING's argument that it is entitled to summary judgment with respect to Count I of Plaintiff's Complaint (*i.e.*, its claim for Breach of Fiduciary Duty) is, in one word, bizarre. First, ING's argument fails to account for the fact that a prohibited transaction under Section 406 of ERISA amounts to an automatic breach of fiduciary duty under Section 404 of ERISA. *Leigh v. Engle*, 727 F.2d 113, 123 (7th Cir. 1984); *Agway, Inc., Employees' 401(k) Thrift Investment Plan v. Magnuson*, 2006 WL 2934391, at *21 (N.D.N.Y. Oct. 12, 2006). Therefore, if Plaintiff prevails as to Count II of its Complaint (*i.e.*, its claim for a Prohibited Transaction), liability under Count I is established. Since ING apparently has no answer for this reality, it chooses not to address it.

Second, ING's attempt to limit Plaintiff's claim for relief under Count I to one for "excessive compensation" from the RSPs -- even though there is nothing in paragraphs 99 through 108 of Plaintiff's Complaint (or elsewhere) to so limit Plaintiff's claims -- is unpersuasive. Indeed, as the Court in *Haddock v. Nationwide Financial Services, Inc.*, 262 F.R.D. 97, 126, n. 19 (D.Conn. 2009), *rev'd on other grounds*, 460 Fed.Appx. 26 (2012), recognized, even where a plan has not suffered losses, it still will be entitled to recover any profits arising from a breach of fiduciary duty under Section 409 of ERISA. *Id.*, *citing* James Jorden, et al., *Handbook on ERISA Litigation*, § 4.05[C] ("Monetary damages for breach of fiduciary duty is provided within ERISA § 409(a), which requires a fiduciary to 'make good to [the] plan any losses to the plan resulting from each such breach.' ... Even when a plan has not suffered losses, ERISA § 409(a) enables the plan to recover 'any profits of such fiduciary which have been made through use of the assets of the plan by the fiduciary.'") Thus, in light of ING's express admission that profits were earned from the RSPs, *see* ING's Mem. at 28,[26] even if ING were correct that no loss could be established (which is patently incorrect), its "loss" argument regarding Count I of

---

[26]Of course, ING's assertions regarding its profit rates are patently absurd and are based (not on competent evidence), but on ING's counsel's work product in which counsel and a witness for ING determined, the day before a 30(b)(6) deposition, that, rather than preparing the witness to testify regarding the required subjects, ING should develop a profit calculation different than those developed in the normal course of business by ING as part of a transparent attempt to avoid the consequences of ING's true profit numbers. (RCS, ¶ 135.)

Plaintiff's Complaint would fail on its face.[27]  Moreover, ING's argument fails to acknowledge that, since it is legally required to disgorge the RSPs to the Plans, *see Lowen*, 829 F.2d 1213 ("defendants were required both to disgorge all profits and other consideration received in violation of Section 406"), HSI obviously has established the existence of a loss within the meaning of ERISA.  (RCS, ¶ 218.) Moreover, the undisputed evidence that increases in the amount of RSPs does not result in any reduction of fees to the Plans (or of the FFAs, where applicable), establishes the direct nature of the losses suffered by HSI and the Plans.  (*See, e.g.,* RCS, ¶¶67, 183-184.)[28]

## F.     PLAINTIFF'S CLAIMS ASSERTED IN COUNTS I AND II ARE NOT TIME-BARRED AND SUMMARY JUDGMENT IS NOT WARRANTED

ING contends that because Plaintiff knew ING received RSPs from mutual funds prior to February 23, 2008, that knowledge alone constitutes "actual knowledge" of ING's ERISA violations, such that Counts I and II are barred by the three-year statute of limitations set forth in ERISA § 502.  This argument fails because, as demonstrated below, a clear factual dispute exists as to whether and when Plaintiff possessed actual knowledge of all material facts necessary to understand that ING committed ERISA violations by receiving sharing payments from mutual funds.  Thus, summary judgment on this ground is plainly improper and must be denied.

### 1.     Legal Standard For Determining Actual Knowledge

The Second Circuit has made clear that "[i]n determining whether or not a plaintiff has actual knowledge that an ERISA violation has occurred, . . . a party will be deemed to have such knowledge 'when he has knowledge of ***all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act***.'"  *Chao v. Emerald Capital Management, Ltd.*, No. 01-CV-6356T, 2006 WL 2620055, at *3 (W.D.N.Y. Sept. 13, 2006)(quoting *Caputo v. Pfizer, Inc.*,

---

[27]ING's citation to *Silverman v. Mutual Ben. Life Ins. Co.*, 138 F.3d 98, 104 (2d Cir. 1998), which simply addresses causation issues related to liability claims under ERISA §§ 1105(a)(3) and 1109(a), which issues are not present here, demonstrates the desperation of ING's position.

[28]ING's self-serving, incomplete and immaterial recitation of "facts" in an effort to create a causation issue, *see* ING's Mem. at 28-29, where none exists, deserves little attention in light of the evidence establishing ING's active acts of concealment and deception with respect to the true nature of the RSPs.

267 F.3d 181, 193 (2nd Cir.2001)(emphasis added)); *Frommert v. Conkright*, 433 F.3d 254, 272 (2d Cir.

2006)(same).  Actual knowledge of the facts supporting an ERISA claim, in turn, requires that plaintiff

have "***specific knowledge of the actual breach of duty upon which [the claim is founded]***."  *Caputo*,

267 F.3d at 193 (quoting *Brock v. Nellis*, 809 F.2d 753, 755 (11th Cir.1987)(emphasis added).

"Significantly, a showing that the plaintiff should have known that an ERISA violation occurred is

insufficient to establish that the plaintiff had actual knowledge of such a violation, as a plaintiff's

constructive knowledge of a violation is immaterial to the issue of whether the plaintiff had actual

knowledge."  *Chao*, 2006 WL 2620055, at *3 (citing *Caputo*, 267 F.3d at 194).

      Thus, when adjudging a defense that seeks the application of ERISA's three-year statute of

limitations period, as ING does here, "[t]he Statute is clear that ***actual knowledge of the fiduciary***

***breach*** is required before the three year limitation period begins to run."  *L.I. Head Start Child*

*Development Services, Inc.,* 558 F.Supp.2d at 393 (emphasis added).  "The three year statute of

limitations is an exception to the six year time period[,]" whereas "'[t]he six year time period reflects

Congress' determination to impress upon those vested with control of pension funds the importance of

the trust they hold.  Thus, Congress evidently did not desire that those who violate the trust could easily

find refuge in a time bar.'" (*Id.*)(internal citation omitted).

      *Frommert*, *supra*, aptly illustrates the Second Circuit's standard for determining actual

knowledge.  There, participants of Xerox's retirement plan brought an action against the plan

administrators, among others, alleging that the plan administrators violated ERISA law in connection

with the manner in which a "phantom account" offset of prior distributions was applied when

determining the amount of retirement benefits to which former employees who were subsequently rehired

were entitled.  *Frommert*, 433 F.3d at 257-258.  Seeking equitable relief pursuant to ERISA § 502, the

plan participants claimed that the plan administrators breached their fiduciary duties by providing

misleading information about the "phantom account" offsets.  (*Id.* at 269-271.)  Without deciding

defendants' fiduciary status, the district court dismissed this claim on a motion for summary judgment,

finding that the claim was untimely because ERISA's three-year statute of limitations had run in 1995,

"when the Benefits Update disclosing the nature of the phantom account was issued." (*Id.* at 272.)

The Second Circuit reversed the district court's dismissal and, in doing so, instructed as follows:

> The flaw with the district court's conclusion is that the plaintiffs' claim for breach of fiduciary duty is not premised solely on the defendants' adoption of the phantom account; rather, it is based on allegations that the defendants made ongoing misrepresentations about the origins of the phantom account in an effort to justify its usage. As a result, learning the manner in which the phantom account functions was not sufficient to provide "actual knowledge" that a breach of fiduciary duty had occurred. "[A] plaintiff has 'actual knowledge of the breach or violation' within the meaning of ERISA § 413(2), 29 U.S.C. § 1113(2), when he has knowledge of all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act." *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 193 (2d Cir.2001). ***Although the 1995 Benefits Update may have provided notice that the plaintiffs' benefits would be lower than they expected, it certainly did not inform the plaintiffs that the phantom account was being applied in contravention of the Plan's terms.*** Thus, while the Benefits Update may have heightened the plaintiffs' concerns regarding their expected benefits, "it is not enough that [plaintiffs] had notice that something was awry; [plaintiffs] must have had specific knowledge of the actual breach of duty upon which [they sued]." *Id.* (alteration in original) (internal quotation marks and citation omitted). ***Such knowledge of an actual breach could only come with disclosure of the fact that the defendants misrepresented the terms of the Plan in justifying the usage of the phantom account.***

*Id.* at 272-273 (emphasis added).

*Zang v. Paychex, Inc.*, 728 F.Supp.2d 261 (W.D.N.Y. 2010), is also instructive on the issue of

actual knowledge. In *Zang*, the plan administrator brought an ERISA action against Paychex, the plan's

service-provider, for breach of fiduciary duties and prohibited transactions in connection with Paychex's

receipt of RSPs from mutual funds and the custodial bank. (*Id.* at 262-263.) Paychex moved to dismiss

the breach of fiduciary duty claims on statute of limitations grounds. The district court denied Paychex's

motion as to the RSPs received from the mutual funds, but granted it as to those payments received from

the custodial bank. (*Id.* at 267-269.) With respect to the custodial bank payments, the district court

found that "the fact and nature of the RSPs with the bank were fully disclosed in the administrative

service agreement," which plaintiff conceded to be true and did not argue was misleading or inaccurate in

any way.  (*Id.* at 267.)  Since ERISA imposes a "blanket prohibition" on fiduciaries engaging in such

transactions, the district court concluded that "disclosure of the fact of such transactions alone is enough

to give actual notice of the alleged ERISA violation."  (*Id.*)

      However, as the district court explained, the RSPs from mutual funds were qualitatively

different.  (*Id.*)  Although Paychex disclosed its receipt of those payments in the administrative services

agreement, it described the payments as "'[i]n consideration of the recordkeeping, shareholder servicing,

marketing, and other administrative services that Paychex provides . . . [,]'" thereby implying that "the

fees are paid by the mutual funds in return for administrative services rendered by Paychex to those

funds."  (*Id.*)  Plaintiff alleged, however, that this description was false and the payments were, in

actuality, "kickbacks to Paychex for including the funds in the menu offered to plaintiff," which Paychex

failed to disclose.  (*Id.* at 268.)  Against these allegations, the district court concluded that plaintiff could

not have possessed actual knowledge of Paychex's ERISA violations:

> [F]or plaintiff to have been given "actual notice" of such transactions, *he
> must still have been provided with enough information to understand
> the nature and reason for those transactions, so that he could know
> whether they were prohibited or not*.  Thus, since the parties'
> agreements did not disclose the alleged basis for the revenue-sharing
> payments by the mutual funds, those agreements did not provide plaintiff
> with actual notice of the alleged § 1106(b) violation.

(*Id.*)(internal citation omitted).

      Lastly, in *Chao*, *supra*, the Department of Labor brought an action against an investment

company and certain related individuals, claiming that they violated ERISA laws by excessively trading

plan assets which they managed.  2006 WL 2620055, at *1.  Defendants argued that the claims were

time-barred because the Department of Labor acquired knowledge of the alleged ERISA violations three

years before filing its complaint, when it received trading records detailing the trades made by defendants

in their capacity as investment managers.  (*Id.* at *3.)  The district court agreed the claims were untimely,

finding that the Department of Labor had actual knowledge of defendants' fiduciary status vis-à-vis the

plan assets, as well as of their excessive trading of those assets for their own benefit.  (*Id.* at *4-6.)

Significantly, in assessing whether the Department of Labor had actual knowledge of defendant's fiduciary status, the district court in *Chao* explained that "under ERISA, an 'Investment Manager' of an ERISA plan is by definition a fiduciary of such a plan," and documents requested and received by the Department of Labor explicitly identified defendants as investment managers.   (*Id.* at * 4.)  But even more damning, months before requesting and receiving those documents, the Department of Labor commenced an investigation against defendants for excessive trading in which it specifically identified the company defendant as the investment manager.  (*Id.* at *5.)  Indeed, as the district court explained, its very act of requesting documents in connection with its excessive trading investigation presupposed that defendants were fiduciaries, since defendants could only be liable for excessive trading to the extent they were fiduciaries.  (*Id.*)  Based on these facts, the district court concluded that the Department of Labor "not only had sufficient facts to conclude that the defendants acted as fiduciaries with respect to the plans at issue, but also *believed* that the defendants were fiduciaries."  (*Id.*)(italics added).

In finding that the Department of Labor also had actual knowledge of defendants' acts of excessive trading, the district court rejected the Department of Labor's argument that it could not have known that defendants' trading was excessive until it obtained an expert's opinion, which occurred within the three-year statute of limitations period.  (*Id.* at *5-6.)  The district court found this argument disingenuous because "[t]he Department of Labor is the federal agency charged with implementing ERISA and enforcing that statute on behalf of the government[,] . . . which employs hundreds of investigators and attorneys all of whom are charged with enforcing ERISA [and] should, in cases where the trading is grossly excessive, be able to determine that such trading is excessive without the assistance of an expert."  (*Id.* at *6.)  Moreover, the trades were "excessive on their face" and, as the district court explained, "where the transaction is facially illegal, awareness of the occurrence of the transaction itself does constitute knowledge of facts necessary to understand that breach of a fiduciary duty occurred." (*Id.*)  The district court also found that the Department of Labor could have but did not analyze the trades during its investigation, when it had all of the information pertaining to the trades at issue.  (*Id.* at *7.)

Lastly, because the Department of Labor was in possession of information relating to a so-called "soft dollar program," whereby defendants received a financial benefit for every trade that it ordered from Merrill Lynch, the Department of Labor could have understood that the defendants had a financial motivation for engaging in the allegedly excessive trading." (*Id.*)  The totality of these facts, the district court concluded, established that the Department of Labor had actual knowledge that defendants were in breach of their fiduciary duties in violation of ERISA. (*Id.*)

2.      HSI's Purported Knowledge Of The Existence Of RSPs Does Not
Constitute Actual Knowledge Of ING's ERISA Violations

As a preliminarily matter, ING grossly mischaracterizes the legal standard for actual knowledge when it asserts that "knowledge of the existence of RSPs is enough to confer 'actual knowledge' of the alleged violation." (ING's Mem. at 35.)  As explained above, that clearly is not the law.  Under the prevailing law in the Second Circuit, it is plainly not enough, as ING contends, that HSI purportedly knew of the existence of the RSPs to establish actual knowledge.  *Frommert*, 433 F.3d at 272 (reversing the district court's dismissal of plaintiffs' ERISA claim on statute of limitations grounds because the claim was "not premised solely on the defendants' adoption of the phantom account," but rather "on allegations that the defendants made ongoing misrepresentations about the origins of the phantom account in an effort to justify its usage.")  Indeed, this contention is directly belied by ING's own self-serving argument that RSPs are a "longstanding" and "acceptable" practice.  (ING's Mem. at 13-15).  Even if this argument were true, which Plaintiff vigorously contests, it illustrates why, unlike the excessive trades in *Chao*, the mere existence of RSPs is not facially illegal so as to impart actual knowledge of ING's ERISA violations upon HSI.

More importantly, as in *Frommert* and *Zang*, actual knowledge cannot lie because HSI has alleged, and the facts demonstrate, that ING actively hid and misrepresented the true nature and reasons for the RSPs from the very outset of it relationship with HSI.  (RCS, ¶¶ 26, 105.)  Significantly, the 1997 Group Contract itself contains no disclosure of RSPs of any kind.  (RCS, ¶ 208.)  Moreover, the Group Contract Application, while referencing RSPs, misleadingly described the payments as compensation for

"*administrative services only and do not constitute payment for investment advisory services or costs of distribution*."  (RCS, ¶ 209.)  Even when ING was required to deliver specific disclosures so as to clarify the nature and reasons for its receipt of RSPs pursuant to a settlement agreement with the New York Attorney General's Office in October 2006, ING provided a materially modified version of the disclosure to HSI which continued to mischaracterize the payments as service-related.  (RCS, ¶ 210.)  By its own admission, however, the purported relationship between RSPs and services rendered to mutual funds was wholly inconsistent ING's actual practices and simply is untrue.  (RCS, ¶ 211.)

Ironically, ING's own purported "disclosures" are damning, as they highlight its attempts to obfuscate the true nature and reasons for the RSPs.  Specifically, ING misleadingly asserted that RSPs "are disclosed in a Fund Fees and Expenses Table," yet the Fund Fees and Expenses Table failed to indicate the actual amount of payments being received by ING from the mutual funds, whether in terms of basis points on assets or in dollar amounts.  (RCS, ¶ 213.)  ING also incorrectly asserted that "[t]hese additional payments are made by the funds or the funds' affiliates to the Company or its affiliates and do not increase, directly or indirectly, the fund fees and expenses." (*Id.*)  But, as ING's own Senior Vice President testified, there is at least an indirect relationship between RSPs and mutual fund expense ratios. (RCS, ¶ 212.)  Indeed, in its Statement of "Undisputed Material Facts," ING now concedes a direct relationship between RSPs and a mutual fund's expense ratio, thereby confirming the falsity of ING's past representations regarding the RSPs.

In other purported "disclosures," ING referred to certain fees and compensation but, like its other misleading "disclosures," ING failed to explain with any detail the reasons why the fees were being paid and/or that such fees directly or indirectly increase the expenses charged to the Plans by the mutual funds – and, importantly, it failed to provide little, if any, meaningful information regarding the amount of the RSPs actually received by ING.  (RCS, ¶ 213.)  While ING conveniently referred the Plans to mutual fund prospectuses for a listing of RSPs, the prospectuses did not and admittedly could not contain this

information.  (RCS, ¶ 214.)[29]

Clearly, against these facts, ING's attempt to equate some, alleged knowledge of the RSPs with actual knowledge of its ERISA violations is legally meritless, factually baseless, and, in reality, is nothing more than a desperate attempt to mask and distract from the glaring infirmities in its statute of limitations defense.  Accordingly, summary judgment should be denied.  *See also* Scheinberg Report at 26-34.

---

[29]Lastly, the purported "disclosures" by Steve Eyer do not establish HSI's actual knowledge of the true nature and reasons for the RSPs.  As he stated to HSI, "you're going to pay a fee *for services* rendered [by ING] ...." (RCS, ¶ 215.)(emphasis added.)  This statement is exactly like the misleading, "service-related" depictions of the payments as "service-related" described above.  Even Mr. Eyer himself testified equivocally about whether and to what extent he discussed RSPs with HSI in the first place.  (RCS, ¶ 216.)  This testimony is hardly certain or undisputed, and it glaringly lacks any details about what precisely was told to HSI about RSPs.

3.   ING Has Failed To Show That No Factual Dispute Exists As To
Whether HSI Had Actual Knowledge Of ING's ERISA Violations

The applicable legal standard dictates that, to prevail on summary judgment on statute of

limitations grounds, ING must demonstrate that it is factually undisputed that HSI possessed actual

knowledge of all material facts necessary to understand that ING was in violation of ERISA when it

received RSPs from mutual funds.  *Frommert*, 433 F.3d at 272.  This means that ***ING must demonstrate***

***that no factual dispute exists as to HSI's knowledge of ING's fiduciary status***, which, as a matter of

black-letter law, is a necessary threshold element of HSI's claims against ING.  *See* ERISA § 406

(expressly prohibiting *fiduciaries* from engaging in certain transactions); ERISA § 404 (expressly

imposing certain duties and obligations upon *fiduciaries*).  ***ING must also demonstrate that no factual***

***dispute exists as to HSI's knowledge that ING's receipt of these payments was in connection with its***

***fiduciary status or that the RSPs were Plan assets with which ING was acting in its own interest or for***

***its own account***, which is another threshold element of HSI's claims.  *See, e.g.*, ERISA § 406

(prohibiting a fiduciary from "receiv[ing] any consideration for his own personal account from any party

dealing with such plan in connection with a transaction involving the assets of the plan"); *see also Leigh*

*v. Engle*, 727 F.2d 113, 123 (7th Cir. 1984)(a violation of Section 406(b) of ERISA is an automatic

violation of Section 404 of ERISA); *Agway, Inc., Employees' 401(k) Thrift Investment Plan v.*

*Magnuson*, No. 5:03-1060, 2006 WL 2934391, at *21 (N.D.N.Y. Oct. 12, 2006)(same).  As demonstrated

below, as to the truly material facts necessary to put HSI on notice of ING's wrongdoing, ING has wholly

failed in its summary judgment burden.

a.  *HSI Did Not Have Actual Knowledge of ING's Fiduciary Status*

Contrary to ING's assertions, there are no facts whatsoever demonstrating that HSI possessed

actual knowledge of the material fact of ING's fiduciary status, which, under Second Circuit law, HSI

needs to have known in order put it on notice that ING was in violation of ERISA.  Significantly, ING

does not point to any documents or testimony conclusively demonstrating that HSI actually knew ING

was acting in a fiduciary capacity when it received these payments.  (ING's Mem. at 34-38.)  That is

because no such facts of HSI's purported knowledge exist.  Instead, the record is replete with ING's own denials of its fiduciary status in contractual documents and court pleadings.  (RCS, ¶ 217.)

Attempting to distract from this abject factual showing of HSI's actual knowledge, ING resorts to baldly averring that HSI "was plainly aware of all facts supporting her arguments attempting to establish ING's fiduciary status."  (ING's Mem. at 37.)  But the only "evidence" it purports to offer is lacking, unpersuasive, and actually supports Plaintiff's position.  Specifically, ING claims that it "disclosed" in the initial contractual documents certain factors that should have put HSI on notice of its fiduciary status, including (1) ING's ownership of separate accounts; (2) its retention of discretion to add, delete, or substitute mutual funds from the Plan's existing investments; and (3) its authority to amend the contract based on the Plan's investment choices.  (*Id.*)  As *Frommer* and *Zang* teach, however, the mere fact that the 1997 Group Contract included these statements is, without more, wholly insufficient to establish actual knowledge of any violation of ERISA.  *Frommert*, 433 F.3d at 272 ("learning the manner in which the phantom account functions was not sufficient to provide 'actual knowledge'"); *Zang*, 728 F.Supp.2d at 267 (rejecting Paychex's argument that disclosure of the existence and receipt of RSPs in the administrative services agreement constituted actual knowledge, since the disclosed reasons for the payments were false and misleading).  Indeed, even ING has effectively admitted that this argument is untenable, as it has emphatically contested each one of these factors as establishing its fiduciary status. (Answer to ¶¶ 40-43, 50, 85, 111 of Complaint)(denying its fiduciary status with respect to the Separate Accounts; denying that it arranged for, received, and kept RSPs for its own use and benefit, in breach of its fiduciary duties under ERISA; and denying that it received RSPs in connection with its fiduciary status and for its own personal account); (Amended Counterclaims, ¶ 14)("ING did not provide any investment advice to HSI regarding such decisions.  ING never unilaterally substituted or deleted any mutual fund from the Plans' investment options.")[30]

---

[30]Further, as demonstrated above, HSI's purported knowledge of the mere existence of the RSPs is plainly insufficient to impart actual knowledge upon HSI, when, *inter alia*, ING repeatedly misrepresented the payments as "service-related."  Thus, ING's contention in this regard, which is notably asserted in a single unsupported sentence, is wholly unpersuasive.

Equally unpersuasive is ING's last argument that HSI's actual knowledge could be established simply because "Ms. Reardon is an ERISA attorney and an ERISA fiduciary herself." (ING's Mem. at 37.) Unlike the Department of Labor in *Chao*, however, HSI is not a federal government agency charged with implementing and enforcing ERISA, and it does not employ hundreds of investigators and attorneys. Rather, HSI is the service-provider to certain health insurance benefit plans (RCS, ¶ 136), and Ms. Reardon, who is the president and sole shareholder of HSI, while having had the "occasion to advise clients or litigation on ERISA matters" during the course of her legal practice, simply testified that, in regards to her familiarity on ERISA matters, "I know more than someone who doesn't practice in the area." (RCS, ¶ 137). Tellingly, ING makes no mention of these facts, much less offers any other facts or legal authority indicating or explaining how Ms. Reardon's background could have actually alerted HSI as to ING's fiduciary status *and* its violations of ERISA where, as here, ING plainly concealed the nature of the RSPs and HSI never was placed on notice that ING was acting as a fiduciary in connection with its receipt of the RSPs. Instead, it conclusionally states: "to infer that ING's 'denial' of fiduciary status would mislead her with regard to whether she had a claim is simply not reasonable." (*Id.*) This argument is both unreasonable and entirely speculative.

> ### b. HSI Did Not Have Actual Knowledge of That ING's Receipt Of RSPs Was In Connection With Its Fiduciary Status Or Otherwise Involved Self-Dealing With Plan Assets

Similarly lacking are any facts demonstrating that HSI knew the RSPs were received in connection with ING's fiduciary status, much less that they were Plan assets with which ING was acting in its own interest or for its own account. Nor can there be any such facts when, as shown above, no facts exists that put HSI on notice of ING's fiduciary status and when ING falsely and misleadingly characterized the RSPs as compensation for services rendered to mutual funds, and not kickbacks as the Complaint alleges. Nowhere in its Motion does ING even attempt to offer any evidence that the RSPs were, in fact, disclosed as kickbacks from mutual funds, so as to put HSI on actual notice that the payments were Plan assets and that ING received those payments in violation of its fiduciary status and/or for its own benefit. Absent such disclosure, actual knowledge of ING's ERISA violations could

not exist. *Frommert*, 433 F.3d at 273 ("Such knowledge of an actual breach could only come with

disclosure of the fact that the defendants misrepresented the terms of the Plan in justifying the usage of

the phantom account."); *Zang*, 728 F.Supp.2d at 268 ("[S]ince the parties' agreements did not disclose

the alleged basis for the revenue-sharing payments by the mutual funds, those agreements did not provide

plaintiff with actual notice of the alleged § 1106(b) violation.").  Therefore, as with ING's fiduciary

status, ING has fallen far short of its burden of establishing that HSI understood the true nature and

reasons for the RSPs, much less that ING's receipt of them was in breach of its fiduciary duties and

acting in violation of ERISA by committing prohibited transactions.

### G.   ING HAS FAILED TO DEMONSTRATE THAT SUMMARY JUDGMENT IS WARRANTED FOR PLAINTIFF'S ALTERNATIVE, COUNT III CLAIM

ING argues that Plaintiff's alternative claim asserted in Count III should be dismissed because

Plaintiff cannot satisfy the test for obtaining relief against a non-fiduciary who knowingly participated in

a breach of trust, which is set forth in *Harris Trust and Savings Bank v. Salomon Smith Barney, Inc.*, 530

U.S. 238 (2000).  ING's argument is procedurally and legally meritless, and should be rejected.

ERISA § 502(a)(3) authorizes a civil action "by a participant, beneficiary, or fiduciary (A) to

enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to

obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of

this title or the terms of the plan."  As the U.S. Supreme Court in *Harris Trust* instructed, "§ 502(a)(3)

admits of no limit . . . on the universe of possible defendants," and a non-fiduciary may be a proper

defendant under § 502(a)(3) if it is "a transferee of ill-gotten trust assets . . ., and then only when the

transferee . . . knew or should have known of the existence of the trust and the circumstances that

rendered the transfer in breach of the trust."  530 U.S. at 251. In other words, "the transferee must be

demonstrated to have had actual or constructive knowledge of the circumstances that rendered the

transaction unlawful.  Those circumstances, in turn, involve a showing that the plan fiduciary, with

***actual or constructive knowledge of the facts satisfying the elements of a § 406(a) transaction***, caused

the plan to engage in the transaction."  (*Id.*)(citing *Lockheed Corp. v. Spink*, 517 U.S. 882, 888–889

(1996)(emphasis added).  Importantly, "'[a]lthough the trustee bases his cause of action upon his own voluntary act, and even though the act was knowingly done in breach of his duty to the beneficiary, *he is permitted to maintain the action, since the purpose of the action is to recover money or other property for the trust estate, and whatever he recovers he will hold subject to the trust*.'"  (*Id.* at 252)(quoting Restatement (Second) of Trusts, § 294, Comment c)(emphasis added).

ING's challenge to this claim fail for several reasons.  To begin with, as ING itself concedes, Count III is asserted as an alternative claim and only if ING is deemed a non-fiduciary.  (ING's Mem. at 38.)  Because, as demonstrated above, a significant factual dispute exists as to the issue of ING's fiduciary status, dismissal of this claim at this stage is premature and procedurally improper.   Moreover, contrary to ING's contention, Plaintiff has aptly demonstrated that a significant factual dispute also exists as to whether the RSPs it received from mutual funds were Plan assets, and such showing defeats summary judgment on this ground.  Finally, as the Supreme Court instructed in *Harris Trust*, HSI's purported knowledge of ING's violations of ERISA, regardless of whether HSI contests such knowledge, does not bar it from bringing a claim under ERISA § 502(a)(3).  The operative standard is "actual or constructive knowledge" and, contrary to ING's assertions, HSI is neither required to concede actual knowledge of ING's misconduct nor admit that it breach its fiduciary duties under this standard.  ING has wholly failed to make any demonstration as to the operative standard and, thus, has failed to met its burden on summary judgment.[31]

---

[31]On November 26, 2012, Movant, The Derosa Corp., ("Derosa"), filed its Motion to Intervene in the instant case, together with a proposed Amended Complaint, in which Derosa seeks to be added as an additional plaintiff and Class representative.  In light of this development, ING's attempt to obtain summary judgment of the injunctive relief claim is now moot and need not be decided at this time.

III.   <u>**CONCLUSION**</u>

For all of the reasons stated above, the Motion for Summary Judgment of Defendant,,

should be denied in its entirety.

Dated: December 3, 2012                     Respectfully submitted,

/s/ Karen M. Leser-Grenon
James E. Miller  (ct21560)
Laurie Rubinow (ct27243)
Karen M. Leser-Grenon (ct23587)
SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP
65 Main Street
Chester, Connecticut  06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120
E-mail:  jmiller@sfmslaw.com
        lrubinow@sfmslaw.com
        kleser@sfmslaw.com

Scott R. Shepherd
James C. Shah
Eric L. Young
Shepherd, Finkelman, Miller & Shah, LLP
35 East State St.
Media, Pennsylvania 19063
Telephone: (610) 891-9880
Facsimile:  (610) 891-9883
Email:  sshepherd@sfmslaw.com
       jshah@sfmslaw.com
       eyoung@sfmslaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2012, a copy of the foregoing Opposition Memorandum, together with the supporting Declaration and referenced exhibits, and Local Rule 56(a)(2) Statement, were filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ Karen M. Leser-Grenon
Karen M. Leser-Grenon (ct17813)