# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HEALTHCARE STRATEGIES, INC., Plan | : | |
| Administrator of the Healthcare Strategies, Inc. | : | No. 3:11-cv-00282 (WGY) |
| 401(k) Plan and the Healthcare Strategies, Inc. | : | |
| CBU 401(k) Plan, On Behalf of Itself and All | : | |
| Others Similarly Situated, | : | |
| | : | |
| and | : | |
| | : | |
| The DEROSA CORPORATION, | : | |
| Plan Administrator of The DeRosa Corporation | : | |
| 401K PS Plan, On Behalf of Itself and All | : | |
| Others Similarly Situated, | : | |
| | : | |
| Plaintiffs, | : | |
| vs. | : | |
| | : | |
| ING LIFE INSURANCE AND ANNUITY | : | |
| COMPANY, | : | |
| | : | |
| Defendant. | : | April 5, 2013 |

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
## THE MOTION FOR SUMMARY JUDGMENT OF DEFENDANT,
## ING LIFE INSURANCE AND ANNUITY COMPANY

---

| | |
|---|---|
| James E. Miller | Scott R. Shepherd |
| Laurie Rubinow | James C. Shah |
| Karen M. Leser-Grenon | Eric L. Young |
| Shepherd, Finkelman, Miller & Shah, LLP | Shepherd, Finkelman, Miller & Shah, LLP |
| 65 Main Street | 35 East State Street |
| Chester, CT 06412 | Media, PA 19063 |
| Telephone: (860) 526-1100 | Telephone: (610) 891-9880 |
| Facsimile: (860) 526-1120 | Facsimile: (610) 891-9883 |
| E-mail: jmiller@sfmslaw.com | E-mail: sshepherd@sfmslaw.com |
| lrubinow@sfmslaw.com | jshah@sfmslaw.com |
| kleser@sfmslaw.com | eyoung@sfmslaw.com |

**TABLE OF CONTENTS**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.    INTRODUCTION AND SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    Standard Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.    ING's Receipt of RSPs Violates the DOL's Specific And Longstanding Guidance
            On Practices Deemed Acceptable In 1997. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      C.    ING Acts As A Fiduciary When It Receives The RSPs. . . . . . . . . . . . . . . . . . . . . 6

            1.    ING Was A Fiduciary When It Received The RSPs Because It Owned
                  And Exercises Authority And Control Over The Separate Accounts. . . . . . . . . . . 9

            2.    ING Was A Fiduciary When It Received The RSPs Because Of Its
                  Discretionary Authority In The Administration Of The Separate
                  Accounts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            3.    ING Was A Fiduciary When It Received The RSPs Because Of Its
                  Discretionary Authority To Add, Delete, Or Substitute Funds. . . . . . . . . . . . . 15

            4.    ING Was A Fiduciary When It Received The RSPs Because It Exercised
                  Its Discretionary Authority To Add, Delete, Change
                  Or Substitute Funds. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

            5.    ING Was A Fiduciary When It Received The RSPs Because It Exercised
                  Discretionary Authority And Control Not To Offer, Purchase, Or
                  Substitute Institutional And Other Lower Cost Share Classes. . . . . . . . . . . . . 19

            6.    ING Was A Fiduciary When It Received The RSPs Because It Exercised
                  Discretionary Authority To Re-Invest The Mutual Fund Dividends
                  Generated By The Separate Accounts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

            7.    ING Was A Fiduciary When It Received The RSPs Because Of Its
                  Discretionary Authority To Self-Determine And Draw Its Own
                  Compensation Directly From The Separate Accounts. . . . . . . . . . . . . . . . . . . 22

            8.    ING Was A Fiduciary When It Received The RSPs Because It Exercised
                  Its Discretionary Authority To Self-Determine And Draw Its
                  Compensation Directly From The Separate Accounts. . . . . . . . . . . . . . . . . . . 23

      D.    ING Acted As A Fiduciary In Connection With Its Receipt Of The RSPs. . . . . . . . . . . 23

E.  Plaintiffs Also Have Valid Claims for Erisa § 406 (b)(1) Violations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

F.  ING's Argument That The RSPs Are Not Consideration Received In Connection With A Transaction Involving The Assets Of The Plans Is Pure Makeweight. . . . . . . . . . 26

G.  ING's Arguments Regarding Loss To The Plans And The Proper Basis For Disgorgment Are Unpersuasive. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

H.  ING Has Failed To Demonstrate That Summary Judgment Is Warranted For Plaintiffs' Alternative, Count III Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

I.  Plaintiffs' Claims Are Not Time-Barred. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    1.  ING Cannot Establish That Plaintiffs Had Actual Knowledge Of Its Violations Of ERISA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    2.  ING's Six-Year Statute Of Limitations Argument Is Equally Unpersuasive. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

III.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**TABLE OF AUTHORITIES**

<u>**FEDERAL CASES**</u>

*Acosta v. Pacific Enterprises*,
950 F.2d 611, 618 (9th Cir..1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Agway, Inc. Employees' 401(k) Thrift Investment Plan v. Magnuson*,
2006 WL 2934391 (N.D.N.Y. Oct. 12, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Bay Area Laundry & Dry Cleaning Pension Trust Fund. v. Ferbar Corp.*,
522 U.S. 192, 195-96 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Beddall v. State St. Bank & Trust Co.*,
137 F.3d 12 (1st Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Blatt v. Marshall*,
812 F.2d 810 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 17

*Borroughs Corp. v. Blue Cross Blue Shield of Michigan*,
2012 WL 3887438 (E.D. Mich. Sept. 7, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 32

*Bouboulis v. Transp. Workers Union of America*,
442 F.3d 65 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Briscoe v. Fine*,
444 F.3d 478, 490-94 (6th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Brovarski v. Local 1205, Intern. Bro. of Teamsters Union, Pension Plan*,
1998 WL 765141 (E.D.N.Y.  Feb. 23, 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Burroughs Corp. v. Blue Cross Blue Shield of Michigan*,
2012 WL 3887438 (E.D. Mich. Sept. 7, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Caputo v. Pfizer, Inc.*,
267 F.3d 181, 193 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

*Carlton v. Mystic Transp., Inc.*,
202 F. 3d 129, 134 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Chao v. Crouse*,
346 F.Supp. 2d 975 (S.D. Ind. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Chao v. Day*,
436 F. 3d 234, 236 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Chao v. Emerald Cap. Mgmt., Ltd.*,
2006 WL 2620055 (W.D.N.Y. Sept. 13, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Chao v. Unique Mfg. Co., Inc.*,
649 F. Supp.2d 827 (N.D. Ill. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Charters v. John Hancock Life Ins. Co.*,
583 F. Supp. 2d at 189, 197 (D. Mass. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 22

*Chicago Bd. Options Exch., Inc. v. Conn. Gen. Life Ins. Co.*,
713 F.2d 1250, 1259 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Coldesina v. Estate of Simper*,
407 F.3d 1126, 1132 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 17

*Cutaiar v. Marshall*,
590 F.2d 523, 528 (3d Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Daniels v. National Employee Benefit Services, Inc.*,
858 F. Supp. at 684, 692, 693 (N.D. Ohio 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*David v. Alphin*,
704 F.3d 327 (4th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

*Eaton v. D'Amato*,
581 F.Supp. 743 (D.D.C. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*F.H. Krear & Co. v. Nineteen Named Trs.*,
810 F.3d 1250, 1259-60 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12

*Fechter v. Connecticut General Life Ins. Co.*,
798 F. Supp. 1120 (E.D. Pa. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Felber v. Estate of Regan*,
117 F.3d 1084, 1087-88 (8th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*FirsTier Bank, N.A. v. Zeller*,
16 F.3d 907, 911 (8th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Framingham Union Hosp., Inc. v. Travelers Ins. Co.*,
744 F.Supp. 29 (D. Mass. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Frommert v. Conkright*,
433 F.3d 254, 271-272 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 35, 36, 37

*Gearren v. McGraw-Hill Cos.*,
660 F.3d 605, 611 (2d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Gruby v. Brady*,
838 F.Supp. 820, 831 (S.D.N.Y. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Haddock v. Nationwide Fin. Servs., Inc.*,
419 F. Supp. 2d 156 (D. Conn. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Haddock v. Nationwide Financial Services, Inc.*,
262 F.R.D. 97, 126, 129-130 (D. Conn. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

*Haddock v. Nationwide Financial Services, Inc.*,
570 F.Supp. 2d 355 (D. Conn. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*Harris Trust and Savings Bank v. John Hancock Mut. Life Ins. Co.*,
302 F.3d 18, 28 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Harris Trust and Savings Bank v. Salomon Smith Barney, Inc.*,
530 U.S. at 238, 250, 120 S.Ct. 2180.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29, 33

*Hecker v. Deere & Co.*,
556 F.3d 575 (7th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Herman v. NationsBank Trust Co.*,
126 F.3d 1354, 1367 (11th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Beacon Assoc. Litig.*,
818 F.Supp. 2d 697 (S.D.N.Y. 2011).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Fruehauf Trailer Corp.*,
250 B.R. 168, 201-203 (D.Del. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*In re Pharmaceutical Industry Average Wholesale Price Litigation*,
309 F.Supp.2d 165, 171 (D.Mass. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*In re State Street Bank and Trust Co. Erisa Litigation*,
579 F. Supp. 2d 512, 518-519 (S.D.N.Y. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*IT Corp. v. Gen. Am. Life Ins. Co.*,
107 F.3d 1415, 1421 (9th Cir. 1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 10, 14

*John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*,
510 U.S. 86, 100-101 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Kanawi v. Bechtel Corp.*,
590 F.Supp.2d 1213, 1223 (N.D. Cal. 2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 38

*Kim v. Fujikawa*,
871 F.2d 1427, 1431 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Kurz v. Phila Elec. Co.*,
96 F.3d 1544, 1551 (3d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*L. I. Head Start Child Development Services, Inc. v. Econ. Opportunity Comm'n*
558 F. Supp. 2d 378 (E.D.N.Y. 208). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*LaScala v. Scrufari*,
479 F.3d 213, 221, n.4 (2d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*LeBlanc v. Cahill,*
153 F.3d 134 (rth Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Leigh v. Engle,*
727 F.2d 113, 123 (7th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 32

*Leimkuehler v. Am. United Life Ins. Co.,*
2012 WL 28608 (S.D. Ind. Jan. 5, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

*Lockheed Corp. v. Spink,*
517 U.S. 882, 888-889 96). 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*LoPresti v. Terwilliger,*
126 F.3d 34, 40 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 10, 12

*Lowen v. Tower Asset Mgmt., Inc.,*
829 F.2d 1209, 1215 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

*Mack Boring and Parts v. Meeker Sharkey Moffitt,*
930 F.2d 267, 275 (3d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Martin v. National Bank of Alaska,*
828 F.Supp. 1427, 1432 (D. Alaska 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Martin v. Schwab,*
1992 WL 296531 (W.D. Mo. Aug. 11, 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Massachusetts Mut. Life Ins. Co. v. Russell,*
473 U.S. 134, 141 n.8, 105 S.Ct. 3085, 3090 n.8, 87 L.Ed.2d 96 (1985). . . . . . . . . . . . . . . . . . . . . 26

*Midwest Community Health Service, Inc. v. American United Life Ins. Co.,*
255 F.3d 374 (7th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Montrose Med. Group Part. Sav. Plan v. Bulger,*
243 F.3d 773, 788 (3d. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*National Sec. Systems, Inc. v. Iola,*
700 F.3d 65, 100-102 (3d Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Nationwide Life Ins. Co. v. Haddock,*
460 Fed. App'x. 26 (2d Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*NYSA-ILA Med. & Clinical Serv. Fund v. Catucci,*
60 F.Supp. 2d 194, 199 (S.D.N.Y. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Olson v. E.F. Hutton & Co., Inc.,*
957 F.2d 622, 625 (8th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Patelco Credit Union v. Sahni,*
262 F.3d 897, 911 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Pegram v. Herdrich,*
530 U.S. 211, 223 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 24

*Pugliese v. United Technologies Corp.,*
552 F. Supp. 2d 266, 269 (D. Conn. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Reich v. Cook,*
94cv2069, slip op. at 10-11 (D. Conn. Mar. 24, 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Reich v. Rowe,*
20 F.3d 25, 32 (1st Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Reich v. Valley Nat. Bank of Arizona,*
837 F.Supp. 1259, 1281 (S.D.N.Y. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Silverman v. Mutual Ben. Life Ins. Co.,*
138 F.3d 98, 104 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Smith v. IBT Local 819 Pension Plan,*
291 F.3d 236 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Sologub v. City of New York,*
202 F.3d 175, 178 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Srein v. Frankford Trust Co.,*
323 F.3d 214, 221 (3d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Tibble v. Edison Int'l,*
639 F.Supp. 2d 1-74 (C.D. Cal. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 37, 38

*Tool v. National Employee Ben. Services., Inc.,*
957 F. Supp. 1114 (N.D. Cal. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Trustees of Laborers' Local No. 72 Pension Fund. v. Nationwide Life Ins. Co.,*
783 F. Supp. 899 (D.N.J. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Tybout v. Karr Barth Pension Admin., Inc.,*
819 F. Supp. 371 (D. Del. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Glick,*
142 F.3d 520, 527-28 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Warner,*
396 F. Supp. 2d 924, 937 (N.D. Ill. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Varity Corp. v. Howe,*
516 U.S. 489, 502 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Yeseta v. Baima,*
837 F.2d 380, 384-85 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Zang v. Paychex, Inc.*,
728 F. Supp. 2d 261 (W.D.N.Y. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 35, 36, 37

## STATUTES AND RULES

29 U.S.C. § 1002(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

29 U.S.C. § 1002(2)(21)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 10, 11, 13-23

29 U.S.C. § 1101(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

29 U.S.C. § 1106(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23-26, 28, 29, 36-38

29 U.S.C. § 1002(16). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

29 U.S.C. § 1002(17). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

29 U.S.C. § 1113. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

ERISA § 406(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 24-31, 39

ERISA § 404. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8, 31, 32, 36

ERISA § 3(21)(A)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 10

ERISA § 502(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

29 C.F.R. § 2550.401c-1(d)(2)( c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

29 C.F.R. § 2550.404a-5(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Fed. R. Civ. P. 56(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

D. Conn L. Civ. R. 56(a)2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## OTHER AUTHORITIES

*In re Aetna Life Ins. & Annuity Co.*,
1997 WL 277979 (May 22, 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

*In re Frost Nat'l Bank*,
1997 WL 277980 (May 22, 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

Muir, *Fiduciary Status As An Employer Shield: The Perversity of ERISA Fiduciary Law*,
2 U. Pa. J. Lab. & Empl. L. 391, 405-409 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Muir, *The Intersection of State Corporation Law and Employee Compensation Programs: Is It
Curtains For Veil Piercing?*, 1996 U. Ill. L. Rev. 1059, 1106 (1996). . . . . . . . . . . . . . . . . . . . . . . 29

Muir, *ERISA Remedies: Chimera or Congressional Compromise?*,
81 Iowa L. Rev. 1, 23 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Reish and Faucher, *The Fiduciary Duty to Avoid Conflicts of Interest in Selecting Plan Service
Providers* (February 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Falk and Kleinman, *What to Do if Your Fund Becomes Subject to ERISA*, 14 The Investment
Lawyer 1, 4 (January, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

James F. Jorden, *Waldemar J. Pflepsen, Jr. & Stephen H. Goldberg, Handbook on ERISA
Litigation*, § 3.03[B][1] (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Restatement (Second) of Trusts, § 294. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

Plaintiffs, Healthcare Strategies, Inc. ("HSI") and The DeRosa Corporation ("TDC")(collectively "Plaintiffs"), individually and in their respective capacities as the Plan Administrator of the Healthcare Strategies, Inc. 401(k) Plan and the Healthcare Strategies, Inc. CBU 401(k) Plan (collectively, the "HSI Plan") and The DeRosa Corporation 401k PS Plan (the "TDC Plan"), and on behalf of the Class of retirement plan administrators certified by the Court on September 27, 2012, respectfully submit this Memorandum of Law in Opposition to the Motion for Summary Judgment (the "Motion" or "Motion for Summary Judgment") of Defendant, ING Life Insurance and Annuity Company ("Defendant" or "ING").[1]

## I.      INTRODUCTION AND SUMMARY OF ARGUMENT

ING's Motion for Summary Judgment misstates applicable law and ignores the actual facts of record, including facts establishing that material issues of fact exist that require a trial on the merits. Indeed, as explained below and in Plaintiffs' accompanying Response and Counter-Statement of Facts ("RCS") pursuant to Local Civil Rule 56(a)2,[2] ING's Statement of Material Facts pursuant to Local Civil Rule 56(a)1, despite its title, largely consists of a statement of immaterial and misleading "facts," many of which are not supported by the record citations attributed to them or any evidence in the record.[3]

As ING's Motion ignores, this case is about ING's lucrative 401k business that bases its program architecture on critical violations of ERISA.  Despite ING's effort to convince the Court that its conduct should be excused because "everyone does it" or that ING somehow disclosed its conduct and practices,

---

[1]This is an action for equitable relief and damages under the Employee Retirement Income Security Act ("ERISA" or "Act"), 29 U.S.C. §§1001 *et seq.*, in which Plaintiffs seek to recover, for the benefit of their 401(k) Plans and all other similarly situated retirement plans, also known as employee pension benefit plans under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), which are subject to Internal Revenue Code ("IRC") § 401(k), payments from mutual funds, mutual fund advisors, investment funds, including collective trusts, and/or other investment instruments (collectively, "mutual funds") to ING ("the revenue sharing payments" or the "RSPs").

[2]Plaintiffs incorporate by reference its RCS, which facts are referenced in response to ING's arguments in this Memorandum in the context of the arguments raised by ING.

[3]ING's Memorandum of Law in Support of Summary Judgment also is replete with factual assertions that have no corresponding citation to the record or other evidentiary support.  Although the examples of this violation of the Local Civil Rules are too numerous to detail in these opposition papers, it bears noting that Defendant's factual assertions (without competent evidentiary support), which constitute the majority of Defendant's supposed facts, cannot form the basis for any summary judgment.

the facts of record confirm that these assertions are incorrect.  It is undisputed that, unlike other service

providers that use RSPs as a dollar-for-dollar offset against expenses that retirement plans would

otherwise pay (like the service provider for which ING's own expert, E. Scott Peterson, worked for a

number of years, *see* RCS, ¶ 155),[4] as sanctioned by the Department of Labor ("DOL") in an Advisory

Opinion, that ING engages in no such dollar-for-dollar offset or direct crediting (nor could it based on the

manner in which it accounts for revenues and expenses (RCS, ¶¶ 99-101, 109, 112, 157), and that, when

a mutual fund increases the amount of RSPs, ING provides no notice to the retirement plans at issue

("Plans"), but simply keeps the increased RSPs)(RCS, ¶¶ 122, 136, 149, 159, 173, 178), and ING's

alleged disclosures regarding RSPs were, to say the least, false and misleading in nature because they

were, at best, opaque in nature and repeatedly ascribed ING's receipt of RSPs as being in return for

actual services performed for mutual funds (RCS, ¶¶ 40, 45, 68, 69,73, 144-147, 149, 165, 178, 180) --

even though the undisputed evidence establishes that (a) ***ING performs the same services regardless of***

***whether mutual funds pay it any RSPs***, and (b) ***the services that ING claims it performs for mutual***

***funds are the same exact services that it provides its retirement plan customers in order to operate its***

***business and, thus, are illusory in nature***.  (RCS, ¶¶ 139, 147, 160, 182.)

      Likewise, as explained below, ING's "baked in" argument, in which it asserts that its alleged

fiduciary conduct occurred pre-contract, cannot be supported by the actual record.  Indeed, ING's factual

assertions in this regard are not supported by any record evidence.  (RCS, ¶¶ 4, 8, 11, 22 and 61.)  The

fact of the matter is that ING continuously negotiates to increase the amount of its RSPs, amends its

agreements with mutual funds to provide for such increases, retains and exercises its discretion to add,

delete, change and substitute mutual funds from its menus of available options, uses the economic value

of the separate accounts (which necessarily is a post-contract action) for which it serves as a fiduciary to

negotiate kickbacks from the mutual fund complexes that bear no relationship to services provided to the

---

[4]In light of Mr. Peterson's admission that his former employer actually credited RSPs on a dollar-for-dollar basis to the benefit of retirement plans and adopted this methodology in an effort to be transparent regarding its fees and services (RCS, ¶ 155), it is perhaps unsurprising that Mr. Peterson has disappeared from the case and is not featured in ING's Motion for Summary Judgment.

mutual fund companies or the Plans (even though the economic value of the separate accounts provides ING with the market power to choose lower cost alternatives for its customers -- which would pay ING less in the way of RSPs), makes post-contractual investment decisions on behalf of the Plans which affect the amount of RSPs and retains and exercises the discretion to change, at any time, the fees it charges the Plans and their participants based upon the amount of RSPs received.  (RCS, ¶¶ 8,22, 59-61, 76-147, 159-177.)  Thus, as explained fully below, ING is a fiduciary that uses its fiduciary status to engage in prohibited transactions ("PTs").   For the reasons explained fully below, HSI respectfully submits that ING's Motion for Summary Judgment should be denied.

## II.    ARGUMENT

### A.    Standard Of Review

It is well settled that on a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.   *Pugliese v. United Technologies Corp.*, 552 F.Supp.2d 266, 269 (D. Conn. 2008) (citations omitted).  "In determining whether the record presents genuine issues for trial, the court must view all inferences and ambiguities in a light most favorable to the non-moving party."  *Id.*  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."  *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000).[5]   Application of this standard results in one conclusion: ING's Motion should be denied.

### B.    ING Receipt Of RSPs Violates The DOL's Specific And Longstanding Guidance On Practices Deemed Acceptable In 1997

In its previous Motion for Summary Judgment, ING argued that its acceptance of RSPs has long been deemed acceptable by the DOL, and that ING's conduct complies with the DOL's guidance on the subject.  (Dkt. 112-1 at 13-16.)  That argument has now effectively disappeared from ING's current summary judgment motion in recognition of the fact that ING serially violates that guidance.

---

[5]Likewise, "[w]hen reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the trier of fact. *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir. 2000).

Examination of the DOL's seminal guidance on the subject is instructive.

In 1997, the DOL approved of service providers' receipt of RSPs in two limited circumstances and provided substantial guidance to providers, such as ING, as to the manner in which RSPs could permissibly be accepted (and, conversely, provided significant guidance regarding actions that could be deemed violative of ERISA). *See In re Frost National Bank*, DOL Opinion No. 97-15A, Pens. Plan Guide (CCH) P 19,986N, 1997 WL 277980 (May 22, 1997)(the "*Frost Letter*"); *In re Aetna Insurance Company*, Opinion No. 97-16A, Pens. Plan Guide (CCH) P 19,986O, 1997 WL 277979 (May 22, 1997)(the "*Aetna Letter*"). Any suggestion by ING that its conduct complies with that of the *Frost Letter* and the *Aetna Letter* cannot withstand cursory scrutiny.

In the *Frost Letter*, the DOL approved a fiduciary's receipt of RSPs in the following delimited circumstances:

> [T]he terms of Frost's ***fee arrangements with the mutual fund families will be fully disclosed to the Plans***. In addition, Frost's trustee agreement with a Plan will be structured so that any 12b-1 or subtransfer agent fees received by Frost that are attributable to the Plan's investment in a mutual fund will be used to benefit the Plan. Pursuant to the particular agreement with each Plan, Frost will offset such fees, ***on a dollar-for-dollar basis***, against the trustee fee that the Plan is obligated to pay Frost or against the recordkeeping fee that the Plan is obligated to pay to a third-party recordkeeper; or Frost will credit the Plan directly with the fees it receives based on the investment of Plan assets in the mutual fund. The trustee agreement will provide that, ***to the extent that Frost receives fees from mutual funds in connection with the Plan's investments that are in excess of the fee that the Plan owes to Frost***, the Plan will be entitled to the excess amount.

*Id*. at * 2 (emphasis added). Here, ING's fee arrangements with mutual fund families are not fully disclosed to the Plans,[6] the RSPs are not credited to the benefit of the Plans on a dollar-for-dollar basis and there is no provision in ING's contract documents providing that, where the amount of the RSPs exceed the amount due from the Plans, the Plans will receive the excess amount. (RCS, ¶¶ 101, 109.) ***Indeed, when a mutual fund increases the amount of RSPs during the term of a retirement plan's contract, ING simply keeps the extra monies and has no policy or practice in place to reduce any other***

---

[6]Indeed, ING's witnesses state that it treats its revenue sharing arrangements with mutual funds as confidential, proprietary and does not disclose the amount of those RSPs to its retirement plan customers. (RCS, ¶ 172.)

*fees charged to its retirement plan customers*.  (RCS, ¶ 122, 159, 173.)  Thus, ING has no factual or

evidentiary basis to suggest that it complies with the DOL's guidance, as contained in the *Frost Letter*.

Moreover, the *Frost Letter* essentially establishes ING's fiduciary status: "[y]our submission indicates,

however, that Frost *reserves the right to add or remove mutual fund families that it makes available to*

*Plans* [and] [u]nder these circumstances, we are unable to conclude that Frost would not *exercise any*

*discretionary authority or control to cause the Plans to invest in mutual funds that pay a fee or other*

*compensation to Frost*."  *Id*. at * 3 (*citing* "the [DOL]'s position as expressed in the preamble to the final

regulation regarding participant-directed individual account plans (ERISA section 404(c) plans)), 57 Fed.

Reg. 46906, 46924 n. 27 (Oct. 13, 1992): [in which '... the [DOL] points out that *the act of limiting or*

*designating investment options which are intended to constitute all or part of the investment universe*

*of an ERISA 404(c) plan is a fiduciary function* which, whether achieved through fiduciary designation

or express plan language, is not a direct or necessary result of any participant direction of such plan.'"

(Emphasis added.))  Thus, ING indisputably holds and exercises the discretionary authority and control to

add, delete, change and substitute investment options for the Plans.  (RCS, ¶ 22.)

      Likewise, in the *Aetna Letter*, the DOL's opinion was predicated on (a) a fulsome disclosure of

the amount and nature of the RSPs, including the services provided to mutual funds in return for the

RSPs, *Id*. at * 2; (b) that the contracts at issue provided "[e]ither party [with the right to] terminate the

arrangement without penalty on 60 days written notice," *Id*.; (c) that the service provider's contract only

provided a right to modify the agreement by deleting or replacing an investment option if 60 days' notice

was provided to the Plans; *Id*. at * 3; (d) that the service provider's notice "would: (1) explain the

proposed modification to the ... menu; (2)  *fully disclose any resulting changes in the fees paid to* [the

service provider] by the Plan, or *by any other entity with respect to Plan assets invested in the affected*

*Funds*; (3) identify the effective date of the change; (4) *explain the Plan fiduciary's right to reject the*

*change or terminate the agreement*.  *Id*. (emphasis added); (e) that, if a Plan fiduciary rejected a

proposed deletion or substitution, the service provider is not authorized to make any change and the Plan

fiduciary is provided with an additional 60 days to identify another service provider, thereby providing

each of the Plans with at least 120 days to reject any proposed deletion or substitution, *Id.*; and (f) *an*

*assumption that the service provider at issue was not the owner of separate accounts*, which would

otherwise render it a fiduciary and materially alter the analysis ("[y]ou have assumed that ALIC, an

affiliate under common control with ALIAC, is a fiduciary with respect to the Plans by virtue of

exercising authority or control over Plan assets invested in separate accounts maintained by ALIC [but]

[t]here is nothing, however, in your submission to indicate that ALIAC is in a position to (or in fact does)

exercise any authority or control over those assets [and] [a]ccordingly it does not appear that ALIAC

would be considered a fiduciary merely as a result of its affiliation with ALIC.")  *Id.* at * 6.  But, in this

case, ING's conduct flaunts virtually each and every material requirement of the *Aetna Letter*: (a) ING

has not provided accurate or fulsome disclosures regarding RSPs; (b) the Group Contracts do not provide

the Plans with the right to terminate the agreements without penalty on 60 days written notice; (c) ING's

Group Contracts do not require any period of notice before an addition, deletion, change or substitution

is accomplished at ING's discretion; (d) any notices provided by ING do not disclose the amount of the

RSPs associated with a deletion or substitution; (e) any notices provided by ING do not explain that the

Plans have the right to reject the change or terminate the Group Contracts; (f) any notices provided by

ING do not explain that if the Plans reject a deletion or substitution, ING is not authorized to make any

change or that the Plans are provided with an additional 60 days to identify another service provider,

thereby providing each of the Plans with at least 120 days to reject any proposed deletion or substitution;

and (g) ING is the owner of the Separate Accounts and, therefore, is a fiduciary of the Plans, thereby

rendering the entire analysis of the *Aetna Letter* inapplicable.  (RCS, ¶¶ 59, 86-97, 170.)[7]  In sum, ING's

clear disregard of the seminal guidance on this subject from the DOL establishes the nature of ING's

liability.

---

[7]Somewhat amazingly, after having unsuccessfully attempted to cloak itself in the *Aetna Letter* in its prior
Motion for Summary Judgment, ING's current Motion for Summary Judgment now omits any reference to the *Aetna
Letter*, even though it is one of the two seminal opinion letters on the subject from the DOL.  And, ING's passing
reliance on the *Frost Letter* defies credulity.

**C.      ING Acts As A Fiduciary When It Receives The RSPs**

ERISA Section 3(21)(A) provides that "a person is a fiduciary with respect to a plan to the

extent:

> (i) he exercises any **discretionary authority or discretionary control respecting management of such plan** or **exercises any authority or control respecting management or disposition of its assets**, or …
>
> (iii) he **has any discretionary authority or discretionary responsibility in the administration of such plan**.

29 U.S.C. § 1002(21)(A)(emphasis added).  ERISA construes the term fiduciary broadly.  *See Frommert*

*v. Conkright*, 433 F.3d 254, 271 (2d Cir. 2006).[8]

Under the rubric of ERISA Section 3(21)(A) and the instruction that an ERISA fiduciary is to be

broadly construed (which Defendant ignores), ING was acting as a fiduciary to the Plans when it

received the RSPs at issue for at least eight (8) independent reasons: (1) ING's exercise of ownership and

control of the Separate Accounts; (2) ING's discretionary authority in the administration of the Separate

Accounts; (3) ING's discretionary authority to add, delete, change or substitute mutual funds from the

menu available to the Plans through the Separate Accounts; (4) ING's exercise of discretionary authority

to add, delete, change or substitute mutual funds from the menu available for the Separate Accounts; (5)

ING's exercise of discretionary authority not to offer, purchase, and substitute institutional share classes;

(6) ING's exercise of discretionary authority to re-invest the mutual fund dividends generated by the

Separate Accounts; (7) ING's discretionary authority to self-determine and draw its compensation

---

[8]The "test" for determining whether a person is an ERISA fiduciary is "functional," and not tethered to any disclaimer or title.  *See LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997). "[Section] 1002(21)(A) creates a bifurcated test: 'Subsection one imposes fiduciary status on those who exercise discretionary authority, regardless of whether such authority was ever granted.  Subsection three describes those individuals who have actually been granted discretionary authority, regardless of whether such authority is exercised.'" *Bouboulis v. Transp. Workers Union*, 442 F.3d 55, 63 (2d Cir. 2006) (*quoting Olson v. E.F. Hutton & Co.*, 957 F.2d 622, 625 (8th Cir. 1992)).  Additionally, the second subpart to subsection one of 29 U.S.C. § 1002(21)(A) has no "discretionary requirement" for imposing fiduciary status on a person who "exercises **any** *authority or control* respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i) (emphasis added); *see, e.g.*, *IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997) ("The statute treats control over the cash differently than control over administration [and] "[t]he statutory qualification, that control must be 'discretionary' for it to establish fiduciary status, applies to the first and third phrases, management and administration but not to the second, assets [because] '[a]ny' control over disposition of plan money makes the person who has control a fiduciary").

directly from the Separate Accounts; and (8) ING's exercise of discretionary authority to set and draw its compensation directly from the Separate Accounts.

Although Plaintiffs must prove *at trial* that ING is a fiduciary, on a motion for summary judgment, the burden is on ING, as the moving party, to show that "there is no genuine issue as to any material fact" and that ***it was not a fiduciary*** when it received the RSPs.  Fed. R. Civ. P. 56(c).  Moreover, unless ING can prove it is not a fiduciary to the Plans, as ING's Motion for Summary Judgment ***critically and fatally ignores***, the burden is on ING to show that its receipt of RSPs was ***not*** "***in connection with***" its fiduciary status.  *See, e.g., Lowen v. Tower Asset Mgmt, Inc.*, 829 F.2d 1209, 1215 (2d Cir. 1987) ("We believe that a fiduciary charged with a violation of Section 406(b)(3) either must prove by a preponderance of the evidence that the transaction in question fell within an exemption, [citation omitted], or must prove by clear or convincing evidence that compensation it received was for services other than a transaction involving the assets of a plan").  As the Second Circuit Court of Appeals in *Lowen* explained, this burden shifting makes perfect sense in an ERISA PT case:

> First, although the "in connection with" requirement departs from the strict common law rules regarding trustees, we are nevertheless instructed by ERISA to look to those rules for interpretive guidance. [citations omitted.] The "in connection with" requirement thus should not be construed in a way that creates a loophole that permits self-dealing and, in particular, "kickbacks" to fiduciaries. [citations omitted.] Second, because the fiduciary has a virtual monopoly of information concerning the transaction in question, it is in the best position to demonstrate the absence of self-dealing.  Placing the burden of proof on the fiduciary is thus justified.

*Lowen*, 829 F.2d at 1215 (affirming summary judgment for plaintiffs).  The same burden applies to the Section 406(b)(1) and 404 claims under applicable law, as well as the logic of *Lowen*.  *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 446 (3d Cir. 1996)(relying upon *Lowen* and noting that, where a fiduciary seeks to exempt itself from ERISA's general fiduciary rules, it bears the burden of establishing that its conduct was exempt); *In re Beacon Assoc. Litig.*, 818 F.Supp.2d 697, 711 (S.D.N.Y. 2011)(the "burden of proving that payments that otherwise violate § 406(b) ... lies squarely with the defendant"); *see also Felber v. Estate of Regan*, 117 F.3d 1084, 1087-88 (8th Cir. 1997)(once plaintiff makes out *prima facie* case that fiduciary has earned ill-gotten funds as a result of prohibited transaction under Section

406(b)(1), burden shifts to defendant to prove that funds earned were not attributable to breach of duty).[9]

Not only has ING failed to meet this significant burden, the facts show that ING received the RSPs directly "in connection with" its fiduciary status and, therefore, regardless of the evidentiary burden, ING cannot prevail.

    1.    ING Was A Fiduciary When It Received The RSPs Because It Owns And Exercises Authority And Control Over The Separate Accounts

It is undisputed that the Separate Accounts at issue hold the Plans' assets, that ING manages and administers the Separate Accounts and that ING is the legal owner of and maintains sole possession, title, and control of the Separate Accounts. (RCS, ¶¶ 21, 76-78.) It also is undisputed that a mutual fund will only provide RSPs to ING when ING delivers the Plans' assets to the mutual funds by and through the Separate Accounts. (RCS, ¶¶ 80-82.) In other words, the Separate Accounts are the delivery mechanism that ING utilizes to obtain the RSPs. In fact, ING's participation agreements with the mutual funds explicitly reference the Separate Accounts and ING's ownership of them in connection with the mutual funds' agreement to pay Defendant the RSPs. (RCS, ¶¶ 105-106.) Moreover, ING can choose the share class of a mutual fund to offer to its retirement plan customers (and the corresponding amount of RSPs) based on the financial status and assets of the Separate Accounts. (*Id.*.) Thus, in direct return for

---

    [9]ING's reliance on *Leimkuehler v. Am. United Life Ins. Co.*, No. 1:10-cv-0333-JMS-TAB, 2012 WL 28608 (S.D. Ind. Jan. 5, 2012)(which is on appeal to the Seventh Circuit Court of Appeals and in which the DOL has filed an *amicus curiae* brief seeking reversal) and *Tibble v. Edison Int'l*, 639 F. Supp. 2d 1-74 (C.D. Cal. 2009), for the proposition that Plaintiffs "must prove that the particular transactions in dispute . . . resulted from [ING's] exercise of its fiduciary authority or control over plan assets" is misplaced and contrary to Second Circuit law. Being out-of-circuit opinions, it is unsurprising that neither address the Second Circuit Court of Appeals' pronouncement and reasoning that the burden of proof shifts to the fiduciary charged with engaging in a prohibited transaction once fiduciary status is established. Moreover, neither *Leimkuehler* nor *Tibble* explicitly address the burden shifting question or address *Lowen*. The other authorities ING cites merely repeat the uncontroversial proposition that a person is only an ERISA fiduciary "to the extent" that he has or exercises the described authority or responsibility over a plan. *See Harris Trust & Savs. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 28 (2d Cir. 2002) (mere possibility of extra-contractual action not "discretionary authority" over plan); *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1259 (2d Cir. 1987) (affirming jury instruction on fiduciary status); *Gearren v. McGraw-Hill Cos.*, 660 F.3d 605, 611 (2d Cir. 2011) ("defendants who signed or prepared the SEC filings were acting in a corporate, rather than ERISA fiduciary, capacity when they did so"); *Chicago Bd. Options Exch., Inc. v. Conn. Gen. Life Ins. Co.*, 713 F.2d 254, 259 (7th Cir. 1983) (cautioning that while insurer's power to amend may render it a fiduciary, liability only extends to actions relating to that authority). Accordingly, while Plaintiffs concur that ING is liable only "to the extent" its receipt of RSPs is related to its fiduciary status, the burden is on ING to prove that there is no relation once ING's fiduciary status is established. ING has failed to offer any such proof beyond conclusory assertion.

delivering retirement assets from the Separate Accounts to the mutual funds, ING receives the revenue

sharing kickbacks at issue.[10]  Accordingly, ING is a fiduciary to the Plans when it manages the Separate

Accounts under the second subpart to ERISA Section 3(21)(A)(i) because it "exercises" its indisputable

authority and control over the Plans' assets in the Separate Accounts.  Moreover, the RSPs that ING

receives are directly related to its role in managing the Separate Accounts because mutual funds would

not otherwise provide ING those RSPs, and ***ING asserts that it accepts those payments as a result of its***

***status as the sole shareholder of the Separate Accounts***.  (RCS, ¶¶ 81, 130.)[11]

---

[10]ING admits the direct connection between its status as the owner of the Separate Accounts and its receipt of RSPs when it asserts that mutual funds provide RSPs in part because "they 'recognize that there will be a substantial savings in administrative expense and recordkeeping expenses by virtue of having ***one shareholder*** [through ING's Separate Accounts] ***rather than multiple shareholders*** [if each Plan had its own account].'" [Dkt. No. 112-2, ¶ 63 (emphasis added.)]

[11]ING attempts to disclaim that fiduciary status by asserting that its managing role amounted to nothing more than ministerial conduct.  In addition to being incorrect, this argument finds no support in the law.  *See* 29 U.S.C. § 1002(21)(A)(i) ("a person is a fiduciary with respect to a plan to the extent he . . . exercises ***any*** authority or control") (emphasis added).  As the court in *Chao v. Unique Mfg. Co., Inc.*, 649 F. Supp. 2d 827 (N.D. Ill. 2009), explained while rejecting the same "ministerial" argument puts forth:

> [T]he majority of other circuits have held that the exercise of even ***ministerial control or authority over plan assets will be sufficient to make a person or entity a fiduciary***.  *See Briscoe v. Fine*, 444 F.3d 478, 490-94 (6th Cir. 2006); *Chao v. Day*, 436 F.3d 234, 236 (D.C. Cir. 2006); *Coldesina v. Estate of Simper*, 407 F.3d 1126, 1132 (10th Cir. 2005); *Srein v. Frankford Trust Co.*, 323 F.3d 214, 221 (3d Cir. 2003); *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997); *IT Corp. v. General Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997); *FirsTier Bank, N.A. v. Zeller*, 16 F.3d 907, 911 (8th Cir. 1994) . . . The majority view of the circuit courts, which is consistent with the plain language of the statute, will be followed.

*Chao*, 649 F. Supp. 2d at 823-33 (emphasis added); *see also LoPresti*, 126 F.3d at 40 (2d Cir. 1997) (finding defendant who had "ministerial" responsibilities a fiduciary and citing *Reich v. Cook*, 94cv2069, slip op. at 10-11 (D. Conn. Mar. 24, 1997), which held that defendants fell within the ambit of section 1002(21)(A) where, even though other employees processed checks for their signature, they were the only signatories on the corporate account, and they "retained the authority to instruct those employees as to what checks to process and what monies were to be paid out").  ING cites *Leimkuehler*, 2012 WL 28608 (S.D.Ind. Jan. 5, 2012), which relies on *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12 (1st Cir. 1998), as contrary authority, but fails to recognize that the Seventh Circuit applies a different construction than the Second Circuit.  The situation in *Beddall* also was quite unique and distinct -- the agreement between the plan and the trustee allowed the plan's administrative committee to micromanage the defendant trustee's creation and control of the separate accounts, which it proceeded to do, and appoint individual investment managers who "relieved the [defendant] of all fiduciary responsibility." *Beddall*, 137 F.3d at 19-21.  Meanwhile, in *Blatt v. Marshall & Lassman*, 812 F.2d 810 (2d Cir. 1987), the Court actually found that, notwithstanding the defendant's protestations that its role was "ministerial," "control" of plan assets alone was sufficient to confer fiduciary status.  *See Blatt*, 812 F.2d at 813 ("When [defendants ignored [plaintiff's] requests and delayed executing the Notice of Change form [which was purportedly ministerial], they effectively prevented the Retirement Committee from returning [the plaintiff's] vested contributions to him").  Of course, here, ING

ING attempts to argue that RSPs are unrelated to its duties of ownership and management of the Separate Accounts because there is no evidentiary support that ING uses its control of the Separate Accounts to "leverage" RSPs.   First, as noted above, the burden is on ING to prove the same by clear or convincing evidence -- a burden it has not even attempted to meet (much less met).  *Lowen, supra* at 1215.  Second, the reason for ING's failure to meet this burden is plain – any argument that there was no connection between ING's fiduciary status with respect to the Separate Accounts and its receipt of RSPs is absurd.  As discussed above, ING only receives revenue-sharing ***because*** of its ownership and management of the Separate Account assets, which ING does not, because it cannot, refute.  Not only has ING failed to show that "there is no genuine issue as to any material fact" that it received RSPs "in connection with" its ownership and management of the Separate Accounts, it would be impossible for ING to do so.

Finally, ING's reliance upon *Leimkuehler* for the proposition that it is not a fiduciary with respect to the Separate Accounts (given its supposedly ministerial duties - which cannot be supported by the record, since ING exercises the discretion to, *inter alia*, choose share classes of mutual funds based on the Separate Accounts and makes the discretionary decision as to whether to reinvest mutual fund dividends payable to the Separate Accounts, *see* RCS, ¶¶ 81, 130), is unavailing.  First, *Leimkuehler* relied upon the current Seventh Circuit definition of fiduciary that effectively inserts the words "discretion" into the text of ERISA's fiduciary definition regarding management or disposition of assets, even though the statutory language notably omits the word discretion: "exercises ***any*** authority or control respect management or disposition of its assets."  29 U.S.C. § 1002(21)(A); *see also Leimkuehler, supra* at * 7 ("[u]ntil the Seventh Circuit or Supreme Court holds otherwise..., [defendant] cannot be a fiduciary ... if [it] exercised non-discretionary authority or control respecting the management or disposition of the [p]lan assets").  But, as ING fatally ignores that this interpretation of ERISA's fiduciary definition, in

---

performed much more than "ministerial" duties with respect to the Separate Accounts and treated one of its actual duties as consistent with the purpose of the Separate Accounts, actively maintaining the menu of available investments.  (RCS ¶ 60.)

addition to conflicting with the plain language of the statute, is directly contrary to Second Circuit

authority on the subject.  *See LoPresti*, 126 F.3d at 40 (2d Cir. 1997); *see also F.H. Krear & Co. v.*

*Nineteen Named Trustees*, 810 F.2d 1250, 1259–60 (2d Cir.1987) (plan attorney held not a fiduciary

under the regulations where he did not exercise authority or discretion over plan assets or management).

Second, unlike here, because the *Leimkuehler* Court found no basis to impose fiduciary status based on

ownership of the separate accounts under Seventh Circuit authority, the *Leimkuehler* Court did not

address whether that defendant's receipt of RSPs was related to its ownership of separate accounts.

> 2. ING Was A Fiduciary When It Received The RSPs Because Of Its
> <u>Discretionary Authority In The Administration Of The Separate Accounts</u>

The plain language of ERISA is fully consistent with congressional intent to impose *per se*

fiduciary status on any insurance company holding plan assets in separate accounts, such as ING here.[12]

Congress exempted certain financial arrangements from giving rise to a fiduciary duty by excluding them

from the definition of "plan assets" in 29 U.S.C. § 1101(b)(2).  But Congress omitted assets held in

separate accounts from this exemption, and expressly provided that funds held in separate accounts are

"plan assets."  *Id.*  In light of the clarity with which ERISA identifies funds held in separate accounts as

plan assets, it is unsurprising that ***it is black letter ERISA law that an insurance company owner of a***

***separate account such as ING is a fiduciary***.  *See Mack Boring and Parts v. Meeker Sharkey Moffitt*,

930 F.2d 267, 275 (3d Cir. 1991); *In re State Street Bank and Trust Co. Erisa Litig.*, 579 F. Supp. 2d 512,

518-519 (S.D.N.Y. 2008) (holding that Prudential, by virtue of its ownership of separate accounts, was a

fiduciary and had standing to assert claims against defendants on behalf of retirement plans with respect

to allegedly inappropriate investments made through the separate accounts).[13]

---

[12]The term "separate account" is a term of art under ERISA, defined at 29 U. S. C. §1002(17).

[13]Other courts have reached exactly the same conclusion.  *See Tool v. National Employee Ben. Services, Inc.*, 957 F.Supp. 1114 (N.D. Cal. 1996) (insurance company was not an ERISA fiduciary, even though it held plan assets, as there was no allegation that it held plan assets in separate account); *Tybout v. Karr Barth Pension Admin., Inc.*, 819 F.Supp. 371 (D. Del. 1993)("[i]f insurance company maintains account for defined benefits plan, finances of which are independent of insurance company's own income, gains, or losses, separate account has been established, and exception to definition of asset under ERISA for guaranteed benefit policy would not apply"); *Trustees of Laborers' Local No. 72 Pension Fund v. Nationwide Life Ins. Co.*, 783 F.Supp. 899, 905 (D.N.J. 1992)

The DOL's regulations explicitly provide that an insurer is a fiduciary with respect to a separate account because it administers the separate accounts:

> In general, an insurer is subject to ERISA's fiduciary responsibility provisions with respect to the assets of a separate account ... to the extent that the investment performance of such assets is passed directly through to the plan policyholders. ***ERISA requires insurers, in administering separate account assets, to act solely in the interest of the plan's participants and beneficiaries; prohibits self-dealing and conflicts of interest; and requires insurers to adhere to a prudent standard of care.*** In contrast, ERISA generally imposes less stringent standards in the administration of general account contracts which were issued on or before December 31, 1998.

29 C.F.R. § 2550.401c-1(d)(2)(c).(emphasis added); *see also Aetna Letter* at *2 (recognizing that administration is inherent in the operation of the separate accounts in stating that "ALIC receives fees for administration and management of the GACs, including the separate accounts maintained in connection with the GACs"). This DOL regulation is significant for at least two reasons. First, the regulation recognizes that an insurer is involved in the administration of the separate accounts, thereby placing it squarely under the regulation of 1002(21)(A)(iii), which renders the insurer a fiduciary if it possesses discretion, whether exercised or not. *Midwest Community Health Service, Inc. v. American United Life Ins. Co.*, 255 F.3d 374, 377 (7th Cir. 2001) (holding that life insurer that issued group annuity contract was ERISA fiduciary since contracts were plan assets and the insurer had discretionary authority, whether exercised or not, with respect to contracts); *Herman v. NationsBank Trust Co.*, 126 F.3d 1354, 1367 (11th Cir. 1997) ("One participant might lose part of the value of his stake in the unallocated share pool due to another participant's imprudent decision or non-decision"); *Martin v. Schwab*, Case No. 91-5059-CV-W-1, 1992 WL 296531 * 5 (W.D. Mo. Aug. 11, 1992) (defendants' failure to appoint a

_____

(pension plan's investment in insurance company, pursuant to insurance policy, to avoid categorization as "plan assets" subject to ERISA, must be deposited in insurance company's general account, not in a separate account, and policy must provide guaranteed benefits); *Fechter v. Connecticut General Life Ins. Co.*, 798 F.Supp. 1120, 1129 (E.D. Pa. 1991) (addressing investments in separate accounts and holding that "[w]e have no doubt that if plaintiffs can prove their allegations, then as a matter of law, Connecticut General is an ERISA fiduciary"). Indeed, the Supreme Court's decision in *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 100-101 (1993), is all about when an insurer becomes a fiduciary with respect to assets in its general account -- and that discussion is predicated on the understanding that an insurer, by law, is a fiduciary with respect to assets held in separate accounts. Likewise, the legislative history of ERISA also demonstrates that Congress intended that insurance companies holding plan assets in separate accounts would be fiduciaries under ERISA, given their exercise of control over plan assets. H.R. Rep. No. 93-1280 at 296-299, WL ERISA-LH 9, at *41-43.

committee was an exercise of their authority); *Eaton v. D'Amato*, 581 F.Supp. 743, 747 (D.D.C. 1980)

(holding that corporation was involved in more than ministerial duties and could be deemed fiduciary

because it provided a range of administrative and management services under a series of service

agreements that required it, among other things, to collect contributions, administer the funds' bank

accounts and keep appropriate financial records). Second, the regulation explicitly recognizes the

importance of prohibiting ***self-dealing and conflicts of interest*** of the kind that exist in this case.[14]

Here, it is undisputed that ING administers the Separate Accounts. (RCS, ¶ 78.) The

participation agreement that ING attaches to its summary judgment papers acknowledges this plain fact.

(D-App. at 982, 990.) And as explained below, ING has discretionary authority when administering the

Separate Accounts, including the power to change the fund menu that the Separate Accounts access,

changing the type of fund shares on the fund menu, setting and drawing its compensation directly from

the Separate Accounts, and reinvesting dividends in the Separate Accounts, while ING receives the RSPs

directly in connection with this fiduciary status and responsibility. (RCS, ¶¶ 81, 171**.**) Accordingly, ING

also is plainly a fiduciary with respect to the Separate Accounts under 29 U.S.C. § 1002(21)(A)(iii).

And, as explained above, ING has not presented any evidence (much less clear or convincing evidence)

to establish that its receipt of RSPs occurred in any manner other than in connection with that fiduciary

status (nor could it). Thus, ING's summary judgment argument with respect to liability fails in this

respect as well.[15]

---

[14]*See also* Muir, *Fiduciary Status As an Employer Shield: The Perversity of ERISA Fiduciary Law*, 2 U. Pa. J. Lab. & Empl. L. 391,405-409, 421 (2000)(distinguishing between benefit administration and asset administration, stating that, with respect to asset administration, as here, "pension plan actors tended to act wrongfully at the aggregate level and with respect to the corpus of the trust" through "inadequate funding, making inappropriate investments, or self-dealing" and stating that "[t]he prohibited transactions provisions [of ERISA] serve as another constraint on self-interested fiduciary behavior in asset administration").

[15]As the Second Circuit has conclusively held (and as ING has repeatedly failed to come to grips with), anyone with a right to exercise discretionary control is an ERISA fiduciary, whether or not they exercise that right. *Bouboulis v. Transport Workers Union of America*, 442 F.3d 55, 65 (2nd Cir. 2006) ("Subsection three describes those individuals who have actually been granted discretionary authority, regardless of whether such authority is ever exercised"). *See also IT Corp. v. General American Life Ins. Co.*, 107 F.3d 1415, 1419 (9th Cir. 1997)(holding that administrator of ERISA plan could be fiduciary even though contract stated that administrator performed purely ministerial functions for employer within framework of policies made by employer*)*; *Daniels v. National Employee Benefit Services, Inc.*, 858 F.Supp. 684, 692 ("NEBS is a Plan fiduciary with respect to investment of Plan funds as a

3.      ING Was A Fiduciary When It Received The RSPs Because Of Its
        Discretionary Authority To Add, Delete, Or Substitute Funds

It is uncontested that the Group Contracts grant ING the authority, responsibility and control to

"add, delete, change or substitute [the] funds [available for allocating the Plan assets in the Separate

Accounts] when [ING] deem[s it] necessary to accomplish the purposes of the separate account." (RCS,

¶¶ 60, 82.)  The only contractual duty ING owes the Plans when it decides to unilaterally change the

selection of funds is to provide some sort of ambiguous "notice" -- and it is not even clear whether such

notice is required before or after the addition, deletion, change or substitution occurs.  (RCS, ¶¶ 86-87.)

Thus, this latitude that ING has to "deem" the slate of funds "necessary to accomplish the purposes of the

separate accounts," which the Plans have no contractual right to accept, reject or veto, is the essence of

discretionary authority.  See Haddock IV, 262 F.R.D. at 108 n.6 (D. Conn. 2009) ("Haddock IV")

("Nationwide has 'final authority': the defendants have the power to permit or veto an investment option

without the Trustees' input"), vacated on other grounds by Nationwide Life Ins. Co. v. Haddock, 460

Fed. App'x 26 (2d Cir. 2012);[16] Charters v. John Hancock Life Ins. Co., 583 F. Supp. 2d 189, 199 (D.

Mass. 2008)(holding that insurer's "ability to substitute investment options also rendered it a fiduciary of

the [p]lan" because the plan "did not have a meaningful opportunity to reject substitutions"); Aetna

Letter, 1997 WL 277979, at *5 (DOL explaining that a company retaining the right to delete or substitute

available investments is not a fiduciary so long as the plan fiduciary has meaningful opportunity to accept

or reject the change, assuming that the company does not hold title to the separate account); Frost Letter

at *3(DOL stating that a bank may have discretionary authority or control over plan assets if it has the

right to add or remove "families" of mutual funds made available to plans); see also Leimkuehler, supra

---

result of the discretionary authority conferred upon it by the Plan documents, regardless of whether this authority was
ever exercised, pursuant to § 1002(21)(A)(iii)"); Smith v. IBT Local 819 Pension Plan, 291 F.3d 236, 242 (2d Cir.
2002)(reversing dismissal of third party complaint against Connecticut General Life Insurance Company and finding
that insurance company service provider was potentially liable as fiduciary under Section 1002(21)(A)(iii) on the
basis that it possessed discretionary authority with respect to a pension plan).

[16]At oral argument in Haddock, former Chief Judge Walker appeared to recognize that such veto power
over a fund menu, whether exercised or not, would confer fiduciary status related directly to the receipt of RSPs.

at *13 (S.D. Ind. Jan. 5, 2012) (defendant "does not deny that those contractual rights [which includes the right "to make additions to, deletions from, substitution for, or combinations of, the securities that are held by the Investment Account"] implicate discretionary administration of the [p]lan"); Black's Law Dictionary (defining "discretionary" as "involving an exercise of judgment and choice, not an implementation of a hard-and-fast rule").  And, maintaining a fund menu is one of the services that ING provides to the Plans to assist with plan administration; specifically, to "accomplish the purposes of the separate account." (RCS, ¶¶ 60, 83.)  That is why Judge Hall specifically held that ING's "*contractual right to delete and substitute mutual funds from its menu gave it discretion with respect to administration of the plan sufficient to make it a fiduciary with respect to its allegedly inappropriate receipt of revenue sharing payments....*"  *See* Dkt. 102 at 11 (emphasis added); *see also* Dkt. 102 at 8-11 (distinguishing *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009); *Zang v. Paychex*, 728 F.Supp.2d 261 (W.D.N.Y. 2010) and relying upon *Haddock IV*, which Judge Hall noted "is emphatic in its holding that the defendant's contractual right to modify the menu, rather than any other feature of the contract, determines its status as a fiduciary").

ING's argument that its authority to "add, delete, or substitute funds when necessary to accomplish the purposes of the separate account" only relates to "management or disposition of plan assets" but not "administration," ignores the Supreme Court's decision in *Varity Corp. v. Howe*, 516 U.S. 489, 502 (1996), where the Supreme Court defines "administration" using the ordinary trust law definition of exercise of "'such powers as are necessary or appropriate for the carrying out of the purposes' of the trust."  And, maintaining a fund menu is one of the services that ING provides to the Plans to assist with plan administration; specifically, to "accomplish the purposes of the separate account."  Id. at 502 (defining "administration" under ERISA as an "exercise of a power 'appropriate' to carrying out an important plan purpose").   Accordingly, ING is a fiduciary under 29 U.S.C. § 1002(21)(A)(iii) because of its contractual authority to unilaterally add, delete, or substitute funds

available in the administration of the Separate Accounts.[17]

ING resists its fiduciary status under 29 U.S.C. § 1002(21)(A)(iii) for its contractual authority to unilaterally add, delete, or substitute funds by insisting on an absurdly strained and shunted interpretation of "administration."  According to ING, the authority to add, substitute, or delete funds falls exclusively in the category of "management or disposition of plan assets."  The sole authority ING cites for its strained interpretation of administration is 29 U.S.C. § 1002(16)(A),[18] the statutory definition of plan administrator.

ING also argues that there is no "connection" between its right to add, delete, or substitute mutual funds and ING's receipt of RSPs because there is no evidence showing one affecting the other. Once again, ING's Motion fails because Defendant does not recognize that it is ING's burden to prove by clear or convincing evidence that this fiduciary status was unrelated to its receipt of RSPs.  Moreover, the evidence of record establishes otherwise.  Simply put, if mutual funds are not added to (or maintained on) ING's menu of available mutual fund investments, the mutual funds do not pay ING the RSPs -- that is why ING refers to the agreements as "participation agreements."  (RCS, ¶¶ 81, 84, 85, 103, 117, 128.)

---

[17]It is undisputed that mutual funds only provide RSPs to ING if that fund is placed on the menu ING provides to the Separate Accounts. [Dkt. No. 112-2, ¶¶ 56-58, 63.] Indeed, it is undisputed that mutual funds provide RSPs as *part of the exchange* for being included by ING on the menu. [*Id.*, ¶¶ 58, 63.] Thus, ING's authority to alter its fund menu is undeniably and directly connected to the RSPs that the funds provide to ING.  Nor has ING presented any evidence (much less clear or convincing evidence) to persuade the Court otherwise.

[18]ING suggests that only the named "plan administrator," here the plan sponsor, has authority over the administration of the plan.  This tautological reasoning is complete nonsense.  The title "administrator" is strictly defined under 29 U.S.C. § 1002(16)(A) as either a person specified by the plan documents, the plan sponsor, or a person prescribed by the Secretary of Labor if neither a person is specified in the plan documents nor is the plan sponsor identifiable.  So under ING's interpretation, 29 U.S.C. § 1002(21)(A)(iii) can only confer fiduciary status to the "plan administrators" defined under 29 U.S.C. § 1002(16)(A), an absurd result since Congress would have simply and expressly limited fiduciary liability under 29 U.S.C. § 1002(21)(A)(iii) to the "plan administrators" of 29 U.S.C. § 1002(16)(A). *Cf. Coldesina*, 407 F.3d at 1132 ("regardless of status or title, parties are only plan fiduciaries to the extent they are performing one of the functions identified in the definition [from 29 U.S.C. § 1002(21)(A)]"); *Acosta v. Pacific Enterpris* Indeed, ERISA does not define "administration," and there is nothing to suggest that a person cannot "administer" a plan and "manage or dispose of plan assets" simultaneously when performing the same or similar duties.  ING's interpretation does much violence to the concept of a "functional fiduciary" and the Congressional intent that fiduciary duty under ERISA be "broadly construed." *Blatt v. Marshall*, 812 F.2d 810, 812 (2d Cir. 1987).  Indeed, ING's interpretation would give lie to every court that has applied 29 U.S.C. § 1002(21)(A)(iii) to a non-plan administrator. *See, e.g., Pegram v. Herdrich*, 530 U.S. 211, 223 (2000) ("although [the health maintenance organization ("HMO") that contracted with the health insurance plan provide services] is not an ERISA fiduciary merely because it administers or exercises discretionary authority over its own HMO business, it may still be a fiduciary if it administers the plan").

Indeed, the evidence confirms that mutual funds make higher RSPs to be more "competitive" than other mutual funds that ING may offer on its menus and that mutual funds will increase the amount of their RSPs for this same reason -- because the services that ING provides are entirely unrelated to the amount of RSPs received. (RCS, ¶ 84.)  ING's claim that its participation agreements are negotiated pre-contract, in addition to lacking competent evidentiary support, ignores the evidence showing that the RSPs play a direct role in influencing whether a fund is added, maintained, changed, or even replaced on the menu. (*Id.*)[19]

4.     ING Was A Fiduciary When It Received The RSPs Because It Exercised
       Its Discretionary Authority To Add, Delete, Change Or Substitute Funds

ING is also a fiduciary under 29 U.S.C. § 1002(21)(A)(i) because it exercised its contractual authority to unilaterally add, delete, or substitute funds.[20]  ING admits that it changed all of the Plans that were invested in Janus mutual funds at a time in the past, based upon its authority as the owner of the Separate Accounts.  (RCS, ¶¶ 89-91, 170.)  ING also concedes that it discontinued a set of "Solutions ortfolio" funds and replaced it with a different set, which, no matter how "similar," are apparently different enough to warrant a substitution.  (RCS, ¶ 83, 85, 88.)  ING also ignores that it abjectly failed to satisfy the conditions set forth in the *Aetna Letter* in connection with this substitution.  (RCS, ¶ 87.)

Second, ING exercised its contractual authority to unilaterally add, delete, or substitute funds by affirmatively monitoring the ongoing performance of the funds and ultimately deciding not to change its menu selection. (RCS, ¶¶ 92, 94.)  ***Indeed, ING admits that a driving consideration when reviewing the funds is the impact of substituting a fund on its revenues***.  (RCS, ¶ 93.)  This is the essence of post-contract discretionary conduct.  This "ongoing fund review process" which measures each fund's impact on revenues is a reason why mutual funds continuously compete with each other to offer higher RSPs to

---

[19]ING's reference to offering certain plan fiduciaries the services of an independent registered investment advisor, *see* Dkt. 183-1 at 23-24, finds no support in the record citations provided.  Nor is there any case law suggesting that 29 CFR § 2550.404a-5(f), upon which Defendant relies, exempts ING itself from the PT rules and fiduciary standards of ERISA.

[20]ING apparently concedes that adding, changing, deleting, or substituting funds from the menu is within the "management or disposition" language of 29 U.S.C. § 1002(21)(A)(i).

ensure their place on the fund menu. (RCS, ¶¶ 92, 97, 173-174.) Additionally, ING considered and rejected advice from certain Plans' investment advisers to delete an existing menu fund at least once. In October 2006, Morningstar advocated eliminating the Oppenheimer Capital Appreciation Fund from the menu selection. (RCS, ¶ 94.) If plan sponsors did not do so, Morningstar would discontinue the services it provided them. (*Id.*) Although aware of this development, ING chose not to eliminate the Oppenheimer Capital Appreciation Fund from the menu selection of the Plans that were both clients of Morningstar and ING. (*Id.*) This refusal to change the menu, even though it would adversely affect some Plans is an obvious exercise of discretion.

ING effectively argues that authority and lack of affirmative action is insufficient to constitute an "exercise" of authority within the meaning of 29 U.S.C. § 1002(21)(A)(i), relying upon *Leimkuehler*. But as explained above, there is nothing "theoretical" about ING's authority to modify the fund menu. Unlike the situation here, there was no evidence in *Leimkuehler* that the defendants even **considered** the possibility of using their control over the plan assets. *See Leimkuehler*, 2012 WL 28608, at *8 (plaintiff only "contends that the failure to exercise a contractual power to substitute or delete mutual funds that participants have already 'purchased' constitutes an exercise of authority or control").[21] In contrast, the evidence here shows that ING actively and palpably considered its contractual right to add, delete, or substitute funds (RCS, ¶¶ 22, 97, 142, 163, 176), ultimately making a decision to use its authority to retain or change the existing fund menu (*Id.*), which constitutes an exercise of its authority or control over plan assets.

> 5.    ING Was A Fiduciary When It Received The RSPs Because It Exercised
>        Discretionary Authority And Control Not To Offer, Purchase, Or
>        Substitute Institutional And Other Lower Cost Share Classes

Inherent within its contractual authority to add, delete, or substitute funds, as well as confirmed by the terms of the participation agreements, ING also had the authority to choose and/or add, delete,

---

[21]Additionally, *Leimkuehler* is currently on appeal before the Seventh Circuit Court of Appeals. *Leimkuehler v. Am. United Life Ins. Co.*, 12-2536 (7th Cir.).

change or substitute existing share classes of mutual funds with institutional and other lower cost share classes ("I share classes") of the same mutual fund, which would have resulted in the Plans receiving higher returns on their investments (because of lower expense ratios than their counterparts) but also would have resulted in ING receiving lower RSPs. (RSC, ¶¶ 104, 105, 124.) And, the evidence, including the participation agreements between ING and the mutual funds, demonstrates that ING certainly had the discretionary authority and power to choose lower cost mutual fund share classes, based upon the financial status of the Separate Accounts, in connection with its administration of the menu of available investment options and management of the Plans' assets. (RCS, ¶ 106.) But in most circumstances, along with the "ongoing fund review process" that ING engages regarding different funds, ING actively and affirmatively reviews the different available share classes while servicing the Plans and affirmatively decides to remain with the share classes that have higher expense ratios but provide more RSPs. (RCS, ¶ 107.) This is an exercise of discretionary authority and control within the meaning of 29 U.S.C. § 1002(21)(A)(i), and is inextricably related to ING's receipt of the RSPs -- a position that is entirely consistent with the DOL's views. *See* Brief of the Secretary of Labor as Amicus Curiae in Support of Plaintiff-Appellant Urging Reversal and Remand filed June 6, 2012, *Leimkuehler v. Am. United Life Ins. Co.*, No. 12-1081, at 12-14 (7th Cir.) (pending).

ING's justification in this regard is the same inadequate defense it supplies for its exercise of discretionary authority of the funds on the fund menu; that the decisions are allegedly made pre-contract (even though it produces no competent evidence to support this assertion), even though ING continues to actively monitor the different funds, and contemplates unilateral changes when the Separate Accounts may qualify for lower cost share classes post-contract, thereby resulting in the exercise of a discretionary decision by ING each and every time that ING elects to remain invested in higher cost share classes of the same mutual fund. (RCS, ¶¶ 106-107.)[22] Finally, ING's irrelevant (and unsupported) assertion that the RSPs offset costs, which has no bearing on the fact that ING exercised its discretionary authority,

---

[22]Even ING's proffered expert, Professor John Langbein, admits that such actions amount to a clear breach of fiduciary duty. (RCS, ¶ 107.)

regardless of motive or purpose, is belied by the evidence (RCS, ¶ 101.)

        6.      ING Was A Fiduciary When It Received The RSPs Because It Exercised Discretionary Authority To Re-Invest The Mutual Fund Dividends Generated By The Separate Accounts

ING does not dispute that it uniformly reinvests all mutual fund dividends in the Separate Accounts.  (RCS, ¶ 132.)  ING also concedes that its reinvestment of mutual fund dividends could be an exercise of discretionary investment decisions regarding the Plans' assets, which would render it an ERISA fiduciary under 29 U.S.C. § 1002(21)(A)(i).  But according to ING, there was no discretion because there are no "viable alternatives" due to purported tax considerations and the fact that dividend reinvestment is supposedly a uniform practice.  Additionally, ING asserts that the Plans' sponsors and participants expect mutual fund dividends to be reinvested.

ING's argument is unpersuasive.  First, the only "evidence" that ING offers is not competent, since it is offered by a legal scholar without expertise regarding reinvestment of dividends.  (RCS, ¶ 62.) Second, ING provides no evidentiary support that the Plans' sponsors and participants expected mutual fund dividends to be reinvested beyond what can only be ING's clairvoyance; ING has proffered absolutely no evidence that the Plans' sponsors and participants made that investment decision.  Third, ING's consideration of the tax implications of receiving a cash dividend is precisely an exercise of investment discretion (while ignoring the plain fact that, as described in the Scheinberg Report and conceded by Mr. Peterson, dividends could be paid into a qualified cash account (RCS ¶¶ 62, 65, 130-131), there simply is no evidence that the Plans' sponsors and participants agreed that re-investment is a better course of action than receiving a cash dividend or some other alternative in light of tax implications.  Moreover, the wisdom of reinvesting dividends depends on the investment strategy.  (RCS, ¶ 65.)  Lastly, ING's half-hearted "everyone does it" defense is not a legitimate defense. *United States v. Warner*, 396 F. Supp. 2d 924, 937 (N.D. Ill. 2005).

ING's position is completely undermined by its own publication that discusses the fact that ING itself (as the sole shareholder of the Separate Accounts) exercises the discretion to "elect" to reinvest the

mutual fund dividends, rather than receive them in cash, and its participation agreements with mutual funds in which ING states that it will "assist[] customers in designating and changing dividend options...," thereby confirming that a discretionary decision exists and is exercised by ING.  (RCS, ¶ 130.)[23]  The mutual fund dividends could have been placed in a cash or cash-equivalent account, or invested in a different mutual fund, and even ING's own expert supports this position.  (RCS, ¶ 131.)  At the very least, ING had the option of depriving itself of any discretionary exercise by requesting instruction from the Plans' sponsors or participants for disposing of mutual fund dividends.  But, of course, ING chose not to engage in this action.

> 7.     ING Was A Fiduciary When It Received The RSPs Because Of Its Discretionary Authority To Self-Determine And Draw Its Own Compensation Directly From The Separate Accounts

It is undisputed that the Group Contracts provide ING with the unilateral authority to change the fees it assesses and draws directly from the Separate Accounts for its compensation by and through, among other things, "fund fee adjustments" ("FFAs").  (RCS, ¶¶ 108-114, 120-121.)  Although that authority obviously grants ING discretionary authority in the administration of the Plans, thus rendering ING a fiduciary under 29 U.S.C. § 1002(21)(A)(iii), ING curiously fails to address this basis for establishing liability.  Although a service provider is not liable for receiving agreed-upon *fixed* fees, it is crystal clear (and beyond cavil) that the authority to adjust fees drawn from Plan assets during the performance of the contract creates a fiduciary relationship.  *See United States. v. Glick*, 142 F.3d 520, 527-28 (2d Cir. 1998) (the defendant "had full discretion in selecting the amount of [his company's] commission to be collected from each [plan] participant . . . [and] [i]t is clear that [the defendant] exercised fiduciary power with regard to those [plan] assets he used to pay [his company's] commissions"); *Charters v. John Hancock Life Ins. Co.*, 583 F. Supp. 2d 189, 199 (D. Mass. 2008) ("[i]n

---

[23]ING attempts to preemptively defuse this damaging evidence by asserting that it "prove[s] nothing as to whether there is truly an option" and are "not plan documents" relating to ING and the Plans.  ING forgets that it bears the burden of showing that it is undisputed that there are no alternatives to dividend reinvestment.  Moreover, it is irrelevant whether this evidence is drawn from plan documents.  The evidence simply and conclusively demonstrate that ING has acknowledged that there are viable alternatives to dividend reinvestment.

each of these cases [where the service provider was found not to be a fiduciary], however, the insurance companies exercised no discretionary authority with respect to their fees . . . As explained above, [the insurance company] did exercise discretion over the amount of its compensation by unilaterally setting the administrative maintenance charge").[24]

8.   ING Was A Fiduciary When It Received The RSPs Because It Exercised Its Discretionary Authority To Self Determine And Draw Its Compensation Directly From The Separate Accounts

ING concedes it exercises the authority to unilaterally change the fees it assesses and draws directly from the Separate Accounts for its compensation through the FFAs under the Group Contracts. (RCS, ¶ 108.)  As explained above, FFAs are directly related to the RSPs that ING receives from the funds. (RCS, ¶¶ 108-115.)  Accordingly, ING was a fiduciary under 29 U.S.C. § 1002(21)(A)(i) when it receives RSPs.

**D.   ING Acted As A Fiduciary In Connection With Its Receipt Of The RSPs**

As explained above, ING was a fiduciary when it received the RSPs from the mutual funds for at least eight independent reasons.  As HSI's expert explains, ING receives the RSPs in direct connection with its fiduciary status in each and every case.  (RCS, ¶ 183.)  But even if the Court were not entirely convinced at this juncture, at the very least, ING has failed its burden to demonstrate that the undisputed material facts conclusively show that it was never a fiduciary to the Plans, much less that it was not a fiduciary when it received the RSPs.   As explained above, in the Second Circuit, if one cannot disprove fiduciary status, ***the burden is on the fiduciary*** charged with engaging in prohibited transactions under 29 U.S.C. § 1106(b)(3) to "prove by clear or convincing evidence that compensation it received was for services other than a transaction involving the assets of a plan," and this burden relates directly to "the

---

[24] ING has, in the past, conceded that FFAs are related to RSPs, but argued that its purported policy of "revenue neutrality" should somehow absolve it of fiduciary status.  This policy of "revenue neutrality" is not disclosed to the Plans (RCS, ¶ 109), the amount of RSPs received is not disclosed to the Plans so there is no way to verify that it is actually "neutral," and an increase in RSPs does not necessarily correspond to a dollar-for-dollar decrease in the FFA (*Id.*)  Moreover, when a mutual fund increases the amount of RSPs -- which ING continuously seeks, ING does not change its FFA or other fees and, instead, keeps the extra funds. (RCS, ¶ 121-122.)  ING has the right to unilaterally change its FFAs at any time and they are related directly to RSPs. (RCS, ¶ 108, 114.)  This is the essence of the reason for ERISA's prohibited transaction rules.

-23-

extent of" limitation.  *Lowen*, 829 F.2d at 1215.  ING has not attempted, much less met, its burden of

proof and it could not.  Moreover, ING consistently ignores the fact that "ERISA does require, however,

that the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making

fiduciary decisions."  *Pegram v. Herdrich*, 530 U.S. 211 (2000).  Since ING regularly was wearing a

fiduciary hat, it simply could not engage in the conduct at issue because, when it is wearing its fiduciary

hat, it is subject to the restrictions of ERISA.

     **E.**      **Plaintiffs Also Have Valid Claims For ERISA § 406(b)(1) Violations**

     ING also argues that Plaintiffs' claims under ERISA § 406(b)(1) should not survive summary

judgment:"Plaintiffs' § 406(b)(1) claim is premised on the notion that revenue sharing payments are plan

assets and that [ING] received them for its own interest or account." [Dkt. 183-1 at 33, *citing* Plaintiffs'

Amended Complaint at ¶¶ 100, 107.]  But, Plaintiffs' Section 406(b)(1) claim is not so limited.  Although

Paragraph 100 of the Amended Complaint admittedly states that "[t]he revenue sharing payments made

by the mutual fund companies to ING constitute plan assets because: (a) ING received the payments as a

result of its fiduciary status or function (*e.g.*, because ING received payments from mutual funds in

exchange for offering and/or recommending the funds as an investment option to the Plans and their

participants); (b) the mutual funds make payments to ING at the expense of the Plans and participants

(*e.g.*, because the mutual funds set the fees they charge Plans and participants to cover not only the fees

they would normally charge but also the amount of the revenue-sharing payments they have to make to

ING); and/or (c) revenue-sharing payments effectively constitute the proceeds of the Plans' and

participants' investments," Paragraph 107 of the Amended Complaint, which states the core Section

406(b)(1) claim ("ING has engaged in and continues to engage in prohibited transactions in violation of

ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), by dealing with the assets of the Plans in its own interest or

for its own account"), is, by its express language, not so limited.  *See also* Court's September 27, 2012

Ruling Re Plaintiff's Motion to Certify Class [Dkt. 102] at 11-12 (only Section 406(b)(1) "could

reasonably - but not necessarily - be interpreted to require that the revenue sharing payments be plan

assets"). As explained below, based on the evidence adduced, Plaintiffs' Section 406(b)(1) claim stands

on the merits (a) based on a finding of RSPs to be plan assets themselves, and (b) independent of any

such requirement.

In the Court's September 27, 2012 Ruling, the Court explained the contours of the Section

406(b)(1) claim as follows:

> The court in *Haddock v. Nationwide Fin. Servs., Inc.*, 419 F. Supp. 2d 156 (D. Conn.
> 2006) ("*Haddock I*") defined plan assets to "include items a defendant holds or receives:
> (1) as a result of its status as a fiduciary or its exercise of fiduciary discretion or
> authority, and (2) at the expense of plan participants or beneficiaries." *Id.* at 170. As
> discussed above, under HSI's theory, ILIAC is a fiduciary with respect to the inclusion
> of funds in its menu, and uses its investment power amassed from the assets of the plans
> to arrange revenue sharing agreements. HSI alleges that the revenue sharing payments
> are made at the expense of the plans because this payment structure causes the funds to
> elevate their fees. *See* Compl. ¶ 103. ILIAC argues that, in order to show that these
> payments are at the expense of plan participants, HSI must prove whether and how much
> each plan's expense ratio increased by virtue of revenue sharing payments by any mutual
> fund included in that plan. *See* Def.'s Mem. in Opp'n at 21. The court rejects ILIAC's
> argument—that the question of whether revenue sharing payments from mutual funds to
> ILIAC were made at the expense of plans or beneficiaries necessarily implicates the
> question of the amount of each of the plans' losses. In other words, HSI has identified a
> question common to the class: whether ILIAC used the plans' assets held in the separate
> accounts in its own interest or for its own account.

Here, as explained above, Plaintiffs clearly have established that ING receives the RSPs as a result of its

fiduciary status and at the expense of plan participants and beneficiaries. (RCS, ¶¶ 97, 105, 107, 116,

122-128, 173.)

ING's argument also ignores the fact that its undisputed ability to self-determine its fees by

unilaterally adjusting the FFAs, which are taken directly from Plaintiffs' assets deposited in the Separate

Accounts. (RCS ¶ 108). As the Court in *Borroughs Corp. v. Blue Cross Blue Shield of Michigan*, Nos.

11–12565, 11–12557, 2012 WL 3887438 * 7-11 (E.D.Mich. Sept. 7, 2012), persuasively explained:

> *Seaway* does not control for one simple reason: *Seaway* holds that adherence to a
> contractual term does not give rise to fiduciary status "unless the term authorizes the
> party to *exercise discretion* with respect to that right." 347 F.3d at 619 (emphasis added).
> The ASC ... grants Blue Cross discretion to determine the amount of the Disputed Fee,
> and the record reflects that Blue Cross did just that....

*     *     *

> It is undisputed that Blue Cross determined its own administrative fee and collected it
> from plan assets. Plaintiffs need establish nothing more to prove a violation of Section
> 1106(b) (1).... This sort of self-dealing is a per se breach of Section 1106(b)(1).

*See also Chao v. Crouse*, 346 F.Supp.2d 975 (S.D.Ind. 2004)("ERISA ... does not allow a fiduciary to set

its own administrative fee and directly collect those fees from plan assets"), *citing Patelco Credit Union*

*v. Sahni*, 262 F.3d 897, 911 (9th Cir. 2001)(holding that, "at the very least [the fiduciary] determined his

own administrative fees and collected them himself from the Plan's funds, in violation of § 1106(b)(1)").

Here, it cannot be seriously disputed that ING retained the contractual right to change its FFAs at any

time, as well as the right to change any term of its contracts, including the amount of fees assessed, based

on the investments chosen by Plaintiffs (including the amount of the RSPs associated with those

investments), that the FFAs squarely relate to the amount of RSPs, and that ING's direct fees, including

FFAs, as well as the indirect fees in the form of RSPs, are paid from and/or consist of plan assets. (RCS,

¶¶ 108-115.) Thus, there are two independent ways in which ING's violations of Section 406(b)(1) can

be established. Finally, at a minimum, material issues of fact clearly exist that prevent summary

judgment with respect to Plaintiffs' 406(b)(1) claims.

### F.    ING's Argument That The RSPs Are Not Consideration Received In Connection With A Transaction Involving The Assets Of The Plans Is Pure Makeweight

In the face of *Lowen*, *supra*, it frankly is somewhat surprising that ING would argue that its

receipt of RSPs did not occur in connection with a transaction involving the assets of Plaintiffs' Plans.

Section 406(b)(3) of ERISA provides that a fiduciary, such as ING, shall not "receive any consideration

for his own personal account from any party dealing with such plan in connection with a transaction

involving the assets of the plan." 29 U.S.C. § 1106(b). As the Second Circuit teaches in *Lowen*, *supra* at

1213-1214:

> ERISA establishes both a duty of loyalty and a duty of care. The Act's legislative history
> indicates that the "crucible of congressional concern was the misuse and mismanagement
> of plan assets," particularly self-dealing by plan managers. *Massachusetts Mut. Life Ins.*
> *Co. v. Russell*, 473 U.S. 134, 141 n. 8, 105 S.Ct. 3085, 3090 n. 8, 87 L.Ed.2d 96 (1985)
> (describing legislative history). At issue in the present case is the duty of loyalty as
> codified in ERISA Section 406(b)....

This rule both assures protection to plan beneficiaries and provides notice to plan fiduciaries of their obligations. It protects beneficiaries by prohibiting transactions tainted by a conflict of interest and thus highly susceptible to self-dealing. ***It gives notice to fiduciaries that they must either avoid the transactions described in Section 406(b) or cease serving in their capacity as fiduciaries***, no matter how sincerely they may believe that such transactions will benefit the plan. ***Such protection of beneficiaries and notice to fiduciaries requires that Section 406(b) be broadly construed***, *see Leigh v. Engle*, 727 F.2d 113, 126 (7th Cir.1984), and that liability be imposed even where there is "no taint of scandal, no hint of self-dealing, no trace of bad faith," *Cutaiar v. Marshall*, 590 F.2d 523, 528 (3d Cir.1979)....

\*     \*     \*

With regard to Section 406(b)(3), Tower Capital and Tower Securities entered into agreements with companies to raise capital in exchange for commissions, equity interests or other compensation. Tower Asset then invested the Plans' assets in these companies.... The district court granted summary judgment against defendants as to such arrangements with twenty-six companies, on the ground that the nature and circumstances of these agreements demonstrated that the payment of fees was "in connection with" the investment of the Plans' assets in violation of Section 406(b)(3)....

Here, of course, ING likewise entered into agreements with mutual funds to deliver retirement funds (*i.e.*, raise capital for the mutual funds) in exchange for RSPs (in essence, pay-to-play commissions since they bear no relationship to services rendered). (RCS, ¶ 161.)

Moreover, ING's assertion that RSPs are a component of its compensation from the plans, negotiated by Defendant at arm's length with the plan fiduciaries and, therefore, not consideration for its own personal account cannot be supported. First, that assertion is not supported by any record evidence or the actual facts of record. Second, as detailed herein, ING consistently represented that the RSPs constituted compensation for services rendered to the mutual funds. (RCS, ¶ 73, 145. ) Third, ING's own representatives and documents confirm that the amount of RSPs were treated as proprietary, that the terms of ING's Participation Agreements, including the amount of RSPs, were generally not disclosed, that ING continuously negotiated to increase the amount of RSPs, that mutual funds offered greater RSPs to be more "competitive" in the eyes of ING and that, when a mutual fund increased the amount of RSPs, ING simply kept the money, did not tell the Plans and did not reduce any other charges. (RCS, ¶¶ 84, 122, 162, 173.) Thus, ING's attempt to avoid liability on this basis fails as well. *See Lowen, supra* at

1214-1215.[25]

## G.    ING's Arguments Regarding Loss To The Plans And The Proper Basis For Disgorgement Are Unpersuasive

ING's argument that Plaintiff havefailed to produce viable evidence of losses to the plans or a viable basis for disgorgement finds no support in the law.  The cases are legion that, in the instance where a *per se* prohibited transaction is alleged under Section 406(b) of ERISA, 29 U.S.C. § 1106(b), disgorgement (which is sometimes referred to interchangeably with the term, restitution) is the appropriate remedy.  In the seminal case on prohibited transaction remedies associated with Section 406(b) violations of ERISA (*i.e.*, *per se* violations for which there is no defense), *Lowen*, 829 F.2d at 1213, the Second Circuit Court of Appeals expressly held as follows: "All defendants are therefore jointly and severally liable for violations of Section 406(b).  Judge Broderick held that defendants should disgorge fees of $1,087,787 and other consideration they received in violation of Section 406.  We agree."  *Id*. at 1221.  As the *Lowen* Court explained, that is because ERISA's prohibited transaction rules are so important to the proper functioning of retirement plans and the protection of their beneficiaries that it is inappropriate to permit a fiduciary to retain consideration obtained through a PT.  *Id*. at 1213.

As the Third Circuit Court of Appeals more recently explained in *National Sec. Systems, Inc. v. Iola*, 700 F.3d 65, 100-102 (3d Cir. 2012):

> It is undisputed that restitution of ill-gotten commissions is an equitable remedy. The Restatement of Restitution provides, "where a fiduciary in violation of his duty to the beneficiary receives or retains a bonus or commission or other profit, he holds what he receives upon a constructive trust for the beneficiary."  Restatement of Restitution § 197, at 808 (1937).  This rule applies even when the fiduciary's disloyal enrichment causes the beneficiary no harm. Id. § 197, at 809–10, cmt. c. "The rule ... is not based on harm done to the beneficiary in the particular case, but rests upon a broad principle of preventing a conflict of opposing interests in the minds of fiduciaries, whose duty it is to act solely for the benefit of their beneficiaries."  *Id.*  The Restatement of Trusts is in accord: when a fiduciary receives a commission from an insurance company in exchange for purchasing insurance policies as trust assets, "he is accountable for the commission." Restatement (Second) of Trusts § 170, at 370–71, cmt. o (1959).

---

[25]As in *Lowen*, "the receipt of compensation by [Defendant] was virtually contemporaneous with the investment of the Plans' funds," *Id*. at 1217, because that compensation is derived directly from and increases the expenses that the Plans pay to the mutual funds. (RCS, ¶¶ 97, 105, 107, 116.)  ING's misreading of Judge Hall's previous rulings regarding the scope of available relief are addressed below.

These authorities instruct that had Tri–Core, as fiduciary, remained in the suit as a defendant, its commissions acquired from Commonwealth in breach of § 406(b)(3) would be subject to a constructive trust for the plaintiffs, who would be entitled to restitution of the payments. *See Harris Trust*, 530 U.S. at 250, 120 S.Ct. 2180 ("The trustee or beneficiaries may ... maintain an action for restitution of the property (if not already disposed of) or disgorgement of proceeds (if already disposed of), and disgorgement of the third person's profits derived therefrom.")....

(Emphasis added.)  Similarly, in the factually analogous case, *Haddock v. Nationwide Financial Services, Inc.*, 262 F.R.D. 97, 129-130 (D. Conn. 2009), *rev'd on other grounds*, 460 Fed.Appx. 26 (2d Cir. 2012), the Honorable Stefan Underhill persuasively explained as follows: "Section § 1106(b) thus creates a *per se* ERISA violation; even in the absence of bad faith, or in the presence of a fair and reasonable transaction, § 1106(b) establishes a blanket prohibition of certain acts, easily applied, in order to facilitate Congress' remedial interest in protecting employee benefit plans."  Thus, for this reason as well, ING's attempt to effectively invoke a "back door" defense based on its supposed receipt of "reasonable compensation," by arguing that it somehow offsets the amount of revenue sharing payments as part of its internal pricing model, is unpersuasive.[26]

---

[26]The Court in *Kanawi v. Bechtel Corp.*, 590 F.Supp.2d 1213, 1223 (N.D. Cal. 2008)(a Section 406(b) prohibited transaction case in which the court also noted that a defendant cannot rely upon a "reasonable compensation" defense in response to a Section 406(b) claim), more succinctly enunciated the point: "*[a] fiduciary that engages in self-dealing is obligated to disgorge all benefits it obtains from such conduct*."  (Emphasis added.) *See also Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 250 (2000); *LeBlanc v. Cahill*, 153 F.3d 134 (4th Cir. 1998); *Reich v. Rowe*, 20 F.3d 25, 32 (1st Cir. 1994); *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 309 F.Supp.2d 165, 171 (D.Mass. 2004); *Framingham Union Hosp., Inc. v. Travelers Ins. Co.*, 744 F.Supp. 29, 33 (D. Mass. 1990); *Martin v. National Bank of Alaska*, 828 F.Supp. 1427, 1436 (D.Alaska 1992)(disgorgement of all fees is the appropriate remedy in a prohibited transaction case); *Reich v. Valley Nat. Bank of Arizona*, 837 F.Supp. 1259, 1281 (S.D.N.Y. 1993).

Academics and other ERISA commentators also agree that the scope of relief available under Section 409 is broad and that disgorgement is the appropriate remedy in a prohibited transaction case. Muir, *The Intersection of State Corporation Law and Employee Compensation Programs: Is It Curtains For Veil Piercing?*, 1996 U. Ill. L. Rev. 1059, 1106 (1996)(discussing broad provisions of Section 409 and focusing on the "other equitable or remedial relief" provision of Section 409 as "broad language [that] has provided the courts with a clear basis to award a wide variety of remedies"); *Muir, ERISA Remedies: Chimera or Congressional Compromise?*, 81 Iowa L. Rev. 1, 23 (1995)("[r]elying upon Section 409's broad language, courts have awarded a wide variety of remedies to successful plaintiffs... [and] [c]ourts have forced fiduciaries to repay salaries received for provision of plan services" -- in essence, a disgorgement award); *see also* Reish and Faucher, *The Fiduciary Duty to Avoid Conflicts of Interest in Selecting Plan Service Providers* (February 2009)(in which two defense counsel employed at Drinker Biddle & Reath, LLP acknowledge that disgorgement is the remedy in the case of prohibited transactions); Falk and Kleinman, *What to Do if Your Fund Becomes Subject to ERISA*, 14 The Investment Lawyer 1, 4 (January, 2007)(in which two defense counsel employed by Morgan Lewis & Bockius, LLP opine that "[v]iolation of the prohibited transaction rules [of ERISA] will generally require the unwinding of the transaction (that is, offering recision rights, disgorgement, etc.)(emphasis added); James F. Jorden, Waldemar J. Pflepsen, Jr. & Stephen H. Goldberg, *Handbook*

ING misleadingly argues that, in discussing and dismissing ING's Counterclaims, Judge Hall held that HSI could not seek a full disgorgement award, based upon the Court's quotation to only the alternative prayer for relief contained in the second portion of Paragraph 112 of the original Complaint in this case, completely ignores Judge Hall's observation in the same decision that "*the core relief sought in this case is disgorgement of all [revenue sharing payments]*." *See* [Dkt. 102 at 23 (emphasis added.] And, as ING conveniently ignores, in ruling on its Motion to Dismiss, Judge Hall explicitly held that "*[i]n the second count of its Complaint, HSI charges that [ING] is liable 'to credit back, disgorge, and/or make restitution of all of the revenue sharing payments and other improper compensation received by it*; or [alternatively, ING is liable] to make restitution to the plans in an amount representing the difference between the revenue sharing payments and other compensation it received, and the reasonable fair market value of any services provided by ING...." [Dkt. 40 at 11, *quoting* Compl. ¶ 112 (emphasis added).]   "*HSI's second count, like the claim in Haddock, seeks disgorgement, which is an equitable remedy*." *Id*.  (emphasis added.)  In considering the Motion for Class Certification and granting class certification, Judge Hall explicitly held that "*[i]f a transaction violates Section 406(b), it violates ERISA without regard to the 'reasonableness' of the compensation for services performed*." Dkt. 102 at 13, *citing Haddock IV*, 262 F.R.D. 97, 129-130 (D.Conn. 2009).  Moreover, in dismissing ING's Counterclaims as to HSI in that same Ruling, Judge Hall observed that "[i]n *Haddock III*, 570 F.Supp. 2d 355, [362-364] (D.Conn. 2008), *because the plaintiff's claims were limited to the payments received by the defendant -- as in Count Two of this case* -- the court dismissed the defendant's counterclaims for indemnification and contribution because it was the sole beneficiary of the breach as so defined," *Id*. at 37, thereby acknowledging that the reasonableness of Defendant's compensation was not at issue.   In also considering the Motion to Dismiss the Counterclaims, Judge Hall discussed Plaintiff's alternative request for relief, as contained in the second part of Paragraph 112 of the Complaint, and

---

*on ERISA Litigation*, § 3.03[B][1] (2013) (footnotes omitted) ("Prohibited 'party in interest' transactions are often characterized by the courts as 'per se' violations of ERISA because liability may be imposed even where such transactions are entered into in good faith, where such transactions would be found to be prudent under ERISA's prudence standard, and where no harm results to the plan.")

stated with respect to that distinct, alternative prayer for relief, that such relief would be limited to restitution to the plans representing the difference between the revenue sharing payments and other compensation it received, and the fair market value of any services provided by ING," *Id.* at 36, *citing* Complaint at ¶ 112, and that such relief could not give rise to a claim for contribution or indemnity. *Id.*, *cting Haddock III*, 570 F.Supp.2d 355 (D.Conn. 2008)  The only logical way that this section of the Ruling can be properly read and squared with the remainder of Judge Hall's September 27, 2012 Ruling, as well as her prior Ruling on the Motion to Dismiss, is as being limited to the alternative prayer for relief contained in Paragraph 112 of the Complaint in the event that full disgorgement is not awarded. Thus, ING's argument that Plaintiffs are prevented from seeking full disgorgement of the RSPs finds no support in Judge Hall's actual Ruling, when read in proper context.  Perhaps more importantly, as the Court in *Haddock* explained, "***even if Nationwide is permitted to off-set any benefits to the Plans, it is Nationwide's burden to prove such benefits [because] [w]here the defendant is the party responsible for the difficulty in determining reasonable compensation, awarding the total amount of compensation obtained is not inappropriate***." *Haddock IV*, 262 F.R.D. at 130 (emphasis added), *citing Kim v. Fujikawa*, 871 F.2d 1427, 1431 (9th Cir. 1989 )(upholding district court's award of entire cost of the prohibited transaction even where there were benefits to the plan because defendants had not presented sufficient evidence to apportion the benefits received); *see also LaScala v. Scrufari*, 479 F.3d 213, 221, n.4 (2d Cir. 2007)(defendant bears the burden of establishing that services and value of services was reasonable in a case under ERISA §§ 404(a)(1) and 406(b)(1)).  As ING fatally ignores, it was its burden to produce any evidence to prove any alleged off-set of benefits in the face of the request for full disgorgement and it is ING (not Plaintiffs) that has failed to meet this burden.

Likewise, ING's attempt to limit Plaintiffs' claim for relief under Count I to one for "excessive compensation" from the RSPs -- even though there is nothing in Plaintiffs' Amended Complaint (or elsewhere) to so limit Plaintiffs' claims -- is unpersuasive.  Indeed, as the Court in *Haddock v. Nationwide Financial Services, Inc.*, 262 F.R.D. 97, 126, n. 19 (D.Conn. 2009), *rev'd on other grounds*,

460 Fed.Appx. 26 (2012), recognized, even where a plan has not suffered losses, it still will be entitled to

recover any profits arising from a breach of fiduciary duty under Section 409 of ERISA. *Id.*, *citing* James

Jorden, et al., *Handbook on ERISA Litigation*, § 4.05[C] ("Monetary damages for breach of fiduciary

duty is provided within ERISA § 409(a), which requires a fiduciary to 'make good to [the] plan any

losses to the plan resulting from each such breach.' ... Even when a plan has not suffered losses, ERISA §

409(a) enables the plan to recover 'any profits of such fiduciary which have been made through use of

the assets of the plan by the fiduciary.'") Thus, in light of ING's prior admission that profits were earned

from the RSPs, *see* [Dkt. 112-1 at 28],[27] even if ING were correct that no loss could be established

(which is patently incorrect), its "loss" argument would fail.[28]  Moreover, ING's argument fails to

acknowledge that, since it is legally required to disgorge the RSPs to the Plans, *see Lowen*, 829 F.2d

1213, and Plaintiffs state a claim that ING has received improper fees, Plaintiffs obviously have

established the existence of a loss within the meaning of ERISA. *Borroughs Corp.,* 2012 WL 3887438

(claim that fiduciary retained improper fees stated loss claim under ERISA); (RCS, ¶¶ 101, 109, 122, 155

162, 173)(record establishes that ING engaged in no offset and retained increases in RSPs).  Moreover,

the undisputed evidence that increases in the amount of RSPs does not result in any reduction of fees to

the Plans (or of the FFAs, where applicable), establishes the direct nature of the losses suffered by HSI

and the Plans.

Finally, ING's argument that it is entitled to summary judgment with respect to Count I of

Plaintiffs' Complaint (*i.e.*, its claim for Breach of Fiduciary Duty) fails to account for the fact that a

prohibited transaction under Section 406 of ERISA amounts to an automatic breach of fiduciary duty

under Section 404 of ERISA. *Leigh v. Engle*, 727 F.2d 113, 123 (7th Cir. 1984); *Agway, Inc.,*

*Employees' 401(k) Thrift Investment Plan v. Magnuson*, 2006 WL 2934391, at *21 (N.D.N.Y. Oct. 12,

---

[27]Plaintiffs contest the manner in which ING calculates such profits but not its admission that profits were earned in connection with its receipt of the RSPs.

[28]ING's citation to *Silverman v. Mutual Ben. Life Ins. Co.*, 138 F.3d 98, 104 (2d Cir. 1998), which simply addresses causation issues related to liability claims under ERISA §§ 1105(a)(3) and 1109(a), which issues are not present here, demonstrates the desperation of ING's position.

2006).  Therefore, if Plaintiffs prevail as to Count II of their Complaint (*i.e.*, its claim for a Prohibited

Transaction), liability under Count I is established.  Since ING apparently has no answer for this reality,

it chooses not to address it.

>    **H.      ING Has Failed To Demonstrate That Summary Judgment Is Warranted**
>    **For Plaintiffs' Alternative, Count III Claim**

ING argues that Plaintiffs' alternative claim asserted in Count III should be dismissed because

Plaintiffs cannot satisfy the test for obtaining relief against a non-fiduciary who knowingly participated

in a breach of trust, which is set forth in *Harris Trust and Savings Bank v. Salomon Smith Barney, Inc.*,

530 U.S. 238 (2000).  ING's argument is procedurally and legally meritless, and should be rejected.

ERISA § 502(a)(3) authorizes a civil action "by a participant, beneficiary, or fiduciary (A) to

enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to

obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of

this title or the terms of the plan."  As the U.S. Supreme Court in *Harris Trust* instructed, "§ 502(a)(3)

admits of no limit . . . on the universe of possible defendants," and a non-fiduciary may be a proper

defendant under § 502(a)(3) if it is "a transferee of ill-gotten trust assets . . ., and then only when the

transferee . . . knew or should have known of the existence of the trust and the circumstances that

rendered the transfer in breach of the trust."  530 U.S. at 251. In other words, "the transferee must be

demonstrated to have had actual or constructive knowledge of the circumstances that rendered the

transaction unlawful.  Those circumstances, in turn, involve a showing that the plan fiduciary, with

*actual or constructive knowledge of the facts satisfying the elements of a § 406(a) transaction*, caused

the plan to engage in the transaction."  (*Id.*)(citing *Lockheed Corp. v. Spink*, 517 U.S. 882, 888–889

(1996)(emphasis added).  Importantly, "'[a]lthough the trustee bases his cause of action upon his own

voluntary act, and even though the act was knowingly done in breach of his duty to the beneficiary, *he is

permitted to maintain the action, since the purpose of the action is to recover money or other property

for the trust estate, and whatever he recovers he will hold subject to the trust*.'"  (*Id.* at 252)(quoting

Restatement (Second) of Trusts, § 294, Comment c)(emphasis added).

ING's challenge to this claim fails for several reasons.  To start, Count III is asserted as an alternative claim and only if ING is deemed a non-fiduciary.  Because, as demonstrated above, a significant factual dispute exists as to the issue of ING's fiduciary status, dismissal of this claim at this stage is premature and procedurally improper.   Moreover, contrary to ING's contention, Plaintiffs have aptly demonstrated that a significant factual dispute also exists as to whether the RSPs it received from mutual funds were Plan assets, and such showing defeats summary judgment on this ground.  Finally, as the Supreme Court instructed in *Harris Trust*, Plaintiffs' purported knowledge of ING's violations of ERISA, regardless of whether Plaintiffs' contests such knowledge, does not bar them from bringing a claim under ERISA § 502(a)(3).  The operative standard is "actual or constructive knowledge" and, contrary to ING's assertions, Plaintiffs are neither required to concede actual knowledge of ING's misconduct, nor admit that they breached their own fiduciary duties under this standard.  ING fails to meaningfully address the applicable standards or its burden on summary judgment.

## I.   **Plaintiffs' Claims Are Not Time-Barred**

### 1.    ING Cannot Establish That Plaintiffs Had Actual Knowledge Of Its Violations Of ERISA

ING contends that Plaintiffs' alleged knowledge of ING's receipt of RSPs from mutual funds prior to February 23, 2008 alone constitutes "actual knowledge" of ING's ERISA violations, such that Plaintiffs' claims are barred by the three-year statute of limitations set forth in ERISA § 502.  This argument fails because, as demonstrated below, at a minimum, a clear factual dispute exists as to whether and when Plaintiffs possessed "actual knowledge" of all material facts necessary to understand that ING committed ERISA violations by receiving RSPs from mutual funds in its own interest or for its own account.

As a preliminary matter, ING misstates the standard to establish "actual knowledge" for prohibited transactions.  It is true that, under Second Circuit law, "actual knowledge" only exists when a party "has knowledge of ***all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act***." *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 193 (2d

Cir. 2001) (emphasis added).  But ING conveniently omits that "awareness of the occurrence of the transaction itself . . . constitute[s] knowledge of facts necessary to understand that a breach of fiduciary duty occurred" *only "where the transaction is facially illegal,"* not, as ING has it, for every prohibited transaction.[29] *Chao v. Emerald Cap. Mgmt., LTD.*, No 01-cv-6356, 2006 WL 2620055, at *6 (W.D.N.Y. Sept. 13, 2006).  Moreover, a plaintiff's "constructive knowledge of a violation is immaterial to the issue of whether the plaintiff had actual knowledge." *Id.* (citing *Caputo*, 267 F.3d at 194).  Under this correct standard, it becomes obvious that Plaintiffs did not have "all material facts necessary to understand that ING has breached [its] duty or otherwise violated the Act."

First, ING's position relies on its purported "disclosures" of its collection of RSPs, and Ms. McCreedy and Ms. Reardon's purported reviews of those "disclosures," to establish "actual knowledge." But these "disclosures" actually show that Plaintiffs did not have all the "material facts necessary" for "actual knowledge." The mere receipt of RSPs is not illegal, so Plaintiffs' purported knowledge that ING received RSPs alone is not sufficient to show "actual knowledge." *See Frommert v. Conkright*, 433 F.3d 254, 272 (2d Cir. 2006) (knowledge of "phantom account" not sufficient for "actual knowledge" that the "phantom account" was being applied in contravention of the [p]lan's terms").  Meanwhile, as the "disclosure" ING quotes demonstrates self-evidently, ING misleadingly asserted that the RSPs were only to "compensate ING for the recordkeeping and related services ING provides and, in some cases, for distribution-related expenses ING incurs." (D-App. at 226, 834.)  Nowhere in that "disclosure," or any of the other "disclosures" that ING provided to Plaintiffs, is there language communicating, *inter alia*, the amount of RSPs paid, that the RSPs were actually unrelated to those "services" for mutual funds, or that the level of RSPs has a direct relationship with the mutual fund's expense ratio imposed upon the Plans. (RCS, ¶¶ 37, 45, 67-73, 98, 100, 135, 139, 145, 146-147, 151-152, 160, 165, 180-182.)  Without those material facts and others, it is impossible for Plaintiffs to have "actual knowledge" that ING was violating its fiduciary duties.

[29]Interestingly, ING correctly quoted the pertinent language in the previous iteration of its memorandum. [Dkt. No. 112-1, at 34.]

*Zang v. Paychex, Inc.*, 728 F.Supp.2d 261 (W.D.N.Y. 2010), is instructive. Like ING here, the defendant service provider in *Zang* argued that the plaintiff's prohibited transaction claims on the service provider's receipt of RSPs from mutual funds were barred because of the "disclosure" describing the payments as "'[i]n consideration of the recordkeeping, shareholder servicing, marketing, and other administrative services that Paychex provides . . . [,]'" which communicated that "the fees are paid by the mutual funds in return for administrative services rendered by Paychex to those funds." *Zang*, 728 F. Supp. 2d at 267-269. Like Plaintiffs here, the plaintiff in *Zang* alleged, however, that this description was false and the payments were actually "kickbacks to Paychex for including the funds in the menu offered to plaintiff," which Paychex failed to disclose. *Id.* at 268. Against these allegations, the district court concluded that plaintiff could not have possessed actual knowledge of Paychex's ERISA violations:

> [F]or plaintiff to have been given "actual notice" of such transactions, ***he must still have been provided with enough information to understand the nature and reason for those transactions, so that he could know whether they were prohibited or not***. Thus, since the parties' agreements did not disclose the alleged basis for the revenue-sharing payments by the mutual funds, those agreements did not provide plaintiff with actual notice of the alleged § 1106(b) violation.

(*Id.*) (emphasis added and internal citation omitted). The facts in *Zang* are squarely on point, and the holding in *Zang* forecloses summary judgment here. *See also Frommert*, 433 F.3d 254 at 272-273 (reversing summary judgment because "[a]lthough the 1995 Benefits Update may have provided notice that the plaintiffs' benefits would be lower than they expected, it certainly did not inform the plaintiffs that the phantom account was being applied in contravention of the Plan's terms [and] [t]hus, while the Benefits Update may have heightened the plaintiffs' concerns regarding their expected benefits, 'it is not enough that [plaintiffs] had notice that something was awry; [plaintiffs] must have had specific knowledge of the actual breach of duty upon which [they sued].'" *Id.*[30]

Second, ING must demonstrate that no factual dispute exists as to Plaintiffs' "actual knowledge"

---

[30] Nor do the purported "disclosures" by Steve Eyer establish HSI's actual knowledge of the true nature and reasons for the RSPs. As he stated to HSI, "you're going to pay a fee ***for services*** rendered [by ING] ...." (RCS, ¶ 151)(emphasis added.) This statement is exactly like the misleading, "service-related" depictions of the payments as "service-related" described above. Even Mr. Eyer himself testified equivocally about whether and to what extent he discussed RSPs with HSI in the first place. (RCS, ¶ 37.) This testimony is hardly certain or undisputed, and it glaringly lacks any details about what precisely was told to HSI about RSPs.

of ING's fiduciary status, as well as to ING's receipt of the RSPs in connection with its capacity as a fiduciary or that the RSPs were the Plans' assets or thst ING was acting in its own interest or for its own account.  *See* ERISA § 404; ERISA § 406.  ING provides no evidence whatsoever demonstrating that Plaintiffs possessed "actual knowledge" of the material fact that ING was acting as a fiduciary, which ING denies, or any facts demonstrating that Plaintiffs "actually knew" the RSPs were received in connection with ING's fiduciary status, much less that these were Plan assets with which ING was acting in its own interest or for its own account.  (RCS, ¶¶ 180-181.)  And there is no such evidence because, as shown above, ING falsely and misleadingly characterized the RSPs as compensation for services rendered to mutual funds, and not kickbacks as the Amended Complaint alleges.  Absent such disclosures, "actual knowledge" of ING's ERISA violations could not exist.  *Frommert*, 433 F.3d at 273 ("Such knowledge of an actual breach could only come with disclosure of the fact that the defendants misrepresented the terms of the Plan in justifying the usage of the phantom account"); *Zang*, 728 F.Supp.2d at 268 ("[S]ince the parties' agreements did not disclose the alleged basis for the revenue-sharing payments by the mutual funds, those agreements did not provide plaintiff with actual notice of the alleged § 1106(b) violation").

Clearly, against these facts, ING's assertion equating some alleged knowledge as to the existence of RSPs with "actual knowledge" of its ERISA violations is legally meritless and factually baseless. (RCS, ¶¶ 27, 180-181.)  Therefore, ING has not met its burden of establishing that Plaintiffs had the necessary material facts to understand the true nature and reasons for the RSPs, much less that ING received the RSPs in its capacity as a fiduciary and its breach of its fiduciary duties when it decided to pocket the RSPs.  (*Id.*.)

2.    ING's Six Year Statute Of Limitations Argument Is Equally Unpersuasive

ING asserts that the six-year statute of limitations for Plaintiffs' ERISA claims have expired for mutual funds added to ING's menus prior to February 23, 2005.  According to ING, the "last action which constituted a part of [ING]'s breach" was the addition of that mutual fund to ING's menu, relying on *David v. Alphin*, 704 F.3d 327 (4th Cir. 2013) and *Tibble*.  But neither case is applicable to the

situation here.  In *David*, the plaintiffs claimed that the defendants, who were the *plan sponsor* and its

agents, engaged in prohibited transactions when they entered into agreements adding funds affiliated

with the defendants in the plans' lineup.  *See David*, 704 F.3d at 339.  Likewise, in *Tibble*, the plaintiffs

claimed that the *plan sponsor* engaged in prohibited transactions when it entered into contracts with

mutual funds directing the mutual funds to pay it revenue sharing.  *See Tibble*, 639 F. Supp. 2d at 1087.

Thus, in both *David* and *Tibble*, the limitation period began to run the moment those contracts and

agreements were executed.

      Here, in contrast, Plaintiffs are the plan administrators, as well as plan sponsors, seeking relief

for the actions ING, a fiduciary service provider, committed *after* entering into contracts with Plaintiffs

and the funds were selected.  Specifically, Plaintiffs dispute each and every payment of revenue-sharing

consideration and self-dealing with plan assets with the mutual funds post-contract, where ING, in its

own discretion, decided to pocket the proceeds, rather than transfer or fully credit the monies to the

Plans, as ING was obligated to do as a fiduciary.  *See Kanawi v. Bechtel Corp.,* 590 F.Supp.2d 1213,

1233 (N.D.Cal. 2008)(upon which Defendant relies in its Partial Motion and which holds that "Plaintiffs

claim under § 406 survives to the extent that Plan assets were used to pay FIA's fees for four months

during November 2003 until February 2004"); *see also In re Fruehauf Trailer Corp.*, 250 B.R. 168,

201-203 (D.Del. 2000)(statute of limitations under ERISA must be judged based on the date of the

alleged violation and whether each overt act results in a new injury to the plaintiff); *L.I. Head Start Child*

*Develop. Serv., Inc. v. Econ. Opportunity Com'n*, 558 F. Supp. 2d 378, 400 (E.D.N.Y. 2008), *aff'd* 2013

WL 950692 (2d Cir.) ("a new cause of action accrues for each violation where separate violations of the

same type, or character, are repeated over time . . . [where] there is repeated decision-making, of the

same character, by the fiduciaries").  Under this scenario, there are separate limitations periods that begin

to run after each transaction where ING received "consideration for [its] own personal account," *i.e.* each

time ING pocketed the revenue-sharing payments.  29 U.S.C. § 1106(b)(3); *see, e.g.*, *NYSA-ILA Med. &*

*Clinical Serv. Fund v. Catucci*, 60 F. Supp. 2d 194, 199 (S.D.N.Y. 1999) (new cause of action each time

fiduciary made improper payment during bankruptcy); *Gruby v. Brady*, 838 F. Supp. 820, 831 (S.D.N.Y.

1993) (new cause of action created each time fund is injured, *i.e.* when excessive benefit payment is made); *Martin v. Nat'l Bank*, 828 F. Supp. 1427, 1432 (D. Alask. 1992) (finding that if dispute was regarding the amount of fees charged, rather than the fact that fees are charged, cause of action does not accrue until the fees are pocketed); *cf. Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp.*, 522 U.S. 192, 195-96 (1997) (statute of limitations only begins to run after each instance actual injury occurs).

Even assuming *arguendo* that the statute of limitations began to run after each participation agreement was executed or amended to revise the amount of RSPs or otherwise, which fails to account for the actual language of Sections 406(b)(1)("***deal with the assets of the plan*** in his own interest or for his own account") and 406(b)(3)("***receive any consideration*** for his own personal account"),"fraud and concealment" still tolls the statute of limitations, as ING previously and explicitly admitted. [Dkt. No. 27-1, at 7; 29 U.S.C. § 1113; *see Kurz v. Phila. Elec. Co.*, 96 F.3d 1544, 1551 (3d Cir. 1996). Here, ING's "disclosures" regarding RSPs in which it misrepresented to Plaintiffs (and other Plans) that the RSPs were "payments compensat[ing] ING for the recordkeeping and related services ING provides," when in reality, these payments have no relation to such "services" and are, in fact, kickbacks, as well as ING's consistent denials of fiduciary status, are precisely the acts of "fraud and concealment" that tolls Plaintiffs' claims. *See, e.g.*, *Brovarski v. Local 1205, Intern. Bro. of Teamsters Union, Pension Plan*, No. 97-CV-489, 1998 WL 765141, at *3 (E.D.N.Y. Feb. 23, 1998) (tolling where plan administrator made material misrepresentations and omissions regarding transactions between the plan administrator and the plans); *Montrose Med. Group Part. Sav. Plan v. Bulger*, 243 F.3d 773, 788 (3d. Cir. 2001) (tolling where defendant falsely represented that transaction would reduce costs while substantially increasing benefits); *Borroughs*, Case No. 11-12565, Case No: 11-12557, 2012 U.S. Dist. LEXIS 127587, at *6-*7, *33-*34 (E.D. Mich. Sept. 7, 2012) (issue of material fact on tolling where surcharges were disguised and packaged with hospital bills). Finally, ING's Motion for Summary Judgment fails for yet another reason. Defendant has produced no evidence that any of the Participation Agreements applicable to Plaintiffs were executed or left unamended for the six-year period preceding the filing of the Complaint. Indeed,

the only Participation Agreement that ING attaches to its summary judgment papers relates to a mutual fund (Buffalo Funds) in which neither HSI nor TDC invested and, in any event, that Participation Agreement was entered into on May 19, 2009. (D-App. at 982.) Thus, even if ING's argument was correct (which it most assuredly is not), Defendant's Motion fails on the evidence. Accordingly, all of Plaintiffs' claims are timely.

## III.    <u>CONCLUSION</u>

For all of the reasons stated above, Defendant's Motion for Summary Judgment should be denied.

Dated: April 5, 2013                                    Respectfully submitted,

                                                        /s/ Karen M. Leser-Grenon
                                                        James E. Miller  (ct21560)
                                                        Laurie Rubinow (ct27243)
                                                        Karen M. Leser-Grenon (ct23587)
                                                        SHEPHERD, FINKELMAN, MILLER
                                                            & SHAH, LLP
                                                        65 Main Street
                                                        Chester, Connecticut  06412
                                                        Telephone: (860) 526-1100
                                                        Facsimile: (860) 526-1120
                                                        E-mail:  jmiller@sfmslaw.com
                                                                 lrubinow@sfmslaw.com
                                                                 kleser@sfmslaw.com

                                                        Scott R. Shepherd
                                                        James C. Shah
                                                        Eric L. Young
                                                        Shepherd, Finkelman, Miller & Shah, LLP
                                                        35 East State St.
                                                        Media, Pennsylvania 19063
                                                        Telephone: (610) 891-9880
                                                        Facsimile:  (610) 891-9883
                                                        Email:   sshepherd@sfmslaw.com
                                                                 jshah@sfmslaw.com
                                                                 eyoung@sfmslaw.com

Rose F. Luzon
Kolin C. Tang
Shepherd, Finkelman, Miller & Shah, LLP
401 West A St., Suite 2350
San Diego, California 92101
Telephone: (619) 235-2416
Facsimile:  (619) 234-7334
Email:    rluzon@sfmslaw.com
              ktang@sfmslaw.com

Douglas P. Dehler
O'Neil, Cannon, Hollman, DeJong & Laing S.C.
111 E. Wisconsin Avenue, Suite 1400
Milwaukee, Wisconsin 53202
Telephone: (414) 276-5000
Facsimile:  (414) 276-6581
Email:    Doug.Dehler@wilaw.com

Attorneys for Plaintiffs and the Class

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2013, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

I also hereby certify that a complete, duplicate copy of the foregoing document has been forwarded directly to the Honorable William G. Young in Boston, Massachusetts c/o Judge Young's Deputy Clerk, Jennifer Gaudet, for delivery on Monday, April 8, 2013, and addressed as follows:

Via Hand Delivery

Jennifer Gaudet, Deputy Clerk

United States District Court

for the District of Massachusetts

Clerk's Office, Suite 2300

1 Courthouse Way

Boston, MA 02210

/s/ Karen M. Leser-Grenon

Karen M. Leser-Grenon (ct23587)

Shepherd Finkelman Miller & Shah, LLP

65 Main Street

Chester, CT  06412

Telephone: (860) 526-1100

Facsimile: (860) 526-1120

E-mail: kleser@sfmslaw.com