IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HEALTHCARE STRATEGIES, INC., Plan Administrator of the Healthcare Strategies, Inc. 401(k) Plan and the Healthcare Strategies, Inc. CBU 401(k) Plan, On Behalf of Itself and All Others Similarly Situated, | : : : : : : : | No. 3:11-cv-00282 (WGY) |
| and | : : | |
| The DEROSA CORPORATION, Plan Administrator of The DeRosa Corporation 401K PS Plan, On Behalf of Itself and All Others Similarly Situated, | : : : : : | |
| Plaintiffs, | : : | |
| vs. | : : : | |
| ING LIFE INSURANCE AND ANNUITY COMPANY, | : : : : | |
| Defendant. | : : | October 30, 2013 |

_____

PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MEMORANDUM
OF LAW ON "SHELF SPACE" PAYMENTS AND FIDUCIARY DUTY
_____

I.      INTRODUCTION

Plaintiffs, Healthcare Strategies, Inc. ("HSI") and The DeRosa Corporation ("TDC")(collectively, "Plaintiffs"), respectfully submit this Reply Brief in Support of their Memorandum of Law on Shelf Space Payments and Fiduciary Duty ("Shelf Space Memorandum") and, specifically, in reply to the Response of Defendant, ING Life Insurance and Annuity Company ("ING" or "ILIAC" or "Defendant"), to Plaintiffs' Shelf Space Memorandum. ING's purported defenses and attempts to deflect attention from its true conduct, in the face of clear and convincing evidence that Defendant engaged in prohibited transactions in violation of Section 406(b) the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1106(b),

have grown tiresome. Indeed, ING's entire attempt to defend its conduct in this case could aptly be characterized as an "Emperor's New Clothes" defense in which Defendant holds its head high and effectively dares recognition of the fact that its defenses are naked and without merit or substance.[1] Indeed, Defendant begins its "Response" to Plaintiffs' Memorandum regarding Shelf Space Payments with its false mantra that "Plaintiffs have spent most of this case in search of a theory of fiduciary status." See Defendant's Response at 1, line 1. ***That is not correct***.[2] ***It is beyond cavil that Plaintiffs have asserted consistent and related theories regarding ING's fiduciary status from the outset and throughout this entire litigation***. See, e.g., [Dkt. 43-1 at 13-17](identifying virtually all of the same theories of fiduciary liability presented at trial in support of class certification on January 31, 2012); [Dkt. 79 at 1-4](discussing the same theories of fiduciary liability in a reply brief in support of class certification on April 23, 2012); [Dkt. 116-4 at 11-25](discussing same theories of fiduciary liability); [Dkt. 133 at 7-24](discussing the same theories of fiduciary liability in opposing summary judgment on December 3, 2012); [Dkt. 186 at 6-23](discussing the same exact theories of fiduciary liability in opposing summary judgment again on April 5, 2013). Thus, the only party changing its position in this litigation has been ING, which consistently has found itself in search of a meritorious defense -- where none exists.[3]

---

[1]Plaintiffs respectfully submit that, like the bystanders in Hans Christian Andersen's classic tale, the Court should announce in the case of ING: "The boy is right! The Emperor is naked! It's true!" See Hans Christian Andersen, *The Emperor's New Clothes* (1837); see also http://www.andersen.sdu.dk/vaerk/hersholt/TheEmperorsNewClothes_e.html.

[2]Defendant's constant repetition of an incorrect assertion does not render it true and cannot take the place for persuasive or compelling argument. Of course, this is not the first time that Defendant has been less than entirely genuine with the Court in the positions it has taken. See [Dkt. 186 at 1-2.]

[3]As Defendant also disingenuously fails to acknowledge, the Court has already found ING to be a fiduciary under ERISA:

Defendant's Response to Plaintiffs' Shelf Space Memorandum also is frankly insulting in its nature. Simply put, Plaintiffs did not file their Memorandum regarding ING's receipt of shelf

---

> ILIAC's contractual authority to change investment options in order "to accomplish the purpose" of the plan, HSI Grp. Contract § 8.02, at D-App. 716, appears -- by the very terms of the contract -- to grant ILIAC authority in the plan's administration. As a result, ILIAC's discretionary authority to change the funds available to 401(k) plans supports fiduciary status under subsection three of 29 U.S.C. section 1002(21)(A). Because subsection three endows fiduciary status on anyone who possesses discretionary authority in a plan's administration, regardless of whether that authority is exercised, ILIAC's fiduciary role is not necessarily limited to the two instances in which it substituted mutual funds out of 401(k) plans. *See Bouboulis*, 442 F.3d 55, 63-65 (2d Cir. 2006).

*Healthcare Strategies, Inc. et al. v. ING Life Ins. & Annuity Co.*, No. 11-00282-WGY, 2013 U.S. Dist. LEXIS 120456 * 25-26 (August 9, 2013); *see also Id.* at * 19-21 (reciting authority acknowledging that the ability or power to add, delete, change or substitute mutual fund investments, whether exercised or not, confers fiduciary status, **and** that an entity, such as ING, is a fiduciary if it has control over factors that determine its compensation); *Healthcare Strategies, Inc. et al. v. ING Life Ins. & Annuity Co.*, No. 11-00282-WGY, 2012 U.S. Dist. LEXIS 184544 * 19-20 (August 9, 2013)(JCH)("the court finds that ILIAC's contractual right to delete and substitute mutual funds from its menu gave it discretion with respect to the administration of the plan sufficient to make it a fiduciary with respect to its allegedly inappropriate receipt of revenue"). Indeed, despite ING's convenient inability to face the reality of this Court's prior decisions, independent commentators had no trouble understanding the meaning of this Court's ruling denying summary judgment. *See* Barstein, *ING Is Ruled a Fiduciary In Class Action Suit*, http://www.napa-net.org/news/technical-competence/erisa/ing-is-a-ruled-a-fiduciary-in-class-action-suit (August 13, 2013)("A federal district court ... ruled that the DC plan administrator is a fiduciary related to its revenue sharing practices regarding funds in a group annuity it manages. As part of the arrangement, ING has the ability to change, add and eliminate investments, and only has to notify the plan sponsor"). Thus, as this Court made crystal clear in its summary judgment decision, the issue for trial was and is whether ING was wearing a fiduciary hat when it negotiated for *or* received the revenue sharing payments at issue: "a question of fact exists as to whether ILIAC acted in a fiduciary capacity when it negotiated or received revenue-sharing fees from mutual funds...." *Healthcare Strategies, Inc. et al. v. ING Life Ins. & Annuity Co.*, No. 11-00282-WGY, 2013 U.S. Dist. LEXIS 120456 * 28-29 (August 9, 2013). Nor did the Court limit Plaintiffs in the means that they could prove that ING was wearing a fiduciary hat - despite Defendant's wishful thinking to the contrary. As ING ignored in the apparent hope that it could somehow avoid the consequences at trial, under Second Circuit authority, Defendant bore the burden of proving by clear or convincing evidence that it was not wearing its fiduciary hat when it negotiated for *or* received the revenue sharing payments at issue -- a burden it utterly failed to meet under any construction of the facts and law. *See Lowen v. Tower Asset Mgmt, Inc.*, 829 F.2d 1209, 1215 (2d Cir. 1987).

space payments "in search of a theory of fiduciary status" as Defendant blithely asserts. Instead, Plaintiffs submitted their Memorandum in specific response to the Court's inquiry and observations regarding "shelf space" payments, including the fact that the Court was inclined to find that the revenue sharing payments were such payments, and the acknowledgments by ING's witnesses at trial that selling "shelf space" would be illegal based upon the advice of ING's own counsel. Thus, ING's attempt to characterize Plaintiffs' Shelf Space Memorandum as somehow untoward or self-serving (as opposed to directly responsive to the Court's inquiry) finds no support in the record. Perhaps unsurprisingly then, ING's Response to Plaintiffs' Shelf Space Memorandum fails to address the issues at hand in a meaningful fashion and, when viewed in proper light, actually establishes the unlawful nature of Defendant's conduct. Plaintiffs respectfully submit that the time for ING's obfuscation is at an end. Plaintiffs have proven by clear and convincing evidence that ING wore a fiduciary hat when it accepted the revenue sharing payments at issue under the clear terms of ERISA § 406(b). That evidence establishes ING's liability under the great weight of legal authority on the subject. ING's desperate, unconvincing attempts to avoid this truth should be recognized for what they are -- unpersuasive and lacking in genuine merit.

## II.  ARGUMENT

### A.  The SEC Settlements Are Factually And Legally Relevant In Light Of The Court's Inquiry

In response to the Court's inquiry regarding why ING's witnesses were so adamant that ING did not accept shelf-space payments and what was wrong with shelf space payments in light of these same witnesses' acknowledgment that they had been advised by ING itself that acceptance of such payments was impermissible, Plaintiffs produced the explanation -- numerous settlements by mutual funds with the SEC for making shelf-space payments. Although it still

fails to offer a credible explanation for the understanding by ING's own witnesses that shelf-space payments are impermissible, ING goes to great (but ultimately unpersuasive) lengths to distinguish the SEC settlements in an effort to disguise the true nature of its conduct. That effort should not be permitted to stand.

First, ING's attempt to distinguish *In the Matter of Citigroup Global Markets, Inc.*., File No. 3-11869 (Mar. 23, 2005)(*see* Plaintiffs' Shelf Space Memorandum at Exhibit "E"), only demonstrates the desperate nature of its position. In *Citigroup Global Markets*, the SEC specifically explained as follows:

> From at least January 1, 2002 through July 31, 2003, CGMI failed to disclose adequately certain material facts to its customers in the offer and sale of mutual fund shares. At issue in this case are two distinct disclosure failures. The first relates to CGMI's ***revenue sharing program***. In addition to standard sales loads and 12b-1 trail payments, ***CGMI received revenue sharing payments from investment advisers and distributors associated with approximately 75 mutual fund complexes***. ***In exchange for these payments, CGMI provided "shelf space" to mutual funds by granting them access to, or increased visibility in, CGMI's extensive retail distribution network***.....
>
> CGMI's ***revenue sharing program***, known as the Tier Program, ***created an undisclosed conflict of interest because CGMI offered and sold to its customers only the shares of those mutual fund complexes that paid CGMI additional compensation***. When CGMI recommended and sold mutual funds to its customers, ***CGMI relied upon the disclosures that fund companies made in their prospectuses and statements of additional information ("SAIs"), although most of those disclosures did not provide sufficient facts that would enable CGMI's customers to understand the nature and scope of CGMI's revenue sharing program***....

*Id*. at ¶¶ 2-3 (emphasis added). Likewise, here, the record reflects that ING provided access to different menus of investment options (with corresponding, undisclosed, internal targets for revenue) and the retirement plan customers that were offered those menus of investments, which created an undisclosed conflict of interest because ING only offered those share classes of mutual funds that paid ING revenue sharing payments that it deemed adequate (even though ING could offer customers lower cost share classes of mutual funds and never disclosed this fact), while

relying on mutual fund prospectuses that did not disclose the nature and scope of the revenue sharing program. Moreover, ING's feeble attempt to distinguish the revenue sharing at issue in this case from the revenue sharing at issue in *Citigroup* on the basis that the payments in *Citigroup* were in addition to 12b-1 fees and shareholder servicing fees, is completely unpersuasive in light of the consistent admissions in the trial record that increased revenue sharing payments did not relate to any change in purported services rendered, 9/18/13 Tr. at 82:1-5,[4] thereby revealing the payments to be for shelf space, as well as the fact that prospectuses generally fail to disclose the amount of the payments. And, of course, the conflicts of interest that are described in *Citigroup* are just the kind of conflicts of interest that ERISA's prohibited transaction rules were designed to prevent -- with bright line rules regarding appropriate conduct. *See Lowen, supra*.

Second, the circumstances described in *In the Matter of Franklin Advisers, Inc.*, File No. 3-11769 (December 13, 2004)(where Franklin Templeton Investments paid brokerage commissions in the form of 12b-1 fees to offset shelf space arrangements to gain preferential placement on certain broker-dealers lists of recommended mutual funds), are markedly similar to those present in this case. Here, as the record firmly establishes, since ING (a) operates with undisclosed revenue sharing targets for menus of investment options, (b) only will offer mutual funds (and their corresponding share classes with increased expense ratios that meet these targets), (c) takes the extra revenue when it can get it and simply pockets that revenue as additional profit, and (d) provides the same services to mutual funds regardless of the amount of

---

[4]Coupled with the testimony that ING understood the importance of attributing revenue sharing payments to service rendered even when they did not relate in any way to such services, 9/18/13 Tr. at 80:8-81:25, 82:12-83:20, one can only logically conclude that ING was carefully attuned to concealing the nature and existence of these shelf space payments.

revenue sharing it receives, the revenue sharing payments are being made and accepted for one reason and one reason only -- access to the Plans. That is exactly the conduct that the SEC addressed in the settlements at issue. Moreover, as ING attempts to unpersuasively deny, *see* Defendant's Response at 3, n.2, it is beyond serious dispute that ING entered into a specific agreement with Franklin Templeton itself for shelf space payments. The Franklin Templeton agreement (Trial Exhibit 82) specifically provides Franklin Templeton with direct access to ING's brokers, with sales reports so that Franklin Templeton can market to the brokers, and only pays ING additional remuneration if and when Franklin Templeton achieves increased access in the form of additional assets. Despite all of ING's witnesses' attempts to deny the plain language of Trial Exhibit 82 (9/18/13 Tr. at 113:8-122:24; 10/1/13 Tr. at 24:2-29:16), the document speaks for itself and is damning in light of ING's protests that it does not accept shelf space payments.

Third and finally, ING's observation that legal settlements are not legal precedent entirely misses the point. The Court inquired as to why ING's witnesses were so adamant in their denials of offering shelf space to mutual funds and Plaintiffs provided the answer. To date, ING has not. Simply put, since revenue sharing payments do not relate in any way, shape or form to services rendered by ING, the logical question is: What were the payments for? Despite all of ING's protests to the contrary, the answer is obvious and clearly not one to ING's liking.

> **B.     ING's Receipt Of Revenue Sharing Payments Clearly Was For Shelf Space On Its Menus Of Investments**

In its Response, in apparent (albeit belated) recognition of the consequences of its conduct, ING now denies that the revenue sharing payments are made for shelf space. The record, however, confirms otherwise. Indeed, in response to the Court's indication that it would be inclined to find that the revenue sharing payments were for shelf space (*i.e.*, access to ING's menus), *see* 10/2/13 Tr. at 102-103, counsel for ING explicitly admitted that the revenue sharing

payments constitute such payments:

> MR. BRADEN: That's a very good point. I think you're right. I think if you get prime positioning where your product can be pushed in effect then that's one version of selling shelf space. But it's undisputed that we do, and we don't, we don't apologize for it and we freely admit it, that we do take revenue sharing into account in determining where the funds will go on our product menus because they're slotted in a way that allows us to meet this balance between DAC and revenue sharing. But once they're on the product menu there's no strategic positioning, there's no pushing of the fund at eye level as you point out.

10/3/13 Tr. 11:4-14. In an attempt to escape the consequence of that admission (*i.e.*, that the payments of revenue sharing are for access to customers, which the SEC found impermissible under analogous circumstances, because a fiduciary, unlike a grocery store, has an obligation to avoid conflicts of interest and the like), ING now argues that (1) the revenue sharing payments were made for services rendered, *see* Defendant's Response at 5, n.3; and (2) its design and maintenance of investment options (which it regularly updates and modifies on the basis of revenue sharing payments) is not a fiduciary function. Neither assertion is supportable under the actual facts of record and applicable law.

First, ING's outrageous suggestion that the record evidence supports its assertion that the revenue sharing payments relate in some way to services rendered, *see* Defendant's Response at 5, n.3, defies credulity. As the Court will recall, ING's employee responsible for negotiation of participation agreements explicitly admitted that she did not know which, if any, services enumerated in the participation agreements were actually performed by ING, while freely admitting that mutual funds increased revenue sharing payments without any change in services. *See* 9/18/13 Tr. at 80:8-81:25, 82:12-83:20, 94:1-3. Simply put, ING's habit of repeatedly distorting the record and repeating such distortions in the hope that they will be accepted as

equating with some semblance of the actual facts of record should not be countenanced.[5]

Second, ING's assertion that its design and maintenance of investment menu options is not a fiduciary function, *see* Defendant's Response at 8, n.6, conflicts with both the position of the Department of Labor, as well as its own, apparent pre-litigation understanding of the scope of fiduciary duties. As ING conveniently ignores, in *In re Frost National Bank*, DOL Opinion Letter 97-15A, 1997 ERISA LEXIS 18 * 11 (May 22, 1997)(emphasis added), the Department of Labor specifically disagreed with the position that ING now is forced to take in light of the evidence of record:

> Your submission indicates, however, that Frost reserves the right to add or remove mutual fund families that it makes available to Plans. Under these circumstances, we are unable to conclude that Frost would not exercise any discretionary authority or control to cause the Plans to invest in mutual funds that pay a fee or other compensation to Frost.n9
>
> n9 *See*, in this regard, the Department's position as expressed in the preamble to the final regulation regarding participant-directed individual account plans (ERISA section 404(c) plans), 57 Fed. Reg. 46906, 46924 n. 27 (Oct. 13, 1992):
>
>> In this regard [a fiduciary is relieved of responsibility only for the direct and necessary consequences of a participant's exercise of control], ***the Department points out that the act of limiting or designating investment options which are intended to constitute all or part of the investment universe of an ERISA 404(c) plan is a fiduciary function which, whether achieved through fiduciary designation or express plan language, is not a direct or necessary result of any participant direction of such plan***.

---

[5]Likewise, ING's assertions that the revenue sharing payments are simply used to meet (as opposed to exceed) revenue targets flies in the face of the record evidence that ING accepts increases in revenue sharing payments without any change in services rendered or pricing to its customers. 9/16/13 Tr. at 93:11-24, 9/18/13 Tr. at 82:1-5. Similarly, ING's assertion that the record does not include evidence of the pay-to-play nature of these payments ignores the existence of Trial Exhibit 82 and the plain meaning of that document. As Defendant consistently ignores, ERISA's prohibited transaction rules exist specifically to police against such conduct and, despite all of its protests to the contrary, ING has known since at least 1997 when it received the Aetna letter that its conduct is unlawful. *See In re Aetna Life Ins. Co.*, DOL Opinion No. 1997-16A, 1997 ERISA LEXIS 17 (May 22, 1997).

Moreover, the evidence of record establishes that ING knew and understood that this fiduciary function existed independent of the fiduciary function of choosing specific investments from a menu of alternatives. That is why ING considered offering a fiduciary warranty related to investment menu design (independent of a separate fiduciary warranty related to choices from that menu). *See* Trial Exhibit 87; 9/16/13 Tr. at 9:22-14:2. Since ING has no answer for this record reality, it chooses to ignore that evidence as well.

### III. CONCLUSION

For all of the reasons stated above and in their initial Memorandum, Plaintiffs respectfully submit that there was good reason for Defendant's witnesses to resist the characterization of revenue sharing payments as being made for shelf space. That is why Defendant consistently mischaracterizes the payments as relating to services rendered, when the record establishes otherwise. The existence and true nature of these shelf space/access payments highlights the nature of the prohibited transaction under Section 406(b) of ERISA, which was designed to avoid such conflicts of interest, and speaks volumes regarding Defendant's liability.

Dated: October 30, 2013      Respectfully submitted,

/s/ Karen M. Leser-Grenon
James E. Miller (ct21560)
Laurie Rubinow (ct27243)
Karen M. Leser-Grenon (ct23587)
SHEPHERD, FINKELMAN, MILLER
 & SHAH, LLP
65 Main Street
Chester, Connecticut 06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120
E-mail: jmiller@sfmslaw.com
         lrubinow@sfmslaw.com
         kleser@sfmslaw.com

Scott R. Shepherd
James C. Shah
Eric L. Young
Shepherd, Finkelman, Miller & Shah, LLP
35 East State St.
Media, Pennsylvania 19063
Telephone: (610) 891-9880
Facsimile:  (610) 891-9883
Email:   sshepherd@sfmslaw.com
             jshah@sfmslaw.com
             eyoung@sfmslaw.com

Rose F. Luzon
Kolin C. Tang
Shepherd, Finkelman, Miller & Shah, LLP
401 West A St., Suite 2350
San Diego, California 92101
Telephone: (619) 235-2416
Facsimile:  (619) 234-7334
Email:   rluzon@sfmslaw.com
             ktang@sfmslaw.com

Douglas P. Dehler
O'Neil, Cannon, Hollman, DeJong & Laing S.C.
111 E. Wisconsin Avenue, Suite 1400
Milwaukee, Wisconsin 53202
Telephone: (414) 276-5000
Facsimile:  (414) 276-6581
Email:   Doug.Dehler@wilaw.com

Attorneys for Plaintiffs and the Class

## **CERTIFICATE OF SERVICE**

      I hereby certify that on October 30, 2013, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

      I also hereby certify that a complete, duplicate copy of the foregoing document has been forwarded directly to the Honorable William G. Young in Boston, Massachusetts c/o Judge Young's Deputy Clerk, Jennifer Gaudet, for delivery on November 1, 2013, and addressed as follows:

**Via Overnight Delivery**
Jennifer Gaudet, Deputy Clerk
United States District Court
for the District of Massachusetts
Clerk's Office, Suite 2300
1 Courthouse Way
Boston, MA 02210

/s/ Karen M. Leser-Grenon
Karen M. Leser-Grenon (ct23587)
Shepherd Finkelman Miller & Shah, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120
E-mail: kleser@sfmslaw.com