# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

HEALTHCARE STRATEGIES, INC., Plan     :
Administrator of the Healthcare Strategies, Inc.     :
401(k) Plan and the Healthcare Strategies, Inc.     :   No. 3:11-cv-00282 (WGY)
CBU 401(k) Plan, On Behalf of Itself and All     :
Others Similarly Situated,     :
    :
         and     :
    :
The DEROSA CORPORATION, Plan     :
Administrator of The DeRosa Corporation 401K     :
PS Plan, On Behalf of Itself and All Others     :
Similarly Situated,     :
    :
         Plaintiffs,     :
    :
        vs.     :
    :
ING LIFE INSURANCE AND ANNUITY     :
COMPANY,     :
    :
         Defendant.     :   April 10, 2014
    :

## SETTLEMENT AGREEMENT AND RELEASE

# TABLE OF CONTENTS

Page

I.     DEFINITIONS ................................................................................................... 4

II.    MOTION FOR PRELIMINARY APPROVAL ............................................................. 12

III.   PAYMENTS TO THE CLASS .................................................................................. 15

IV.    CHANGES IN PRACTICES .................................................................................... 19

V.     SETTLEMENT ADMINISTRATION .......................................................................... 25

VI.    RELEASES, COVENANTS AND JUDICIAL FINDINGS ............................................ 26

VII.   CASE CONTRIBUTION FEE TO PLAINTIFFS ........................................................ 28

VIII.  ATTORNEYS' FEES AND EXPENSES .................................................................... 29

IX.    CONTINGENCIES, EFFECT OF DISAPPROVAL OR TERMINATION OF
       SETTLEMENT ..................................................................................................... 29

X.     NO ADMISSION OF WRONGDOING ...................................................................... 31

XI.    MISCELLANEOUS ............................................................................................... 32

This Settlement Agreement and Release ("Settlement Agreement" or "Agreement") is entered into on April 10, 2014 by and among Plaintiffs, Healthcare Strategies, Inc. ("HSI"), as Plan Administrator of the Healthcare Strategies, Inc. 401(k) Plan and the Healthcare Strategies, Inc. CBU 401(k) Plan, The DeRosa Corporation ("TDC"), as Plan Administrator of The DeRosa Corporation 401K PS Plan, on their own behalf and on behalf of the Class (defined below), and Defendant, ING Life Insurance & Annuity Co. ("ILIAC" or Defendant").

## RECITALS

WHEREAS, on February 23, 2011, HSI filed a putative class action against ILIAC in the United States District Court for the District of Connecticut (the "Court"), on its own behalf and on behalf of all administrators of employee pension benefit plans covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*., subject to Internal Revenue Code ("IRC") §§ 401(a), (k), with which ILIAC has maintained a contractual relationship based on group annuity contracts and/or group funding agreements for which since February 23, 2005, ILIAC has received Revenue Sharing payments (as defined below) from any mutual fund or investment adviser (the initial Complaint, together with all subsequent pleadings and proceedings in the litigation, are collectively referred to as the "Action");

WHEREAS, the Court in the Action certified the following class on September 27, 2012:

> All administrators of employee pension benefit plans covered by the Employee Retirement Income Security Act of 1974 subject to Internal Revenue Code §§ 401(a), (k) with which ING has maintained a contractual relationship based on a group annuity contract or group funding agreement and for which, since February 23, 2005, ILIAC has received revenue sharing payments (*e.g.*, asset-based sales compensation, service fees under distribution and/or servicing plans adopted by funds pursuant to Rule 12b-1 under the Investment Company Act of 1940, administrative service fees and additional payments, and expense reimbursement) from any mutual fund, investment advisor or related entity.

1

WHEREAS, pursuant to a Motion to Intervene that was granted by the Court on December 26, 2012, TDC was added as a party plaintiff and class representative on December 27, 2012 in connection with the filing of an Amended Complaint by HSI and TDC (collectively, "Plaintiffs");

WHEREAS, following certain additional proceedings, notice of class certification and an opportunity to opt-out was provided to the certified class on July 12, 2013;

WHEREAS, sixteen (16) members of the certified class timely requested exclusion from the certified class (see Excluded Class Members, as defined below);

WHEREAS, a trial commenced in this Action on September 9, 2013;

WHEREAS, the Court entered an Order on September 10, 2013 approving a Stipulation of Plaintiffs and Defendant modifying the definition of the certified class to exclude all plan administrators of employee pension benefit plans with which ILIAC had a contract and which were invested through Separate Account "C" and notice was provided to those employee pension benefit plans so excluded pursuant to the agreement of the Parties (defined below) and the direction of the Court;

WHEREAS, the trial with respect to liability concluded on October 3, 2013;

WHEREAS, Plaintiffs in the Action allege various claims against ILIAC relating to Defendant's operation of its retirement plan business including, but not limited to, claims brought under ERISA, as amended, 29 U.S.C. § 1001, *et seq.*, for breach of fiduciary duty (ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B)), violation of the prohibited transaction rules (ERISA §§ 404 and 406(b), 29 U.S.C. § 1104 and 1106(b)), and knowing participation in a breach of trust;

WHEREAS, Defendant asserted certain counterclaims for indemnification and contribution;

WHEREAS, all of the claims and counterclaims at issue arise, in whole or in part, from Defendant's contractual arrangements with and/or provision of various services to retirement plans and/or its receipt from Mutual Funds (as defined below) of Revenue Sharing Payments or RSPs (as defined below) (collectively, the "Claims");

WHEREAS, since before and after October 3, 2013, the Parties engaged in settlement discussions with the assistance, at times, of a mediator;

WHEREAS, to accommodate the Parties' settlement discussions, the Court delayed ruling on liability for a period of two (2) weeks and then granted extensions of that time period so that the Parties could continue and conclude their settlement discussions;

WHEREAS, during the course of litigation and settlement discussions, the Parties exchanged substantial documentation and engaged in extensive discovery, as well as trial proceedings, and were able to fully evaluate the merits of their respective claims and defenses;

WHEREAS, the Parties have reached an agreement to settle the Claims in the Action on the terms and conditions set forth in this Agreement;

WHEREAS, Defendant has vigorously denied, and continues to vigorously deny, any wrongdoing and any liability for the Claims;

WHEREAS, the Parties have decided to enter into this Settlement (defined below) because it provides substantial and meaningful benefits to the Members of the Class (defined below) and to avoid the uncertainties of continued litigation; and

WHEREAS, entry into this Settlement Agreement is not an admission of liability by Defendant, which liability Defendant denies in its entirety.

3

NOW, THEREFORE, it is agreed, by and among the undersigned, that this Action shall be settled and dismissed with prejudice on the terms and conditions set forth herein, subject to judicial approval.

## I.     DEFINITIONS

1.1     "Administration Costs" shall mean (i) the costs and expenses associated with the production and dissemination of the Long Form Notice (as defined in Section 1.24); (ii) the costs and expenses associated with the production and publication of the Published Notice (as defined in Section 2.3); and (iii) all reasonable costs incurred by the Settlement Administrator in administering and effectuating this Settlement, which costs and expenses are necessitated by performance and implementation of this Settlement Agreement and any Court orders relating thereto.

1.2     "Attorneys' Fees" shall mean any and all attorneys' fees, costs (including expert costs) and expenses of Plaintiffs' counsel for their past, present, and future work, efforts, and expenditures in connection with this Action and the resulting Settlement.

1.3     "Case Contribution Fee" shall have the meaning ascribed to it in paragraph 7.1.

1.4     "Class" or "Settlement Class" shall mean the certified class, as modified by the Court's Order dated September 10, 2013, and excluding the Excluded Class Members (defined below).

1.5     "Class Counsel" shall mean Shepherd, Finkelman, Miller & Shah, LLP, and O'Neil, Cannon, Hollman, DeJong & Laing, S.C.

1.6     "Defendant's Counsel" shall mean Morgan, Lewis & Bockius, LLP and Pullman & Comley, LLC.

1.7     "Defendant's Released Parties" shall mean Defendant and each of its present, past and future predecessors, successors, parents, subsidiaries, affiliates, divisions, assigns, officers,

4

directors, committees, employees, fiduciaries, administrators, actuaries, agents, insurers, representatives, attorneys, retained experts and trustees.

1.8     "Distributable Settlement Amount" shall have the meaning ascribed to it in paragraph 3.2(a).

1.9     "DOL" shall mean the United States Department of Labor.

1.10    The Excluded Class Members shall mean C&C 401(k) Plan & Trust (Claremont, CA), DAC Labels & Graphic Specialties (Dallas, TX), Easy Auto/Sunrise Acceptance, Inc. (Cleveland, TN), Etkin Johnson Group, LLC (Denver, CO), J.W. Cole & Sons, Inc. (Detroit, MI), Liftmoore, Inc. (Houston, TX), Oregon Wire Products (Portland, OR), Powers Products III, LLC (Pleasantville, NY), Prime Engineering, Inc. (Atlanta, GA), SCUREF (Aiken, SC), Sholand, LLC (Nashville, TN), South Louisiana Bank (Houma, LA), Sunsation Products, Inc. (Albonac, MI), The Plastic Works (Rocky River, OH), and The Thomas Compliance Associates, Inc. (Chicago, IL), all of which sought timely exclusion from the class certified by the Court on September 27, 2012.

1.11    "Effective Date" shall mean the date upon which the Final Order and Judgment becomes both final and no longer subject to appeal or review (or further appeal or review), whether by exhaustion of any possible appeal, lapse of time, or otherwise.

1.12    "Escrow Account" shall mean an account at Huntington National Bank or a similar established financial institution agreed upon by the Parties that is established for the deposit of any amounts relating to the Settlement.

1.13    "Escrow Agent" shall mean the Settlement Administrator, or whatever other person or entity is approved by the Court to act as escrow agent for any portion of the Settlement Amount deposited in or accruing in the Escrow Account pursuant to this Agreement.

5

1.14    "Fairness Hearing" shall mean the hearing to be held before the Court pursuant to Federal Rule of Civil Procedure 23(e) to determine whether the Settlement Agreement should receive Final Approval by the Court.

1.15    "Fee and Expense Application" shall mean the petition, to be filed by Plaintiffs' counsel, seeking approval of an award of Attorneys' Fees and Expenses.

1.16    "Final Approval" shall mean the entry of the Final Order and Judgment.

1.17    "Final Order and Judgment" or "Final Approval Order" shall mean a final Order entered by the Court after the Fairness Hearing, identical in all material respects to that attached hereto as Exhibit F, granting its approval of the Settlement.

1.18    "Fixed Account" shall mean any ING Fixed Account investment option made available through a group annuity contract or group funding agreement issued by ILIAC wherein ILIAC contractually guarantees a return based on a specified minimum interest rate for any period.

1.19    "Float" shall mean all items mentioned in DOL Advisory Opinion 93-24A and Field Assistance Bulletin 2002-3, including, but not limited to, earnings or internal banking credits resulting from the short-term investment of cash received from plans in the form of funds awaiting investment into separate accounts or awaiting distributions to plans or their participants. Float shall also include any difference between the value of any participant account at the time of distribution and the value distributed.

1.20    "Fund Agreement" shall mean any agreement (whether written or oral) between a Mutual Fund (as defined in Section 1.26) and Defendant (whether on its own behalf, on behalf of either Defendant's separate account or otherwise) or any affiliate of Defendant relating to investment of funds by retirement plans.

6

1.21    "Guaranteed Accumulation Account" shall mean the ING Guaranteed Accumulation Account investment option made available through a group annuity contract or group funding agreement issued by ILIAC wherein ILIAC guarantees a stipulated rate of interest for a specified period of time.

1.22    "Instruction Form" shall mean the form, identical in all material respects to the document attached hereto as Exhibit B, to be provided to and the returned by the Class Members pursuant to paragraph 2.2.

1.23    "Lead Counsel" shall mean Shepherd, Finkelman, Miller & Shah, LLP.

1.24    "Long Form Notice" shall mean the notice, identical in all material respects to that attached hereto as Exhibit A, to be provided directly to Class Members pursuant to paragraph 2.2 and made available on the Settlement Website and the website of Lead Counsel following publication of the Summary Notice.

1.25    "Member of the Settlement Class" or "Member of the Class" or "Class Member" shall mean any member of the Class and, derivatively, any and all Plans for which such member acts as plan administrator, and any person acting or claiming to act on behalf of such a Plan, or claiming through such a Plan, including, but not limited to, trustees, sponsors, fiduciaries, beneficiaries, and participants.

1.26    "Mutual Fund(s)" shall mean investment companies registered with the U.S. Securities and Exchange Commission under the Investment Company Act of 1940, as amended, which are offered as investment options through Defendant's group annuity contracts/group funding agreements as assets of Separate Accounts (defined below) maintained by Defendants.

1.27    "Parties" shall mean Plaintiffs and Defendant (individually and/or collectively).

1.28    "Plaintiffs' Counsel" shall mean Class Counsel.

7

1.29    "Plans" or "Plan" shall mean those employee pension benefit plans included within the Class -- meaning for which the administrators of the Plans are Class Members.

1.30    "Plan of Allocation" shall mean the plan or formula of allocation of the Distributable Settlement Amount as approved by the Court, which plan or formula shall govern the distribution of the Distributable Settlement Amount, in the form attached hereto as Exhibit D.

1.31    "Plan Fiduciary" shall mean (individually and/or collectively) any and all administrators, sponsors, trustees or other fiduciaries of employee pension benefit plans covered by ERISA, subject to IRC §§ 401(a) or 401(k), which utilize or have utilized ILIAC as a service provider.  For purposes of this Settlement Agreement only, the term "Plan Fiduciary" shall exclude Defendant, its affiliates and agents.

1.32    "Plan Menu" shall mean the menu of investments chosen by a Plan fiduciary from a Product Menu and made available under a Plan to Plan participants for investment.

1.33    "Preliminary Approval Order" shall mean an order entered by the Court preliminarily approving the Settlement pursuant to paragraph 2.1, identical in all material respects to that attached hereto as Exhibit E.

1.34    "Product Menu" shall mean a menu of investment options made available through a group annuity contract or group funding agreement issued by ILIAC to a Plan.

1.35    "Proprietary Funds" shall mean Mutual Funds (as defined in paragraph 1.26) which are advised or sub-advised by any entity affiliated with ILIAC.

1.36    "Regulatory Change" shall have the meaning ascribed to it in paragraph 4.5(b).

1.37    "Released Claims" shall mean any and all claims, liabilities, demands, causes of action or lawsuits, known or unknown (including Unknown Claims, as defined below), whether legal, statutory, equitable or of any other type or form, whether under federal or state law, and

8

whether brought in an individual, representative or any other capacity, that in any way relate to

or arise out of or in connection with acts, omissions, facts, statements, matters, transactions, or

occurrences that have been alleged or referred to or could have been alleged in the Action,

including in any court filing or any discovery request or response including, but not limited to,

(a) matters pertaining to or arising out of the solicitation, negotiation, or receipt of Revenue

Sharing (defined below); (b) claims of excessive fees of any kind in connection with Mutual

Funds, Proprietary Funds, the Fixed Account or the General Accumulation Account or the

administration of the Plans; (c) matters pertaining to disclosure, receipt or retention of Float; (d)

disclosures about Revenue Sharing or any administrative or investment management fees paid

directly or indirectly by the Plans or their sponsors; (e) assembly, substitution, addition, or

removal of investment options from Product or Plan Menus, including the appropriateness of

inclusion of Mutual Funds, Proprietary Funds, the Fixed Account and the General Accumulation

Account in Product or Plan Menus; (f) the investment performance of Mutual Funds, Proprietary

Funds, the Fixed Account, and the General Accumulation Account included in Product Menus or

Plan Menus; (g) Fund Agreements; (h) operation of any Separate Accounts; (i) the reinvestment

of dividends paid by any Mutual Fund; (j) sufficiency of the information about investment

options, fees, and charges that is provided in connection with the operation of Defendant's

retirement plan business(es); (k) contractual arrangements or conduct as a service provider

relating to any Member of the Settlement Class, including, but not limited to, any alleged rights,

obligations, discretion or conduct by Defendant as a service provider claimed to give rise to

fiduciary status on the part of Defendant with respect to Revenue Sharing; (l) any actions arising

out of or related to the negotiation or performance of the Settlement Agreement or matters

9

relating thereto; and (m) all Class Members' decisions related to the allocation of any proceeds of the Distributable Settlement Amount.

      1.38    "Counterclaims" shall mean only those counterclaims asserted in the Action.

      1.39    "Revenue Sharing" "Revenue Sharing Payments" or "RSPs" shall mean any payment made or value provided, directly or indirectly, to Defendant by a Mutual Fund, investment advisor or any related entity pursuant to a Fund Agreement, including asset-based sales compensation, service fees under distribution and/or servicing plans adopted by funds pursuant to Rule 12b-1 under the Investment Company Act of 1940, administrative service fees, additional payments, expense reimbursements and/or other compensation.

      1.40    "Separate Account" or "Separate Accounts" shall mean an account established by ILIAC separating the assets funding the variable benefits for a group annuity contract or group funding agreement from the other assets of Defendant.

      1.41    "Settlement" shall mean the compromise and resolution embodied in this Settlement Agreement.

      1.42    "Settlement Administrator" shall mean Strategic Claims Services (http://www.strategicclaims.net).

      1.43    "Settlement Amount" shall mean the amount of $14,950,000.

      1.44    "Settlement Class" shall mean the Class.

      1.45    "Settlement Website" shall have the meaning ascribed to it in paragraph 2.5.

      1.46    "Taxes" shall have the meaning ascribed to it in paragraph 3.1(g).

      1.47    "Tax-Related Costs" shall have the meaning ascribed to it in paragraph 3.1(g).

      1.48    "Unknown Claims" shall mean any Released Claims which Plaintiffs and any Member of the Settlement Class do not know or suspect to exist in their favor at the time of the

release of the Defendant's Released Parties relating to the claims and allegations asserted in the

Action which, if known by them, might have affected their settlement with and release of the

Defendant's Released Parties, or might have affected their decision not to object to this

Settlement.  Without admitting that California law in any way applies to this Agreement, with

respect to any and all Released Claims, the Parties agree that, upon the Effective Date, Plaintiffs,

and each Member of the Settlement Class, shall be deemed to have, and by operation of the Final

Order and Judgment shall have, expressly waived the provisions, rights and benefits of

California Civil Code § 1542, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT
> TO EXIST IN HIS OR HER FAVOR AT THE TIME OF
> EXECUTING THE RELEASE WHICH, IF KNOWN BY HIM
> OR HER, MUST HAVE MATERIALLY AFFECTED HIS OR
> HER SETTLEMENT WITH THE DEBTOR.

Plaintiffs  and each Member of the Settlement Class shall be deemed to have, and by operation of

the Final Order and Judgment shall have, expressly waived all provisions, rights and benefits

conferred by any law of any state or territory of the United States, or principle of common law,

which is similar, comparable or equivalent to California Civil Code § 1542.  Plaintiffs and any

Member of the Settlement Class may later discover facts in addition to or different from those

which they now know or believe to be true with respect to the subject matter of the Released

Claims, but Plaintiffs and any Member of the Settlement Class, upon the Effective Date, shall be

deemed to have, and by operation of the Final Order and Judgment shall have, fully, finally, and

forever settled and released any and all Released Claims (and Unknown Claims), suspected or

unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist,

or heretofore have existed, upon any theory of law or equity now existing or coming into

existence in the future relating in any way to the Action, including, but not limited to, conduct

which is negligent, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts. Plaintiffs and any Member of the Settlement Class shall be deemed by operation of the Final Order and Judgment to have acknowledged that the foregoing waiver was separately bargained for and a key element of the Settlement of which this release is a part.

## II.    MOTION FOR PRELIMINARY APPROVAL

2.1    *Motion for Preliminary Approval.*  As soon as is practicable after execution of this Agreement, Plaintiffs shall move the Court for preliminary approval of the Settlement, including entry of an Order identical in all material respects to the form of the Preliminary Approval Order attached as Exhibit E hereto.

2.2    *Long Form Notice.*

(a)    Within thirty (30) days of the entry of the Preliminary Approval Order, the Settlement Administrator shall send the Long Form Notice and Instruction Form by first-class mail or electronic mail (if available) to the Class Members.  The Long Form Notice and Instruction Form will be sent to the last known electronic mail address (if any) or last known mailing address of the Class Member, which mailing address has been supplied by Defendant and updated through the National Change of Address database by the Settlement Administrator before mailing (with all returned mail skip-traced and promptly re-mailed), and will be in the forms attached hereto as Exhibits A and B.

(b)    The Instruction Form must be returned to the Settlement Administrator within one hundred and eighty (180) days of entry of the Preliminary Approval Order.  For each Class Member that has not returned the Instruction Form within one-hundred and twenty (120) days of the entry of the Preliminary Approval Order, the Settlement Administrator will send within fourteen (14) days thereafter a post card by electronic mail (if available) or first class mail

12

to such Class Member notifying them again of the deadline by which to submit the Instruction Form, unless the previous mailings and communications to the Class Member have been returned as undeliverable and the Settlement Administrator is unable to identify a valid electronic mail or physical mailing address through the exercise of reasonable and good faith efforts.

(c)    The Settlement Administrator will make payment of the Distributable Settlement Amount to each Class Member's Plan in the form of a check made payable as designated in the Instruction Form. A Class Member that has an in-force contract with ILIAC shall use the Distributable Settlement Amount to pay allowable Plan expenses, and the Plan shall not deposit such amount to the Plan or distribute such amount to the Plan's participants. Class Members, as fiduciaries of their Plans, shall be solely responsible for all fiduciary decisions related to the use of any proceeds of the Distributable Settlement Amount and release and hold harmless Defendant's Released Parties from any claims related thereto. Plaintiffs acknowledge that it is not administratively feasible for ILIAC to distribute any settlement proceeds into any accounts it maintains for Plans, or to current or former Plan participants and that any such distribution to Plan participants would be de minimis.

2.3    *Published Notice.*  Within forty-five (45) days of the entry of the Preliminary Approval Order, and one week after the first date on which the Long Form Notice is emailed or mailed by First Class Mail, the Settlement Administrator shall cause to be published once in the Legal Notices section of the Wall Street Journal a summary class notice (with dimensions of 5.35" x 6" or 1/8 of a page) identical in all material respects to that attached hereto as Exhibit C, which provides the general details of the Settlement Agreement and directs members of the Class

13

to the Settlement Website (the "Published Notice"), where the Long Form Notice, Settlement Agreement and its exhibits all will be available.

2.4     ***Class Action Fairness Act Notice.***  Defendant shall comply with the notice requirements of 28 U.S.C. § 1715, including providing notice to the DOL, and shall file a notice confirming compliance prior to the Fairness Hearing.

2.5     ***Settlement Website.***  Within thirty (30) days of the entry of the Preliminary Approval Order and no later than the first date that the mailing of the Long Form Notice occurs, the Settlement Administrator shall establish the Settlement Website, which will contain the Long Form Notice and this Settlement Agreement and its exhibits.  The Long Form Notice and the Published Notice will identify the web address of the Settlement Website.

2.6     ***Settlement Information Line.***  Within thirty (30) days of the entry of the Preliminary Approval Order, and no later than the first date of mailing of the Long Form Notice, the Settlement Administrator shall establish a toll-free telephone number (the "Settlement Information Line") to which Settlement Class Members can direct questions about the Settlement.  The Settlement Administrator shall develop a question-and-answer-type script, with input and approval from Defendant's and Plaintiffs' Counsel, for the use of persons who answer calls to the Settlement Information Line.

2.7     ***Rights of Exclusion.***  Class Members shall be permitted to opt out of the Class, provided they comply with the requirements for doing so as set forth in the Preliminary Approval Order.

2.8     ***Right to Object.***  Members of the Settlement Class, the DOL and any other federal or state governmental entity, agency or instrumentality with an interest in the Settlement shall be

permitted to object to the Settlement. Requirements for filing an objection shall be as set forth in the Preliminary Approval Order.

## III.    PAYMENTS TO THE CLASS

    3.1    *The Settlement Amount.*

        (a)    Defendant shall cause the Settlement Amount to be deposited by wire transfer into the Escrow Account within fourteen (14) days of entry of the Final Order and Judgment.

        (1)    The Settlement Amount shall be used solely for the purposes set forth in paragraph 3.1(h) below.

        (2)    The Class Members agree that the Settlement Amount shall not be considered "plan assets," as that term is defined in ERISA and the regulations promulgated pursuant to ERISA, until such time as the checks are cashed by the Plans. The Class Members further agree that the Parties are not exercising any discretion over the Settlement Amount as part of this settlement, and that the Class Members, as fiduciaries of their Plans, shall be solely responsible for all fiduciary decisions related to the use of any proceeds of the Distributable Settlement Amount.

        (b)    Subject to Court approval and oversight, the Escrow Account will be controlled by the Settlement Administrator. Neither Defendant nor Plaintiffs shall have any liability whatsoever for the acts or omissions of the Settlement Administrator appointed by the Court. The Settlement Administrator shall not disburse the Settlement Amount or any portion thereof except as provided for in this Agreement, by an Order of the Court, or with prior written agreement of Plaintiffs' Counsel and Defendant's Counsel.

   (c)  The Settlement Administrator is authorized to execute transactions on behalf of the Class Members that are consistent with the terms of this Agreement and with Orders of the Court.

   (d)  All funds held in the Escrow Account shall be deemed to be in the custody of the Court and shall remain subject to the jurisdiction of the Court until the funds are distributed in accordance with this Settlement Agreement.

   (e)  The Settlement Administrator shall, to the extent practicable, invest the Settlement Amount pursuant to paragraph 3.1(a) above in discrete and identifiable instruments backed by the full faith and credit of the United States Government or fully insured by the United States Government or an agency thereof and shall reinvest the proceeds of these instruments as they mature in similar instruments at their then-current market rates.  The Settlement Administrator shall maintain records identifying in detail each instrument in which the Settlement Amount or any portion thereof has been invested, and identifying the precise location (including safe deposit box number) of each such instrument.  Neither the Settlement Amount nor any portion thereof shall be commingled with any other monies in any instruments.  Any cash portion of the Settlement Amount not invested in instruments of the type described in the first sentence of this paragraph shall be maintained by the Settlement Administrator, and not commingled with any other monies, at a bank account, which shall promptly be identified to Plaintiffs and Defendant at either party's request by account number and any other identifying information.  The Settlement Administrator and Class Members shall bear all risks related to investment of the Settlement Amount.  All income, gain, or loss earned by the investment of the Settlement Amount shall be credited to the Escrow Account.

16

(f)      The Escrow Account is intended to be a "Qualified Settlement Fund" within the meaning of Treasury Regulation § 1.468B-1.  The Settlement Administrator, as administrator of the Qualified Settlement Fund within the meaning of Treasury Regulation §1.468B-2(k)(3), shall be solely responsible for filing tax returns for the Escrow Account and paying from the Escrow Account any Taxes owed with respect to the Escrow Account. Defendant agrees to provide the Settlement Administrator with the statement described in Treasury Regulation §1.468B-3(e).  Neither Defendant, Defendant's Counsel, Plaintiffs, or Plaintiffs' Counsel shall have any liability or responsibility of any sort for filing any tax returns or paying any taxes with respect to the Escrow Account.

(g)      All (i) taxes on the income of the Escrow Account ("Taxes") and (ii) expenses and costs incurred in connection with the taxation of the Escrow Account (including, without limitation, expenses of tax attorneys and accountants) ("Tax-Related Costs") shall be timely paid by the Settlement Administrator out of the Escrow Account.

(h)      The Settlement Amount, together with any interest accrued thereon, will be used to pay the following amounts associated with the Settlement:

(i)      Compensation to Class Members determined in accordance with paragraph 3.2;

(ii)     Any Case Contribution Fee (as defined in paragraph 7.1 below) approved by the Court;

(iii)    Administration Costs;

(iv)    All Attorneys' Fees and Expenses approved by the Court; and

(v)     Taxes and Tax-Related Costs.

3.2     **_Distribution to Class Members._**

(a)      The money remaining from the Settlement Amount, including any accrued interest thereon, after the payment of any approved Case Contribution Fee, Administration Costs,

17

approved Attorneys' Fees, and Taxes and Tax-Related Costs, shall be available for distribution to Class Members (the "Distributable Settlement Amount").

(b)     The Distributable Settlement Amount shall be divided among Class Members in accordance with the Plan of Allocation attached hereto as Exhibit D.

(c)     The Settlement Administrator shall disburse the Distributable Settlement Amount as promptly as possible after the Effective Date and, in any event, no later than two hundred-seventy (270) days after the Effective Date.

(d)     Class Members must cash checks within ninety (90) days of issuance.  If they do not do so, the checks will be void.  This limitation shall be printed on the face of each check.  The voidance of checks shall have no effect on the Class Members' release of claims, obligations, representations, or warranties as provided herein, which shall remain in full effect.

3.3     ***Treatment of Uncashed Checks.***  Any funds associated with checks that are not cashed within ninety (90) days of issuance, any funds that cannot be distributed to Class Members for any other reason, together with any interest earned on them, and after the payment of any applicable taxes by the Escrow Agent, shall be donated to an appropriate charity or charities pursuant to a *cy pres* award of the Court.  As soon as practicable following the Effective Date, Plaintiffs shall make any application for a *cy pres* award of any such funds to the Court. Plaintiffs will meet and confer with Defendant regarding the proposed recipients of any *cy pres* awards before making such application and Defendant shall have the right to object to any proposed *cy pres* recipient if Defendant does not believe that such a recipient is appropriate to receive such an award.

3.4     ***Administration Costs.***  The Administration Costs shall be paid from the Settlement Amount beginning thirty (30) days after the entry of the Final Approval Order

and on every thirty (30) days thereafter, and the Settlement Administrator shall provide Plaintiffs with a detailed accounting of any administrative costs expended to date and an invoice for the amount of such Administration Costs payable from the Settlement Amount.

3.5    ***Entire Monetary Obligation.***   In no event, and notwithstanding anything else in this Settlement Agreement (except with respect to the obligations it will be required to incur with respect to implementation of the structural changes/changes in practices described in Section IV below), shall Defendant be required to pay any amounts other than the Settlement Amount.  It is understood and agreed that Defendant's monetary obligations under this Settlement Agreement will be fully discharged by paying the amounts specified in paragraphs 3.1(a) above and that Defendant shall have no other monetary obligations, or obligations to make any other payments under this Agreement or otherwise.

## IV.    CHANGES IN PRACTICES

4.1    ***Changes to Business Practices.***   As part of the Settlement of this Action, Defendant agrees to make certain specified changes to its business practices as set forth in the remaining paragraphs of this Section IV, which would remain in effect after the date of Final Approval of the Settlement, unless there is a change in applicable law that renders any change or practice unlawful (in which case Defendant shall be permitted to alter its practices to the extent (but only to the extent) required by law).  It is understood and agreed by the Parties that by making the changes described in Section IV, Defendant does not agree with or in any way admit, and shall not be deemed to agree with or in any way admit, (a) any theories of Plaintiffs or Plaintiffs' Counsel regarding Defendant's liability in the Action, including, without limitation, that Defendant has exercised any discretion or control with respect to the business practices described in Section IV, or possesses any fiduciary status or obligations in relation thereto, or (b) that any of its prior or existing business practices violate any federal or state laws, statutes, or

19

regulations. Defendant is agreeing to make the changes described in Section IV solely to resolve disputes and provide agreed clarity on a prospective basis as to the propriety of its future conduct and its future receipt of Revenue Sharing Payments.

4.2    ***Changes to Defendant's Practices and Revisions to the Contracting and Disclosure Documents.***

(a)    Subject to the provisions of paragraphs 4.4 and 4.5, Defendant will implement the following changes:

(1)    <u>Defendant-Initiated Changes to Product Menus</u>

The following provisions apply to changes to Product Menus that are initiated solely by Defendant. They do not apply to actions initiated by others or by Defendant or its affiliates in any other capacity that may affect Product Menus or Plan Menus, such as, for example, decisions by mutual funds or separate accounts to close to new investments, merge, or change investment advisers or sub-advisers.

a.    *Additions.* Defendant will specifically identify to plan sponsors, via ILIAC's plan sponsor website, any addition of a fund to a Plan's Product Menu at the time of the addition. Defendant will update its new customer proposals, prospective plan sponsor booklets and plan sponsor website to inform plan sponsors that such additions are identified on the plan sponsor website.

b.    *Removals.* Defendant will provide to plan sponsors written notice of any removal of a fund from a Plan's Product Menu. Such notice shall be published on ILIAC's plan sponsor website at least thirty (30) days prior to the removal, and shall state the effective date of the removal. Defendant will update its new customer proposals, prospective

20

plan sponsor booklets and plan sponsor website to inform plan sponsors that such deletions are identified on the plan sponsor website.

              c.    *Substitutions.* ILIAC will not exercise any authority to make a substitution of one fund for another (*i.e.*, transfer current investment in existing Fund A to Fund B) or to delete/remove a fund from a Plan's Product Menu if the Plan already offers such fund on its Plan Menu, and shall modify its contracts to eliminate any such authority to the extent applicable. This provision shall not limit ILIAC's ability to continue its practice of removing a fund from its Product Menus only for new customers or existing customers that have not included the fund on their Plan Menu and shall apply only to ILIAC acting in its capacity as designer of Product Menus. For example, this provision shall not apply to deletions, removals, or substitutions necessitated by actions of investment option providers such as fund closings or mergers.

        (2)    <u>Disclosures of Fund-Related Fees and Expenses</u>

      The following provisions apply solely to Defendant's disclosures relating to Mutual Fund related fees and expenses contained in new customer proposals, plan sponsor booklets, and ILIAC's plan sponsor website. These provisions do not apply to Rule 408b-2 disclosures or fund fact sheets.

              a.    ILIAC shall provide on the plan sponsor website a disclosure, in the form of Exhibit "G," of fund fees and expenses, including revenue paid to ILIAC, if any, for each fund available within the Plan's Product Menu. Defendant shall discontinue use of the report in the form of Trial Exhibit 16 for any purpose (see Exhibit "H").

              b.    Defendant shall eliminate language that Revenue Sharing Payments neither directly nor indirectly increase mutual fund expenses and replace it with

language that Revenue Sharing Payments may have a direct impact or indirect impact on mutual fund expenses and the share class chosen by ILIAC.

        c.     Defendant shall add language that ILIAC offers various Product Menus to retirement plan customers depending on the amount of direct fees they choose to pay and other factors, and that these various Product Menus have varying degrees and magnitude of Revenue Sharing associated with them (including one Product Menu that pays no Revenue Sharing of any kind and is paid for entirely by direct fees assessed to the plan and/or its participants). Defendant shall add language that, if a plan sponsor wishes to pay all fees to Defendant directly by choosing a Product Menu for which Defendant does not accept any Revenue Sharing Payments from mutual funds, the plan sponsor or its representative should contact Defendant about available options and pricing, including the information regarding the investment options available on such menu(s) and the expense ratios associated with those investments.

        d.     Defendant shall add language that ILIAC chooses to offer various share classes of mutual funds on different Product Menus, that only one share class of each mutual fund investment is typically offered on a given menu in light of pricing and product requirements, and that the primary difference between share classes of a given mutual fund is generally the expense ratio of the mutual fund (i.e., the amount that the plan's participants pay as a fund expense) and the amount of Revenue Sharing that ILIAC receives from the mutual fund, which is paid from the mutual fund expense ratio.

        e.     Defendant shall advise Plans that fund fee adjustments ("FFA(s)") are utilized to increase (and, for certain menus, decrease) the revenue received by ILIAC for certain mutual funds that do not offer sufficient (or, in some case, offer more than

22

sufficient) Revenue Sharing Payments to otherwise be offered on a given Product Menu

(depending on the Revenue Sharing requirements, if any, applicable to the Product Menu) and

that, although FFAs do not always "normalize" or "neutralize" the effect of Revenue Sharing

Payments in total, that is their object and intent.

     f.  Defendant shall advise Plans that more detailed information

regarding the share classes available on various menus offered by ILIAC, as well as the Revenue

Sharing associated with those share classes, and the Revenue Sharing received and fund fee

adjustments in connection with the Plan's investments, shall be provided upon written request to

ILIAC.

    (3)  <u>Other Provisions</u>

     a.  As part of the Settlement, future Plan customers shall be

offered the specific opportunity to pay all fees to Defendant directly by choosing a Plan Menu

(or, to the extent applicable, more than one Plan Menu) for which Defendant does not accept any

Revenue Sharing Payments from mutual fund companies, to the extent that such Plan Menus are

available from ILIAC.  Defendant agrees that it does not have any present intention or future

plans to cease offering its Plan Menu(s) for which Defendant does not accept any Revenue

Sharing Payments from mutual funds (but reserves the right to do so – subject to the restrictions

upon ILIAC's ability to substitute one fund for another as set forth in Section 4.2(a)(1)(c)

above).

     b.  As part of the Settlement, each of the Plans would be

deemed to have elected to reinvest all mutual fund dividends from the date of initial group

annuity contract/group funding agreement.  Defendant's point of sale disclosures will now

provide that, as a result of entering into a contractual relationship with Defendant through a

Case 3:11-cv-00282-WGY   Document 273-2   Filed 04/11/14   Page 27 of 38

group annuity contract or group funding agreement, each Plan is consenting to reinvestment of mutual fund dividends, that reinvestment of dividends may result in undesirable concentration in certain investments over time, and that Defendant makes available certain tools to re-balance investment portfolios.

            c.      Defendant agrees to provide thirty (30) days' written notice of any change in the amount of an FFA.

      4.3    **_Timing of Implementation._**  Unless otherwise specified in this Section IV, Defendant shall begin to implement the changes set forth in this Section IV within six (6) months of Final Approval of the Settlement.  Defendant further agrees that it will make diligent and good faith efforts to ensure that the implementation of the changes set forth in this Section IV are concluded within twelve (12) months of Final Approval, unless there is a change in applicable law that renders any change or practice unlawful (in which case Defendant shall be permitted to alter its practices to the extent (but only to the extent) required by law).  In the event filings are necessary to be made to state departments, approval of these filings may not necessarily occur in this time frame.

      4.4    Subject to the provisions of paragraph 4.5, Defendant shall agree that the actions it undertakes pursuant to this Section IV shall remain in effect for a minimum of five (5) years from the date of Final Approval of the Settlement.

      4.5    **_Impact of Regulatory Changes._**

            (a)      Notwithstanding anything in this Section IV to the contrary, Defendant shall not be required to comply with any provision of this Section IV should any change in applicable law render such compliance unlawful.

(b)    Notwithstanding anything in this Section IV to the contrary, Defendant shall have the right, at its sole option, to modify any of the contractual, disclosure or other changes described in Section IV if Congress, the DOL, or any other applicable regulatory or self-regulatory body imposes different disclosure or other substantive requirements, whether through statute, regulation, official guidance, or otherwise (a "Regulatory Change"); provided, however, that, in the event of a Regulatory Change that affects only certain of the provisions of this Section IV, Defendant shall be required to continue to comply with all other provisions of Section IV that are not affected by the Regulatory Change. In the event of a Regulatory Change, Defendant's compliance with the Regulatory Change shall be deemed in compliance with the terms of this Agreement, to the extent that the Regulatory Change is inconsistent with the structural changes/changes in practices outlined in Section IV.

## V.    SETTLEMENT ADMINISTRATION

5.1    The Settlement Administrator shall administer the Settlement subject to the supervision of Lead Counsel and the Court as circumstances may require.

5.2    Defendant, Defendant's Counsel, and Defendant's Released Parties shall have no responsibility for, interest in, or liability whatsoever, with respect to:

(a)    the fairness of the terms of the Settlement Agreement to any Plan, its fiduciaries, participants, or beneficiaries;

(b)    any act, omission or determination of the Settlement Administrator, Plaintiffs' Counsel or designees or agents of Plaintiffs' Counsel or the Settlement Administrator;

(c)    any act, omission or determination of Plaintiffs' Counsel or their designees or agents in connection with the administration of the Settlement;

(d)    the management, investment, or distribution of the Settlement Amount or the Distributable Settlement Amount;

25

(e)      the determination, administration, calculation, or payment of any claims asserted against the Settlement Amount or the Distributable Settlement Amount;

(f)      the development or execution of the Plan of Allocation; or

(g)      Class Members' decisions related to the use of any proceeds of the Distributable Settlement Amount.

5.3      The Settlement Administrator shall provide to the Lead Counsel, no less than monthly, a full accounting of all expenditures made in connection with the Settlement, including Administration Costs, and any distributions from the Settlement Amount.

5.4      The Settlement Administrator shall provide such information as may be reasonably requested by Plaintiffs or Defendant to implement any distribution of funds under this Agreement.

## VI.    RELEASES, COVENANTS AND JUDICIAL FINDINGS

6.1      *Releases.*  Upon the Effective Date, the Class Members, on behalf of themselves, their predecessors, successors and assigns, their Plans, and their Plans' participants and their beneficiaries, shall be deemed to have, and by operation of the Final Order and Judgment shall have, fully, finally, and forever released, relinquished and discharged, and shall be forever enjoined from the prosecution of, each and every Released Claim, whether arising before or after the date of the Final Order and Judgment, against any and all of Defendant's Released Parties, provided, however, that nothing herein is meant to bar any claim seeking enforcement of this Agreement or Court Orders relating to it.

6.2      *Representation of Capacity to Settle; Indemnification of Attorneys' Fees and Expenses for Breach of Release.*  Each Class Member hereby represents and warrants that the Class Member has the authority as Plan fiduciary to settle the Released Claims on behalf of that Class Member's applicable Plan and to thereby extinguish the Released Claims of all other

26

parties authorized to bring the Released Claims under ERISA section 502(a) and represents that such Class Member has the authority to allocate the Distributable Settlement Amount under such Class Member's Plan to defray or pay for reasonable Plan expenses.  Each Class Member further represents and warrants that such Class Member fully understands his/her/its fiduciary responsibilities under ERISA and represents that such a fiduciary has fully discharged fiduciary responsibilities in determining whether to object to the Settlement and/or seek exclusion and has fully discharged its fiduciary responsibilities in allocating the Distributable Settlement Amount under such Class Member's Plan to defray or pay for reasonable Plan expenses.  Each Class Member acknowledges that the Parties are relying on such Class Member's representations and warranties in entering into this Agreement.  If a Class Member, or its Plan or Plan's fiduciaries, participants or beneficiaries, brings a claim or action that is determined to encompass a Released Claim, that Class Member shall indemnify Plaintiffs and Defendant for any damages awarded and any attorneys' fees, expenses, or other costs incurred by them in defending any such action.

6.3   *Judicial Findings.*  As part of the Final Approval Order, the Parties shall jointly ask the Court to declare that, without implying anything adverse regarding Defendant's previous conduct or its status or any actions by any Class Members, if Defendant implements the changes described in Section IV and this Settlement is fully implemented, neither Defendant nor any Class Members shall be deemed to have breached, or be engaged in a breach of, a fiduciary duty in violation of Section 404 of ERISA, 29 U.S.C. § 1104, or a prohibited transaction in violation of Section 406 of ERISA, 29 U.S.C. § 1106, as a result of the continuation of its business practices (as modified herein), including but not limited to the receipt of revenue-sharing, nor as a result of entering into or participating in this Settlement.  In addition, the Parties will jointly ask the Court to enter the additional findings and declarations set forth in the Final Approval

Order attached hereto as Exhibit F. The Settlement Agreement is contingent upon obtaining such judicial findings and declarations, and the findings pertaining to Section IV shall be effective and binding so long as Defendant continues the practices described in Section IV.

## VII.   CASE CONTRIBUTION FEE TO PLAINTIFFS

7.1     Plaintiffs, on behalf of their Plans, intend to seek a Case Contribution Fee not to exceed the amount of $75,000.00 ($50,000.00 for HSI and $25,000.00 for TDC) which shall be subject to Court approval (the "Case Contribution Fee").  Defendant shall not oppose a Case Contribution Fee up to that amount.  Any Case Contribution Fee approved by the Court shall be paid within thirty (30) days of the Effective Date.  Plaintiffs, at their individual election, may choose to have the Settlement Administrator direct any Case Contribution Fee awarded to them to a charity of its choice, in which case such amount shall be treated as a charitable contribution by the Qualified Settlement Fund on behalf of the respective Plaintiff so directing the contribution.  The Case Contribution Fee shall be paid by the Settlement Administrator solely out of the Settlement Amount and shall be deducted (to the extent approved by the Court) from the Settlement Amount on or after the Effective Date and prior to the distribution to the Class Members.

7.2     Notwithstanding any other provision of this Agreement to the contrary, the procedure for and the allowance or disallowance (in whole or in part) by the Court of any application for the Case Contribution Fee shall be considered by the Court separately from its consideration of the fairness, reasonableness, and adequacy of the Settlement, and any Order or proceedings relating to the Case Contribution Fee, or any appeal of any Order relating thereto, shall not operate to terminate or cancel this Agreement or be deemed material thereto.

## VIII.   ATTORNEYS' FEES AND EXPENSES

8.1      Plaintiffs' Counsel intends to submit a Fee and Expense Application, seeking an award based on the value of the Settlement and the work performed in an amount not to exceed $6,200,000, plus reasonable expenses not to exceed $615,000.00, and Defendant will not oppose the Fee and Expense Application up to this amount.  Any amount awarded by the Court in response to such Fee and Expense Application shall be paid by the Settlement Administrator solely out of the Settlement Amount and shall be deducted (to the extent approved by the Court) from the Settlement Amount and paid to Lead Counsel within fourteen (14) days of entry of the Final Approval Order.  The amount awarded by the Court shall earn interest from the date that the Settlement Amount is deposited into the Escrow Account.  Lead Counsel shall determine the appropriate allocation of attorneys' fees and expenses, in its considered judgment and discretion, based on the contributions of Class Counsel, as well as the expenses incurred by Class Counsel.

8.2      Notwithstanding any other provision of this Agreement to the contrary, the procedure for and the allowance or disallowance (in whole or in part) by the Court of the Fee and Expense Application to be paid out of the Settlement Amount shall be considered by the Court separately from its consideration of the fairness, reasonableness, and adequacy of the Settlement, and any Order or proceedings relating to the award of Attorneys' Fees, or any appeal of any Order relating thereto, shall not operate to terminate or cancel this Agreement or be deemed material thereto.

## IX.   CONTINGENCIES, EFFECT OF DISAPPROVAL OR TERMINATION OF SETTLEMENT

9.1      If the Court or, in the event of an appeal, any appellate court refuses to approve, or modifies any material aspect of this Agreement or the proposed Preliminary Approval Order or Final Order and Judgment, including, but not limited to any judicial findings included therein,

any of Plaintiffs or Defendant may terminate this Agreement and the Settlement as set forth below.

9.2     This Agreement and the Settlement shall terminate and be cancelled if, within ten (10) business days after any of the following events, one of the Parties provides written notification of an election to terminate the Settlement:

(a)     The Court declines to provide preliminary approval of this Agreement, or declines to enter or materially modifies the contents of the Preliminary Approval Order attached hereto as Exhibit E;

(b)     The Court declines to provide final approval of this Agreement, or declines to enter or materially modifies the contents of the Final Order and Judgment attached hereto as Exhibit F;

(c)     The Court's Final Order and Judgment is vacated, reversed or modified in any material respect on any appeal or other review or in a collateral proceeding occurring prior to the Effective Date; or

(d)     The Effective Date does not occur for some other reason.

For purposes of this Agreement and this paragraph 9.2, no Order of the Court, or modification or reversal on appeal of any Order of the Court, solely concerning the administration of the Settlement or the person(s) performing such administrative functions, or the amount, advancement or award of any Attorneys' Fees or Case Contribution Fee shall constitute grounds for cancellation or termination of the Agreement.

9.3     This Agreement and the Settlement shall terminate and be cancelled if (a) Class Members representing, in the aggregate, one (1) percent or more of the Distributable Settlement Amount according to the Plan of Allocation opt out of the Settlement; and (b) within ten (10)

30

business days after receiving written notice from the Settlement Administrator of such opt-outs and the percentage of the Distributable Settlement Amount that they represent, Defendant provides written notification of its election to terminate the Settlement.

9.4     This Agreement and the Settlement shall terminate and be cancelled if (a) any federal or state authorities object to or request material modifications to the Agreement; and (b) within ten (10) business days of receiving any such objection or request, Defendant provides written notice of its election to terminate the Settlement.

9.5     If for any reason this Agreement is terminated or fails to become effective, then:

(a)     The Settling Parties shall be deemed to have reverted to their respective status in the Action as of October 3, 2013, which shall then resume proceedings in the Court, and, except as otherwise expressly provided in this Settlement Agreement, the Parties shall proceed in all respects as if this Agreement and any related orders had not been entered.

(b)     In addition to this Section 9 and its provisions, Section 10 shall survive any termination of this Settlement.

9.6     For purposes of this Section 9, materiality shall be determined by Defendant or Plaintiffs in their sole discretion and communicated to the other party in writing with notice of intent to terminate the Agreement. A determination of materiality shall not be subject to review by the Court.

## X.     NO ADMISSION OF WRONGDOING

10.1     Defendant vigorously denies, and continues to deny, that it committed any violation of ERISA or other laws, and has vigorously denied and continues to deny all allegations of wrongdoing or liability whatsoever with respect to the Released Claims, including any and all claims of wrongdoing or liability alleged or asserted in the Action.  The Parties agree to this Settlement solely because it will eliminate the burden, expense and uncertainties of further

31

litigation.  This Agreement, and any of its terms, any agreement or order relating thereto, and any

payment or consideration provided for herein, is not and shall not be construed as an admission

by Defendant or any of the Plaintiffs or Class Members of any fault, wrongdoing, or liability

whatsoever, or an admission by Plaintiffs of any lack of merit of its claims against Defendant.

This Agreement, and any of its terms, and any agreement or order relating thereto, shall not be

offered by any Party to be received in evidence in any civil, criminal, administrative, or other

proceeding, or utilized in any manner as a presumption, a concession, or an admission of any

fault, wrongdoing, or liability on the part of Defendant.  However, nothing contained in this

paragraph shall prevent this Agreement (or any agreement or order relating thereto) from being

used, offered, or received in evidence in any proceeding to approve, enforce, or otherwise

effectuate the Settlement (or any agreement or order relating thereto) or the Final Order and

Judgment.  This Agreement may be filed and used in other proceedings, where relevant, to

demonstrate the fact of its existence and of this Settlement, including, but not limited to, the

Parties' filing the Agreement and/or the Final Order and Judgment in any other action that may

be brought against them in order to support a defense or counterclaim based on principles of *res*

*judicata*, collateral estoppel, release, waiver, or any other theory of claim preclusion or issue

preclusion or similar defense or counterclaim.

## XI.   MISCELLANEOUS

11.1   *No Disparaging Statements.*  Defendant, Defendant's Counsel, Plaintiffs, and

Plaintiffs' Counsel shall make no statements to the press or public that disparage any Party or

accuse any Party of wrongdoing or, other than as required by law, make any other public

statements describing this Settlement.  The Parties have agreed upon a joint statement to utilize

in response to any inquiries from the press or other third parties regarding this Settlement, which

is attached hereto as Exhibit I.  The Parties will also agree to a list of talking points that

Defendant may use in response to inquiries from its customers.

11.2   **Duty to Cooperate.**  The Parties agree to cooperate in good faith and to take all

actions reasonably necessary to effectuate this Agreement.

11.3   **Entire Agreement.**  This Agreement is the entire agreement among the Parties

and it supersedes any prior agreements, written or oral, between the Parties.  This Settlement

Agreement cannot be altered, modified or amended except through a writing executed by all

Parties.

11.4   **Construction of Agreement.**  This Settlement Agreement shall be construed to

effectuate the intent of the Parties to resolve all disputes encompassed by the Agreement.  All

Parties have participated in the drafting of this Agreement, and any ambiguity shall not be

resolved by virtue of a presumption in favor of any Party.  The Settlement Agreement was

reached at arm's-length by the Parties all of which were represented by counsel.

11.5   **Executed in Counterparts.**  This Agreement may be executed in counterparts, all

of which shall be considered the same as if a single document had been executed, and shall

become effective when such counterparts have been signed by each of the Parties and delivered

to each of the other Parties.  Counterpart copies of signature pages, whether delivered in original,

by electronic mail in pdf format and/or by facsimile, taken together shall all be treated as original

and binding signatures.

11.6   **Notices.**  Unless otherwise provided herein, any notice, request, instruction,

application for Court approval, or application for Court Order sought in connection with the

Agreement, shall be in writing and delivered personally or sent by certified mail or overnight

delivery service, postage pre-paid, with copies by electronic mail to the attention of Plaintiffs'

Counsel, or Defendant's Counsel (as well as to any other recipients that a court may specify).  As

of the date hereof, the respective representatives are as follows:

**For Defendant:**
Gregory C.  Braden
William J.  Delany
Morgan, Lewis & Bockius, LLP
1111 Pennsylvania Ave., N.W.
Washington, DC 20004
gbraden@morganlewis.com
wdelany@morganlewis.com

**For Plaintiffs:**

James E.  Miller
Laurie Rubinow
Shepherd, Finkelman, Miller & Shah, LLP
65 Main Street
Chester, CT 06412
jmiller@sfmslaw.com
lrbinow@sfmslaw.com

11.7   *Extensions of Time.*  The Parties may agree, subject to the approval of the Court

where required, to reasonable extensions of time to carry out the provisions of the Agreement.

11.8   *Governing Law.*  This Agreement shall be governed by and construed in

accordance with ERISA and, to the extent applicable, the laws of Connecticut without giving

effect to any conflict of law provisions that would cause the application of the laws of any state

other than Connecticut.

11.9   *Fees and Expenses.*  Except as otherwise expressly set forth herein, each Party

hereto shall pay all fees, costs and expenses incurred in connection with the Action, including

fees, costs and expenses incident to his, her or its negotiation, preparation or compliance with

this Agreement, and including any fees, expenses and disbursements of its counsel, accountants,

and other advisors.  Nothing in this Agreement shall require Defendant to pay any monies other

than as expressly provided herein.

11.10  *Retention of Jurisdiction.*  As provided in the Final Approval Order, the Court

retains exclusive jurisdiction over the interpretation and enforcement of the Settlement

Agreement, including, but not limited to, any issues regarding the Parties and the Released

Claims.

**Agreed to on behalf of Healthcare Strategies, Inc., The DeRosa Corporation and the Class:**

Dated:  April 10, 2014

By: _____

James E.  Miller
Shepherd, Finkelman, Miller & Shah, LLP
65 Main Street
Chester, CT 06412
Telephone:  (860) 526-1100
Facsimile:  (860) 526-1120
jmiller@sfmslaw.com

**Agreed to on behalf of ING Life Insurance and Annuity Company:**

Dated:  April 11, 2014

By: _____

Gregory C. Braden
William J. Delany
Morgan, Lewis & Bockius, LLP
1111 Pennsylvania Ave., NW
Washington, DC 20004
gbraden@morganlewis.com
wdelany@morganlewis.com