## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

HEALTHCARE STRATEGIES, INC., Plan   :
Administrator of the Healthcare Strategies, Inc.   :
401(k) Plan and the Healthcare Strategies, Inc.   :
CBU 401(k) Plan, On Behalf of Itself and All   :
Others Similarly Situated,   :
  :
     and   :
  :
The DEROSA CORPORATION,   :
Plan Administrator of The DeRosa Corporation   :
401K PS Plan, On Behalf of Itself and All   :
Others Similarly Situated,   :
  :
     Plaintiffs,   :
    vs.   :   No. 3:11-cv-00282 (WGY)
  :
ING LIFE INSURANCE AND ANNUITY   :
COMPANY,   :
  :
     Defendant.   :   August 27, 2014

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
## MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT

Plaintiffs, Healthcare Strategies, Inc. ("HSI") and The DeRosa Corporation ("TDC")

(collectively, "Plaintiffs"), on behalf of themselves and the Class certified in this case,

pursuant to Rules 23(e), 23(h) and 54(d)(2) of the Federal Rules of Civil Procedure and this

Court's Order dated June 3, 2014 granting preliminary approval of the settlement (the

"Settlement") reached with Defendant, ING Life Insurance and Annuity Co. ("ING" or "ILIAC"

or "Defendant"), hereby respectfully submit this Memorandum of Law in Support of Plaintiffs'

Motion for Final Approval of the Settlement reached with ING (the "Motion"). As explained

more fully below, the Settlement between Plaintiffs and Defendant is fair, reasonable and

adequate under all the circumstances.[1]  Indeed, as explained below, the total value of the

Settlement is in excess of $415 million based upon Plaintiffs' conservative expert calculation.

For the Court's convenience, a proposed Order of Final Approval will be submitted in

connection with Plaintiffs' Supplemental Submission and Response to any Objections on

September 10, 2014 ("Supplemental Submission") in advance of the Final Approval Hearing to

be held by the Court on September 24, 2014.[2]  As discussed below, Plaintiffs will include with

their Supplemental Submission on September 10, 2014 the report of an Independent Fiduciary,

Nicholas Saakvitne, Esquire, for the benefit of the Class and to ensure compliance with U.S.

Department of Labor ("DOL") Prohibited Transaction Exemption ("PTE") No. 2003-39, which

report is expected to independently confirm the fairness and adequacy of the Settlement for the

Class members.[3]  For these reasons and the reasons explained fully below, Plaintiffs respectfully

submit that the Court should grant final approval to the parties' Settlement.

---

[1]The parties' Settlement Agreement was previously submitted to the Court as Exhibit 1 to
Plaintiffs' Motion for Preliminary Approval of Settlement dated April 11, 2014 (the "Preliminary
Approval Motion").  For purposes of convenience and consistency, Plaintiff utilizes the same
defined terms adopted in the Preliminary Approval Motion and supporting Memorandum of Law
unless otherwise noted.

[2]To date, as discussed below, there have only been three (3) requests for exclusion and no
objections to the Settlement.  Since the deadline for opting out of the Settlement or objecting to
the Settlement is September 3, 2014 -- after the date of the filing of this Motion -- Plaintiffs will
make their Supplemental Submission and provide a Final Approval Order fully detailing and
accounting for the nature of any additional timely requests for exclusion and any objections to the
Settlement.

[3]Plaintiffs' Motion for Final Approval of this Settlement also is supported by the August
26, 2014 Declaration of Josephine Bravata ("Bravata Decl."), which is attached as Exhibit "1,"
the August 27, 2014 Declaration of James E. Miller ("Miller Decl."), which is attached as
Exhibit "2," and the August 26, 2014 Declaration of James Scheinberg ("Scheinberg Decl."),
which is attached as Exhibit "3."

I.    **INTRODUCTION**

This action was brought by Plaintiffs on behalf of themselves and a proposed Class of

thousands of similarly situated administrators of 401(a) and 401(k) retirement plans governed by

the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, that

engaged ILIAC as a service provider.  Plaintiffs challenged certain business practices of ILIAC

and sought to recover revenue sharing payments made to Defendant by mutual funds or

investment advisors, allegedly in violation of the prohibited transaction and fiduciary duty

provisions of ERISA.

As the Court is aware, this litigation has been hard-fought for over three and one-half

years,[4] and the parties have devoted significant resources over that period to presenting their

respective views of the complex legal and factual issues implicated by this case.  In this

litigation, ING was represented by Morgan, Lewis & Bockius, LLP, as well as Pullman &

Comley, LLC, two well respected law firms in the United States that defend financial services

and insurance companies in ERISA class actions.[5]  At the time that the Settlement was reached, it

_____

[4]Indeed, Plaintiffs' counsel's investigation related to this matter began over four years
ago.

[5]Lead Counsel in this case, Shepherd Finkelman Miller & Shah, LLP ("SFMS"), has
extensive experience litigating cases challenging revenue sharing practices under ERISA in
addition to its work in this case.  In *Phones Plus, Inc. v. Hartford Life Ins. Co.*, 3:2006-cv-01835
(D.Conn.), SFMS, on behalf of its client and a nationwide class of plan sponsors, achieved the
first settlement of its kind under ERISA in 2010, challenging the practice of life insurance
service providers accepting and receiving revenue sharing payments under certain circumstances.
The *Phones Plus* settlement was reached after class certification and summary judgment had
been fully submitted to the court.  In *Butler National Corp. et al. v. Union Life Ins. Co., et al.*,
1:12-cv-177-SJD-KLL (S.D..Ohio ), SFMS, on behalf of its clients and a nationwide class of
sponsors, obtained a positive settlement on behalf of a nationwide class of retirement plans.
Most recently, the court denied defendant's motion for summary judgment in *Golden Star, Inc. v.
Mass Mut. Life Ins. Co.*, 2014 U.S. Dist. LEXIS 69010 (D. Mass. May 20, 2014), in which Lead

bears noting that (a) the parties had completed all factual and expert discovery in the case, (b) Plaintiffs had obtained certification of a nationwide class after contested proceedings, (c) Plaintiffs had successfully defended against (and defeated) Defendant's Motion for Summary Judgment and Motion to Decertify the Class, and (d) the parties had tried the case through liability for a period of almost four (4) weeks and completed closing arguments with respect to liability.

The Settlement terms were arrived at only after three (3) full days of mediation, as well as a number of telephone conferences, with a highly respected mediator, Mark E. Segall, Esq. of JAMS, the former Head of Litigation, Senior Vice President and Associate General Counsel of JPMorgan Chase (JPMC), which occurred over the course of six (6) months, as well as direct negotiations between Lead Counsel and ING's Chief Counsel for Litigation, Regulatory and Employment matters in the United States, which lasted for a period of several additional months. As detailed below, Plaintiffs believe that the Settlement reached is an extremely positive one for the Class, with the members of the Class receiving very significant relief relative to the value of

---

Counsel represents the plaintiff and the proposed class. While Class Counsel have achieved significant results in these cases, it bears noting that some arguably similar actions against insurance company service providers have been entirely unsuccessful. *See, e.g., Leimkuehler v. American United Life Ins. Co.*, 713 F.3d 905 (7th Cir. 2013) (holding that a 401(k) service provider was not a fiduciary with respect to its receipt of revenue sharing from mutual fund companies); *Ruppert v. Principal Life Ins. Co.*, 705 F.3d 839 (8th Cir. 2013) (dismissing appeal of denial of class certification in case challenging service provider's receipt of revenue sharing payments on basis that commonality and typicality was lacking); *Santomenno v. John Hancock Life Ins. Co.,* Civ. No. 2:10-cv-01655 (WJM), 2013 U.S. Dist. LEXIS 103404 (July 24, 2013) (granting motion to dismiss and holding that service provider for retirement plans was not a fiduciary for purposes of plan participants' ERISA breach of fiduciary duty and prohibited transaction claim; and that the provider owed no fiduciary duty with respect to negotiation of its fees, nor was it a fiduciary with respect to revenue sharing payments or selection of a particular investment option). Thus, Plaintiffs also faced substantial risk in litigating this case on behalf of the Class.

their potential claims, especially when the risks of litigation are taken into account. The members of the Class apparently agree with Plaintiffs' view of the Settlement. Only a *de minimis* number (3) of Class members have chosen to exclude themselves from the Settlement, and no Class members have filed objections to the Settlement as of this date. Moreover, as indicated above, it is anticipated that Nicholas Saakvitne, Esquire, an Independent Fiduciary engaged to evaluate the fairness of the Settlement on behalf of the Class, will agree that the Settlement should be finally approved since it is fair, reasonable and adequate under all of the circumstances. As indicated above, Plaintiffs will submit the Independent Fiduciary's Report with their Supplemental Submission for review and consideration by the Court. For this and all of the other reasons discussed below, Plaintiffs respectfully submit that the Settlement should receive final approval from the Court.

## II.  THE SETTLEMENT AGREEMENT, DISSEMINATION OF NOTICE AND REACTION OF THE CLASS

The Settlement Agreement is the culmination of almost four (4) years of hotly contested litigation. That litigation entailed extensive motion practice and discovery, consultation with experts, the production of expert reports, contested class certification and summary judgment proceedings, and an extensive trial with respect to liability, as well as a full evaluation of the evidence and governing legal principles. It was arrived at only after arm's-length negotiations that occurred with the assistance of a highly respected mediator over a period of more than a year. These negotiations, which included the formal and informal exchange of factual information and the full and frank discussion of the parties' respective claims and defenses, including the presentation and discussion of complex legal issues, three (3) days of mediation

and hard-nosed negotiations by each side, were both lengthy and the subject of vigorous advocacy -- two cornerstones of negotiations that typically will result in a settlement that is well considered and inherently fair and reasonable. That is exactly what the parties were able to achieve in this case.

Through the course of discovery in this action, Plaintiffs have received and reviewed hundreds of thousands of pages of documents, obtained expert reports on liability and damages, consulted with experts regarding the liability of ING, reviewed and analyzed the expert reports of ING, deposed numerous fact witnesses over the course of over twenty (20) days, defended the depositions of Plaintiffs' representatives, deposed ING's expert witnesses, defended the depositions of Plaintiffs' proposed testifying experts and pursued and obtained extensive third-party discovery from mutual funds and similar entities. Thus, the Settlement was reached after considerable investigation and discovery in addition to a trial on the merits.

Notice of the Settlement, in the form approved by the Court's Preliminary Approval Order, was disseminated to members of the Class by both electronic and first-class mail, using the services of Strategic Claims Services ("SCS"), a highly respected class action settlement administrator. *See* Bravata Decl. at ¶¶ 1-4. Members of the Class were informed that they had the right to exclude themselves from the Class by serving written notice by September 3, 2014. They were also informed that they had the right to object to the Settlement by filing and serving a written statement by September 3, 2014. In response to the Settlement Notice, to date, only three (3) members of the Class chose to exclude themselves (approximately 0.009% (3/31,558) of the Class), and no objections to the Settlement have been filed with the Court. *See* Miller Decl. at ¶ 19; Bravata Decl. at ¶¶ 9-10. Instead, in recognition of the fairness of the Settlement and the

-6-

significant benefits that it confers, the reaction of the Class has been exceedingly positive.  Class

Counsel have personally spoken to over two hundred and fifty (250) Class members or their

representatives, all of whom have been extremely positive about the Settlement achieved and

quite appreciative of the efforts of Plaintiffs and Lead Counsel.  *See* Miller Decl. at ¶¶ 26, 37.

## III.   THE TERMS OF THE SETTLEMENT

As previously described in connection with Plaintiffs' Motion for Preliminary Approval

of the Settlement, the parties' Settlement provides the following substantial and meaningful relief

to the Class:

- Defendant will deposit $14,950,000 in a common fund to provide compensatory relief to the Class;

- Defendant will make a number of changes to its business practices that directly benefit the Class.  Such changes include:

- Defendant-Initiated Changes to Product Menus

  - Additions.  Defendant will specifically identify to plan sponsors, via ILIAC's plan sponsor website, any addition of a fund to a Plan's Product Menu at the time of the addition.  Defendant will update its new customer proposals, prospective plan sponsor booklets and plan sponsor website to inform plan sponsors that such additions are identified on the plan sponsor website.

  - Removals.  Defendant will provide to plan sponsors written notice of any removal of a fund from a Plan's Product Menu.  Such notice shall be published on ILIAC's plan sponsor website at least thirty (30) days prior to the removal, and shall state the effective date of the removal.  Defendant will update its new customer proposals, prospective plan sponsor booklets and plan sponsor website to inform plan sponsors that such deletions are identified on the plan sponsor website.

  - Substitutions.  ILIAC will not exercise any authority to make a substitution of one fund for another (i.e., transfer current investment in existing Fund A to Fund B) or to delete/remove a fund from a Plan's Product Menu if the Plan already offers such fund on its Plan Menu, and shall modify its

-7-

contracts to eliminate any such authority to the extent applicable.

- **Disclosures of Fund-Related Fees and Expenses**

Defendant will revise and amend its disclosures relating to Mutual Fund related fees and expenses contained in new customer proposals, plan sponsor booklets, and ILIAC's plan sponsor website as follows:

- ILIAC shall provide on the plan sponsor website a disclosure, in the form of Exhibit "G" to the Settlement Agreement with respect to fund fees and expenses, including revenue paid to ILIAC, if any, for each fund available within the Plan's Product Menu. Defendant shall discontinue use of the report in the form of Trial Exhibit 16 for any purpose (*see* Exhibit "H" to the Settlement Agreement).

- Defendant shall eliminate language that Revenue Sharing Payments neither directly nor indirectly increase mutual fund expenses and replace it with language that Revenue Sharing Payments may have a direct impact or indirect impact on mutual fund expenses and the share class chosen by ILIAC.

- Defendant shall add language that ILIAC offers various Product Menus to retirement plan customers depending on the amount of direct fees they choose to pay and other factors, and that these various Product Menus have varying degrees and magnitude of Revenue Sharing associated with them (including one Product Menu that pays no Revenue Sharing of any kind and is paid for entirely by direct fees assessed to the plan and/or its participants). Defendant shall add language that, if a plan sponsor wishes to pay all fees to Defendant directly by choosing a Product Menu for which Defendant does not accept any Revenue Sharing Payments from mutual funds, the plan sponsor or its representative should contact Defendant about available options and pricing, including the information regarding the investment options available on such menu(s) and the expense ratios associated with those investments.

- Defendant shall add language that ILIAC chooses to offer various share classes of mutual funds on different Product Menus, that only one share class of each mutual fund investment is typically offered on a given menu in light of pricing and product requirements, and that the primary difference between share classes of a given mutual fund is generally the expense ratio of the mutual fund (*i.e.*, the amount that the plan's participants pay as a fund expense) and the amount of Revenue Sharing that ILIAC receives from the mutual fund, which is paid from the mutual

-8-

fund expense ratio.

- Defendant shall advise Plans that fund fee adjustments ("FFA(s)") are utilized to increase (and, for certain menus, decrease) the revenue received by ILIAC for certain mutual funds that do not offer sufficient (or, in some case, offer more than sufficient) Revenue Sharing Payments to otherwise be offered on a given Product Menu (depending on the Revenue Sharing requirements, if any, applicable to the Product Menu) and that, although FFAs do not always "normalize" or "neutralize" the effect of Revenue Sharing Payments in total, that is their object and intent.

- Defendant shall advise Plans that more detailed information regarding the share classes available on various menus offered by ILIAC, as well as the Revenue Sharing associated with those share classes, and the Revenue Sharing received and fund fee adjustments in connection with the Plan's investments, shall be provided upon written request to ILIAC.

- <u>Other Provisions</u>

  - Future Plan customers shall be offered the specific opportunity to pay all fees to Defendant directly by choosing a Plan Menu (or, to the extent applicable, more than one Plan Menu) for which Defendant does not accept any Revenue Sharing Payments from mutual fund companies.

  - As part of the Settlement, each of the Plans would be deemed to have elected to reinvest all mutual fund dividends from the date of initial group annuity contract/group funding agreement. Defendant's point of sale disclosures will now provide that, as a result of entering into a contractual relationship with Defendant through a group annuity contract or group funding agreement, each Plan is consenting to reinvestment of mutual fund dividends, that reinvestment of dividends may result in undesirable concentration in certain investments over time, and that Defendant makes available certain tools to re-balance investment portfolios.

  - Defendant agrees to provide thirty (30) days' written notice of any change in the amount of an FFA.

Defendant will begin to implement these changes to its business practices within six (6) months of Final Approval of the Settlement and will make diligent and good faith efforts to ensure that the implementation of the changes set forth above are concluded within twelve (12) months of

-9-

Final Approval.  In addition, Defendant agrees that the above actions will remain in effect for a minimum of five (5) years from Final Approval unless there is a change in applicable law that renders any change or practice unlawful.

The changes in practice agreed upon as part of the Settlement were carefully crafted to address the deficiencies that Plaintiffs alleged existed in Defendant's disclosures and practices, are consistent with the DOL's guidance in *In re Frost National Bank*, DOL Opinion Letter 97-15A, 1997 ERISA LEXIS 18, at \*7-9 (May 22, 1997) (the "*Frost Letter*") (discussing that, if revenue sharing payments are credited to the direct benefit of plans or to cover plan expenses that the plans would otherwise be obligated to pay, no fiduciary breach or prohibited transaction occurs); *In re Aetna Life Insurance Company*, DOL Opinion Letter 97-16A, 1997 ERISA LEXIS 17, at \*11 (May 22, 1997) (the "*Aetna Letter*") (discussing notice and information requirements in the event that a plan investment addition, substitution, deletion or change in the investment menu available to a plan is initiated by a retirement plan service provider), and provide the plans in the Class with the significant opportunity to achieve exceptional savings from a fee/cost perspective by moving to ING's zero revenue sharing menu, which contains a broad array of low cost index funds.  Miller Decl. at ¶ 13.  Plaintiffs' expert estimates that the changes in practice by ING have a value of at least $11,250,000 per year for a total value of $56,250,000 and, perhaps more importantly, that the zero revenue sharing menu option provides the Class members with the opportunity to achieve more than $344,394.071 in savings and as much as $559,870,576 in savings, based on conservative calculations.  *See* Scheinberg Decl. at ¶¶ 18-28.  In fact, if the savings already achieved by the TDC plan, by moving to the zero revenue sharing menu, were extrapolated across the plans in the Class, the savings would amount to more than $1 billion in

the next five (5) years.  Miller Decl. at ¶ 15.[6]  Of course, ING also will incur additional expenses

to make these structural and related changes.  As explained below, Plaintiffs respectfully submit

that they have established all necessary prerequisites for final approval of the Settlement.

## IV.    THE COURT SHOULD GRANT FINAL APPROVAL TO THE SETTLEMENT

Pursuant to the Preliminary Approval Order, Class Notice has been disseminated, by

electronic and first-class mail, directly to members of the Class, and notice of the Settlement also

has been published in *The Wall Street Journal*.  Accordingly, this Court may now finally approve

the Settlement if it concludes that the Settlement merits such approval.

---

[6]As Plaintiffs will explain in detail in the Supplemental Submission, the zero revenue sharing menu provides the plans in the Class with an opportunity to achieve such significant savings because it creates an investment environment in which the fiduciaries of these plans can concentrate on offering low cost index funds similar to those provided under the Federal Employee Thrift Savings Plan, www.tsp.gov/PDF/formspubs/ tspbk08.pdf, which focuses upon offering diversified low expense ratio investments to federal employees and retirees.  *See* Scheinberg Decl. at ¶ 20.  As Plaintiffs also will explain in greater detail in the Supplemental Submission, such an approach makes especial sense for the plans in the Class, the vast majority of which are small plans from an asset perspective, because they are unlikely to have access to sophisticated investment advisors to select actively managed mutual funds in an efficient manner, *Id.* at ¶¶ 20-24, and, in any event, a strong case can be made that it makes little sense to chase higher than market returns by choosing relatively high cost mutual funds given the fact that few, if any, mutual funds actually beat the market over sustained periods of time.  *See* Sommer, *Who Routinely Trounces the Stock Market? Try 2 Out of 2,862 Funds*, www.nytimes.com/2014/ 07/20/ your-money/ who-routinely-trounces-the-stock-market-try-2-out-of-2862-funds.html (July 19, 2014); Tuchman, *Meet The Yale Prof Ripping The Lid Off 401(k) Fund Fees*, www.forbes.com/sites/mitchelltuchman/2013/07/26/meet-the-yale-prof-ripping-the-lid-off-401k-fund-fees/ ("The simple fact is, high fund fees eat up 32% or more of your return over 30 years. The longer you stay invested, the worse it gets. If mutual funds consistently beat index funds paired with a simple asset allocation plan, they would be worth paying for. But that's not what happens.  Instead, actively managed funds often lag the market substantially, largely because of the drag created by high fund fees. Investors figure this out over time, but often so late  it doesn't matter: They lose, and Wall Street wins, again.")  As Plaintiffs also will explain fully in their Supplemental Submission, they will be prepared to offer significant educational resources and assistance to the plans in the Class to assist them in transitioning to a zero revenue sharing environment and achieving the significant benefits provided by that transition.  Miller Decl. at ¶ 31.

### A.    Standard For Final Approval Of Settlement Agreement

Pursuant to Federal Rule of Civil Procedure 23(e), a class action cannot be finally settled

without the approval of this Court.  The standard for final approval of a class action settlement in

this Circuit is clear: this Court must determine, through the exercise of its discretion, whether the

proposed settlement is "fair, adequate, and reasonable, and not a product of collusion." *Wal-

Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (citing *Joel A. v. Giuliani*,

218 F.3d 132, 138 (2d Cir. 2000)); *In re Priceline.com, Inc. Sec. Litig.*, No. 3:00-CV-1884

(AVC), 2007 WL 2115592, at *2 (D. Conn. July 20, 2007) (same).  The Court's discretion is

guided by several general policies, including the "strong judicial policy in favor of settlements,

particularly in the class action context." *Wal-Mart Stores*, 396 F.3d at 116 (citing *In re

PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir.1998)); *see Weinberger v. Kendrick*,

698 F.2d 61, 73 (2d Cir. 1982) ("There are weighty justifications, such as the reduction of

litigation and related expenses, for the general policy favoring the settlement of litigation")

(citations omitted); *see also* 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* §

11:41, at 87 (4th ed. 2002) ("The compromise of complex litigation is encouraged by the courts

and favored by public policy").  In addition, a "presumption of fairness, adequacy, and

reasonableness" attaches to a class action settlement where it is "reached in arm's-length

negotiations between experienced, capable counsel after meaningful discovery." *Wal-Mart

Stores*, 396 F.3d at 116 (citing *Manual for Complex Litigation, Third,* § 30.42 (1995)); *In re

Priceline.com*, 2007 WL 2115592, at *2 (same).

The Court's discretion in granting final approval of a class action settlement is also

informed by the nine (9) factors initially set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d

448 (2d Cir.1974), *abrogated on other grounds by Goldberger v. Integrated Resources, Inc.*, 209

F.3d 43 (2d Cir. 2000): (1) the complexity, expense and likely duration of the litigation, (2) the

reaction of the class to the settlement, (3) the stage of the proceedings and the amount of

discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages,

(6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to

withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of

the best possible recovery, and (9) the range of reasonableness of the settlement fund to a

possible recovery in light of all the attendant risks of litigation. *Grinnell Corp.*, 495 F.2d at 463.

However, "[i]n finding that a settlement is fair, not every factor must weigh in favor of

settlement, [and] 'rather the court should consider the totality of these factors in light of the

particular circumstances.'" *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 456

(S.D.N.Y. 2004) (quoting *Thompson v. Metropolitan Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y.

2003)). An examination of the totality of these factors, as discussed further below, supports final

approval of the Settlement.

**B.     The Settlement Is Presumptively Fair, Adequate And Reasonable**

As detailed above, there can be no question that this Settlement was reached as a result of

arm's-length negotiations between experienced and capable counsel after meaningful discovery.

Therefore, under *Wal-Mart Stores*, 396 F.3d at 116, the Settlement should be adjudged

presumptively fair, adequate and reasonable. Nothing in the record provides any basis to disturb

or question that presumption. Accordingly, the procedural means through which the Settlement

was achieved alone creates a presumption in favor of final approval and strongly weighs in favor

of the Court granting such approval.

C.    The *Grinnell* Factors Support Approval

Review of the *Grinnell* factors also strongly supports final approval.  First, as the Court is aware from the record and docket activity in this litigation, the case was extremely complex and expensive, with at least several additional years likely remaining in duration, including appeals, before the case could be finally concluded.  *See, e.g.*, *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998) ("class actions have a well deserved reputation as being most complex") (citation and internal quotations omitted); *Mertens v. Hewitt Associates*, 508 U.S. 248, 262 (1993) (ERISA is "an enormously complex and detailed statute"); *see Amara v. Cigna Corp.*, 534 F.Supp.2d 288, 296 (D. Conn. 2008) (describing ERISA and implementing regulations as "often lamentably obscure").

Second, as discussed above, the reaction of the Class to the Settlement has been almost universally positive.  *See, e.g.*, *Maley v. Del Global Technologies Corp.*, 186 F.Supp.2d 358, 362 (S.D.N.Y. 2002) (reaction of the class to a settlement agreement "is perhaps the most significant factor to be weighed in considering its adequacy"); *In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104, 126 (S.D.N.Y. 1997) ("A favorable reception by the Class constitutes 'strong evidence' of the fairness of a proposed settlement and ... the absence of [objections] may itself be taken as evidencing the fairness of a settlement") (citations and internal quotations omitted).

Third, the parties had conducted extensive discovery, completed all pretrial work and completed the trial as to all liability issues before the Settlement was reached.  As the Court is aware, the parties were well prepared at trial and Plaintiffs and Defendant vigorously advocated with respect to their differing positions on a number of key liability issues.

Fourth, as discussed above with respect to the *Leimkuehler v. American United Life Ins.*

-14-

*Co.*, 713 F.3d 905 (7th Cir. 2013), *Ruppert v. Principal Life Ins. Co.*, 705 F.3d 839 (8th Cir.

2013), and *Santomenno v. John Hancock Life Ins. Co.,* Civ. No. 2:10-cv-01655 (WJM), 2013

U.S. Dist. LEXIS 103404 (July 24, 2013), and as the Court acknowledged during the trial, a

finding of liability in favor of Plaintiffs was not a foregone conclusion.

     Fifth, although Plaintiffs disagreed with the position, a risk certainly existed with respect

to establishing damages, since one of Defendant's experts, Christine M. Hammer, CPA of

Cornerstone Research, offered an extensive expert opinion that Plaintiffs and the Class had

suffered damages, at most, of $3.4 million and, at trial, the Court expressed certain reservations

about granting a full disgorgement remedy on the facts of the case.

     Sixth, the risks of maintaining the class action through an appeal, are established by the

fact that class certification was denied in *Ruppert v. Principal Life Insurance Co.* and

certification of the class in *Haddock v. Nationwide Insurance* under Rule 23(b)(2) was reversed

during proceedings pursuant to an interlocutory appeal under Rule 23(f) before the Second

Circuit Court of Appeals (before that case was remanded and the class was recertified under Rule

23(b)(3)).

     Seventh, although ING certainly has the ability to withstand a greater judgment than the

Settlement entails, it bears noting that, during the pendency of the litigation, it was necessary for

ING's parent to spin-off its retirement business and engage in an initial public offering as part of

its agreement with the European Union to obtain approval of its 2008 bailout from the

Netherlands.  http://www.bloomberg.com/news/2013-05-01/ ing-u-s-unit-s-ipo-led-by

-unsung-heroes-of-aig-bailout.html.

     Eighth, the total value of the Settlement compares quite favorably to the range of

potential recoveries, as well as the maximum recovery that could be obtained. *See* Miller Decl. at ¶ 16.

Ninth and finally, the Settlement is clearly reasonable and a very positive result for the Class when measured against the possible recovery in light of all the attendant risks of litigation. *Id.* at ¶¶ 9, 16.

### D.   The Court Should Approve The Attorneys' Fee And Expense Request, As Well As The Requested Case Contribution Fee

Plaintiffs request that the Court award attorneys' fees and costs in the amount of $6,815,000 (an amount that equates to a small percentage of the total Settlement value)[7] and is significantly less than Class Counsel's total lodestar devoted to this matter (*i.e.*, the costs and fees, based on Class Counsel's normal hourly rates, expended in prosecuting this case for over the past four years),[8] which Plaintiffs believe is fair and reasonable under applicable law. *See,*

---

[7]Based upon the conservative valuation of the Settlement by Plaintiffs' expert, Mr. Scheinberg, *see* Scheinberg Decl. at ¶¶ 18-28, the requested fee and expense award amounts to only slightly more than 1.6% of the total mid-point value of the Settlement [*i.e.*, ($415,000,000/ $6,862,500), and the fee request amounts to less than 12% of the minimum value of the Settlement in its first year alone [*i.e.,* ($6,200,000/$51,983,513))].

[8]The amount of negotiated fees is the same amount awarded by the Court in the *Phones Plus* matter in which a smaller recovery was obtained for the class in that case and which the lodestar of class counsel was substantially less than that devoted in this case. Miller Decl. at ¶ 20. As a result, Plaintiffs respectfully submit that it should be deemed presumptively reasonable. Moreover, based upon the lodestar of Lead Counsel to date in the case, the requested fee and expense award results in Lead Counsel receiving less than 69% of their lodestar ($6,200,000/$9,009,973), all of which, along with a recitation of counsel's experience, is detailed in the Miller Decl. accompanying this Motion. *See* Miller Decl. at ¶¶ 31, 35. Of course, Lead Counsel also will be required to devote substantial, additional time to this engagement, which Lead Counsel estimate will require them devoting at least $350,000 of additional time and expenses, based upon previous experience, representing the Class and providing certain resources to them. *Id.* at ¶ 31. In addition, the requested expense reimbursement of $615,000 is less than the over $625,000 in expenses that Lead Counsel have incurred in prosecuting this matter and does not take into account additional expenses that Lead Counsel will incur in continuing to

*e.g., Goldberger*, 209 F.3d at 50 ("The question of whether a particular fee is reasonable must be guided by consideration of such factors as "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation ...; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy"); *see also Wal-Mart Stores*, 396 F.3d at 122 ("Consistent with these guidelines, a reasonable attorneys' fee may be calculated using either the percentage method or the lodestar method); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3rd Cir. 2005) (awarding 25% of value of settlement and multiplier of 4.5 to 8.5).

The Settlement also provides for the payment of a Case Contribution Fee to Plaintiffs, HSI and TDC, respectively, in the amounts of $50,000 and $25,000, in recognition of their invaluable contributions to the prosecution of this action. Such awards are commonplace in class actions, especially where, as here, Plaintiffs have made significant contributions to the Settlement, and are intended "to compensate the named plaintiff for any personal risk incurred ... or any additional effort expended by the [named plaintiff] for the benefit of the lawsuit." *Dornberger v. Metropolitan Life Ins. Co.*, 203 F.R.D. 118, 124 (S.D.N.Y. 2001) (citation omitted); *see also In re Publication Paper Antitrust Litig.*, No. 3:04-MD-1631 (SRU), 2009 WL

---

represent the Class going forward. *Id.* at ¶ 33. At the time that the amount of expenses was negotiated as part of the Agreement, Lead Counsel anticipated that the $615,000 would at least cover their expenses but, as a result of Lead Counsel's independent decision to retain the services of the Independent Fiduciary, the expenses exceed the amount of the agreed-upon cap. Thus, in essence, Lead Counsel elected to reduce their total compensation by engaging the services of the Independent Fiduciary on behalf of the Class. Although Lead Counsel respectfully believe that the result obtained justifies a substantial multiplier on their time, they have agreed for purposes of the Settlement to limit the fee and expense request to the amount sought and also have agreed that they would not accept any more than the amount sought. Pursuant to the terms of the Settlement, ING do not oppose an award of fees and expenses up to the amount requested.

2351724, at *1 (D. Conn. July 30, 2009) (same); *Kifali v. Hilton Hotels Retirement Plan*, No. 98-cv-1517, 2013 WL 6053754 (D.D.C. Nov. 18, 2013)(approving $50,000 incentive award for class representative in ERISA class action who was deposed); *McCoy v. Health Net, Inc.*, 569 F.Supp.2d 448, 479-80 (D.N.J. 2008)(approving $60,000 incentive awards to each named plaintiff in ERISA class action and collecting cases approving similar awards); *RMED Intern., Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587 (PKL), 2003 WL 21136726, at *2 (S.D.N.Y. May 15, 2003) (same; approving $25,000 "incentive award" to named plaintiff in recognition of its intimate involvement in the litigation).  Here, Plaintiffs (a) were intimately involved in prosecuting the subject litigation, (b) were forced to defend against counterclaims, (c) were deposed at length in the proceedings, (d) had representatives in attendance at each day of the trial, and (e) each had a principal testify at trial, all as a result of and part of their committed prosecution of this case.  *See* Miller Decl. at ¶ 36.  Under the circumstances, Plaintiffs respectfully submit that the requested Case Contribution Fees are reasonable and fair, and should be approved.  Furthermore, the amount and nature of the Case Contribution Fees were explicitly stated in the Notice and there have been no objections to it.

### E.   The Reaction Of The Federal And State Attorneys General And State Insurance Commissioners Also Supports Final Approval Of The Settlement

Consistent with the requirements of the Class Action Fairness Act, ING provided notice of the Settlement to (a) the Attorney General of the United States, (b) the Attorneys General of each State, and (c) the Insurance Commissioners of each state.  In recognition of the inherent fairness of the Settlement, none of these government regulators have objected in any respect to the Settlement or raised any concern with respect to the fairness of the Settlement.  In fact, a

representative of the DOL in Boston, Massachusetts with previous experience litigating against ING contacted Lead Counsel and congratulated them on the positive outcome achieved. Miller Decl. at ¶ 37. The reaction of these federal and state government regulators, like that of the Class, speaks volumes as to the fairness of the Settlement and the propriety of this Court granting final approval to the Settlement.

## V.   **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Final Approval of Settlement. Plaintiffs will submit a form of proposed Final Approval Order with their Supplemental Submission on September 10, 2014, after the deadline for any objections or additional requests for exclusion expires so that the proposed Final Approval Order can account for any additional requests for exclusions or other pertinent developments in this litigation.

Dated: August 27, 2014                    Respectfully submitted,


                                          /s/ Laurie Rubinow
                                          James E. Miller  (ct21560)
                                          Laurie Rubinow (ct27243)
                                          Karen M. Leser-Grenon (ct23587)
                                          SHEPHERD, FINKELMAN, MILLER
                                             & SHAH, LLP
                                          65 Main Street
                                          Chester, Connecticut  06412
                                          Telephone: (860) 526-1100
                                          Facsimile:  (866) 300-7367
                                          E-mail:  jmiller@sfmslaw.com
                                                   lrubinow@sfmslaw.com
                                                   kleser@sfmslaw.com

-19-

Scott R. Shepherd
James C. Shah
Shepherd, Finkelman, Miller & Shah, LLP
35 East State St.
Media, Pennsylvania 19063
Telephone: (610) 891-9880
Facsimile:  (866) 300-7367
Email: sshepherd@sfmslaw.com
        jshah@sfmslaw.com
        eyoung@sfmslaw.com

Rose F. Luzon
Kolin C. Tang
Shepherd, Finkelman, Miller & Shah, LLP
401 West A St., Suite 2350
San Diego, California 92101
Telephone: (619) 235-2416
Facsimile:  (866) 300-7367
Email: rluzon@sfmslaw.com
        ktang@sfmslaw.com

*Attorneys for Plaintiffs and the Class*