# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

HEALTHCARE STRATEGIES,    :
INC. et al.,    :
    :
          Plaintiff,    :
    :
       vs.    :     No. 3:11-cv-00282 (WGY)
    :
ING LIFE INSURANCE AND    :
ANNUITY COMPANY,    :
    :
          Defendant.    :
_____ :

## DECLARATION OF JAMES SCHEINBERG, CIMA®, PRP, MANAGING PARTNER OF NORTH PIER FIDUCIARY MANAGEMENT, LLC AUGUST 26, 2014

I, James Scheinberg, hereby declare as follows:

1.    I am the founder and Managing Partner of North Pier Fiduciary Management, LLC (North Pier), a company dedicated to advising the fiduciaries of small, mid-sized and larger retirement plans.

2.    I began my professional career at Oppenheimer & Co., Inc. in 1989. I then spent two years in natural resource venture capital with a boutique firm, Cuchara Resources, where I was licensed with the NASD (Series 7, 63, 22 and 39). In 1992, I moved to general securities with Smith Barney Harris Upham. In

1994, I rejoined Oppenheimer & Co., Inc. as an Associate in the Oppenheimer Consulting Group, the firm's institutional investment management consulting department, where I worked with sponsors of ERISA retirement plans and other institutional clients.

3.     In 2001, I founded what would become the Corporate Services Group of Oppenheimer Co., Inc. (CSG), where I eventually held the position of Director and Senior Vice President.  CSG was an industry pioneer in providing conflict free, fee only investment consulting and fiduciary advocacy for institutional, participant-directed, plan sponsors.

4.     In 2008, I, along with other central members of CSG, founded North Pier Fiduciary Management, LLC.  My tenure in the industry has also included experience in hedging and monetization, corporate executive services and corporate cash management, as well as the attainment of my NASD Series 65.

5.     For the past 13 years, I have worked with institutional clients throughout the United States and the focus of my experience has been on providing retirement plan advisory services to the mid-sized and larger retirement plan sponsor.  These services have included fiduciary process management and analysis; investment policy design; plan cost studies and vendor renegotiations; ERISA advisor and provider search and benchmarking; committee level employee

-2-

communication and education consulting; plan design (auto-enrollment/increase analysis, cash balance plans, etc.); mergers and acquisition analysis and integration support; independent fiduciary review for corporate boards/ compensation committees; investment menu design and evaluation; fee review and analysis; investment monitoring and reporting; manager search services; and expert consulting and witness services for ERISA litigation.

6.      Attached as Exhibit A is a true and correct copy of my curriculum vitae, which further details my qualifications.

7.      I have been retained by counsel for Healthcare Strategies, Inc. ("HSI") and The DeRosa Corporation ("TDC") to provide an opinion concerning the value to each class member of the options, services and information to be provided by Defendant, ING Life Insurance and Annuity Co. ("ING" or "ILIAC" or "Defendant") under the Settlement Agreement.  To form my opinion, I reviewed the materials listed in Exhibit B of this declaration and engaged in a review and analysis of certain new options and pricing, and referred to my recent survey of how much consultants would charge to provide the information Defendants will now provide to current and future retirement plan customers under the Settlement Agreement.  I am qualified to provide such an estimate based on my experience detailed above and because, among other things, I regularly investigate, calculate

-3-

and analyze the revenue sharing payments, if any, as well as other fees being

received by service providers and other entities, whether directly or indirectly, in

connection with retirement plan investments.  In performing such work, I research,

analyze, and calculate the amount of total investment expense, revenue sharing

(which typically includes 12b-1 fees, sub-transfer agent fees) and direct expenses

(including administrative service/management fees, separate account fees, flat

charges, per participant fees, and individual participant transaction charges).  I am

being compensated at my standard rate of $550 per hour for my consulting

services in this matter.

> 8.     Consultants like myself are often engaged by retirement plans to

review the fees charged by service providers such as ING.  The general purpose of

such reviews is to determine how much a plan is paying for services and whether

such costs are reasonable in light of the services received.  One of the key pieces

of information that a consultant needs in order to perform this review is the total

compensation received for the services provided by the service provider, which is

often not a simple task.  Some service providers often do not list each of the

components of their fees in a readily available format.

> 9.     In Section 4.2 of the Settlement Agreement, ING is now agreeing to

provide this information in a readily available format.  By providing this

information, the task of a consultant such as myself is rendered considerably easier, which would likely result in a lower bill to the plan to perform an overall fee review.  In addition, by providing this information, ING now will make it possible for a plan to easily and directly determine the level of fees being received by ING without even engaging a consultant such as myself.

10.    To obtain and present the information required to be disclosed by ING in Section 4.2 of the Settlement Agreement, a consultant such as myself would be required to review and analyze (1) the universe of available investments; (2) the specific investment options of the plan; (3) their expense ratios and revenue sharing amounts; (4) the service agreements and riders for the plan; and (5) the wrap fee or separate account fee and other direct expenses; and (6) the service provider's required 408(b)(2) fee disclosures (29 CFR §2550.408b-2). Although obtaining such information can sometimes occur through direct contact with a service provider and the time spent in obtaining such information may be streamlined if the consultant has a pre-existing relationship with the plan or the service provider, many times the process utilized in collecting such information is complex and time consuming for the consultant.

11.    Based upon previous assignments that I have performed in this case, I have a clear understanding of the time it would take to obtain and analyze revenue

-5-

sharing information on behalf of a retirement plan utilizing the services of ING at this time, as well as before this litigation was commenced.

12.    Based on my knowledge and experience, providing information similar to that required by Section I of the Settlement Agreement, it would take approximately 3 to 6 hours to obtain, review, and analyze the information that will now be made available by ING and to present it to a client.  The amount of time, of course, may vary based on a consultant's familiarity with the subject plan.  The greater familiarity an advisor has with the plan, the less time it may take to analyze the expenses of the plan.

13.    My standard hourly rate and the rate that I would charge to perform the work required by Section 4.2 of the Settlement Agreement is $550 an hour for these services, the work conducted, in part, by my firm's associates is $255 an hour, and $65 an hour for administrative support.

14.    As part of a recent expert engagement, I spoke to two small-market and mid-market plan consultants and one actuarial administration firm in order to evaluate what other consultants around the country would charge to perform similar work.

15.    These consultants reported a range of $250 to $4,000 to provide these services.  The low end of the estimated range assumes that the consultant had an

existing relationship with the client and vendor, as well as a high level of familiarity with the plan and the service provider. The high end of the range assumed no familiarity with the plan documents, investments, and service providers, as well as difficulties in obtaining the relevant data from the existing documents. In my estimation, the average amount a competent consultant would charge a plan is approximately $1,500 to obtain and report the information ING will be required to provide under the terms of the Settlement Agreement.

16.    To determine the average hourly rates consultants would charge throughout the country for the expert engagement referenced above, I also consulted a then recent survey reported in the November 2009 issue of *PlanAdviser* Magazine. These materials indicate that the typical hourly rate charged by retirement plan consultants ranged from $150 to $500 per hour. These rates are consistent with my current experience interacting with advisors around the country in connection with my work as an ERISA advisor/search consultant, as well as through my involvement with The Center for Due Diligence (www.thecfdd.com), a well respected industry group. In my recent experience, rates are now generally comparable to those rates determined in the 2009 survey.

17.    Based upon this fee range, and based upon my estimate of the amount of time it would take a consultant to obtain the information, I estimate that the

-7-

average plan would incur consultant fees of at least between $500 and $750. Again, this estimate is based on the fees of a typical consultant, and plans easily could pay more – as much as $2,500 per year – to obtain such information. I have used $625 – the midpoint between $500 and $750 – as a reasonable estimate of the minimum fees that a plan would pay to obtain the information provided by ING.

18.    To calculate the value of ING disclosures to the Settlement Class, I believe that an appropriate method is to multiply the value to each plan ($625) times the number of plans in the Settlement Class. I have been informed that there are approximately 18,000 current plans in the Settlement Class. Therefore, the value of the settlement would be $11,250,000 for each year that this information is obtained by the plans. Using a five year horizon based upon my experience in similar matters with respect to changes in practice and how long, at a minimum, they typically remain in effect and benefit the Settlement Class, the value of this component of the settlement is between $11,250,000 (based on just the first year) and $56,250,000 (assuming that plans will fully benefit from these changes in practice for at least five years).

19.    This calculation is conservative for two reasons. First, as noted above, plans may be charged considerably more than $625 to gather the information that ING is now providing. Second, ING's business has continued to

-8-

grow over the past several years, and may continue to grow in the future, so that the actual number of plans that will benefit may be significantly greater than 18,000. I also understand that it will cost a significant amount of additional funds to accomplish the other Structural Changes detailed in Section IV of the parties' Settlement Agreement in addition to the almost $15 million in cash payments.

20. The other significant and independent value contained in the Settlement is ING's agreement to now offer a zero-revenue sharing menu to all of the plans in the Settlement Class. Given the relatively small size of the vast majority of the retirement plans in the Settlement Class, as explained below, a serious argument can be made that it makes sense for such plans to consider adopting an investment menu that is comprised of a diversified group of low-cost, index funds -- which is available in a broad array (and increased array when compared to other ING menus) on the zero revenue sharing menu. That is because many, if not most, of the retirement plans in the Settlement Class are likely to encounter difficulty in (a) retaining highly qualified investment consultants, in a cost effective manner, to continually evaluate and monitor higher expense ratio investments to ensure that they are worth the extra cost, and (b) ensuring that, from the perspective of the total costs to operate a plan, *see* Report of James Scheinberg dated September 14, 2012, a true and correct copy of which is attached

as Exhibit "C," at 5-9 (discussing total costs to operate a plan as the first step to evaluate plan cost and the reasonableness of service provider fees), total direct fees and indirect fees are fair and reasonable -- while, with a zero revenue sharing menu, fees paid are entirely transparent and known since they are all a matter of contract and direct in nature.  Such an approach is similar to that approach taken by the Federal Employee Thrift Savings Plan, www.tsp.gov/PDF/formspubs/ tspbk08.pdf, which focuses upon offering diversified low expense ratio investments to federal employees and retirees.  It also bears noting that, by choosing a zero revenue sharing menu, each of the plans in the Class will avoid an ongoing duty to ensure that the amount of said revenue sharing payments are being used to fully offset fees that the plans would otherwise be required to pay, as depicted under the terms of *In re Frost National Bank*, DOL Opinion No. 97-15A, Pens. Plan Guide (CCH) P 19,986N (May 22, 1997)(the "*Frost Letter*").  The fact that the terms of revenue sharing agreements (and amounts) change over time, makes this exercise necessary to be performed continually and not just as a sporadic examination. Though a *Frost Letter*-like structure is a viable alternative to be employed by plans, it is generally much more difficult and time-consuming to administer than simply (a) knowing the amount of direct fees being paid by the plan, and (b) knowing that the only fees being paid are those direct fees.  As such,

evaluating a transition to the zero-cost menu is certainly something that all of the plans in the Class should and likely have a fiduciary duty to consider adopting. As I understand, Lead Counsel is prepared to and will offer the plans in the Class education and additional resources regarding this option and assistance in transitioning to a zero revenue sharing environment.

21.    As noted above, it is highly advisable for small plans such as those included in the Class to consider using index funds, as it is unlikely that the plan sponsors have the skill and experience to select superior actively managed funds that can routinely outperform index funds going forward.  For these plans to hire an advisory firm that is capable of performing the superior analytics necessary to select superior, actively managed funds, the plan sponsors would need to hire a skilled institutional advisor and most skilled firms of such caliber charge, at a minimum, $20,000 a year for their services [*i.e.*, 2% for a $1,000,000 plan.]  These actively managed funds would then need to outperform index funds in a sufficient manner to cover the cost of both the active manager's fees (which can be considerable when compared to index funds) and the cost of the skilled institutional advisor.  Given these economic realities for small plans, choice of low cost index funds generally would be a prudent choice.

22.    Although it is a matter of considerable debate in the investment

industry, arguments can be made that it is difficult for the typical smaller

retirement plan to choose higher performing mutual funds that arguably would

justify paying higher expense ratios.  Trailing performance of mutual funds is most

often the metric utilized by less sophisticated investment professionals to measure

whether they should invest in a mutual fund (and, indeed, ING's own materials

regarding mutual funds highlight trailing past performance as the metric to be

reviewed and analyzed by retirement plan customers when choosing which funds

to offer as investments).  A recent study by the S&P Dow Jones Indices, *Does Past*

*Performance Matter?  The View From S&P Dow Jones Indices*,

http://us.spindices.com/ search/ ?ContentType=Research (June, 2014)("*S&P*

*Study*"), shows the difficulty that many investors can face, since the study

demonstrates that trailing past performance is unlikely to be predictive of future

performance in the succeeding market cycle.  The S&P Dow Jones study

illustrates the problem that, although trailing past performance is a central metric

used in analysis to select funds with the intent of beating peers and indices, using

simplified trailing performance data as a predictor of future performance is of little

value.  The problem is that experience has shown that many plan sponsors and

lower level advisors (or brokers) who lack sound academic training and tools use

simplified trailing performance based data in fund selection.

23.     In light of the above and the need to retain (and pay for) highly skilled investment professionals to achieve long-term results that are superior to market performance, *see S&P Study*, it is highly advisable for small plans to consider using index funds as it is unlikely that they will have access to the skill, experience or resources necessary to select superior actively managed funds that have a possibility (much less a probability) of outperforming index funds on a *going forward basis*. Although I certainly am not suggesting that a plan breaches its duty by failing to invest in a low cost, zero revenue sharing environment, I do believe that the funds in the Class should strongly consider this as an option.  That is especially true since, as discussed below, the plans in the Class have an opportunity to achieve very significant savings from a total plan operating cost perspective by moving to the zero revenue sharing menu, which savings are unlikely to be offset by higher returns through investments in other menus. Considering the zero revenue sharing menu also eliminates the need for most of the plans to engage the services of highly skilled, conflict-free investment advisors to actively monitor performance and fees while ensuring that revenue sharing is utilized as a full offset to direct fees (which, frankly, is a much more practical alternative for larger plans that have the appropriate level of sophistication and can afford the services of consultants like North Pier or other similar organizations).

24.     By adopting a zero revenue sharing menu, the plans in the class can assemble a balanced and diversified investment menu of funds to offer to their participants that have extremely low costs, when compared to the investments offered on the other investment menus.  For example, in connection with adopting the zero revenue sharing menu (i.e., ING MAP Select Menu 5), as of October, 2013, plans in the Class can choose to offer the following investments with less than 25 basis points in expense ratio, as compared to an overall expense ratio of 131 basis points for ING MAP Select Core (ING's menu with no "direct" charges) as of October, 2013:

(a)     American Funds The Bond Fund of AmericaSM (R6) (25 bps);

(b)     BlackRock Bond Index Fund (K) (22 bps);

(c)     DFA Inflation-Protected Securities Portfolio (Inst) (13 bps);

(d)     DFA Intermediate Govt Fixed Income Portfolio (Inst) (13 bps);

(e)     DFA Short-Term Extended Quality Portfolio (Inst) (22 bps);

(f)     Vanguard Total Bond Market Index Fund (Signal) (10 bps);

(g)     BlackRock LifePath Index 2015 Fund (16 bps);

(h)     BlackRock LifePath Index 2020 Fund (16 bps);

(i)     BlackRock LifePath Index 2025 Fund (16 bps);

(j)     BlackRock LifePath Index 2030 Fund (16 bps);

(k)    BlackRock LifePath Index 2035 Fund (16 bps);

(l)    BlackRock LifePath Index 2040 Fund (16 bps);

(m)    BlackRock LifePath Index 2045 Fund (16 bps);

(n)    BlackRock LifePath Index 2050 Fund (16 bps);

(o)    BlackRock LifePath Index Retirement Fund (16 bps);

(p)    Vanguard LifeStrategy Conservative Growth Fund (Investor)(15 bps);

(q)    Vanguard LifeStrategy Growth Fund (Investor)(17 bps);

(r)    Vanguard LifeStrategy Income Fund (Investor) (14 bps);

(s)    Vanguard LifeStrategy Moderate Growth Fund (Investor) (16 bps);

(t)    Vanguard Target Retirement 2010 Fund (Investor) (16 bps);

(u)    Vanguard Target Retirement 2015 Fund (Investor) (16 bps);

(v)    Vanguard Target Retirement 2020 Fund (Investor) (16 bps);

(w)    Vanguard Target Retirement 2025 Fund (Investor) (17 bps);

(y)    Vanguard Target Retirement 2030 Fund (Investor) (17 bps);

(z)    Vanguard Target Retirement 2035 Fund (Investor) (18 bps);

(aa)    Vanguard Target Retirement 2040 Fund (Investor) (18 bps);

(ab)    Vanguard Target Retirement 2045 Fund (Investor) (18 bps);

(ac)    Vanguard Target Retirement 2050 Fund (Investor) (18 bps);

(ad)    Vanguard Target Retirement 2055 Fund (Investor) (18 bps);

(ae)   Vanguard Target Retirement 2060 Fund (Investor) (18 bps);

(af)   Vanguard Target Retirement Income Fund (Investor) (16 bps);

(ag)   Vanguard Balanced Index Fund (Signal) (10 bps);

(ah)   American Beacon S&P 500 Index Fund (Institutional) (15 bps);

(ai)   DFA U.S. Core Equity 1 Portfolio (Institutional) (19 bps);

(aj)   Vanguard 500 Index Fund (Signal) (5 bps);

(ak)   Vanguard Total Stock Market Index Fund (Signal) (5 bps);

(al)   DFA Real Estate Securities Portfolio (Institutional) (18 bps);

(am)   DFA U.S Core Equity 2 Portfolio (Institutional) (22 bps);

(an)   Vanguard Mid-Cap Index Fund (Signal) (10 bps);

(ao)   Vanguard Small-Cap Index Fund (Signal) (10 bps);

(ap)   American Beacon International Equity Index Fund (Institutional) (19 bps);

(ar) Vanguard Total International Stock Index Fund (Signal) (16 bps).

A plan easily could create a diversified menu to offer its participants from the above investments (totaling over 40 in number) and thereby achieve an average expense ratio of 15.86 basis points (i.e., .001586%).  Although, as reflected above, a plan should be able to easily achieve an average expense ratio of less than 16 basis points by adopting the zero revenue sharing menu and paying all direct fees

-16-

[which ING has consistently indicated would not exceed 70 basis points for the plans in the Class, see Trial Testimony of Jeffrey Lombardo (September 18, 2013) at 12:15, 23:10-12, 42:21-25, 48:23-49:1], thereby achieving a total plan operating cost of 86 basis points or less, even if the plans choose to offer certain more expensive investment options, each plan should be able to easily achieve average expense ratios (on a weighted average basis) of 25 basis points or less for total costs to operate a plan of 95 basis points. Thus, based upon the above and my experience in the field, the plans in Class should be able to achieve total plan operating cost in the range of 85-95 basis points by adopting the zero revenue sharing menu.

25.    A review of ING's MAP Select Core Menu, for which there are no direct fees (other than fund fee adjustments ("FFAs") associated with the investments and for which ING receives all compensation through revenue sharing illustrates the substantial savings that can be achieved. The weighted average expense ratio (and minimum total plan operating cost) for ING's MAP Select Core Menu (based upon the weighted average of investments in Separate Account D as of December 31, 2013),[1] and assuming the same distribution of assets in the MAP

---

[1]A review of the assets invested in Separate Account D, based upon the 2012 and 2013 Annual Reports for Separate Account D, reveal that the total assets invested in the low cost alternatives appearing on MAP Select Menu 5 (i.e., the zero revenue sharing menu) account for

-17-

Select Core Menu, the product through which a majority of the Class is invested)

is over 123 basis points (1.230592%), a full 28-38 basis points higher than the

total plan operating cost that easily can be achieved through ING's zero revenue

sharing menu.[2]   As a result, at a minimum, each of the plans in the class could

achieve savings of 28-38 basis points per annum in total plan operating cost

savings if they adopt the zero revenue sharing menu and offer investments to their

participants in low cost index funds and similar investments (assuming a range of

total plan operating cost of 85-95 basis points in the zero revenue sharing menu).

26.   In order to perform an "apples to apples" comparison, I also engaged

in an analysis based upon total plan operating cost between ING's Menu 5 and

---

less than 3% of all investments in Separate Account D.  It can be reasonably assumed that the distribution in Separate Account D is similar to the investment distribution of the plans in the Settlement Class.  In any event, since less than 3% of the assets invested through Separate Account D contain these low cost alternatives, the opportunity to shift investments to these mutual funds and achieve savings for the plans in the class from a cost perspective is quite significant.  I have been advised that ING's MAP Select product accounts for approximately 50% of the plans, while 25% of the plans in the class utilize MAP V products and 25% of the plans in the class utilize MAP Plus products.  The trial testimony and the experience of TDC, as illustrated below, as well as the total plan operating cost being incurred by HSI when it left ING as a customer in 2011, reflects the fact that customers of MAP V and MAP Plus paid even higher total plan operating cost than MAP Select customers because MAP V and MAP Plus products are legacy products that were priced when the marketplace in the retirement field was less competitive.  As a result, the value of the zero revenue sharing menu that I have calculated herein likely understates the full potential value because it does not take into account the fact that MAP V and MAP Plus customers generally pay even higher total plan operating costs than MAP Select customers.

[2]This estimate of 28-38 basis points in savings also falls squarely between my calculation of minimum savings in the amount of 8.75 basis points and the 80 basis points in savings achieved by the TDC plan, as discussed below.

ING's MAP Select by comparing total plan operating cost between similar or the same investments on the same menu.  Even if an analysis is performed in which total plan operating cost is compared between ING's Menu 5 (the zero revenue sharing menu) and ING's MAP Select Core (the product menu utilized by approximately half of the plan assets in the Settlement Class and through which ING is compensated solely through revenue sharing payments and FFAs), with respect to low cost index funds and similar investment options with the same or comparable investments available on each menu, the difference in total plan operating cost is 8.75 basis points (after considering FFAs).  I believe this is a reasonable manner to calculate the minimum savings that a plan could achieve by adopting the zero revenue sharing menu in terms of total plan operating cost.  *See* Trial Testimony of Jeffrey Lombardo (September 18, 2013) at 27:14-27:25 (confirming also that, on ING's MAP Select Core, all of the low cost index funds that do not pay ING revenue sharing have a corresponding FFA of 65-70 basis points).  Interestingly, as explained below, the TDC Plan was able to achieve much more significant savings (by almost a factor of 10 over this conservative calculation) when they recently moved to a zero revenue sharing menu.

27.    I have been advised by counsel for Plaintiffs that, when TDC recently entered into an agreement to move to ING's Menu 5 (the zero revenue sharing menu), the TDC plan was able to achieve total plan operating costs savings of 80

basis points, having reduced total plan operating costs from 181 basis points to 101 basis points.  Given the size of the TDC plan, this means that, by moving to ING's Menu 5, the TDC plan itself will save in excess of $8,000 in fees per year going forward, which monies also will be available for investment and growth as retirement savings.

28.    Based upon the estimated total assets of the plans in the Class, I conservatively estimate that the zero revenue sharing menu option provides the plans in the class with the ability to achieve savings in total plan operating cost per annum of between $25,783,513 ($29,466,872,430 in assets times .000875) to $119,974,115 ($29,466,872,430 in assets times .0038).  Of course, in light of TDC's experience, it is possible that many of the plans in the Class could achieve even greater savings.  If one measures these savings over the next five (5) years, the class of plans can achieve savings of between $128,917,565 and $559,870,576 by adopting the zero revenue sharing approach outlined above with a mid-point savings of $344,394,071 over the next five years.  These calculations also do not include the increased return on retirement assets that likely will be achieved, since such assets will remain invested in the market, as opposed to being paid to ING or mutual funds as fees/revenue sharing.  As a result, the zero revenue sharing menu provides a significant opportunity to achieve literally hundreds of millions of

dollars in cost savings for the plans in the Settlement Class over the next several years.

29.    When all of the elements of the Settlement are taken into account, I conservatively estimate the value of the Settlement available to the Class as being in excess of $415 million ($14,950,000 + $56,250,000 + $344,394,071).

30.    I reserve the right to revise the opinions expressed in this Declaration in the event that I receive additional information, documents or materials that are pertinent to the opinions expressed herein.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: August 26, 2014

James Scheinberg

# EXHIBIT A

## Exhibit A - Curriculum Vitae

**James Scheinberg CIMA®**
**Managing Partner, Founder and Chief Investment Officer**
**North Pier Fiduciary Management, LLC**
**Jim.Scheinberg@npier.com**
**(800) 403-7065 ext. 272**

Born and raised in the North Suburbs of Chicago, Jim Scheinberg came to Southern California in 1987 to pursue his B.A. in Political Science at University of California, Los Angeles. He formerly held the SEC Series 7, 22, 39 (Principal), 63, and 65 Licenses. Jim achieved the Certified Investment Management Analyst (CIMA) designation in 2001 from The Investment Management Consultants Association (IMCA®) in conjunction with the Wharton School of Business of the University of Pennsylvania. He has also earned the Accredited Investment Fiduciary™ (AIF®) and Accredited Investment Fiduciary Analyst™ (AIFA®) designations, awarded by the Center for Fiduciary Studies, which is associated with the Joseph M. Katz Graduate School of Business of the University of Pittsburgh. He is one of the first 100 professionals to earn the PLANSPONSOR Retirement Professional designation (PRP) from PLANSPONSOR Institute and sits on the Steering Committee of The Center for Due Diligence. He is a quoted resource to journalists, a regularly featured radio show contributor and a frequent speaker at industry conferences.  He also serves as a consulting expert and expert witness for ERISA litigation.

Jim Scheinberg began his career in venture capital in 1990 moving to general securities with Smith Barney Harris Upham in 1992. He joined Oppenheimer & Co., Inc. in 1994 as an Associate in the Oppenheimer Consulting Group, the firm's institutional investment management consulting department, where he worked with sponsors of trustee-directed plans and other institutional clients. In 2001, Jim founded what would become the Corporate Services Group of Oppenheimer Co., Inc. (CSG), where he eventually held the position of Director and Senior Vice President. CSG was an industry pioneer in providing conflict free, fee-only investment consulting and fiduciary advocacy for institutional, participant-directed plan sponsors. In 2008, Jim and CSG Partner Brant Griffin, founded North Pier Fiduciary Management LLC. His tenure in the industry has also included experience in hedging and monetization, corporate executive services, and corporate cash management.

Professional Activities:

- Advising Member of the Center for Due Diligence
- Member of the Investment Management Consultants Association

Expert Witness/Consultant Cases:

- PHONES PLUS, INC. vs. HARTFORD LIFE INSURANCE COMPANY
  2008-2010: Engaged by plaintiff's counsels (Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor LLP) and (Shepherd, Finkelman, Miller & Shah, LLP)– Consulting Expert, Expert Opinion and Fairness Opinion
- KATZIFF vs. BEVERLY ENTERPRISES, INC
  2009-2009 Engaged by plaintiff's counsel (Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor LLP) – Consulting Expert, Expert Opinion
- CORMIER vs. RADIOSHACK CORPORATION
  2010: Engaged by plaintiff's counsel (Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor LLP) – Consulting Expert
- HEALTHCARE STRATEGIES INC. VS. ING LIFE INSURANCE & ANNUITY CO.
  2012-present: Engaged by plaintiff's counsels (Shepherd, Finkelman, Miller & Shah, LLP) – Consulting Expert, Expert Opinion
- GOLDEN STAR, INC. V. MASS MUTUAL LIFE INSURANCE CO.
  2012-present: Engaged by plaintiff's counsels (Shepherd, Finkelman, Miller & Shah, LLP) –

Consulting Expert
- CASE NAME WITHHELD – Pre Filing
  2014-present: Engaged by government agency / prosecutor (United States Department of Labor) – Consulting Expert

Articles & Media

- *Fishing from the Wrong PEER - Target Date Fund Analysis*; Oct. 2008: Author
- Quoted resource in several publications including H.R. Magazine, The Hedge Fund Law Report, AOL's Finance Daily, New York Daily News, DepositAccounts.com and SmartMoney.com,
- *Periodic Blog/Newsletter: THE NORTH PIERspective*; Nov. 2008 – Present; http://pierspective.wordpress.com/

Speaking Engagements:

- 2014 San Francisco Mid-Sized Retirement & Healthcare Plan Management Conference; Lecturer: "Tips Learned from Litigation." March 16, 2014 - March 19, 2014; San Francisco, CA
- Center for Due Diligence Advisor Conference; Moderator: "Mock Plan Sponsor Committee Meeting" Monday, October 7, 2013; San Antonio, TX
- Mid-Sized Retirement and Pension Plan Management Conference; Lecturer: "K.I.S.S – Keep It Specialized S... "Better Sponsor Advice for Less." October 13, 2011; Chicago, IL
- Mid-Sized Retirement and Pension Plan Management Conference; Lecturer: "Cut the Fat: Reduce Costs While Improving your Plan." October 12, 2010; Chicago, IL
- Mid-Sized Retirement and Pension Plan Management Conference; Lecturer: "Cut the Fat: Reduce Costs While Improving your Plan." May 5, 2010; Boston, MA
- Mid-Sized Retirement and Pension Plan Management Conference; Lecturer: "Cut the Fat: Reduce Costs While Improving your Plan." March 9, 2010; San Francisco, CA
- Mid-Sized Retirement and Pension Plan Management Conference; Lecturer: "Worried about Inflation and the Dollar? As a Fiduciary You Should Be." March 8, 2010; San Francisco, CA
- Center for Due Diligence Advisor Conference; Lecturer: "Can an Advisor Be A Fiduciary To The Plan & Provide Participant Advice?" October 6, 2009; Scottsdale, AZ
- Center for Due Diligence Advisor Conference; Lecturer: "Gross-To-Net Pricing Revisited: Now What?" October 5, 2009; Scottsdale, AZ
- Center for Due Diligence Advisor Conference; Lecturer: "MPT: Bruised, Broken, Misunderstood or Misapplied." October 5, 2009; Scottsdale, AZ
- Center for Due Diligence 2008 Advisor Conference; Panelist: "QDIA's — Look Before You Leap." October 13, 2008; Phoenix, AZ
- Center for Due Diligence 2008 Advisor Conference; Presenter and Panel Moderator: "Ethics & the Advisor: How to Pursue Business While Honoring Your Fiduciary Duties." October 13, 2008; Phoenix, AZ
- Berkeley Center for Executive Development's 15th Annual Mid-Sized Pension and Retirement Plan Management Conference; Lecturer and Author: "Advisors are Providers too: prudent and practical steps for benchmarking, evaluating and ensuring value." March 12, 2008; San Francisco, CA
- Berkeley Center for Executive Development's 15th Annual Mid-Sized Pension and Retirement Plan Management Conference; Lecture Co-Author and Presenter: "How to truly differentiate among Record-keepers; it's not just about bundled or unbundled anymore." March 14, 2008; San Francisco, CA
- Berkeley Center for Executive Development's 14th Annual Mid-Sized Pension and

Retirement Plan Management Conference; Lecturer and Author: "Evaluating Plan Advisors: What's Optimal for Your Plan and What Should You Pay?" March 12, 2007; San Francisco, CA

- Berkeley Center for Executive Development's 14th Annual Mid-Sized Pension and Retirement Plan Management Conference; Co-Author and Presenter: "Discussions with an ERISA Plaintiff's Attorney: Potential Future Litigation and How to Protect Yourself Today." March 13, 2007; San Francisco, CA
- Center for Due Diligence 2006 Advisor Conference; Presenter and Panel Moderator: "Strengths & Weaknesses of Various Mid-Market Plan Providers." October 5, 2006; Chicago, IL
- Center for Due Diligence 2006 Advisor Conference; Panelist: "Practice Management: Maximizing the Team Effort." October 5, 2006; Chicago, IL
- Center for Due Diligence Advisor Conference; Panelist: "Should Advisors Offer Other Services" October 6, 2005; Chicago, IL
- Center for Due Diligence Advisor Conference; Lecturer: "How To Move Your Practice Upstream & Compete Effectively In The $25-100 Million Market", October 6, 2005; Chicago, IL

Live Media Appearances

- Bruce Sallan's, "A Dad's Point of View" Radio Show (KZSB AM 1290); Regular Weekly Featured Guest on "Family Financial Matters" segment: June 2010 – September 2011 & subsequent quest appearances; Santa Barbara, CA. (Nationally Syndicated)

Notable Achievements

- Nominee - 401(k) Wire's 100 Most Influential People in Defined Contribution, 2009
- Named among 401(k) Wire's 300 Most Influential Advisors, In Defined Contribution, 2010
- Named among 401(k) Wire's 500 Most Influential Advisors, In Defined Contribution, 2011

# EXHIBIT B

## Exhibit B - Materials Reviewed Regarding Declaration

- Complaint
- Amended Complaint
- Class Certification Papers
- Summary Judgment Papers
- Court's Decisions Regarding Class Certification and Summary Judgment
- Trial Briefs and Memoranda
- Expert Reports of E. Scott Peterson and Professor John Langbein
- Trial Transcript
- Deposition Testimony of Defendant's Witnesses, Plaintiffs' Witnesses and All Expert Witnesses
- Executed Settlement Term Sheet
- Executed Settlement Agreement
- *In re Frost National Bank*, DOL Opinion Letter 97-15A (May 22, 1997)
- *In re Aetna Life Insurance Company*, DOL Opinion Letter 97-16A (May 22, 1997)
- Separate Account D Financial Statements for 2012 and 2013
- MAP Select Core Investment Menu
- MAP Select Five Investment Menu
- MAP Plus Investment Menu
- MAP V Investment Menu
- Numerous Documents Produced By Defendant In Discovery
- Documents Produced By Third Parties In Discovery
- Independent Research Referenced in Declaration

# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HEALTHCARE STRATEGIES, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | No. 3:11-cv-00282 (JCH) |
| | : | |
| ING LIFE INSURANCE AND ANNUITY COMPANY, | : | |
| | : | |
| Defendant. | : | |
| | : | |

---

**REBUTTAL REPORT AND DECLARATION OF JAMES SCHEINBERG, CIMA®, AIFA®, PRP, MANAGING PARTNER OF NORTH PIER FIDUCIARY MANAGEMENT, LLC**
**SEPTEMBER 14, 2012**

---

## I.      Qualifications

I incorporate by reference my qualifications, as stated, in my Report and Declaration dated June 1, 2012 ('June 1 Report'). For purposes of consistency, I have used the same definitions in this Report as I did in my June 1 Report. In connection with my retention by counsel for Healthcare Strategies, Inc. ('HSI'), I have been asked to review and provide my opinion with respect to the Expert Report of E. Scott Peterson ('Peterson Report') that was produced in this case on August 17, 2012. The following is a statement of my opinions with respect to the Peterson Report and the basis and reasons for them. I have attached as exhibits to this Report and Declaration any documents that I have referred to herein that

cannot otherwise be referenced by exhibit number to a deposition or declaration, by an identifying number assigned to the document by the parties in this case or which otherwise are not publically available and accessible.

## II.     Information Reviewed

In connection with this engagement, in addition to the documents that I previously reviewed in connection with my work on this matter, as listed in my June 1 Report, and the documents cited in this Report by url or similar reference, I have reviewed the following documents and information:

- ☐   Peterson Report
- ☐   Deposition of E. Scott Peterson dated August 29, 2011 and Exhibits
- ☐   401k Averages Book (12th Edition)(2011)([www.401ksource.com](www.401ksource.com))

## III.    Opinions

I first provide my opinion and analysis with respect to the Peterson Report's Summary of Opinions in paragraph 12 on pages 3 and 4 of the Peterson Report in the letter order in which they are raised:

> a.   *401(k) plans are an important component of the private retirement system in the United States. ILIAC is one of the 401(k) plan service providers that focus primarily on providing services to sponsors of small plans. These service providers play an important function by providing small businesses with access to efficient, cost effective 401(k) plan services.* Peterson Report at Paragraph 12(a).

I do not have any basis to disagree with the statements contained in the first two sentences of this paragraph. Although I do believe that certain service providers play a function in providing small businesses with access to 401(k) plan services, the Peterson Report does not offer any support for the assertion that ING provides access to either efficient or cost effective 401(k) plan services, as the

-2-

Peterson Report appears to imply.  In other words, the Peterson Report's reference
to ING (or ILIAC) as 'one of the 401(k) plan service providers that focus
primarily on providing services to sponsors of small plans" should in no way be
taken as a suggestion that it is one of the providers of 'efficient or cost effective
401(k) services.' In fact, in my experience, ING is not.  Further, the Peterson
Report's assertion about the efficiency of the small business plan market segment
is supported by neither any study nor personal expertise.  In his deposition, Mr.
Peterson admits that he is not aware of the scope of variations in fees in this
segment.  (Deposition of E. Scott Peterson at 178-179.)  I do not understand how
the Peterson Report can assert that this market is efficient without knowledge of
the variance in fees.[1]   Indeed, Mr. Peterson admitted in his deposition that he had
no basis for this statement because he had no personal knowledge or information
regarding ING's profitability, efficiency or cost-effectiveness.  (Deposition of E.
Scott Peterson at 34-35, 90-91).  In addition, studies, including the most recent
edition of the 401k Averages Book published in 2011, show that costs in the
retirement market for small plan sponsors vary widely for the same or comparable
services, which tends to dispel the notion that the market in this field is efficient or
that ING necessarily provides cost-effective retirement services, as the Peterson
Report tends to imply.  In his deposition, Mr. Peterson agreed that 'in a highly
competitive marketplace with good information and comparable services, the ...

---

[1]In fact, I would draw great exception to the Peterson Report's definition of the small plan
market. In his deposition, Mr. Peterson defines the small to micro plan market to include companies
under 1000 employees and $5 million in assets. (Deposition of E. Scott Peterson at 33).  Typically,
companies with 500-1000 employees would have between 10 million and 50 million in assets, which
hardly is considered the 'small plan' space in the retirement industry.  The Peterson Report's failure to
appreciate the actual contours of the small plan market segment is likely due to Mr. Peterson's lack of
meaningful experience working in a professional capacity with plans in that market space.

price variations should be small' in terms of the fees charged to retirement plans. (Deposition of E. Scott Peterson at 179.)  Mr. Peterson does not explain the wide variation in cost and fees that exists in the small plan marketplace, which fact contradicts the opinions he expressed.

> b.  *Payment of revenue sharing payments from fund management companies to other retirement plan services providers (like ILIAC) is a normal and accepted practice.*

Although I do not entirely disagree with the above statement, it is overly broad and potentially misleading. The germane issue at hand is not payment of revenue sharing but the structure for how it is received and credited.  In this context, the modalities differ greatly in the retirement plan industry.  Specifically, in my experience, the specific structure in which ING receives revenue sharing payments is not a 'normal and accepted practice,' nor does the Peterson Report ever specifically state that it is actually either normal or accepted.  It bears noting that a number of service providers have a policy against retaining such payments. The most important question, in my professional judgment, is what the service provider does with such fees.  Specifically, as in the case of the Frost Letter addressed in my June 1 Report and as apparently was predominantly the case at Aon Hewitt during Mr. Peterson's career at the organization (Deposition of E. Scott Peterson at 19-26), the important question is whether the service provider credits the revenue sharing payments on a dollar for dollar basis (also sometimes referred to as the 'gross to net' model in the industry).  The Peterson Report's failure to deal squarely with this critical fact makes its statement in Paragraph 12(b) incomplete at best and, in my view, essentially inaccurate or misleading in nature.

-4-

> c. *The use of revenue sharing has strengthened the 401(k) industry. It has led to more providers and greater competition. The result is better service and lower total plan cost for plan sponsors and plan participants.*

These assertions in the Peterson Report are not supported by any evidence or information cited and, during his deposition, Mr. Peterson essentially admitted that he had no basis for these opinions. (Deposition of E. Scott Peterson at 90-99). I also could not disagree more with these statements and I believe that Mr. Peterson's own testimony contradicts the assertions. In essence, Mr. Peterson testified, and my experience has supported, that the use of revenue sharing payments permits service providers to hide the true nature of their fees (Deposition of E. Scott Peterson at 191-201), and this conclusion is consistent with my own opinion, especially as it pertains to ING in light of its opaque and essentially misleading disclosures with respect to revenue sharing payments that I detailed in my June 1 Report. Based upon Mr. Peterson's testimony and the literature I have reviewed, I believe that revenue sharing payments actually increase the actual cost to retirement plans, when received and used in a manner similar to the approach taken by ING, without any benefit to the retirement plans at issue. See John A. Haslem, 'Issues in Mutual Fund Revenue Sharing Payments,' *The Journal of Index Investing* at 57 (Summer, 2012)('revenue sharing payments conflict with fund shareholder interests and reduce fund assets and returns, and such payments should be prohibited').

> d. *Total Plan Cost (TPC) is the relevant measure for evaluating the cost of plan services, not the total compensation paid to individual service providers.*

The Peterson Report endorses the use of and reliance upon total plan cost

-5-

('TPC') as *the* relevant measure for evaluating the cost of plan services, as opposed to a methodology based on evaluating the total compensation paid to each service provider. The approach endorsed by the Peterson Report is unsurprising to me in light of the fact that Mr. Peterson spent virtually his entire professional career working for one service provider. I have seen this approach used when organizations market retirement plan platforms, as well as when certain providers provide proprietary reporting on the cost of their client's plans (by providing very convenient self-evaluations). However, with all due respect to Mr. Peterson, no competent disinterested third party professional would use this methodology when evaluating new or existing providers. It should be noted that Mr. Peterson does not appear to have any professional experience in the independent evaluation of plan costs. I have performed well in excess of one hundred (100) cost studies and comparative searches in the recordkeeper space during my career and have lectured on the subject. Notably, in his deposition, when asked if he 'know(s) of any other service providers that advocate using a TPC approach,' he admits that he doesn't 'know specifically of others.' (Deposition of E. Scott Peterson at 143.) I have never used TPC as an exclusive methodology, as the Peterson Report advocates.

Though TPC may be used to evaluate the services at a first blush, evaluation of 'total plan costs' does not allow for evaluation of the value being received for services rendered, which I understand is required as part of a fiduciary's duty to monitor. Indeed, since it is my general understanding that a fiduciary, like a plan sponsor, has a duty to confirm that only reasonable compensation is paid to third parties providing services to the plan (and Mr. Peterson apparently agrees that this

-6-

duty exists, Deposition of E. Scott Peterson at 206-207,[2]

http://www.groom.com/media/publication/143 ERISAPlanExpensesv.4.pdf), sole

reliance upon TPC may even conflict with the legal requirements imposed on

fiduciaries since, on its face, it eliminates the step of determining the amount of

compensation paid to each service provider, as the Peterson Report concedes.  In

any event, the problem with the TPC approach of the Peterson Report, which is

self-evident from the Peterson Report's description of TPC, is that there is no

evaluation of the reasonableness of compensation to any individual service

provider and that while, in the view of the Peterson Report, overall cost may

acceptable and reasonable, a lower (and more reasonable) cost may be achievable

because one service provider is being overcompensated.[3]  An article in Plan

Sponsor Magazine illustrates this principle in a succinct way:

> The first step for a plan sponsor is to know the total annual fees. The
> second step is to benchmark—to obtain information on the costs for
> similar plans (i.e., plans with similar assets and numbers of
> participants); the competitive marketplace does a good job of
> establishing reasonable prices.  However, even where the total
> expenses are reasonable, the costs for one of the categories may be
> too expensive. As a result, fiduciaries need to identify, quantify, and
> evaluate each major type of expense.

---

[2]As I noted in my June 1 Report, ING deceptively and incorrectly described the revenue sharing payments as being made in return for services performed for the mutual funds, as opposed to the retirement plans.

[3]I do not believe that Mr. Peterson's explanation that, in the event one element of compensation is unreasonable, this excessive compensation always will be evident from a higher TPC is supportable. (Deposition of E. Scott Peterson at 206-210).  That is because, as noted above and based upon my direct professional experience in this field, there are wide variations in the amount of compensation paid to service providers for the same or equivalent services and the market for retirement services, although admittedly occupied by a number of competitors, does not function in a manner that I would characterize as efficient or expense minimizing, as a result of wide variations in the availability of information and the sophistication of plan sponsors and other actors in the field, as Mr. Peterson alluded to in his deposition. (Deposition of E. Scott Peterson at 191-201).

http://www.plansponsor.com/MagazineArticle.aspx?Id=4294990006. In other words, the approach that the Peterson Report advocates is just the first step in evaluating the reasonableness of fees or compensation for any experienced professional in this field. The Peterson Report actually provides a number of good examples of the problems that can be created in using a simplistic TPC approach to benchmarking because the method fails to focus on an important issue: the reasonableness of compensation. For example, although the Peterson Report explicitly includes the margin that ING earns on its fixed account investments as part of TPC (which is one element of the compensation that ING earns), it does not include the revenue sharing payments as an element of TPC – even though they also are an equivalent element of specific compensation to ING. (Peterson Report at Paragraph 44.) Obviously, there is no logical reason to include one element of compensation and not another in arriving at TPC. This logical inconsistency in the Peterson Report highlights the problems that can arise when one focuses solely on TPC, as opposed to each element of compensation paid. In addition, as the Peterson Report ignores, since ING did not voluntarily disclose the amount of the revenue sharing payments it receives, there is no practical manner to determine the actual compensation that it is earning from the Plans at issue.[4] For all of these reasons, I completely and emphatically disagree with the conclusions

---

[4] Mr. Peterson states in his Report that he was requested by defense counsel to 'discuss the relative importance of total plan cost and component fees in evaluating fees paid for 401(k) services.' It is striking that Mr. Peterson never engages in such discussion, and never even discusses the actual practice of examining 'component fees' in his Report. Mr. Peterson's own lack of experience in performing such evaluations on a professional basis may be the reason for his frankly incorrect conclusion that '[TPC] is the relevant measure for evaluating the cost of plan services.' Simply put, although service providers may advocate such a position, TPC is not the relevant or correct measure for evaluating the cost of plan services.

reached by the Peterson Report in Paragraph 12(d).

   e. *ILIAC's use of revenue sharing in pricing its products is*
     *reasonable and consistent with industry practice*

   In light of my disagreement with the Peterson Report's TPC approach, as
well as my disagreement with his conclusions regarding the utility of revenue
sharing payments where, as in this case, there is no dollar-for-dollar credit or
adequate disclosure as to the actual expenses of and compensation paid by the
retirement plans, it is perhaps unsurprising that I also disagree with this conclusion
expressed in the Peterson Report.  Since Mr. Peterson admitted that he has no idea
how profitable ING is or the amount of profits it derives from revenue sharing
payments (Deposition of E. Scott Peterson at 34-35), I also find this opinion
somewhat remarkable since it appears to lack any basis beyond the words
expressed.  As noted above, Mr. Peterson himself admitted that his former
employer generally took a different approach with respect to revenue sharing
payments and transparently credited them to the benefit of the retirement plans it
serviced on a dollar-for-dollar basis.  (Deposition of E. Scott Peterson at 25-27,
41.)  I also note that, as discussed above, ING's use of revenue sharing payments
is inconsistent with the way that a number of providers use such payments and, as
discussed in my June 1 Report, conflicts with the approach approved of in the
Frost Letter issued by the Department of Labor ('DOL').  Finally, the Peterson
Report fails to state any direct comparison between ING's actual approach with
respect to revenue sharing payments and any specific industry practice and,
therefore, is without support in this regard.

> f.      *In constructing offers to plan sponsors, ILIAC, through
>         intermediaries called Third Party Administrators ("TPAs"),
>         offers menus of investments to be made available to
>         participants in the sponsors' plans. Menus are designed to
>         achieve a targeted level of revenue. The revenue is attained
>         through a combination of "revenue sharing" received from
>         fund managers and additional fees (e.g., Daily Asset Charges,
>         fund fee adjustments, and the margin on the Fixed Income
>         Accounts). This practice of using revenue sharing and other
>         plan-level fees to reach target revenue levels is consistent with
>         approaches used by competing providers.*

To the extent that this section of the Peterson Report's opinion is meant to

convey that certain service providers engage in conduct similar to the challenged

conduct in this case, I do not disagree that certain, but certainly not all, service

providers engage in such conduct -- as Mr. Peterson conceded in the case of his

prior employer. I also believe that ING's ability to determine, set and change its

own compensation through the use of what ING refers to as 'Fund Fee

Adjustments,' and to change the Fund Fee Adjustments without notice to the

Plans, places ING in an unusual position within the industry because, as its

documents detail and I explained in my June 1 Report, it has virtually unfettered

discretion to determine its own compensation through these adjustments to DAC.

In addition, I note that, in the cases where service providers credit all revenue

sharing payments to the benefit of the retirement plans, they have no incentive to

design or modify menus of investments to maximize their own compensation.

Finally, I object to the Peterson Report's definition of Third Party Administrators

(TPAs) as including all third-party intermediaries since (1) this is not the manner

in which the term TPA is typically used in the industry, and (2) the use of TPA in

this manner is confusing and misleading, since the Peterson Report couples groups

of third party intermediaries (other than traditional TPAs) under one definition - even though these intermediaries often perform much different functions, have significantly different motivations and are responsible to different parties in the retirement industry.  As a result of this definitional approach to the term TPA, I find most of the Peterson Report's references to TPAs to be inconsistently applied, imprecise and, at times, incorrect.[5]

---

[5]I also take issue with the definition of 'management fee' that is used in the Peterson Report (apparently as a term synonymous with 'expense ratio,' which I have never seen in my professional career). A fund's management fee is a sub-component of (or is actually the resulting net amount that a fund manager receives after paying certain revenue sharing payments out of the total amount captured from) a fund's expense ratio.  In my experience, 12b-1 fees are never included in a management fee.  In 'R' shares, most, if not all, revenue sharing payments are typically excluded from management fees.  It is also true that management fees do not include the administrative expenses of a fund, which are also a component of the expense ratio. What is certain, when choosing a different share class of a mutual fund, whether with a higher or lower 12b-1 fee, the fund management fee does not typically change. As evidenced below, one can see the same in all share classes that are presently in use in various 401(k) plans from American Funds Growth Fund of America (one of the largest mutual funds in the world and a popular 401(k) investment option over the last 10-20 years):

| Growth Fund of America Share Class | Ticker | Front Load | Deferred Load | 12b-1 Current | Management Fee | Expense Ratio |
|---|---|---|---|---|---|---|
| A | AGTHX | 5.75 | NA | 0.24 | 0.50 | 0.68 |
| B | AGRBX | NA | 5.00 | 1.00 | 0.50 | 1.43 |
| C | GFACX | NA | 1.00 | 1.00 | 0.50 | 1.46 |
| F-1 (Institutional) | GFAFX | NA | NA | 0.25 | 0.50 | 0.67 |
| F-2 (Institutional) | GFFFX | NA | NA | NA | 0.50 | 0.43 |
| R1 | RGAAX | NA | NA | 1.00 | 0.50 | 1.43 |
| R2 | RGABX | NA | NA | 0.75 | 0.50 | 1.39 |
| R3 | RGACX | NA | NA | 0.50 | 0.50 | 0.97 |
| R4 | RGAEX | NA | NA | 0.25 | 0.50 | 0.68 |
| R5 | RGAFX | NA | NA | NA | 0.50 | 0.38 |
| R6 | RGAGX | NA | NA | NA | 0.50 | 0.33 |

Source MorningStar® data accessed through MPI Stylus Pro as of 6/30/12.
As seen above, the fund 'expense ratio' and 'management fee' are different things, despite Mr. Peterson's deposition testimony to the contrary.  (Deposition of E. Scott Peterson at 24.)

> g.  *For mutual funds with multiple share classes, ILIAC selects the share class consistent with the target revenue for the investment menu. This process of selecting alternative share classes to help achieve specific revenue targets is consistent with industry practice.*

As in the case of Paragraph 12(f) of the Peterson Report, I do not disagree with the assertion that certain service providers engage in this conduct. This opinion in the Peterson Report fails to address a critical question in my view: if ING actually intended to use its Fund Fee Adjustments to modify or supplement DAC with respect to certain investments and 'normalize' revenue (which ING's witnesses admitted it does not do precisely), why would ING design plan menus on the basis of anticipated revenue sharing payments? (See Exhibit G to June 1 Report). In other words, if ING actually were approaching its design of menus from the position of revenue 'neutrality,' it would not even consider the amount of the revenue sharing payments because it would simply apply Fund Fee Adjustments, based upon its ability to so determine its own compensation under the Group Contracts. The fact that ING designs its fund menus and the share

---

As a result of this error in nomenclature, Mr. Peterson also responds quite inaccurately to questioning at deposition:

> Q.  And do you know if the share class of a mutual fund has an effect on what I believe you called the fund management fee?
>
> A.  Yes, it does.

As evident in the example above, the fund management fee virtually never changes, regardless of share class and resultant expense ratio. Clearly, it is the revenue sharing payment component that varies amongst share classes, thus affecting the expense ratio with a high degree of correlation. Similarly, the Peterson Report's use of the terms 'bundled' and 'unbundled' retirement plans in a manner that is different than the manner in which ING and the industry use the term (which use bundled to refer to combined recordkeeping and TPA services, but see Peterson Report at Paragraph 25, n. 7), is similarly unhelpful and, at best, renders the Peterson Report confusing in its use of these terms.

classes of mutual funds based upon 'target revenue,' in the Peterson Report's terminology, supports the reasonable view that ING uses revenue sharing payments to disguise the nature of and veil the true amount of compensation it receives from the mutual fund complexes and for the services performed for the Plans at issue.

      h.   *ILIAC's practice of automatically reinvesting mutual funds dividends in shares of the fund making the distribution is consistent with industry practice. It also is consistent with the expectations of plan sponsors and participants.*

Although I agree with the Peterson Report's statement that other industry recordkeepers may engage in this practice, I do not find any support for the assertion that the decision that ING makes to automatically engage in this practice is consistent with the expectations of sponsors or participants. That is because the Peterson Report fails to cite any study or evidence to support its assertion with respect to these supposed, expectations of sponsors and participants. In addition, my professional experience and understanding that (a) investors regularly choose not to reinvest dividends and that the wisdom of reinvesting dividends can be a matter of debate in terms of an investment strategy, Arden Dale, *Rethinking Reinvestment*, Wall Street Journal (May 7, 2012), http://online.wsj.com/article/ SB10001424052702304432704577348090646918980.html ('Another knock against dividend reinvestment is how it can shift a portfolio overall ... paying dividends into cash accounts, rather than reinvesting them, gives him more control over rebalancing that aims to diversify a portfolio'); http://www.rothira.com/blog/ should-you-automatically-reinvest-your-dividends (discussing the advantages and disadvantages of dividend reinvestment), (b) there is no structural or technological reason that mutual fund dividends cannot be designated as payable to a cash

-13-

account or other account within a 401k plan (a point with which Mr. Peterson agrees - see Deposition of E. Scott Peterson at 122), (c) there are circumstances, particularly with respect to employer stock for example, http://www.tsfg401kadvantage.com/dividend.html, as well as other instances, in which the decision to reinvest dividends within retirement plans is regularly made and/or may not be desired by the retirement plan participants, and (d) ING's own documents confirm that, when ING elects to receive dividends from mutual funds payable in the form of additional mutual fund shares, ING is making an affirmative, discretionary decision because it clearly has a choice to do otherwise. (See Exhibit E to June 1 Report; Exhibit 2 to Deposition of Lisa Gilarde). Moreover, as noted above, Mr. Peterson appears to agree with these facts in his deposition. The fact that Mr. Peterson may question the wisdom of this approach, in certain circumstances, or opine that reinvestment of dividends is consistent with industry practice or certain person's expectations, simply does not address the fundamental question of whether ING has the right to act differently -- which it clearly does from the face of its own documents -- and the implications of the choices that ING makes on behalf of the retirement plans and their participants with respect to dividend reinvestment.

### Additional Comments And Analysis

Although I disagree with many other aspects of the Peterson Report that I find to be inaccurate and in virtually all respects to be far too general in nature, I also have the following, specific, additional comments on the Peterson Report:

1. Although I do not dispute the assertion in paragraph 19 that 'the per-participant cost of supporting smaller plans is generally higher than that

of larger plans,' I completely disagree with the Peterson Report's offered reasons for that phenomenon – specifically, allocation of technology and resources. Generally, it is my experience that major technology investments benefit and are necessary for all plans segments, large and small.  Though true that setting up plan specific technology for a large plan client may entail a resource commitment, that expenditure should be a small expense in comparison to a general system-wide investment tools, which are required universally in both the large and small plan markets.  At best, the Peterson Report's claim that these expenditures are 'substantial' should be taken with a grain of salt, when compared to the real and true costs of plan participant operations.  And, as for variance in the cited services themselves (e.g. recordkeeping, call centers, website access, etc.), these are relatively indistinguishable between plan size markets at this time and that has been the case for many years.  From my experience, the key reason that per participant costs are higher in smaller plans is based, not on participant services related expenses, as the Peterson Report suggests, but in the allocation of plan level costs (such as 5500 preparation and compliance testing) amongst a smaller number of participants. Again, Mr. Peterson's admitted lack of small plan experience, especially with respect to comparative analytics, limits his ability to comprehensively and correctly opine on this element of his Report.

2.      The Peterson Report asserts in Paragraph 22 that 'most sponsors served by ILIAC, seek assistance from …"TPAs"…to assist in the process [of oversight and accountability].'  I take exception with the Peterson Report's portrayal of the role that intermediaries play in the small plan marketplace.  Mr. Peterson states that TPAs (as he more broadly defines them) as 'often play[ing] a key advisory role to plan sponsors' providing among other

things: candidates for potential providers, evaluation of costs and quality of alternatives, and that they ensure that plan needs are being met at competitive prices (implying benchmarking-type services). It is my experience that these services are seldom, if ever, provided by TPAs, let alone brokers and other intermediaries in the small plan space. Most small plans that I have observed are not served by advocates acting in a fiduciary capacity but, rather, by entities that primarily serve their own interests, as well as the product lines (such as those of ING) that they sell.

       3.     The Peterson Report's assertion that the use of revenue sharing payments has improved the 401(k) market by allowing revenue to be reallocated among providers is neither supported by any facts nor by the actual history of the use and spread of revenue sharing payments in the retirement industry. Rather, as Mr. Peterson explained in his deposition when discussing 'sold as free' and similar sales approaches in the retirement market, the use of revenue sharing payments simply permitted certain service providers to mask the level of their true compensation and thereby acquire retirement plan customers. (Deposition of E. Scott Peterson at 191-201.) I do not find any actual or historical support in the Peterson Report, beyond the blanket assertions contained in the Report itself, for the proposition that revenue sharing payments have, in any respect, improved the retirement marketplace or created greater competition. Instead, as discussed in the Haslam article referenced above, a strong case can be made that the use of revenue sharing payments by certain service providers (as in the case of ING) has decreased the transparency of service provider compensation, and reduced the competitiveness and efficiency of the defined contribution retirement market in the United States, having allowed higher cost, but more opaque providers to remain

-16-

competitive with more transparent organizations.

The opinions expressed in this report are based on my review of information and documents received to date. I reserve the right to modify or supplement my opinion based on additional information that may be provided in the future.

Executed this 14th day of September, 2012.

James Scheinberg, CIMA®, AIFA®, PRP

-17-